SCANNED at and Emailed 11/21/24 by C. 189 pages
date initials No.

AO 241 (Rev. 09/17)

**PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

| United States District Court | District: Connecticut |
|---|---|
| Name (under which you were convicted): Carvaughn Johnson | Docket or Case No.: |
| Place of Confinement : Brooklyn Correctional Intitution | Prisoner No.: 284952 |
| Petitioner (include the name under which you were convicted) Carvaughn Johnson v. | Respondent (authorized person having custody of petitioner) Angel Quiros |
| The Attorney General of the State of: William Tong | |

**PETITION**

1. (a) Name and location of court that entered the judgment of conviction you are challenging: Judicial District of New Haven at New Haven Superior Court 235 Church Street, 06510

   (b) Criminal docket or case number (if you know): CR02-0003996

2. (a) Date of the judgment of conviction (if you know): 4/24/2004

   (b) Date of sentencing: 7/9/2004

3. Length of sentence: 43 years

4. In this case, were you convicted on more than one count or of more than one crime? ☒ Yes ☐ No

5. Identify all crimes of which you were convicted and sentenced in this case: 1) Murder, 2) Carrying a pistol witout a permit, 3) Criminal possession of a weapon.

6. (a) What was your plea? (Check one)

   ☒ (1) Not guilty ☐ (3) Nolo contendere (no contest)

   ☐ (2) Guilty ☐ (4) Insanity plea

(b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to? ______

(c) If you went to trial, what kind of trial did you have? (Check one)

☒ Jury ☐ Judge only

7. Did you testify at a pretrial hearing, trial, or a post-trial hearing?

☐ Yes ☒ No

8. Did you appeal from the judgment of conviction?

☒ Yes ☐ No

9. If you did appeal, answer the following:

(a) Name of court: Supreme Court of Connecticut.

(b) Docket or case number (if you know): S.C. 17267

(c) Result: Appeal denied

(d) Date of result (if you know): August 5, 2008

(e) Citation to the case (if you know): State V Johnson 288 Conn. 236.

(f) Grounds raised: See Below (g)(6) and Attachment 1

(g) Did you seek further review by a higher state court? ☒ Yes ☐ No

If yes, answer the following:

(1) Name of court: Supreme court of Connecticut

(2) Docket or case number (if you know): S.C. 17267

(3) Result: Appeal Denied

(4) Date of result (if you know): ______

(5) Citation to the case (if you know): ______

(6) Grounds raised: 1.) The Defendant was denied his right to a impartial Jury, and confrontation. And wa denied those rights by the court's failure adequately to inquire into possible racial bias by Jurors (see attached #1)

(h) Did you file a petition for certiorari in the United States Supreme Court? ☐ Yes ☒ No

If yes, answer the following:

(1) Docket or case number (if you know): ______

(2) Result: ______

(3) Date of result (if you know): ______

(4) Citation to the case (if you know): ______

10. Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court? ☒ Yes ☐ No

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court: Rockville Superior court

(2) Docket or case number (if you know): CV09-4002796

(3) Date of filing (if you know): December 11, 2008

(4) Nature of the proceeding: Writ of habeas corpus

(5) Grounds raised: 1) The petitioner's constitutional right to conflict free Trial Counsel was violated. 2) Right to effective assistance of counsel was violated.

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☒ Yes ☐ No

(7) Result: Writ granted Sentence and conviction vacated

(8) Date of result (if you know): September 11, 2016

(b) If you filed any second petition, application, or motion, give the same information:

(1) Name of court: SUPERIOR COURT

(2) Docket or case number (if you know):

(3) Date of filing (if you know): MARCH 08, 2004

(4) Nature of the proceeding: MOTION FOR A NEW TRIAL (see Attached 2)

(5) Grounds raised:

JURY CONSIDERED EXTRINSIC evidence during their deliberations

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☒ Yes ☐ No

(7) Result: Motion Denied

(8) Date of result (if you know): June 22, 2004 (see Attached 3)

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court:

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?

☐ Yes ☐ No

(7) Result: ______

(8) Date of result (if you know): ______

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?

(1) First petition: ☒ Yes ☐ No

(2) Second petition: ☐ Yes ☒ No

(3) Third petition: ☐ Yes ☐ No

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

Pending habeas

12. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground. Any legal arguments must be submitted in a separate memorandum.

**CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.**

(See Attachment 4)

**GROUND ONE:** DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHTS TO AN IMPARTIAL JURY, TO BE PRESUMED INNOCENT, TO CONFRONTATION, COUNSEL,

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

IMPORTANTLY, RALPH FORD WAS THE STATE'S KEY WITNESS AND THE ONLY ONE directly linking the DEFENDANT to the shooting. Jurors TESTIFIED THAT DURING THEIR DELIBERATIONS THEY CONSIDERED OBSERVING SEVERAL BLACK SPECTATORS SEATED BEHIND THE DEFENDANT. According to SEVERAL JURORS, THE JURORS BELIEVED THAT THE BLACK SPECTATORS WERE THERE IN SUPPORT OF THE DEFENDANT TO INTIMIDATE FORD INTO RECANTING HIS STATEMENTS.

(b) If you did not exhaust your state remedies on Ground One, explain why:

(c) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue? ☒ Yes ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: ______

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☒ Yes ☐ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: Direct appeal & Motion for a New trial

Name and location of the court where the motion or petition was filed: SUPERIOR COURT 235 Church street New HAVEN, CT 06510

Docket or case number (if you know): No. CR23-3796

Date of the court's decision: June 22, 2004

Result (attach a copy of the court's opinion or order, if available): (see Attachment 3)

(3) Did you receive a hearing on your motion or petition? ☒ Yes ☐ No

(4) Did you appeal from the denial of your motion or petition? ☒ Yes ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? ☐ Yes ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: Supreme court State of Connecticut 231 Capitol Avenue Hartford, CT, 06106

Docket or case number (if you know): S.C. 17267

Date of the court's decision: August 5, 2008

Result (attach a copy of the court's opinion or order, if available): (Appeal denied see Attachment 5)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: ______

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground One: __________

**GROUND TWO:** FAILURE TO PRESERVE METHOD BY WHICH POLICE BROUGHT ABOUT RALPH Ford's changed ACCOUNT ULTIMATELY implicating the (see Attachment 4)

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

FORD WAS 15 years old WHEN HE WAS QUESTIONED ALONE BY DETECTIVES FOR HOURS. Initially, HE REPEATEDLY TOLD POLICE THAT HE DID NOT SEE ANY ASPECT OF THE SHOOTING. HOWEVER, AFTER HOURS OF BEING Threatened By Police that HE WAS SEEN WITH A GUN AND COULD RECEIVE A 30 YEAR SENTENCE, HE (FORD) finally implicated the DEFENDANT. SUBSEQUENTLY, HOWEVER, DURING HIS TRIAL TESTIMONY, HE RECANTED HIS STATEMENTS WHICH IMPLICATED THE DEFENDANT. THE Police NEVER recorded OR Preserved Ford's Initial EXPULATORY STATEMENTS; THUS HANDICAPPING (see Attached)

(b) If you did not exhaust your state remedies on Ground Two, explain why: __________

(c) **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue? ☒ Yes ☐ No

(2) If you did <u>not</u> raise this issue in your direct appeal, explain why: __________

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes ☒ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: __________

Name and location of the court where the motion or petition was filed: __________

Docket or case number (if you know): __________

Date of the court's decision: ______

Result (attach a copy of the court's opinion or order, if available): ______

(3) Did you receive a hearing on your motion or petition? ☑ Yes ☐ No

(4) Did you appeal from the denial of your motion or petition? ☑ Yes ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? ☑ Yes ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: Supreme Court State of Connecticut 231 Capitol Avenue Hartford, CT 06106

Docket or case number (if you know): S.C. 17267

Date of the court's decision: State V. Johnson, 288 Connecticut 236 (2008) 8/05/08

Result (attach a copy of the court's opinion or order, if available): Appeal Denied (See Attachment 5)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two : ______

**GROUND THREE:** LIMITATIONS ON CROSS-EXAMINATION OF RALPH FORD DENIES THE DEFENDANT'S RIGHT TO CONFRONTATION AND DUE PROCESS OF LAW

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

THE COURT SEALED FORD'S Psychological AND PSYCHIATRIC type records from APRIL AND JUNE 2000. THE court refused to allow the defendant to confront Ford with these records or cross-examine him after he did they existed.

(b) If you did not exhaust your state remedies on Ground Three, explain why: ______________________

(c) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue? ☑ Yes ☐ No

(2) If you did not raise this issue in your direct appeal, explain why: ______________________

(d) **Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes ☑ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: ______________________

Name and location of the court where the motion or petition was filed: ______________________

Docket or case number (if you know): ______________________

Date of the court's decision: ______________________

Result (attach a copy of the court's opinion or order, if available): ______________________

(3) Did you receive a hearing on your motion or petition? ☐ Yes ☐ No

(4) Did you appeal from the denial of your motion or petition? ☐ Yes ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? ☐ Yes ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: * Supreme Court State of Connecticut 231 Capitol Avenue Hartford, CT, 06106

Docket or case number (if you know): S.C. 17267

Date of the court's decision: State v. Johnson, 288 Connecticut 236 (2008) 8/05/08

Result (attach a copy of the court's opinion or order, if available): Appeal Denied (See Attachment 5)

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three:

**GROUND FOUR:** THE COURT GAVE AN ERROS charge ON CONSCIOUSNESS OF GUILT

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

AT THE CONCLUSION OF EVIDENCE AND CLOSING ARGUMENTS, THE COURT INCORRECTLY, IMPROPERLY, AND UNCONSTITUTIONALLY gave AN ERROUS Charge ON THE DEFENDANT'S CONSCIOUSNESS OF GUILT

(b) If you did not exhaust your state remedies on Ground Four, explain why:

(c) **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue? ☒ Yes ☐ No

(2) If you did not raise this issue in your direct appeal, explain why:

(d) **Post-Conviction Proceedings**:

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

☐ Yes ☒ No

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed: ______________________

______________________

Docket or case number (if you know): ______________________

Date of the court's decision: ______________________

Result (attach a copy of the court's opinion or order, if available): ______________________

______________________

______________________

(3) Did you receive a hearing on your motion or petition? ☐ Yes ☐ No

(4) Did you appeal from the denial of your motion or petition? ☐ Yes ☐ No

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal? ☐ Yes ☐ No

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: x Supreme Court State of Connecticut

231 Capitol Avenue Hartford, CT. 06106

Docket or case number (if you know): S.C. 17267

Date of the court's decision: State V. Johnson, 288 Connecticut 236(2008) 8/05/08

Result (attach a copy of the court's opinion or order, if available): Appeal Denied (See Attachment 5)

______________________

______________________

______________________

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue:

______________________

______________________

______________________

______________________

______________________

______________________

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four: ______________________

______________________

______________________

______________________

______________________

______________________

13. Please answer these additional questions about the petition you are filing:

(a) Have all grounds for relief that you have raised in this petition been presented to the highest state court having jurisdiction? ☒ Yes ☐ No

If your answer is "No," state which grounds have not been so presented and give your reason(s) for not presenting them:

(b) Is there any ground in this petition that has not been presented in some state or federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

14. Have you previously filed any type of petition, application, or motion in a federal court regarding the conviction that you challenge in this petition? ☐ Yes ☒ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed. Attach a copy of any court opinion or order, if available.

15. Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging? ☒ Yes ☐ No

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised. Superior Court J.D. of Tolland at 20 Park Street P.O. Box 980, Rockville, CT. 06060-0980, TSR-CV18-4009643-S, Writ of Habeas-Corpus.

16. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: Beth Merkin Scott Jones 235 Church Street New Haven, CT 06510

(b) At arraignment and plea: Beth Merkin Scott Jones

(c) At trial: Beth Merkin Scott Jones

(d) At sentencing: Beth Merkin Scott Jones

(e) On appeal: Lauren Weisfeld 2911 Dixwell Avenue 4floor 06518

(f) In any post-conviction proceeding: Damon Kirschbaum 1290 Silas Deane Highway Wethersfield, CT 06109

(g) On appeal from any ruling against you in a post-conviction proceeding: ____________

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging? ☐ Yes ☑ No

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed: ____________

(c) Give the length of the other sentence: ____________

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future? ☐ Yes ☐ No

18. TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.*

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1) A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of -

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Therefore, petitioner asks that the Court grant the following relief: Sentences and convictions vacated and immediate release.

or any other relief to which petitioner may be entitled.

______________________________
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the ~~prison mailing system~~ on November 21, 2024 (month, date, year).

Given to Counselor for efiling

Executed (signed) on November 21, 2024 (date).

[signature]
Signature of Petitioner

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition.

Carvaughn Johnson

19. Ground 5. 1) The petitioner's Constitutional Right to Conflict Free Trial Counsel was Violated.
2) Right to Effective Assistance of Counsel was Violated.

Supporting Facts: Petitioner's trial Attorney(s) - Beth Merkin and Scott Jones - were both supervised by Atty Tom Ullman. Atty. Ullman, at all relevant to this habeas, represent defense witness, William Holly. While both Assiting and supervising the petitioner's case advised Ullman Advised Holly not to give exculpatory testimony at the petitioner's trial which create a actual/potential conflict of interest. Secondly, Merkin and Jones were ineffective for failing to investigate or call alibi witness (Joyce Johnson and Taylor Allen). Failure to present third party defense. Failure to call Jermaine Diggs to impeach testimony of Ford. Failure to properly impeach Ralph Ford.

(b) Issues are exhausted.

(c) Issues raised on a state habeas as it is the proper venue.

(d)(1) Issue raised on state habeas.

(2) Rockville Superior Court 20 park street Rockville CT. 06060-0980
DOC. CV-09-4002796 Date of Decision 9/11/2013

Result: Habeas granted sentence vacated (See Attachment 6)

Carvaughn Johnson

19.(3) Hearing was held on Petition

(4) State filed an Appeal on Petition.

(5) All relevant issue were contain on state's Appeal

Location: Appellate Court State of Connecticut
75 Elm Street Hartford, CT. 06106
Case # 36185 Date of Court Decision
June 14, 2016.
Result Decision Reversed (See Attachment 7)

(6) Petitioner sought Appeal to state's Highest Court :

Supreme Court of Connecticut
231 Capitol Avenue Hartford CT. 06106
324 Conn. 904
Date of Decision Jan. 4, 2017
Petition for certification Granted . See Attachment 8

(7) Petitioners Appeal was heard by state's highest court:
Supreme court of Connecticut
231 Capitol Avenue Hartford CT. 06106
Case # S.C. 19856
Date of Decision Jan 8, 2019
Result Appellate Court Decision upheld (See Attachment 9)

Attachment (1)

Carvaughn Johnson Attachment-1

(G)(6) Grounds raised

2) Defendant due process rights was violated by the courts refusal to give requested adverse interference Charge

3) Whether limitations on cross-Examination of Ralph Ford denied the defendant his rights to confrontation and to due process of Law.

4) Whether the court erroneously Charged on consciousness of guilt.

5) Whether the court failed adequately to instruct on reasonable doubt.

See Attachment (2)

NO.CR23-3996

| | |
|---|---|
| STATE OF CONNECTICUT | : SUPERIOR COURT |
| V. | : NEW HAVEN JUDICIAL DISTRICT |
| CARVAUGHN JOHNSON | : MARCH 8, 2004 |

DEFENDANT'S MOTION FOR A NEW TRIAL

Pursuant to §42-53(a) of the Conn. Practice Book, the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution, and Article I, §8 of the Conn. Constitution, the defendant requests the court to grant him a new trial in the above case. In support of his motion, the defendant claims as follows:

1. That he was convicted of Murder and Carrying a Pistol without a Permit on February 23, 2004;

2. That based upon conversations between the undersigned and several members of the jury in this case, it became clear that the jurors considered extraneous evidence during their deliberations on this case, specifically that:

a. various observations were made by some or all of the jurors, during the testimony of Ralph Ford, as to a number of individuals who were present as spectators in the audience section of the defendant's side of the courtroom, and many jurors formed the opinion that those spectators were in the courtroom to compel Mr. Ford to re-cant his earlier statements and testimony;

b. at least one juror believed that both the court and the prosecutor were aware of those spectators, based on his perception of a bench-side conference;

c. one of the jurors observed Mr. Ford, during a recess, smoking outside the building, and also present near him was either a uniformed police officer or court marshal, and there was some discussion amongst some jurors as to whether Mr. Ford needed some form of protection, possibly from the group of spectators;

3. That the jury's consideration of any "extrinsic evidence", not part of the trial court record, "is presumptively prejudicial because it implicates the defendant's constitutional right to a fair trial before an impartial jury," State v. Brown, 235 Conn. 502, 523(1995), citing State v. Asherman, 193 Conn. 695, 736(1984);

4. That any inference drawn by the jurors as to either what role the spectators played in affecting Ralph Ford's courtroom testimony, or whether he needed some type of law enforcement protection on the day of his testimony, would be purely speculative, as no evidence was developed during the trial regarding any of those factors;

5. That there was a significant degree of prejudice caused to the defendant, based upon the juror's placing *any weight* upon any of these extraneous facts, because on the record here, the state's case was based solely upon the jury's assessment of whether to believe Mr. Ford's courtroom testimony, or his out-of court statements/testimony;

6. That there were indications from the jury, based upon both the deadlock-type note given to the court on February 20, 2004 (Court's Exhibit 13)

and the undersigned's conversations with jurors, that for some members of the jury, this case presented a "close" question of guilt[1];

7. That the defendant is entitled to an evidentiary hearing, pursuant to State v. Brown, supra, and its progeny, so that the court can explore the extent and substance of any juror misconduct, and so that the defendant can establish for the record the degree of prejudice caused by this misconduct;

8. That in addition to any claims of juror misconduct, the defendant further claims that he is entitled to a new trial based upon material evidence from William Holly, d.o.b. 7/12/83, *not presented* during the trial, that would bear on Ralph Ford's credibility, as follows[2]:

a. that two or three days prior to the homicide, Mr. Holly was near the corner of Read and Shephard Streets and observed Ralph Ford, Markeith Strong, Corey Hunter and another kid on their bikes. That Ralph Ford rode up Mr. Holly and stated "hey L-O, look what I got", and he pulled out a gun from a pocket of his hoodie. Mr. Holly tried to grab the gun, but the kids left the area on their bikes. Mr. Holly said that the gun was a black-colored semi-automatic, either a 9-mm or a 380 caliber, and he does not know if it was real or fake. Mr.

[1] Conversations with jurors revealed that the initial vote, on Thursday, February 19, 2004, was 8 to 4 for not guilty. On Friday, February 20, 2004, the vote was 8 to 4 for guilty. At the end of the day on Monday, February 23, 2004, the four jurors who had earlier voted for not guilty had changed their minds, leading to a unanimous guilty verdict. One juror has, since the verdict, felt that she made a mistake by rendering a guilty verdict, and believes that she "caved" to pressures by the others.

[2] The defendant attempted to lay the foundation for the admission of this evidence during the cross-examination of Ralph Ford. Mr. Jones questioned Mr. Ford about whether he knew William Holly, or knew of a person named "L-O", and Mr. Ford claimed that he did not know any such person. There was no further questioning regarding any interactions between Mr. Holly and Mr. Ford, and the defense did not pursue an offer of proof through Mr. Holly with respect to this area of evidence. Given the broad language contained in §42-53, however (that the court may grant a new trial "if it is required in the interests of justice"), the defendant asserts that such evidence may be offered in support of his motion here.

Holly thinks that Ralph Ford showed him the gun to "gain respect" from older kids in the neighborhood;

b. that any evidence which could establish, that shortly prior to Ralph Ford's interview with the police on October 10, 2001 he had access to a firearm similar to the one used to shoot Markeith Strong, would be helpful to the defendant in that it could provide a motive for Mr. Ford to implicate the defendant as the perpetrator;

c. that even though defense counsel did not make an offer of proof regarding the admission of such evidence during trial, the court should not preclude considering testimony from Mr. Holly in support of this motion, as the "interests of justice" warrant the allowance of this unusual procedure, given the importance of Mr. Ford's credibility in this case;

9. That improper comments made by the state during summation, particularly in view of the jury's improper consideration of what impact members of the audience had upon Ralph Ford's testimony, require the ordering of a new trial[3];

10. That all other claims of error raised during the trial, in their entirety, require the ordering of a new trial.

---

[3] Two comments were particularly disturbing in this respect. First, the state argued that Ralph Ford re-canted his testimony because he had seen, "first hand", what happens when someone comes forward with information to the police, referring here to the killing of Markeith Strong. And second, the state argued that the "perfect witness", such as a "Yale professor", would not go to the Newhallville area. Each of these improper comments was intended solely to arouse the passions and emotions of the jurors, and neither was based upon the evidence presented. In view of the speculation already going on in the jury room based upon the presence of audience members, this type of improper summation, which seems designed to fuel emotion and speculation into the deliberation process, was highly prejudicial.

WHEREFORE, for all of the foregoing reasons, as well as those set forth during either argument or a hearing pursuant to this motion, the defendant requests that it be granted.

RESPECTFULLY SUBMITTED,
THE DEFENDANT

BY: [signature]
BETH A. MERKIN
SCOTT M. JONES
HIS ATTORNEYS
PUBLIC DEFENDER'S OFFICE
235 CHURCH STREET
NEW HAVEN, CT 06510

ORDER

The foregoing motion, having been duly heard by this court, is hereby ORDERED: GRANTED / DENIED.

______________________
JUDGE THOMPSON

Certified in accordance with the Conn. Practice Book.

[signature]
Beth A. Merkin, Esq.

See Attachment 3

STATE'S ATTORNEY'S OFFICE

JUN 22 3 41 PM '04

| | |
|---|---|
| NO. CR23-3996 | : SUPERIOR COURT |
| STATE OF CONNECTICUT | : JUDICIAL DISTRICT OF NEW HAVEN |
| V. | : AT NEW HAVEN |
| CARVAUGHN JOHNSON | : JUNE 22, 2004 |

## MEMORANDUM OF DECISION
## RE: DEFENDANT'S MOTION FOR A NEW TRIAL

The defendant, Carvaughn Johnson, was convicted on February 23, 2004 of murder and a weapons charge in connection with the shooting death of Markieth Strong on October 10, 2001.

The State's key witness was Ralph Ford who had given statements to the New Haven Police shortly after the shooting in which he implicated the defendant. At an earlier trial which resulted in a mistrial, Mr. Ford had testified in a manner consistent with the statements to the New Haven Police.

At the trial that resulted in the defendant's conviction, however, Mr. Ford recanted his prior statements and testimony and testified that such statements and testimony were not truthful. Since Mr. Ford was the only witness directly linking the defendant to the shooting, it is logical to conclude that the jury was called upon to determine whether Mr.

Judicial District of New Haven
SUPERIOR COURT
FILED
JUN 22 2004
CHIEF CLERK'S OFFICE

Ford was being truthful either when he gave his prior testimony and statements, when he testified at this trial, or not at all.

The defendant has now moved for a new trial on the basis that the jury considered extrinsic evidence during their deliberations. The defendant claims that during the testimony of Ralph Ford, some or all of the jurors observed a number of individuals who were present in the audience section of the courtroom, on the defendant's side and that many jurors formed the opinion that those spectators were there to compel Mr. Ford to recant his earlier statements and testimony.

The defendant claims that consideration by the jury of the above circumstances would constitute consideration of "extrinsic evidence" which would be presumptively prejudicial to the defendant.

Pursuant to the dictates of State v. Brown, 235 Conn. 502 (1995), the court held an evidentiary hearing regarding the defendant's motion on May 6, 2004 and May 21, 2004. During the hearings held on those days, the court asked questions of each of the jurors which questions were essentially agreed upon by the attorneys for the parties as being reflective of the proper scope of the inquiry.[1]

[1] The only objection was by the State which objected to the court inquiring as to whether certain things were discussed at a time other than during deliberations.

As a result of the above proceedings, the following information was obtained. During the testimony of Ralph Ford, each of the twelve jurors observed a number of individuals on the defendant's side of the courtroom. Six jurors testified that they drew no conclusions from the presence of those individuals. One juror concluded that they were there to watch Ralph Ford, a second wondered if they were family members of the defendant or Ralph Ford, a third believed that they were "people from the neighborhood,"[2] a fourth thought they were friends of the defendant,[3] a fifth said he had no idea who they were but assumed that they were here for the defendant, and a sixth wondered why they were there for only that one day.

All but two of the jurors questioned testified that the presence of those individuals was discussed during deliberations. One juror recalled no discussions and a second recalled such discussions but not when they took place. No juror testified that any such discussions took place at a time other than during deliberations.

The court also inquired of the jurors as to the extent of any such discussions. Two jurors stated that there were a lot of discussion, five jurors indicated that there was a little

[2] This juror stated that "it seemed they were altering the testimony of Ralph Ford."

[3] This juror stated that "[M]aybe that Ralph Ford was afraid, intimidated."

or minimal discussions and the rest stated that the extent of such discussions was in between a little and a lot.[4]

Some jurors either saw Mr. Ford during a recess or were aware that another juror or jurors may have seen him but those jurors testified that there was either no discussion concerning that subject matter or any discussion was minimal.

It is fair to conclude therefore that each of the jurors observed individuals seated in the courtroom on the defendant's side during the testimony of Ralph Ford, and some drew the conclusions noted above. There was some discussion of the presence of these individuals during deliberations, the extent of which is unclear.

As a threshold issue, the court is not at all convinced that the record as related above indicates jury misconduct. Certainly a jury is charged with the obligation to assess the credibility of witnesses based upon many factors including their demeanor and circumstances which might affect this credibility. The question becomes whether it is impermissible for a jury to evaluate the testimony of a witness as to credibility by considering factors such as demeanor, motive, bias, etc. but also the circumstances under which he testifies including whether he is facing a courtroom containing people who they reasonably may infer are somehow associated with the defendant.

---

[4] One juror stated for example that the presence of the individuals was more than just mentioned, but not dwelled upon.

This is not a situation where a juror or jurors went outside the evidence to do research, conduct an experiment or visit a crime scene, nor has there been any improper communication to or by any juror. The jurors in this case observed what was there to be seen during the testimony of Mr. Ford.

However, even if it were to be conceded for the sake of argument, that the jury engaged in "misconduct" by considering "extrinsic evidence," under the circumstances present, the court does not believe that the defendant is entitled to a new trial.

Connecticut Practice Book § 42-33, "Impeachment of Verdict," provides as follows:

> Upon an inquiry into the validity of a verdict, no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror nor any evidence concerning mental processes by which the verdict was determined. Subject to these limitations, a juror's testimony or affidavit shall be received when it concerns any misconduct which by law permits a jury to be impeached.

As was done in this case the court may inquire of the jurors as to the existence of a condition or a happening of an event but may not receive evidence of the actual effect of any such extraneous matter upon the juror's minds, as such implicates their mental processes. Aillon v. State, 168 Conn. 541, 551 (1975); Turk v. Silberstein, 48 Conn. App. 223, 228 (1998). In determining whether the "misconduct," as it is determined to be, affected the jury's deliberations, the court must "use an objective standard in which the

focus is on the nature and quality of the misconduct, rather than the mental processes of the jurors." Speed v. DeLibero, 19 Conn. App. 95, 102 (1989).

Where "the trial court was in no way responsible for the juror misconduct...a defendant who offers proof of juror misconduct bears the burden of proving that actual prejudice resulted from that misconduct." State v. Castonguay, 194 Conn. 416, 435-36 n. 19 (1984). The defendant has been prejudiced if the juror misconduct is such to make it probable that the juror's mind was influenced by it so as to render him unfair and prejudicial. State v. Newsome, 238 Conn. 588, 628 (1996).

It appears that the jurors did observe people in the courtroom a number whom associated those people with the defendant and the presence of these individuals was discussed during deliberations. What impact, if any, such events or circumstances had upon the ultimate outcome of this case has not, however, been removed from the realm of speculation.

The defendant's position is that the jury improperly considered the presence of those individuals in assessing the credibility of Ralph Ford. Whether they did so, and if they did, the impact thereof is pure speculation. It must be remembered that there were a number of instances where Ralph Ford's own testimony indicated that he was in fear of the defendant and/or his friends to the point where he moved from the neighborhood. (Testimony of Ralph Ford trans. pp. 103-104, pp. 179-180).

The defendant has simply not sustained his burden of proving that he was prejudiced by any improper conduct on the part of the jury.

Accordingly, the defendant's motion for a new trial is denied.

Bruce W. Thompson

Bruce W. Thompson, Judge

See Attachment (4)

CARVAUGHN JOHNSON #284952

12) GOUND ONE (CONT...): DUE PROCESS, A FAIR TRIAL, AND JURORS WERE INFLUENCED BY EXTRINSIC EVIDENCE, AND WAS THE COURT FAILED TO Adequately inquire into possible racial bias by jurors.

(a) SUPPORTING FACTS (CONT...): MADE TO DETECTIVES. MOST JURORS BELIEVED THAT BECAUSE THE SPECTATORS WERE Black THAT THEY WERE ONLY Present to intimidate Ford and WERE IN SUPPORT OF THE DEFENDANT, ADDITIONALLY, they used this extrinistic EVIDENCE TO Bolster Ford's credibility to SUPPORT THEIR VERDICT OF GUILT.

GROUND TWO (CONT...): IN THE SHOOTING, VIOLATED THE DEFENDANT'S DUE PROCESS RIGHTS WHICH WERE FURTHER VIOLATED WHEN THE COURT REFUSED TO GIVE THE REQUESTED ADVERSE Inference charge

(a) SUPPORTING FACTS (CONT...): THE DEFENDANT'S ABility to BUILD and Present a defense and receive A PROPER Jury Charge.

Attachment 5

Supreme Court of Connecticut.
STATE of Connecticut
v.
Carvaughn JOHNSON.

No. 17267.
Argued Nov. 26, 2007.
Decided Aug. 5, 2008.

**Background:** Defendant was convicted by jury in the Superior Court, Judicial District of New Haven, Thompson, J., of murder and carrying a pistol without a permit. Defendant appealed.

**Holdings:** The Supreme Court, Zarella, J., held that:
(1) no inherent prejudice resulted from jurors' observation of spectators sitting on defendant's side of courtroom during testimony of state's key identification witness;
(2) no actual prejudice resulted from jurors' observation of spectators sitting on defendant's side of courtroom during testimony of state's key identification witness;
(3) trial court, in conducting inquiry of jurors post-verdict regarding defendant's claim that jurors were biased, improperly invaded mental processes of the jurors; and
(4) in a matter of first impression, failure of investigating officers to record entirety of their interviews with state's witness did not constitute a failure to preserve evidence in violation of due process.

Affirmed.

West Headnotes

**[1] Criminal Law 110 ⚷1130(5)**

110 Criminal Law
110XXIV Review
110XXIV(I) Briefs
110k1130 In General
110k1130(5) k. Points and authorities. Most Cited Cases

Supreme Court, in considering on appeal murder defendant's claim that he was denied his right to a fair trial by impartial jury due to juror misconduct, would confine its analysis to federal constitutional law, as defendant did not present any independent state constitutional analysis of this claim. U.S.C.A. Const.Amend. 6.

**[2] Criminal Law 110 ⚷659**

110 Criminal Law
110XX Trial
110XX(B) Course and Conduct of Trial in General
110k659 k. Presence and conduct of bystanders. Most Cited Cases

Murder defendant's claim that jurors were improperly biased against him as a result of their observation of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

spectators sitting on defendant's side of the courtroom during testimony of state's key identification witness was not one of juror misconduct, but, rather, was more appropriately characterized as a claim that the courtroom environment or courtroom situation improperly biased jury, and, thus, trial court was not required to conduct inquiry on record with counsel present, and defendant had burden of demonstrating either that the environment was inherently prejudicial, or that it caused actual prejudice. U.S.C.A. Const.Amend. 6.

**[3] Jury 230 ⚿33(2.10)**

230 Jury
230II Right to Trial by Jury
230k30 Denial or Infringement of Right
230k33 Constitution and Selection of Jury
230k33(2) Competence for Trial of Cause
230k33(2.10) k. In general. Most Cited Cases

Jury impartiality is a core requirement of the right to trial by jury guaranteed by the State and Federal Constitutions. U.S.C.A. Const.Amend. 6; C.G.S.A. Const. Art. 1, § 8.

**[4] Criminal Law 110 ⚿868**

110 Criminal Law
110XX Trial
110XX(J) Issues Relating to Jury Trial
110k868 k. Objections and disposition thereof. Most Cited Cases

Trial court must conduct a preliminary inquiry, on the record, whenever it is presented with any allegations of jury misconduct in a criminal case, regardless of whether an inquiry is requested by counsel.

**[5] Criminal Law 110 ⚿868**

110 Criminal Law
110XX Trial
110XX(J) Issues Relating to Jury Trial
110k868 k. Objections and disposition thereof. Most Cited Cases

Allegations of juror misconduct in which the trial court is directly implicated shift the burden to the state to demonstrate that the misconduct did not harm the defendant, and away from the defendant, who ordinarily would be required to demonstrate actual prejudice.

**[6] Criminal Law 110 ⚿1163(2)**

110 Criminal Law
110XXIV Review
110XXIV(Q) Harmless and Reversible Error
110k1163 Presumption as to Effect of Error
110k1163(2) k. Conduct of trial in general. Most Cited Cases

Defendant who claims that a courtroom situation or environment rendered the jury incapable of being impartial has the burden of demonstrating either that the environment was inherently prejudicial or, in the alternative, that it caused actual prejudice.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**[7] Criminal Law 110 ⚷659**

110 Criminal Law
110XX Trial
110XX(B) Course and Conduct of Trial in General
110k659 k. Presence and conduct of bystanders. Most Cited Cases

Comments jurors made to each other during deliberations about spectators that sat on murder defendant's side of courtroom during testimony of state's key identification witness did not violate defendant's right to fair trial by impartial jury, as comments were based entirely on speculation and conjecture, and record revealed nothing to suggest that any juror was exposed to actual knowledge as to identity of spectators in the courtroom or their relationship to defendant or to witness. U.S.C.A. Const.Amend. 6.

**[8] Criminal Law 110 ⚷1155**

110 Criminal Law
110XXIV Review
110XXIV(N) Discretion of Lower Court
110k1155 k. Issues related to jury trial. Most Cited Cases

**Criminal Law 110 ⚷1156(5)**

110 Criminal Law
110XXIV Review
110XXIV(N) Discretion of Lower Court
110k1156 New Trial
110k1156(5) k. Misconduct of or affecting jury. Most Cited Cases

When the impartiality of the jury was challenged by a motion for mistrial or a new trial, the trial court's determination will be reversed only where it can fairly be said that it abused its discretion in denying the mistrial or new trial.

**[9] Criminal Law 110 ⚷867.6**

110 Criminal Law
110XX Trial
110XX(J) Issues Relating to Jury Trial
110k867 Discharge of Jury Without Verdict; Mistrial
110k867.6 k. Fairness and justice in general. Most Cited Cases

General principle is that a mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial and the whole proceedings are vitiated.

**[10] Criminal Law 110 ⚷918(1)**

110 Criminal Law
110XXI Motions for New Trial
110k918 Errors and Irregularities in Conduct of Trial
110k918(1) k. In general. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Criminal Law 110 ⚷925(1)**

110 Criminal Law
110XXI Motions for New Trial
110k924 Misconduct of or Affecting Jurors
110k925 In General
110k925(1) k. In general. Most Cited Cases

When defendant seeks a new trial on the basis of juror bias, whether the result of juror misconduct or a prejudicial courtroom situation, to prevail on such a claim, he must raise his contention of bias from the realm of speculation to the realm of fact.

**[11] Criminal Law 110 ⚷1166.7**

110 Criminal Law
110XXIV Review
110XXIV(Q) Harmless and Reversible Error
110k1166.5 Conduct of Trial in General
110k1166.7 k. Public or open trial; spectators; publicity. Most Cited Cases

No inherent prejudice resulted from jurors' observation of spectators sitting on defendant's side of the courtroom during testimony of state's key identification witness, as necessary to establish that defendant's right to fair trial by impartial jury was violated; defendant did not allege any conduct by spectators that caused prejudice beyond their mere presence on defendant's side of courtroom, or that spectators misbehaved or in any way should have come to attention of trial court or counsel, and defendant never objected to spectators during trial. U.S.C.A. Const.Amend. 6.

**[12] Criminal Law 110 ⚷659**

110 Criminal Law
110XX Trial
110XX(B) Course and Conduct of Trial in General
110k659 k. Presence and conduct of bystanders. Most Cited Cases

Mere spectator attendance at a public trial is expected and cannot, without more, create an unacceptable risk of impermissible factors coming into play, as necessary to establish inherent prejudice violative of defendant's Sixth Amendment right to trial by impartial jury. U.S.C.A. Const.Amend. 6.

**[13] Criminal Law 110 ⚷659**

110 Criminal Law
110XX Trial
110XX(B) Course and Conduct of Trial in General
110k659 k. Presence and conduct of bystanders. Most Cited Cases

If spectator presence and location in the courtroom appear potentially prejudicial, defendant must object and give the trial court an opportunity to cure any possible prejudice, perhaps by ordering a rearrangement of the spectators or by instructing the jury to disregard their presence.

**[14] Criminal Law 110 ⚷1166.7**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

110 Criminal Law
110XXIV Review
110XXIV(Q) Harmless and Reversible Error
110k1166.5 Conduct of Trial in General
110k1166.7 k. Public or open trial; spectators; publicity. Most Cited Cases

No actual prejudice resulted from jurors' observation of spectators sitting on defendant's side of the courtroom during testimony of state's key identification witness, as necessary to establish that defendant's right to fair trial by impartial jury was violated; to extent jurors formed opinions as to witness's credibility by observing his demeanor on stand and his spontaneous reactions in courtroom, this was proper, and such observations and rational inferences drawn therefrom were not prejudicial, and with respect to conclusions drawn by jurors about spectators' presence, there were a plethora of potential inferences that could be drawn, such that defendant's contention of bias was speculation. U.S.C.A. Const.Amend. 6.

**[15] Criminal Law 110 ⚷957(6)**

110 Criminal Law
110XXI Motions for New Trial
110k948 Application for New Trial
110k957 Statements, Affidavits, and Testimony of Jurors
110k957(6) k. Misconduct of others affecting jurors. Most Cited Cases

Trial court, on a post-verdict claim that a courtroom situation or environment rendered the jury incapable of being impartial, may inquire about whether members of the jury observed the situation, whether they discussed it during deliberations, and whether they, as individuals, arrived at a fixed opinion as to the situation such that they were unable to deliberate with open and impartial minds, but beyond that, a court may not tread; a court may not inquire as to evidence of the actual effect of the extraneous matter upon jurors' minds because such evidence implicates their mental processes. U.S.C.A. Const.Amend. 6.

**[16] Criminal Law 110 ⚷868**

110 Criminal Law
110XX Trial
110XX(J) Issues Relating to Jury Trial
110k868 k. Objections and disposition thereof. Most Cited Cases

Once a verdict has been reached, the proper inquiry on a claim that a courtroom situation or environment rendered the jury incapable of being impartial does not involve a determination of what conclusions the jurors actually drew but, rather, of whether the jurors were aware of or actually exposed to the courtroom situation, whether it affected their ability to be impartial and whether it was of such a nature that it probably rendered the jurors unfair or partial. U.S.C.A. Const.Amend. 6.

**[17] Criminal Law 110 ⚷1158.27**

110 Criminal Law
110XXIV Review
110XXIV(O) Questions of Fact and Findings
110k1158.26 Course and Conduct of Trial
110k1158.27 k. In general. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Appellate court defers to findings of the trial judge, who is uniquely qualified to appraise the probable effect of information on the jury, the materiality of spectator or other courtroom influence, and its prejudicial nature.

**[18] Criminal Law 110 ⚷957(6)**

110 Criminal Law
110XXI Motions for New Trial
110k948 Application for New Trial
110k957 Statements, Affidavits, and Testimony of Jurors
110k957(6) k. Misconduct of others affecting jurors. Most Cited Cases

Trial court, in conducting inquiry of jurors post-verdict regarding murder defendant's claim that jurors were biased as result of their observation of spectators sitting on defendant's side of the courtroom during testimony of state's key identification witness, improperly invaded mental processes of the jurors, as trial court asked jurors whether they drew any conclusions regarding the presence of spectators and what those conclusions were, and this amounted to an inquiry into the actual effect of spectators' presence on jurors' minds. Practice Book 1998, § 42-33.

**[19] Criminal Law 110 ⚷742(1)**

110 Criminal Law
110XX Trial
110XX(F) Province of Court and Jury in General
110k733 Questions of Law or of Fact
110k742 Credibility of Witnesses
110k742(1) k. In general. Most Cited Cases

It is a jury's duty to determine the credibility of witnesses and to do so by observing firsthand their conduct, demeanor and attitude.

**[20] Criminal Law 110 ⚷553**

110 Criminal Law
110XVII Evidence
110XVII(V) Weight and Sufficiency
110k553 k. Credibility of witnesses in general. Most Cited Cases

Fact finders properly may consider not only a witness's demeanor during his testimony but also his spontaneous reactions in the courtroom, as a whole, provided these considerations are limited to assessing credibility.

**[21] Criminal Law 110 ⚷553**

110 Criminal Law
110XVII Evidence
110XVII(V) Weight and Sufficiency
110k553 k. Credibility of witnesses in general. Most Cited Cases

A jury's assessment of a witness' credibility naturally and rightly may include observations of his reaction to having to confront the defendant physically and to testify in an open and public forum.

**[22] Criminal Law 110 ⚷868**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

110 Criminal Law
110XX Trial
110XX(J) Issues Relating to Jury Trial
110k868 k. Objections and disposition thereof. Most Cited Cases

Trial court, in questioning jurors in connection with murder defendant's post-verdict claim that jurors were biased as result of their observation of spectators sitting on defendant's side of the courtroom during testimony of state's key identification witness, was not required to conduct more extensive inquiry to determine whether race of spectators prejudiced jury, as there was nothing in record to suggest racial bias on the part of any juror that would require trial court to investigate further; jurors who mentioned race offered this information when asked to describe spectators, and five of the seven jurors who mentioned race first mentioned gender or height of spectators rather than their race.

**[23] Constitutional Law 92 ⚷4594(8)**

92 Constitutional Law
92XXVII Due Process
92XXVII(H) Criminal Law
92XXVII(H)4 Proceedings and Trial
92k4592 Disclosure and Discovery
92k4594 Evidence
92k4594(8) k. Duty to preserve. Most Cited Cases

**Criminal Law 110 ⚷2010**

110 Criminal Law
110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)3 Destruction or Loss of Information
110k2010 k. In general. Most Cited Cases

Failure of investigating officers to record entirety of their interviews with state's key identification witness did not constitute a failure to preserve evidence in violation of due process, as rule requiring state to disclose, upon written request by defendant, any statements of witnesses in state's possession did not impose an affirmative duty on state to create a record of witness interviews. U.S.C.A. Const.Amend. 14; C.G.S.A. Const. Art. 1, § 8; Practice Book 1998, §§ 40-13(a), 40-15.

**[24] Criminal Law 110 ⚷752.5**

110 Criminal Law
110XX Trial
110XX(F) Province of Court and Jury in General
110k752.5 k. Dismissal or nonsuit. Most Cited Cases

**Criminal Law 110 ⚷1155**

110 Criminal Law
110XXIV Review
110XXIV(N) Discretion of Lower Court

110k1155 k. Issues related to jury trial. Most Cited Cases

Generally, the decision whether to grant a motion to dismiss a criminal charge rests within the sound discretion of the trial court and is one that the appellate court will not disturb on appeal absent a clear abuse of that discretion.

**[25] Criminal Law 110 ⚷1139**

110 Criminal Law
 110XXIV Review
  110XXIV(L) Scope of Review in General
   110XXIV(L)13 Review De Novo
    110k1139 k. In general. Most Cited Cases

Underlying determination as to whether the court correctly applied the law is a legal question that the appellate court reviews de novo.

**[26] Constitutional Law 92 ⚷4594(1)**

92 Constitutional Law
 92XXVII Due Process
  92XXVII(H) Criminal Law
   92XXVII(H)4 Proceedings and Trial
    92k4592 Disclosure and Discovery
     92k4594 Evidence
      92k4594(1) k. In general. Most Cited Cases

**Constitutional Law 92 ⚷4594(8)**

92 Constitutional Law
 92XXVII Due Process
  92XXVII(H) Criminal Law
   92XXVII(H)4 Proceedings and Trial
    92k4592 Disclosure and Discovery
     92k4594 Evidence
      92k4594(8) k. Duty to preserve. Most Cited Cases

There are two areas of constitutionally guaranteed access to evidence such that denying or foreclosing defendant's access to that evidence may constitute a due process violation; the first situation concerns the withholding of exculpatory evidence by the police from the accused, and the second situation concerns the failure of the police to preserve evidence that might be useful to the accused. U.S.C.A. Const.Amend. 14.

**[27] Constitutional Law 92 ⚷4594(8)**

92 Constitutional Law
 92XXVII Due Process
  92XXVII(H) Criminal Law
   92XXVII(H)4 Proceedings and Trial
    92k4592 Disclosure and Discovery
     92k4594 Evidence

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

92k4594(8) k. Duty to preserve. Most Cited Cases

In determining whether a defendant claiming that the state has failed to preserve potentially useful evidence has been afforded due process of law under the State Constitution, the trial court must weigh the reasons for the unavailability of the evidence against the degree of prejudice to the accused; more specifically, the trial court must balance the totality of the circumstances surrounding the missing evidence, including the following factors: the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the defense, and the prejudice to the defendant caused by the unavailability of the evidence. C.G.S.A. Const. Art. 1, § 8.

**[28] Criminal Law 110 ⚷2010**

110 Criminal Law
110XXXI Counsel
110XXXI(D) Duties and Obligations of Prosecuting Attorneys
110XXXI(D)3 Destruction or Loss of Information
110k2010 k. In general. Most Cited Cases

Police do not have a duty to make a record of all interviews or interrogations with witnesses.

**[29] Criminal Law 110 ⚷822(1)**

110 Criminal Law
110XX Trial
110XX(G) Instructions: Necessity, Requisites, and Sufficiency
110k822 Construction and Effect of Charge as a Whole
110k822(1) k. In general. Most Cited Cases

Supreme Court, in reviewing jury instruction to determine whether it was reasonably possible that the jury was misled, is required to view trial court's instructions as a whole.

**[30] Criminal Law 110 ⚷627.8(6)**

110 Criminal Law
110XX Trial
110XX(A) Preliminary Proceedings
110k627.5 Discovery Prior to and Incident to Trial
110k627.8 Proceedings to Obtain Disclosure
110k627.8(6) k. Failure to produce information. Most Cited Cases

Murder defendant waived any objection to trial court's failure to order disclosure of psychological records of state's key identification witness, as defense counsel acknowledged, after questioning witness, that defendant could not meet necessary showing to warrant disclosure of the privileged records, and defense counsel withdrew defendant's request that court disclose the records and did not request that court conduct an in camera inspection.

**[31] Criminal Law 110 ⚷1037.1(1)**

110 Criminal Law
110XXIV Review
110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
110XXIV(E)1 In General

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

110k1037 Arguments and Conduct of Counsel
110k1037.1 In General
110k1037.1(1) k. Arguments and conduct in general. Most Cited Cases
(Formerly 110k1035(2))

Murder defendant's claim on appeal, that trial court's failure to order disclosure of psychological records of state's key identification witness violated his rights to due process of law and to confront the witnesses against him, was not reviewable under *Golding*, which provides for appellate review of unpreserved constitutional errors if certain conditions are met; even if it were assumed that claim was of constitutional magnitude, defendant's concession that he could not make the requisite factual showing to warrant disclosure of records and his subsequent withdrawal of disclosure request constituted a waiver of any objection to trial court's failure to disclose. U.S.C.A. Const.Amends. 6, 14.

**[32] Criminal Law 110 ⚿627.6(6)**

110 Criminal Law
110XX Trial
110XX(A) Preliminary Proceedings
110k627.5 Discovery Prior to and Incident to Trial
110k627.6 Information or Things, Disclosure of
110k627.6(6) k. Records. Most Cited Cases

**Criminal Law 110 ⚿627.8(4)**

110 Criminal Law
110XX Trial
110XX(A) Preliminary Proceedings
110k627.5 Discovery Prior to and Incident to Trial
110k627.8 Proceedings to Obtain Disclosure
110k627.8(4) k. Examination by court; inspection in camera. Most Cited Cases

Prior to disclosure of or an in camera inspection of privileged psychological records, the party seeking such disclosure must demonstrate a factual basis from which the trial court may conclude that there is a reasonable ground to believe that the records will reveal that at any pertinent time the witness' psychological condition affected his testimonial capacity to a sufficient degree to warrant further inquiry.

**[33] Witnesses 410 ⚿345(9)**

410 Witnesses
410IV Credibility and Impeachment
410IV(B) Character and Conduct of Witness
410k345 Accusation or Conviction of Crime
410k345(4) Conviction, Acquittal, and Pardon
410k345(9) k. Juvenile, youthful offender or military adjudications. Most Cited Cases

Nature of crime underlying witness's youthful offender status, which was felony-level crime of possession of narcotics with intent to sell, did not constitute a felony conviction such that the specific was admissible for impeachment purposes, in murder prosecution.

**[34] Criminal Law 110 ⚿822(1)**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

110 Criminal Law
110XX Trial
110XX(G) Instructions: Necessity, Requisites, and Sufficiency
110k822 Construction and Effect of Charge as a Whole
110k822(1) k. In general. Most Cited Cases

When reviewing a challenged jury instruction, Supreme Court must adhere to the rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts.

**[35] Criminal Law 110 ⚷769**

110 Criminal Law
110XX Trial
110XX(G) Instructions: Necessity, Requisites, and Sufficiency
110k769 k. Duty of judge in general. Most Cited Cases

The test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law.

**[36] Criminal Law 110 ⚷769**

110 Criminal Law
110XX Trial
110XX(G) Instructions: Necessity, Requisites, and Sufficiency
110k769 k. Duty of judge in general. Most Cited Cases

As long as the instructions are correct in law, adapted to the issues, and sufficient for the guidance of the jury, Supreme Court will not view the instructions as improper.

**[37] Criminal Law 110 ⚷1043(3)**

110 Criminal Law
110XXIV Review
110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
110XXIV(E)1 In General
110k1043 Scope and Effect of Objection
110k1043(3) k. Adding to or changing grounds of objection. Most Cited Cases

Supreme Court would not review on appeal issue of whether consciousness of guilt instruction was improperly slanted because it made no mention of murder defendant's innocent conduct after shooting had occurred, as defendant did not raise this issue at trial, but instead objected to instruction on a different theory.

**[38] Criminal Law 110 ⚷1038.1(5)**

110 Criminal Law
110XXIV Review
110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
110XXIV(E)1 In General
110k1038 Instructions

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

110k1038.1 Objections in General
110k1038.1(3) Particular Instructions
110k1038.1(5) k. Evidence and witnesses. Most Cited Cases

Consciousness of guilt instruction given in murder prosecution was not reviewable under *Golding*, which provides for appellate review of unpreserved constitutional errors if certain conditions are met, as instructions that allowed permissive inference did not implicate defendant's constitutional rights and properly framed consciousness of guilt instructions allowed only a permissive inference.

****1262** Lauren Weisfeld, assistant public defender, for the appellant (defendant).

Timothy J. Sugrue, senior assistant state's attorney, with whom were Michael A. Pepper, senior assistant state's attorney, and, on the brief, Michael Dearington, state's attorney, and Julia K. Conlin, assistant state's attorney, for the appellee (state).

ROGERS, C.J., and KATZ, VERTEFEUILLE, ZARELLA and SCHALLER, Js.

ZARELLA, J.

***238** A jury found the defendant, Carvaughn Johnson, guilty of murder in violation of General Statutes § 53a-54a (a),[FN1] and carrying a pistol without a permit in violation of General Statutes § 29-35.[FN2] The trial court rendered judgment in accordance with the verdict, and the defendant appealed to this court.[FN3] The defendant seeks a new trial on the basis of his claims that the trial court improperly (1) concluded that he had not proven actual prejudice resulting from the influence of courtroom spectators on the jury's deliberations and its assessment of the witnesses' credibility, (2) concluded that the New Haven police department did not violate his due process rights in failing to make a record of the entirety of its questioning of the state's key witness and improperly declined the defendant's request for an adverse inference instruction, (3) failed to disclose to the defendant the psychological records of the state's key witness and improperly restricted defense counsel's impeachment of that witness, and (4) charged the jury regarding consciousness of guilt and reasonable doubt. We have examined each of the claims, find no impropriety and, therefore, affirm the judgment of conviction.

FN1. General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person...."

FN2. General Statutes § 29-35 provides in relevant part: "(a) No person shall carry any pistol or revolver upon his or her person, except when such person is within the dwelling house or place of business of such person without a permit to carry the same issued as provided in section 29-28...."

FN3. The trial court sentenced the defendant to a total effective term of forty-three years imprisonment.

***239** On the basis of the evidence presented at the trial, the jury reasonably could have found the following facts. The defendant shot and killed the sixteen year old victim, Markeith Strong, on the evening of October 10, 2001, in New Haven. In the weeks prior to that evening, the defendant and the victim had been at odds with each other. Approximately three weeks prior to the shooting, the victim's teenage sister, L'Kaya Ford, was sitting with the victim at the corner of Read and Shepard Streets when she observed the defendant approach.[FN4] The defendant walked toward Ford and the victim, called the victim "a punk," and threatened to assault him. ****1263** The victim said nothing, and the defendant walked away.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN4. The record *reveals* that the area of New Haven where most of the pertinent events occurred is called Newhallville and is a block-shaped area formed around the intersections of Read, Shepard, Huntington and Newhall Streets.

The victim next encountered the defendant in the late afternoon of September 29, 2001, and the two engaged in a dispute over a bicycle. The victim and Ralph Ford[FN5] were around the intersection of Read and Shepard Streets, where the victim either was riding his bicycle or standing near it, when the defendant stopped him, declared that the bicycle belonged to him and demanded that the victim give it to him. The victim refused and informed the defendant that he had found the bicycle about one month earlier and had fixed it up. The victim told the defendant that he owned the bicycle. The defendant asked for the bicycle a second time, and, when the victim refused, the defendant said, "[d]on't make me do something to you." The defendant then punched the left side of the victim's head twice, which caused a small cut near the victim's left ear. During this encounter, the defendant may have been ***240** carrying a gun.[FN6] The defendant then took the bicycle and rode away.

FN5. L'Kaya Ford and Ralph Ford are not related.

FN6. The victim told police investigating the incident that the defendant did not have a weapon. A witness, Dwana Wilson, however, saw the encounter from across the street and testified that she had witnessed the defendant holding a black handgun and pointing it at the victim.

After this encounter, the victim, accompanied by Ralph Ford, returned home, where his family contacted the New Haven police to report the incident. After speaking with the victim, the police officers radioed a description of the defendant and notice of a possible robbery and larceny. The police did not apprehend any suspect that day. Over the next few days, the defendant approached the victim and L'Kaya Ford about the police report, asserted that he was not going to jail, apologized to the victim and told him not to press charges. Toward the end of September, the defendant also expressed concern to his friend, Tashana Milton Toles, about the possible criminal charges that he faced as a result of the bicycle incident and specifically remarked to her that he thought he might be going back to jail.

On the morning of October 10, the defendant approached L'Kaya Ford while she was waiting for a bus. The defendant, who was driving a black car that L'Kaya Ford described as an Acura or Ford Probe, pulled the car alongside of her and accused her of being a snitch. The defendant insulted her, told her he did not like snitches and that she knew what happened to "snitches in the hood." That night, the victim, L'Kaya Ford, Ralph Ford, and other friends gathered on the corner of Read and Shepard Streets to celebrate L'Kaya Ford's birthday. Some of the group, but not Ralph Ford or the victim, were drinking alcohol and smoking marijuana. Around 10 p.m., the victim and Ralph Ford departed together. The neighborhood around Read, Shepard, Huntington and Newhall Streets affords many shortcuts through the yards of houses that are occupied by neighborhood***241** residents. On that night, however, Ralph Ford did not take his usual shortcut but parted from the victim, who took the shortcut home. Ralph Ford then continued walking alone on Read Street and proceeded around the corner to his house on Newhall Street.[FN7] Upon arriving at his house, Ralph Ford heard a gun shot coming from the backyard of the house across the street. Ralph ****1264** Ford then entered his front hallway. Ralph Ford heard someone running from the yard across the street and saw the defendant run into the driveway leading to Ford's house.[FN8] Ralph Ford saw the defendant carrying a semiautomatic handgun and entering a black Acura as it exited the driveway.[FN9] James Baker, who lived near the crime scene, heard someone run past his window, jump the fence outside his house and head into the backyard, toward Huntington Street. Approximately five minutes later, and around 10:20 p.m., Baker heard a single gunshot coming from behind his house. LaMont Wilson, who had left the group

earlier than Ralph Ford and the victim, lived on Read Street and also heard a gunshot from the direction of his backyard, sometime between 10 and 10:45 p.m. Baker called the police at approximately 10:45 p.m. to report the gunshot but did not initially identify himself because he feared retaliation from "certain individuals" for contacting the police. Joanie Joyner, a resident of Huntington Street and the *242 victim's next-door neighbor, also heard a loud "boom" from the direction of her backyard and then, sometime after 11 p.m., saw something in her yard. At approximately 11:25 p.m., she also called the police.

FN7. Ralph Ford did not explain why he did not remain with the victim and take the usual shortcut home that night, other than indicating that he liked to walk on Read Street.

FN8. As we explain more fully in the text of this opinion, Ralph Ford, the state's key identification witness, recanted his testimony from the defendant's first trial at the defendant's retrial, but his prior inconsistent statements were used to impeach him at the second trial and admitted as substantive evidence pursuant to § 8-5(1) of the Connecticut Code of Evidence. See, e.g., *State v. Whelan,* 200, Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S.Ct. 597, 93 L.Ed.2d 598 (1986).

FN9. At trial, Toles testified that, earlier that day, she had seen the defendant in a cranberry colored car that she believed was a Dodge Intrepid. The defendant was a passenger in the car and was accompanied by two other people.

The defendant contacted Toles by telephone between 9:45 and 10 p.m., told her that he was about five minutes away from her dormitory at Southern Connecticut State University, and asked if he could visit her. Toles agreed. The defendant did not arrive at the dormitory until 11 p.m., at which time he phoned Toles from the lobby, and she came down to the lobby to register him as a visitor at the security desk.[FN10] The defendant was with a friend, Travis Scott.[FN11] To enter the dormitory, the defendant was required to provide identification at the security desk where security personnel record the information. The sign-in sheet at Toles' dormitory indicated that she signed the defendant into her building at 11:10 p.m. Shortly after they signed in, a fire alarm required all residents and visitors to evacuate the building. The alarm occurred at approximately 11:30 p.m., and the fire department and university police responded to the scene. The defendant and Scott waited with Toles and her roommate until the university permitted students to reenter the building. They retrieved their identification from the security desk and departed. During the investigation, Detective Breland of the New Haven police department drove from Ralph Ford's house to **1265 Toles' dormitory, recorded the distance to be about three *243 miles and noted that the trip took approximately ten minutes.

FN10. There was conflicting testimony at trial about the clothes that the defendant was seen wearing on the night the victim was shot. Toles observed him around 11 p.m. wearing "[a] black T-shirt, some blue jeans, a black leather coat, and black Jordan sneakers." Ralph Ford's testimony from the defendant's first trial was read into evidence at the second trial, and he testified that, when he saw the defendant running across Huntington Street from the direction of the gunshot, the defendant was wearing blue jeans, a grey hooded sweatshirt with orange stripes on the sleeves, and black boots.

FN11. Toles did not see what car, if any, the defendant and Scott arrived in that evening.

Officers Mark Taylor and Brian Pazsak of the New Haven police department were on patrol in the Newhall and Huntington Street area on the night of October 10, 2001, and received the dispatch related to Baker's and Joyner's calls. Police responded first to Baker's call and investigated the general area, but saw nothing amiss. After responding to Joyner's call around 11:35 p.m., the officers found the victim lying face down in Joyner's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

backyard. The victim appeared to be unconscious and bleeding from the mouth. The officers also found a spent nine millimeter shell casing nearby. New Haven fire department personnel were called but were unable to resuscitate the victim, who was pronounced dead at the Hospital of Saint Raphael in New Haven.

Arkady Katsnelson of the chief medical examiner's office performed an autopsy of the victim on October 11, 2001, and determined that he had died of a single gunshot wound to the right side of his face.[FN12] Katsnelson concluded that the bullet penetrated the victim's face and neck, and completely severed the spinal cord, instantly incapacitating the victim. The defendant was charged with the victim's murder and related crimes on April 24, 2002, and subsequently was tried. After seven days of deliberations, the jury in the defendant's first trial was unable to reach a verdict. Therefore, the trial court, *Licari, J.*, declared a mistrial pursuant to ***244** Practice Book § 42-45.[FN13] The present appeal arises from the second trial of the defendant in which the jury returned a verdict of guilty of the crimes of murder and carrying a pistol without a permit. Additional facts will be set forth as necessary in the context of the defendant's specific claims on appeal.

FN12. The police, relying on information received and the identifications made by Ralph Ford and L'Kaya Ford, secured a search warrant for the defendant's residence and seized a .45 caliber handgun. Ballistics testing confirmed that the gun seized from the defendant's home was not the gun used to kill the victim. The parties stipulated at trial that there was no record of a permit in the defendant's name to carry a handgun. The police also seized a pair of black, high-top sneakers from the defendant's home but did not find a gray sweatshirt with orange stripes or blue jeans.

FN13. Practice Book § 42-45 provides: "The judicial authority shall declare a mistrial in any case in which the jury are unable to reach a verdict."

I

[1] The defendant first claims that he was denied his right to a fair trial by an impartial jury in violation of the sixth amendment to the United States constitution and article first, § 8, of the Connecticut constitution as a result of juror misconduct.[FN14] Specifically, the defendant claims that he was prejudiced by the jury's improper consideration of extrinsic evidence in assessing Ralph Ford's[FN15] credibility. According to the defendant, this extrinsic evidence consisted of the jurors' observations of certain courtroom spectators who were present on the day Ford testified and the conclusions that the jurors drew from the presence of those spectators. The defendant also contends that the trial court should have determined whether the jurors were improperly influenced by racial ****1266** bias in response to these spectators. The state claims, in response, that the spectators' presence in the courtroom should not be deemed extrinsic evidence that the jury improperly had considered. The state claims, in the alternative, that, if this court determines that the jury's consideration of the presence of the spectators is misconduct, the trial court properly concluded that the defendant failed to meet his burden ***245** of demonstrating actual prejudice. We agree with the state that the mere presence of spectators in a public courtroom and the jury's observation of them does not constitute juror misconduct or the consideration of extrinsic evidence. Further, we conclude that the trial court did not abuse its discretion in determining that the defendant had failed to demonstrate that he was denied a fair trial by an impartial jury.

FN14. Because the defendant does not present any independent state constitutional analysis of this particular claim, we confine our analysis to federal constitutional law. E.g., *State v. Valentine,* 240 Conn. 395, 405 n. 12, 692 A.2d 727 (1997).

FN15. In the interest of simplicity, we hereinafter refer to Ralph Ford by his last name.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

We begin with the additional facts relevant to this claim. The defendant has maintained throughout this case that the state's evidence was weak and that he is innocent. Thus, because he was surprised by the jury's verdict, the defendant, through an investigator at the office of the public defender, requested feedback from some of the jurors. As a result of conversations with members of the jury, the investigator learned that some of the jurors appeared to have drawn their own conclusions regarding the presence of the spectators in the courtroom on the day Ford testified and that these observations may have been discussed during the jury's deliberations.

The defendant filed a motion seeking an evidentiary hearing, pursuant to *State v. Brown,* 235 Conn. 502, 526, 668 A.2d 1288 (1995), to inquire into possible juror misconduct. The trial court, *Thompson, J.,* granted the defendant's motion and held an evidentiary hearing on May 6, 2004.[FN16] After conducting the evidentiary hearing and considering the arguments of counsel, the trial court issued a memorandum of decision denying the defendant's motion for a new trial. In its decision, the ***246** court observed that, "[s]ince ... Ford was the only witness directly linking the defendant to the shooting, it is logical to conclude that the jury was called upon to determine whether ... Ford was being truthful either when he gave his prior testimony and statements, when he testified at this trial or not at all."

> FN16. On that day, the trial court, *Thompson, J.,* questioned eleven of the twelve jurors. The hearing was continued for the purpose of completing the juror questioning on May 21, 2004.
>
> The court questioned the jurors individually. Each juror was sworn in and instructed not to discuss the questions asked or their responses with anyone, including fellow jurors. The court essentially asked the same questions of each juror, and counsel for both parties agreed on the questions.

The trial court then made the following findings of fact and conclusions: "During [Ford's] testimony ... each of the twelve jurors observed a number of individuals on the defendant's side of the courtroom.[FN17] ****1267** Six jurors testified that they drew no conclusions from the presence of those individuals. One juror concluded that they were there to watch ... Ford, a second wondered if they were family members of the defendant or ... Ford, a third believed that they were 'people from the neighborhood' [and that 'it seemed [that] they were altering the testimony of ... Ford'], a fourth thought they were friends of the defendant [and '[m]aybe that ... Ford was afraid, intimidated'], a fifth said he had ***247** no idea who they were but assumed that they were [t]here for the defendant, and a sixth wondered why they were there for only that one day.

> FN17. The transcript of the two days of the hearing *reveals* the substance of the questions that were posed to the jurors:
>
> (1) Did you observe individuals sitting in the spectator area of the courtroom on the defendant's side during Ford's testimony?
>
> (2) Would you describe those individuals?
>
> (3) Did you draw any conclusions regarding the presence of those individuals?
>
> (4) What were those conclusions?
>
> (5) Did you see those individuals in the courtroom at any other time during the trial?
>
> (6) Was the presence of those individuals whom you observed and any conclusions about those individuals discussed among the jurors during deliberations or prior thereto?

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

(7) Can you tell me the extent of those discussions without getting into what was said? Was it a little bit, a lot, or somewhere in the middle?

(8) Did you observe Ford on the day that he testified during any court recess?

(9) If yes, what did you observe?

(10) To your knowledge, did any other juror or jurors observe Ford during any court recess?

(11) If so, was the subject of this observation discussed during deliberations and what was the extent of any such discussions?

"All but two of the jurors questioned testified that the presence of those individuals was discussed during deliberations. One juror recalled no discussions and a second recalled such discussions but not when they took place. No juror testified that any such discussions took place at a time other than during deliberations.

"The court also inquired of the jurors as to the extent of any such discussions. Two jurors stated that there were a lot of discussion[s], five jurors indicated that there was a[few] or minimal discussions and the rest stated that the extent of such discussions was in between a little and a lot.

"Some jurors either saw ... Ford during a recess or were aware that another juror or jurors may have seen him, but those jurors testified that there was either no discussion concerning that subject matter or [that] any discussion was minimal.

"It is fair to conclude, therefore, that each of the jurors observed individuals seated in the courtroom on the defendant's side during [Ford's] testimony ... and some drew the conclusions noted [previously]. There was some discussion of the presence of these individuals during deliberations, the extent of which is unclear." On the basis of these findings and conclusions, the trial court ultimately concluded that, although it was not convinced that the facts supported an allegation that the jury improperly had considered extrinsic evidence,[FN18] even if it was misconduct, the defendant did ***248** not meet his burden of proving actual prejudice because "there were a number of instances where ... Ford's own testimony indicated that he was in fear of the defendant [and] his friends to the point where he moved from the neighborhood." Thus, "[w]hat impact, if any, such events or circumstances had upon the ultimate outcome of this case has not ... been removed from the realm of speculation."

FN18. The trial court observed: "This is not a situation where a juror or jurors went outside the evidence to do research, conduct an experiment or visit a crime scene, [and there] has [not] been any improper communication to or by any juror. The jurors in this case observed what was there to be seen during the testimony of ... Ford."

A

[2][3] We first must decide whether the defendant's claim is properly viewed as juror misconduct because our case law requires certain actions by a trial court in response to allegations of juror misconduct that are not required, generally, for a defendant's claim that he has been denied a fair trial. See, e.g., *State v. Roman,* 262 Conn. 718, 726, 817 A. 2d 100 (2003); *State v. Brown,* supra, 235 Conn. at 526, 668 A. 2d 1288. As a preliminary matter, we ****1268** note the settled principle that "[j]ury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and by the sixth amendment to the United States constitution.... In essence, the right to jury trial guarantees to the criminally accused a fair trial by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

a panel of impartial, indifferent jurors.... The modern jury is regarded as an institution in our justice system that determines the case solely on the basis of the evidence and arguments given [it] in the adversary arena after proper instructions on the law by the court." (Citations omitted; internal quotation marks omitted.) *State v. Brown,* supra, at 522-23, 668 A.2d 1288. "The United States Supreme Court has noted, however, that the [c]onstitution does not require a new trial every time a juror has been placed in a potentially compromising situation ... [because] it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." (Internal quotation marks omitted.) *State v. Weinberg,* 215 Conn. 231, 249, 575 A.2d 1003, cert. denied, ***249**498 U.S. 967, 111 S.Ct. 430, 112 L.Ed.2d 413 (1990). "Were that the rule, few trials would be constitutionally acceptable." *Smith v. Phillips,* 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). We have recognized, moreover, that "[t]he trial court, which has a first-hand impression of [the] jury, is generally in the best position to evaluate the critical question of whether the juror's or jurors' exposure to improper matter has prejudiced a defendant." (Internal quotation marks omitted.) *State v. Weinberg,* supra, at 249, 575 A.2d 1003.

In the present case, the defendant claims that the jurors' "[c]onsideration of the spectators' presence was consideration of a fact outside the evidence, no different than if jurors had done their own investigations and considered any other extraneous facts." The state disagrees and argues that the presence of spectators, "who are doing nothing other than being spectators," at a *public* trial is not extrinsic evidence. We agree with the state and conclude that the nature of the defendant's claim is not one of juror misconduct but, rather, more appropriately characterized as a claim that the courtroom environment or a courtroom situation improperly biased the jury.

In *Aillon v. State,* 168 Conn. 541, 363 A.2d 49 (1975), we observed that, as early as 1866, courts had recognized certain occurrences as being "irregularities and misconduct" of a jury such that evidence of such misconduct could be considered to challenge a verdict: "[A]ffidavits of jurors may be received for the purpose of avoiding a verdict, to show any matter occurring during the trial or in the jury room, which does not essentially inhere in the verdict itself, *as that a juror was improperly approached by a party, his agent, or attorney; that witnesses or others conversed as to the facts or merits of the cause, out of court and in the presence of jurors; that the verdict was determined by aggregation and average or by lot, or game of chance or* ***250** *other artifice or improper manner.*" (Emphasis added; internal quotation marks omitted.) Id., at 550-51, 363 A.2d 49. Our case law further confirms that such occurrences are properly considered juror misconduct. See, e.g., *State v. Roman,* supra, 262 Conn. at 727, 817 A.2d 100 (allegation that juror spoke with victim's family out of court treated as juror misconduct); *State v. Brown,* supra, 235 Conn. at 519-21, 668 A.2d 1288 (court received anonymous letter describing misconduct because jurors overheard sheriffs making racial remarks about defendant and discussing improper identification procedures used by detective who testified for state); ****1269***State v. Asherman,* 193 Conn. 695, 738-40, 478 A.2d 227 (1984) (misconduct for jurors to bring nonevidentiary material into jury room to conduct experiment testing defense counsel's theory of case), cert. denied, 470 U.S. 1050, 105 S.Ct. 1749, 84 L.Ed.2d 814 (1985); see also *State v. Harris,* 230 Conn. 347, 349, 644 A.2d 911 (1994) (*Berdon, J.,* dissenting) (misconduct for juror to conduct experiment outside of jury room to test theory of case and to report findings to other jurors). This case law also illustrates that juror misconduct occurs predominantly when jurors are exposed to information outside of the courtroom that may tend to affect deliberations and that cannot be observed by the trial judge or by counsel. In analyzing whether juror misconduct has prejudiced a defendant, we have observed that a defendant is prejudiced when "the misbehavior is such to make it probable that the juror's mind was influenced by it so as to render him or her an unfair and prejudicial juror." (Internal quotation marks omitted.) *State v. Newsome,* 238 Conn. 588, 628, 682 A.2d 972 (1996).

Significantly, what we traditionally have recognized as juror misconduct is not the only potentially prejudi-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

cial influence that courts have addressed in responding to a defendant's claim that his trial was unfair. Another line of cases addresses the question of whether a *situation, arrangement or presence in the courtroom* during ***251** the defendant's trial prejudiced him such that it biased the jury. See, e.g., *Holbrook v. Flynn,* 475 U.S. 560, 570-72,106 S.Ct. 1340, 89 L.Ed.2d 525 (1986) (presence of uniformed officers seated behind defendant in courtroom may be prejudicial but must be considered on case-by-case basis and weighed against state's interest in security); *Estelle v. Williams,* 425 U.S. 501, 512-13, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976) (compelling prisoner to wear prison garb during trial deprives him of fair trial); *Woods v. Dugger,* 923 F.2d 1454, 1459 (11th Cir.) (totality of circumstances including overwhelming presence of uniformed prison guards as spectators in courtroom led court to conclude that case was one of those "extreme cases" in which defendant was prejudiced [internal quotation marks omitted]), cert. denied sub nom. *Singletary v. Woods,* 502 U.S. 953, 112 S.Ct. 407, 116 L.Ed.2d 355 (1991); *Norris v. Risley,* 918 F.2d 828, 830 (9th Cir.1990) (courtroom spectators wearing "women against rape" buttons created unacceptable risk that jury would consider "impermissible factors"), overruled in part by *Carey v. Musladin,* 549 U.S. 70, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006); see also *State v. Atwood,* 171 Ariz. 576, 633, 832 P.2d 593 (1992) (defendant contended that courtroom presence and behavior of citizen action group during trial denied him fair trial), cert. denied, 506 U.S. 1084, 113 S.Ct. 1058, 122 L.Ed.2d 364 (1993), overruled in part on other grounds by *State v. Nordstrom,* 200 Ariz. 229, 25 P.3d 717, cert. denied, 534 U.S. 1046, 122 S.Ct. 627, 151 L.Ed.2d 548 (2001); *Overstreet v. State,* 877 N.E.2d 144, 157 (Ind.2007) (allegation that courtroom spectators were wearing buttons depicting victim denied defendant fair trial); *State v. Lord,* 161 Wash.2d 276, 278, 165 P.3d 1251 (2007) (allegation that buttons depicting victim and worn by spectators in courtroom denied defendant fair trial); cf. *State v. Higgins,* 265 Conn. 35, 78, 826 A.2d 1126 (2003) (presence of two uniformed officers seated ***252** behind defendant did not prejudice him such that mistrial should have been granted). This line of cases addresses allegedly improper influences on the jury within the adversarial arena that have not been characterized as juror misconduct. Rather, these cases focus on whether the situation or atmosphere in the courtroom created inherent or actual prejudice to the defendant such that a new trial should be granted.

****1270** [4] Undoubtedly, there is an area of overlap between these lines of cases as both are concerned with protecting the defendant's right to a fair trial by an impartial jury. There are distinctions between them, however. First, in *Brown,* on which the defendant and the trial court in the present case relied, we invoked our "inherent supervisory power" to conclude that "a trial court must conduct a preliminary inquiry, on the record, whenever it is presented with any allegations of jury misconduct in a criminal case, regardless of whether an inquiry is requested by counsel." (Emphasis added.) *State v. Brown,* supra, 235 Conn. at 526, 668 A.2d 1288; see also *State v. Roman,* supra, 262 Conn. at 726, 817 A.2d 100. Although *Brown* left the scope of the inquiry to the sound discretion of the trial courts, it created a mandate that courts conduct an inquiry on the record with counsel present whenever an allegation of juror misconduct comes to light. In adopting this rule, we recognized that "the jury room cannot be guarded with too much vigilance and jealousy. Courts must reject all evidence not received on the trial, and must repel every foreign influence, which may affect the minds of the jury." (Internal quotation marks omitted.) *State v. Brown,* supra, at 527, 668 A.2d 1288.

This court never has invoked *Brown* in a case involving an allegation that spectators in the courtroom or the courtroom atmosphere itself rendered the trial unfair. In *Higgins,* which was decided after *Brown,* we addressed a claim that the presence of two uniformed officers seated in the spectator section of the courtroom ***253** behind the defendant prejudiced the jury. See *State v. Higgins,* supra, 265 Conn. at 75-78, 826 A.2d 1126. We did not apply *Brown* or analyze the case as one involving juror misconduct. Rather, we applied the inherent versus actual prejudice analysis used in cases of potential bias arising from the courtroom environment. See id., at 76-77,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

826 A.2d 1126. In *Weinberg,* which was decided before *Brown* but which is the only case in which we have addressed the potentially prejudicial impact of spectator presence or behavior during a trial, we applied an abuse of discretion standard in determining whether the trial court properly denied a claim that the trial was unfair. See *State v. Weinberg,* supra, 215 Conn. at 248-50, 575 A.2d 1003. We observed that the determination as to the best response to such a claim should be left to the trial court's "wide discretion...." Id., at 249, 575 A.2d 1003.[FN19] We note that there is a fundamental difference between the potential prejudice created by traditional juror misconduct and that created by the courtroom environment. A courtroom environment that is challenged as prejudicial involves situations or events that occur under the watchful gaze of the presiding judge and in the presence of counsel for the state and the defendant, whereas claims of juror misconduct deal with allegations that something unobservable or hidden potentially has tainted the unbiased nature of the jury. Generally, juror misconduct claims involve actions that occur beyond the courtroom.[FN20] See, ****1271** e.g., ***254***State v. Brown,* supra, 235 Conn. at 526, 668 A.2d 1288 (trial judge must conduct inquiry to determine whether jurors have been exposed to prejudicial information outside of courtroom); cf. *State v. Weinberg,* supra, at 249, 575 A.2d 1003 (trial court has firsthand impression of jury during proceeding and is in best position to evaluate whether jurors have been prejudiced by courtroom spectators' outburst or conduct). Because of this fundamental difference, we conclude that it is appropriate for trial courts to have wide discretion in responding to allegations that the courtroom environment resulted in an unfair trial, which are unfettered by the mandate in *Brown.*

FN19. We note that, in *Weinberg,* we relied in part on juror misconduct cases. We, however, did not characterize a claim of prejudicial spectator behavior as juror misconduct. See generally *State v. Weinberg,* supra, 215 Conn. at 248-50, 575 A.2d 1003. We observed that a trial court is in the best position to judge what impact, if any, the spectators' actions in the courtroom had on the jury. See id., at 249, 575 A.2d 1003.

FN20. We recognize that juror misconduct potentially can occur in the courtroom and even during trial, for example, when a court officer whispers something to a juror about the case or shares information with the juror about a witness. We note, however, the inherent difference between this type of communication that may bias a juror and a claim that the courtroom environment itself is unfair.

[5][6] Second, we have concluded that certain allegations of juror misconduct may shift the burden to demonstrate prejudice away from the defendant. Allegations of juror misconduct in which the trial court is directly implicated shift the burden to the state to demonstrate that the misconduct did not harm the defendant, and away from the defendant, who ordinarily would be required to demonstrate actual prejudice. *State v. Newsome,* supra, 238 Conn. at 628, 682 A.2d 972. Additionally, we have observed that allegations that a juror or jurors considered extrinsic evidence have been deemed presumptively prejudicial for purposes of determining the type and scope of the inquiry that a trial court must conduct, and when such claims are based on specific factual allegations, they may require a full evidentiary hearing to afford the defendant an opportunity to demonstrate actual prejudice. See *State v. Rhodes,* 248 Conn. 39, 48-49 & n. 16, 726 A.2d 513 (1999). In contrast, a defendant who claims that a courtroom situation or environment rendered the jury incapable of being impartial has the burden of demonstrating either that the environment was inherently prejudicial or, in the alternative, that it caused actual prejudice. See, e.g., *Holbrook v. Flynn,* supra, 475 U.S. at 570-72, 106 S.Ct. 1340; *State v. Higgins,* supra, 265 Conn. at 76-77, 826 A.2d 1126.

[7] ***255** In the present case, the defendant claims that the jurors were improperly biased against him as a result of their observation of spectators sitting on the defendant's side of the courtroom during Ford's testimony.[FN21] The defendant's theory of prejudice is premised on the belief that the conclusions that the jurors drew

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

from the presence of those spectators improperly encouraged the jury to disregard Ford's recanted testimony that was introduced at the defendant's second trial and to credit Ford's earlier identification of the defendant as the shooter. The defendant characterizes this claim as one alleging juror misconduct involving the consideration of extrinsic evidence; however, he relies heavily on the separate line of cases, previously discussed, that do not engage in an analysis of "juror misconduct" but, ****1272** rather, analyze claims of prejudicial courtroom environment and spectator influence by looking at whether there was inherent or actual prejudice. Furthermore, we note that, during oral argument before this court, the defendant's appellate counsel conceded that "what was really" at issue was an "improper influence" rather than the jurors' "violati [on] [of] a specific" rule, for example, by going to the crime scene or by conducting an independent investigation of the case. We conclude that the defendant's claim is more properly viewed as challenging the courtroom environment due to the presence of spectators rather than alleging juror misconduct.[FN22] 256See *People v. Cornwell,* 37 Cal.4th 50, 88 n. 9, 33 Cal.Rptr.3d 1, 117 P.3d 622 (2005) ("[The] [d]efendant's attempt to characterize the issue [of improper spectator behavior] as one involving jury misconduct giving rise to a presumption of prejudice is unavailing. There is no indication of misconduct by any juror."), cert. denied, 546 U.S. 1216, 126 S.Ct. 1432, 164 L.Ed.2d 135 (2006); see also *People v. Houston,* 130 Cal.App.4th 279, 319-20, 29 Cal.Rptr.3d 818 (2005) (distinguishing law that applies to claims of spectator misconduct influencing jury from law that applies to claims of juror misconduct), review denied, No. S135593, 2005 Cal. Lexis 10344 (September 21, 2005).[FN23] We next address whether the defendant was entitled to a new trial.

FN21. We acknowledge that the defendant also raised concerns about observations that some jurors made of Ford outside of the courtroom during a court recess. The record, however, *reveals* nothing to suggest that any juror interacted with Ford, or was exposed to any extrinsic facts that could be considered extrinsic evidence or juror misconduct. Even if we assume that such interaction with a witness constitutes potential misconduct, the trial court conducted a full evidentiary hearing pursuant to *Brown* and concluded that there was no prejudice to the defendant. Any opinion of Ford was entirely speculative, and the trial court found that there was no or minimal discussion of the out-of-courtroom observations during deliberations. Nothing in the record remotely suggests that these out-of-courtroom observations resulted in a juror's closed mind. We agree with the trial court's assessment.

FN22. As we explain more fully in the text of this opinion, we view the defendant's claim to be that the presence of the spectators during Ford's testimony led the jury to conclude improperly that those spectators were associated with the defendant and were present to influence Ford's testimony. We note, however, that the defendant also calls attention to the fact that the record reveals some evidence that certain jurors commented on their observations of those spectators to other jurors during deliberations. To the extent that the defendant bases his claim that he received an unfair trial on these comments, it may be summarily rejected. In *State v. McCall,* 187 Conn. 73, 444 A.2d 896 (1982), we concluded that a juror's "[m]ere expression of opinion, as opposed to positive expression of facts [to other jurors during deliberations], does not warrant a mistrial" and does not constitute the consideration of extrinsic evidence. Id., at 81, 444 A.2d 896. In the present case, any comments that the jurors made about the spectators were based entirely on speculation and conjecture. The record reveals nothing to suggest that any juror was exposed to *actual knowledge* as to the identity of the spectators in the courtroom or their relationship to the defendant or to Ford.

FN23. Because we conclude that the nature of the defendant's claim is not one of juror misconduct but one alleging that the courtroom situation deprived him of a fair trial, we need not address the defendant's claims concerning whether it is appropriate to require a defendant to shoulder the burden of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

demonstrating prejudice in cases involving allegations of juror misconduct.

[8][9][10] The appropriate standard of review is well settled. When, as in the present case, "the impartiality of the jury was challenged by a motion for mistrial [or a new trial], the trial court's determination will be reversed ***257** only where it can fairly be said that it abused its discretion in denying the mistrial [or new trial].... In noting that a trial court has wide discretion ... [t]he general principle is that a mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial ... and the whole proceedings are vitiated." (Citations omitted; internal quotation marks omitted.) *State v. Weinberg,* supra, 215 Conn. at 249-50, 575 A.2d 1003; see also *State v. Rasmussen,* 225 Conn. 55, 86-88, 621 A.2d 728 (1993) (applying same standard to claim that juror's pending vacation plans caused jury to feel rushed to reach verdict, thereby prejudicing defendant). When a defendant seeks a new trial on the basis of juror bias, whether****1273** the result of juror misconduct or a prejudicial courtroom situation, to prevail on such a claim, he must "raise his contention of bias from the realm of speculation to the realm of fact." (Internal quotation marks omitted.) *State v. Anderson,* 255 Conn. 425, 436, 773 A.2d 287 (2001).

[11] The United States Supreme Court has addressed the issue of whether a courtroom situation is inherently or actually prejudicial only with respect to state-sponsored conduct. See *Holbrook v. Flynn,* supra, at 475 U.S. 570-72, 106 S.Ct. 1340; *Estelle v. Williams,* supra, 425 U.S. at 512-13, 96 S.Ct. 1691. In *Holbrook* and *Estelle,* the United States Supreme Court held that a courtroom situation is inherently prejudicial when there is "an unacceptable risk ... of impermissible factors coming into play" thus, violating the defendant's sixth amendment right to have his guilt determined by an impartial jury on the basis of the evidence presented. (Internal quotation marks omitted.) *Holbrook v. Flynn,* supra, at 570, 106 S.Ct. 1340; accord *Estelle v. Williams,* supra, at 505, 96 S.Ct. 1691. In *Holbrook,* the court further explained, however, that a determination that a situation in a courtroom is not inherently prejudicial does not end the analysis. If the defendant can demonstrate that the influence *actually* ***258** prejudiced the jury, then a constitutional violation has occurred. *Holbrook v. Flynn,* supra, at 572, 106 S.Ct. 1340. Federal and state courts have applied this inherent or actual prejudice analysis to claims that private actor or spectator conduct during a trial rendered the proceedings unfair. See, e.g., *Woods v. Dugger,* supra, 923 F.2d at 1457; *Norris v. Risley,* supra, 918 F.2d at 830; *State v. Atwood,* 171 Ariz. at 633, 832 P.2d 593; *Overstreet v. State,* supra, 877 N.E.2d at 158; *State v. Lord,* supra, 161 Wash.2d at 287-88, 165 P.3d 1251. We note that, recently, in *Carey v. Musladin,* supra, 549 U.S. 70, 127 S.Ct. at 653-54, the United States Supreme Court suggested that this two step inherent or actual prejudice inquiry is limited to situations that result from *state-sponsored* conduct. Thus, the court's decision in *Carey* suggests that when a defendant moves for a mistrial or a new trial because he claims *private* conduct in the courtroom deprived him of a fair trial, he may be required to show actual prejudice. See id. Regardless of whether private conduct inside the courtroom ever can be deemed inherently prejudicial to a defendant, we conclude that the defendant in the present case has not shown inherent *or* actual prejudice. See *State v. Lord,* supra, at 287, 290, 165 P.3d 1251 (noting that Supreme Court has not applied inherent or actual prejudice inquiry to spectators wearing buttons but applying test and concluding that it was not per se inherently prejudicial); see also *State v. Paige,* 375 S.C. 643, 649, 654 S.E.2d 300 (Ct.App.2007) (even if state supreme court would apply inherent or actual prejudice test to claim that courtroom spectators biased jury, defendant failed to show either).

[12] Our research reveals no Connecticut authority, nor has the defendant cited any, that suggests that the mere presence of spectators in a public courtroom, without more, is inherently prejudicial. The constitution protects not only the defendant's right to a fair trial by an impartial jury but also the right of the defendant and the public to have open courtrooms. The United States ***259** Supreme Court has recognized the importance of public courtrooms, especially in the context of criminal trials, and has observed that "[p]ublic scrutiny of a criminal tri-

al enhances the quality and safeguards the integrity of the factfinding process...." *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 606, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982). ****1274** We conclude that mere spectator attendance at a public trial is expected and cannot, without more, create an "unacceptable risk of impermissible factors coming into play." (Internal quotation marks omitted.) *Holbrook v. Flynn,* supra, 475 U.S. at 570, 106 S.Ct. 1340; cf. *State v. McClure,* 184 W.Va. 418, 427, 400 S.E.2d 853 (1990) (court stressed need to consider importance of open and public courtroom in resolving claim of improper spectator influence).

[13] In the present case, the defendant does not allege any conduct by the spectators that caused prejudice beyond their mere presence on the defendant's side of the courtroom. Cf. *Carey v. Musladin,* supra, 549 U.S. 70, 127 S.Ct. at 651 (spectators wore buttons portraying murder victim throughout defendant's trial and in view of jury); *State v. Weinberg,* supra, 215 Conn. at 247, 575 A.2d 1003 (spectators gestured, uttered words and expressed disagreement during defense counsel's closing argument). Therefore, to support a finding of inherent prejudice, the defendant must show that the presence of the spectators for only a single day of the trial and their location on the defendant's side of the courtroom created an unacceptable risk of impermissible factors impacting the jury. The defendant does not allege that the spectators misbehaved or in any way should have come to the attention of the trial court or counsel. In *Estelle v. Williams,* supra, 425 U.S. at 508-10, 96 S.Ct. 1691, the United States Supreme Court observed that a defendant must show that he was *compelled* to wear prison garments during his trial and that he objected to wearing them in order to later claim that his attire deprived him of his right to trial by an impartial ***260** jury. The court noted that the reason for the "focus [on] compulsion is simple...." Id., at 508, 96 S.Ct. 1691. Because "instances frequently arise where a defendant *prefers* to stand trial before his peers in prison garments ... it is not an uncommon defense tactic to produce the defendant in jail clothes in the hope of eliciting sympathy from the jury." (Emphasis added.) Id. Likewise, we note that, often times, it will be a defense tactic to have members of the defendant's family, coworkers or the community attend the defendant's trial to demonstrate community support or otherwise imply his innocence. We conclude that if spectator presence and location in the courtroom appear potentially prejudicial, the defendant must object and give the trial court an opportunity to cure any possible prejudice, perhaps, by ordering a rearrangement of the spectators or by instructing the jury to disregard their presence. To require otherwise would be to permit the defendant to encourage spectator attendance during the trial in the hopes of increasing the likelihood of his acquittal and to use the fact of their presence later to attempt to impeach a guilty verdict. In the present case, the defendant never objected to the spectators during the trial and cannot now claim that their presence was inherently prejudicial.

[14] We next address whether the defendant met his burden of demonstrating actual prejudice. We must begin by noting the significance of the fact that the defendant raised this claim for the first time *after* the jury returned its verdict. If a defendant raises the allegedly prejudicial condition *during* the trial, the court may be able to cure any prejudice by dismissing a juror, instructing the jury accordingly, or ordering spectators to refrain from certain conduct or to sit randomly in the courtroom gallery. See, e.g., *State v. Weinberg,* supra, 215 Conn. at 250, 575 A.2d 1003 (following spectator outburst, court instructed jury to disregard spectators and permitted defense counsel to ****1275** reargue). If a defendant first objects ***261** to the courtroom environment after the jury has returned its verdict, however, the only potential remedy available to the trial court is to grant a new trial. Additionally, we must recognize that, once the jury has returned its verdict, the defendant's claim that he has been denied a fair trial necessarily involves an attempt to impeach that verdict. Thus, if the trial court, in its discretion, determines that it is necessary to conduct some form of inquiry, it is greatly limited as to the type of inquiry that it may conduct to ascertain the impact, if any, of the courtroom environment on the jurors.

We have recognized that, "[a]lthough both the state and a criminal defendant have an interest in impartial

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

jury trials ... after a jury verdict has been accepted, other state interests emerge that favor proceedings limited in form and scope. The state has a strong interest in the finality of judgments ... and in protecting the privacy and integrity of jury deliberations, preventing juror harassment and maintaining public confidence in the jury system." (Citations omitted.) *State v. Brown,* supra, 235 Conn. at 531, 668 A.2d 1288. Additionally, when a defendant claims that the courtroom environment deprived him of his right to an impartial jury after a verdict has been reached, he implicates the well settled limitation on inquiring into the mental processes of jurors.[FN24] See Practice Book § 42-33 ("no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror nor any evidence concerning mental processes by which the verdict was determined").

FN24. We note that these limitations apply to *any* postverdict inquiry that involves questioning jurors and is not limited to responses to allegations of a prejudicial courtroom environment.

In *State v. Castonguay,* 194 Conn. 416, 436-37, 481 A.2d 56 (1984), we described the permissible scope of a trial court's postverdict juror inquiry in response to ***262** a claim that the court improperly instructed the jury that it could discuss the evidence prior to its deliberations. Although the precise nature of the claim in *Castonguay* was not the same as in the present case, we find the discussion instructive, generally, for understanding the practical limitations imposed by our prohibition on postverdict inquiry into jurors' mental processes.[FN25] In *Castonguay,* we explained that any postverdict inquiry of jurors must be narrow. Id., at 437, 481 A.2d 56. We further observed that the trial court is prohibited from "[a]ny inquiry into ... the *impact*" of the situation on the jury. (Emphasis added.) Id.

FN25. We recognize that our discussion in *Castonguay* was provided as guidance for the trial court on remand. See *State v. Castonguay,* supra, 194 Conn. at 436, 481 A.2d 56. In that case, we acknowledged that, because both parties conceded that the instruction to the jury was improper as a matter of law, the trial court had abused its discretion in not conducting a further inquiry as to the harm that may have resulted to the defendant. See id., at 434, 481 A.2d 56. We expressly rejected the defendant's claim that it reasonably could be assumed that the jurors did engage in some discussion of the evidence prior to deliberations and that he, therefore, was entitled to a new trial. Id., at 434, 436, 481 A.2d 56. We note that, because *Castonguay* involved potential prejudice *caused by the court,* the burden was on the state to demonstrate lack of prejudice, rather than on the defendant to demonstrate prejudice, as in the present case.

[15][16][17] Thus, a trial court may inquire about whether members of the jury observed the situation, whether they discussed it during deliberations, and whether they, as individuals, arrived at a fixed opinion as to the situation such that they were unable to deliberate with open and ****1276** impartial minds. See id. Beyond that, however, as we recognized in *Aillon v. State,* supra, 168 Conn. at 551, 363 A.2d 49, a court may not tread. A court may not inquire as to "[e]vidence of the *actual effect of the extraneous matter upon jurors' minds*" because "such evidence implicates their mental processes...." (Emphasis added; internal quotation marks omitted.) Id. We conclude that, once a verdict has been reached, the proper inquiry does not involve a determination of what conclusions the jurors *actually* drew but, rather, of whether the ***263** jurors were aware of or actually exposed to the courtroom situation, whether it affected their ability to be impartial and whether it was of "such a nature that it *probably* rendered the juror[s] unfair or partial."[FN26] (Emphasis added;****1277** internal quotation marks omitted.) ***264** *State v. Castonguay,* supra, 194 Conn. at 437, 481 A.2d 56. We further emphasize that "[t]he trial judge is uniquely qualified to appraise the probable effect of information on the jury, the materiality of [spectator or other courtroom influence], and its prejudicial nature...." (Citations omitted; internal quotation

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

marks omitted.) *State v. Weinberg,* supra, 215 Conn. at 250-51, 575 A.2d 1003.

FN26. We recognize that this objective inquiry into actual prejudice, which is proper for a postverdict claim, is similar in nature to the test for inherent prejudice articulated by the United States Supreme Court. See, e.g., *Holbrook v. Flynn,* supra, 475 U.S. at 570, 106 S.Ct. 1340. Several considerations counsel in favor of this parallel. First, in addressing the potential prejudice of spectator conduct, as the United States Supreme Court has noted, we are not concerned with *state-sponsored* conduct that a jury runs the risk of viewing with additional weight or authority or that is likely to prompt an inference that the state has come to a conclusion as to the defendant's guilt. Second, we must balance the importance of open and public courtrooms with the potential influence that the public's presence may have on the jury. Third, when a defendant fails to object during the trial, and the challenged spectator influence was not observable to the court and was an influence clearly in need of remediation, the trial court is deprived of an opportunity to craft a remedy-e.g., a curative instruction, admonishing the spectators, or ordering them to leave the courtroom-short of vitiating the entire proceedings. We note, however, that the two inquiries are not identical. The inherent prejudice inquiry focuses on whether the challenged situation or environment creates an "unacceptable risk...." *Holbrook v. Flynn,* supra, at 570, 106 S.Ct. 1340. Our postverdict analysis of whether the defendant has demonstrated actual prejudice looks at whether the jury was *actually* aware of the challenged situation and then assesses the *probability* of prejudice in light of the nature of the challenged courtroom scheme.

Finally, we emphasize that we do not anticipate many *postverdict* claims that challenge the potential prejudice stemming from the influence of courtroom spectators because, as our case law and that of other jurisdictions suggest, a courtroom environment that deprives a defendant of his right to a fair trial is likely to come to the court's attention and be addressed long before the jury reaches a verdict. See, e.g., *Carey v. Musladin,* supra, 549 U.S. 70, 127 S.Ct. at 651 (defense counsel raised objection *during trial* to spectators' wearing buttons portraying victim); *State v. Higgins,* supra, 265 Conn. at 73-78, 826 A.2d 1126 (trial court did not abuse discretion in denying motion for mistrial after inquiring into potential prejudice resulting from presence of uniformed officers in courtroom by questioning jurors *before deliberations,* and excusing one juror who appeared to be unable to be impartial); *State v. Weinberg,* supra, 215 Conn. at 246-47, 575 A.2d 1003 (defense counsel moved for mistrial after spectators gestured and mocked him during closing argument, prompting court to give multiple cautionary instructions and to permit defense counsel another opportunity to present argument *before deliberations*); see also *People v. Cornwell,* supra, at 37 Cal.4th at 87, 33 Cal.Rptr.3d 1, 117 P.3d 622 ("Although spectator misconduct constitutes a ground for a new trial if the misconduct is of such a character as to prejudice the defendant or influence the verdict, the trial court must be accorded broad discretion in evaluating the effect of claimed spectator misconduct.... The reason is obvious: *the court ordinarily is present in the courtroom at any time when a spectator engages in an outburst or other misconduct in the jury's presence and is in the best position to evaluate the impact of such conduct on the fairness of the trial.*" [Citation omitted; emphasis added; internal quotation marks omitted.]); *People v. Smith,* 253 Ill. App.3d 443, 453, 191 Ill.Dec. 648, 624 N.E.2d 836 (1993) (juror brought conduct of spectator to trial court's attention prior to deliberations); *State v. McClure,* supra, 184 W.Va. at 427, 400 S.E.2d 853 ("[t]here are valid reasons for the conduct of an open trial and, given the record ... the [c]ourt does not believe that the defendant can establish that the victim's conduct was of such an *overt, outrageous, and inflammatory character to warrant the conclusion that the jury was influenced by what occurred* or that the trial judge abused his discretion by refusing to declare a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

mistrial" [emphasis added]).

[18] We note that the trial court in the present case was not required to conduct a *Brown* inquiry. The trial court elected to, however, and we conclude that the court's inquiry improperly invaded the mental processes of the jurors. As we previously discussed, it was proper for the trial court to ask the jurors whether they observed the spectators on the defendant's side of the courtroom and whether they discussed their observations during deliberations. Furthermore, we conclude that it would have been proper for the trial court to inquire as to whether the jurors drew fixed opinions about the spectators that impeded their ability to approach deliberations with a fair and open mind. The trial court asked the jurors, however, whether they drew any conclusions regarding the presence of those individuals and *what those conclusions were.* See footnote 17 of this opinion. ***265** This inquiry into the specific conclusions that the jurors drew about the presence of spectators amounted to an inquiry into *the actual effect* of the spectators' presence on the jurors' minds and was improper. The trial court should have considered whether the mere presence of spectators on the defendant's side of the courtroom on the day of Ford's testimony created a situation "of such a nature that it probably rendered the juror[s] unfair or partial." (Internal quotation marks omitted.) *State v. Castonguay,* supra, 194 Conn. at 437, 481 A.2d 56. Because the trial court posed improper questions, however, we are presented with knowledge of the jurors' mental processes to which we otherwise would not have access. Therefore, we are compelled to address whether the conclusions that the jurors drew demonstrate that they were biased.

[19][20][21] Our law is well settled that it is a jury's duty to determine the credibility of witnesses and to do so by observing firsthand their conduct, demeanor and attitude. See, e.g., *State v. Morgan,* 274 Conn. 790, 800, 877 A.2d 739 (2005). Some of our older cases indicate that fact finders properly may consider not only a witness' demeanor during his testimony but also his spontaneous reactions in the courtroom, as a whole, provided these considerations are limited to assessing credibility. See *Kovacs v. Szentes,* 130 Conn. 229, 233, 33 A.2d 124 (1943); *State v. McLaughlin,* 126 Conn. 257, 264-65, 10 A.2d 758 (1939). A jury's assessment of a witness' credibility also naturally and rightly may include observations of his reaction to having to confront the defendant physically and to testify in an open and public forum. See *State v. Jarzbek,* supra, 204 Conn. at 683, 692-93, 529 A.2d 1245 (1987) (confrontation clause "finds its modern justification in the perceived role that physical confrontation plays in the truth-seeking process"), cert. denied, 484 U.S. 1061, 108 S.Ct. 1017, 98 L.Ed.2d 982 (1988). We have observed that the ***266** confrontation clause was conceived as a means of providing the accused with "an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of *compelling him to stand face to face with the jury in order* *****1278*** *that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.*" (Emphasis added; internal quotation marks omitted.) Id., at 692, 529 A.2d 1245. Therefore, we conclude that, to the extent that the jurors formed opinions as to Ford's credibility by observing *his demeanor* on the stand and *his* spontaneous reactions in the courtroom, they acted properly. Such observations and the rational inferences drawn therefrom are not prejudicial. See *State v. Porter,* 241 Conn. 57, 120, 698 A.2d 739 (1997) ("forming impressions and intuitions regarding witnesses is the quintessential jury function"), cert. denied, 523 U.S. 1058, 118 S.Ct. 1384, 140 L.Ed.2d 645 (1998).

Furthermore, with respect to the conclusions drawn by the jurors about the presence of the spectators, we conclude that the defendant has failed to "raise his contention of bias from the realm of speculation to the realm of fact." (Internal quotation marks omitted.) *State v. Anderson,* supra, 255 Conn. at 436, 773 A.2d 287. In *Higgins,* we noted that one of the reasons the presence of uniformed officers in the spectator section of the courtroom was not deemed inherently prejudicial was because of "the wider range of inferences that a juror might reasonably draw from the officers' presence." (Internal quotation marks omitted.) *State v. Higgins,* supra,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

265 Conn. at 76, 826 A.2d 1126. Furthermore, in *State v. Cubano,* 203 Conn. 81, 523 A.2d 495 (1987), we observed that it would be an abuse of discretion to refuse to dismiss a juror only when "a juror has indicated a refusal to consider testimony and displayed evidence of a closed mind concerning [the] defendant's innocence...." FN27 (Internal quotation ***267** marks omitted.) Id., at 91-92, 523 A.2d 495. We conclude that there must be a similar indication that jurors were incapable of approaching their deliberations with fair and open minds to warrant a new trial under the circumstances of the present case. In this case, as in *Higgins,* we recognize a plethora of potential inferences that the jury could have drawn. See *State v. Higgins,* supra, at 76, 826 A.2d 1126. We know from the trial court's inquiry that not all of the jurors testified to drawing any conclusions, none of the jurors drew the same inferences from the presence of the spectators, and it is clear from the jurors' testimony that the conclusions that they drew were not certain or fixed. Rather, the testimony of the two jurors that is most indicative of any possible prejudice includes statements that "it *seemed* [that the spectators] were altering [Ford's] testimony" and "*[m]aybe* that ... Ford was afraid, intimidated." (Emphasis added; internal quotation marks omitted.) Therefore, we conclude that the trial court correctly****1279** found that the defendant had failed to establish actual prejudice, and its denial of his motion for a new trial was not an abuse of discretion.

FN27. In *Cubano,* we reviewed a defendant's claim that the trial court improperly denied his motion for a mistrial when a juror informed the court that she had recognized a family friend in the spectator section of the courtroom behind the defendant and was "shocked" to learn that, based on her observations, the defendant could have been a friend of her acquaintance. *State v. Cubano,* supra, 203 Conn. at 84, 523 A.2d 495. We did not recognize this situation as one involving juror misconduct but, rather, assessed whether the defendant had established actual prejudice. Id., at 90-92, 523 A.2d 495. We concluded that the juror's statements did not suggest a fixed opinion as to the defendant's guilt, that the court found the juror could approach her deliberations with an open mind, and that the defendant had relinquished the opportunity to question the juror further to establish bias. Id., at 90-91, 523 A.2d 495. After concluding the trial court's decision was not an abuse of discretion, however, we then assumed, arguendo, that it was "juror misconduct" and recognized that, even if it was juror misconduct, it would not automatically require a new trial. Id., at 91, 523 A.2d 495.

B

The defendant claims, in the alternative, that, if we agree with the state that the influence of the presence ***268** of the spectators on the jury did not prejudice the defendant, we must remand the case to the trial court for an evidentiary hearing on whether the race of the spectators prejudiced the jury. This claim is without merit. In support of this claim, the defendant asserts that the trial court "failed to inquire sufficiently to determine if any juror inferred from the spectators' race that they were present to intimidate Ford." Specifically, the defendant claims that, "[s]ince so many jurors noted the race of the spectators, the court had a duty to determine whether the influence of racism even subtly affected any conclusion that their purpose was intimidation ... and thus that racism affected the verdict." In response, the state argues that this claim should be "summarily rejected" because "there was no evidence of racial bias before the trial court to trigger further inquiry," and the jurors who mentioned race "offered this information when asked to describe the spectators...."

In *State v. Santiago,* 245 Conn. 301, 340, 715 A.2d 1 (1998), we exercised our supervisory authority to expand the scope of the inquiry required by *Brown* for general allegations of juror misconduct when the alleged misconduct results from the racial bias of a juror or jurors. In reaching this conclusion, we noted that "[p]rejudice negates the defendant's right to be tried on the evidence in the case and not on extraneous issues.... [Moreover] ... the introduction of racial prejudice into a trial helps further embed the already too deep impression in public consciousness that there are two standards of justice in the United States, one for whites and the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

other for [minorities]." (Internal quotation marks omitted.) Id., at 335, 715 A.2d 1. We determined that, "in all future cases in which a defendant alleges that a juror has made racial epithets ... the trial court should conduct a more extensive inquiry...." Id., at 340, 715 A.2d 1.

[22] ***269** Although we concluded in part I A of this opinion that the defendant did not allege juror misconduct and that the trial court, therefore, was not required to conduct a *Brown* inquiry, the court nevertheless did conduct such an inquiry. We conclude, however, that the resulting record reveals nothing to suggest racial bias on the part of any juror that would come within the purview of *Santiago* or otherwise require the trial court to investigate further. The only mention of race by the jurors occurred when they responded directly to the trial court's question, "Can you describe the spectators?" When asked to describe the spectators, seven of the twelve jurors did note that the individuals were "African-American" or "black."[FN28] We find it significant, however, that five of these seven jurors first mentioned the gender or height of the individuals rather than their race. In *State v. Merriam,* 264 Conn. 617, 835 A.2d 895 (2003), we concluded that a trial court did not abuse its discretion when it excused a juror who had been heard to make "off-color," racially based remarks; id., at 676, 835 A.2d 895; but refused a request by the defense to poll the entire jury on the basis of the ****1280** comments of the excused juror. Id., at 676-77, 835 A.2d 895. In that case, we concluded that the "highly speculative nature of the defendant's claim and the absence of any demonstrable prejudice ... provided no appreciable support for the defendant's claim." Id., at 678, 835 A.2d 895. The defendant's argument in the present case rests on even less support than that of the defendant in *Merriam,* who was armed with *some evidence* of a juror's racial bias. Acceptance of the defendant's position in the present case would require trial courts to conduct *Santiago* inquiries on the basis of *the mere presence* of courtroom spectators who appear to be members of a minority population or certain ethnicity, ***270** without more. We acknowledge, unfortunately, that the rationale that this court relied on in *Santiago,* namely, that "[t]he intransigent nature of racial prejudice in our society is an unfortunate truth"; *State v. Santiago,* supra, 245 Conn. at 335, 715 A.2d 1; still exists and is one from which the judicial system is not exempt. We decline the defendant's invitation to apply *Santiago* to the facts of the present case, as we conclude that to do so would demand an overly cynical and unjustified assessment of the jurors.[FN29]

FN28. One juror's initial response to the question did not include a description of race, but, in response to the trial court's inquiry about race, the juror recalled that the individuals being discussed were black.

FN29. We further note that the defendant never raised the issue of racial prejudice in the trial court. Although the defendant is correct that *Santiago* places a duty on a trial court to make an inquiry into race-based allegations regardless of whether counsel requests it, "[t]he defendant's failure to make such a request ... suggests that, at the time of trial, he did not believe that ... [such an inquiry] was necessary under the circumstances." *State v. Merriam,* supra, 264 Conn. at 676 n. 48, 835 A.2d 895.

II

[23] The defendant next claims that the trial court improperly denied his motion to dismiss on the ground that the police department had failed to preserve the methods by which they interrogated Ford and, thus, violated the defendant's due process rights under the state and federal constitutions.[FN30] Further, the defendant claims that the trial court improperly denied his request for an adverse inference instruction as an alternative remedy for this alleged due process violation. In response, the state contends that the trial court properly declined to dismiss the charges because it correctly recognized the distinction between allegations that the police had failed to *preserve* exculpatory evidence and allegations that the police had failed to *create* evidence that might have been exculpatory. The state further argues that ***271** the trial court correctly declined to give the adverse inference instruction because it was not appropriate under the facts of this case, and because the court adequately instructed

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the jury that it could consider, in assessing Ford's credibility, both his prior inconsistent testimony from the defendant's first trial, as well as the failure, if it so found, of the police to record exculpatory information. We agree with the state.

FN30. The basis of the defendant's due process claim is the lack of any record documenting the interrogation methods that the police used or the content of their discussions with Ford from a preinterview with him on the night of the shooting, prior to his audiotaped statement, and another similar preinterview period on October 12, 2001.

The following additional facts and procedural history are relevant to our resolution of these claims. As we previously noted, Ford was the state's key witness and the source of the only evidence that the defendant was seen running from the direction of the crime scene on the night of October 10, 2001. Ford's testimony was complicated by the fact that his version of the **1281 events changed multiple times from his first interaction with the New Haven police on the night of the shooting to his in-court testimony at the defendant's second trial.

It is undisputed that Ford initially told the police that he knew nothing about the shooting and had seen nothing unusual after leaving the victim's company.[FN31] After hours of questioning, which the police characterized as a "preinterview," Ford identified a photograph of the defendant from an eight photograph array and told the police that he had seen the defendant running away from the crime scene and getting into a black Acura parked in Ford's driveway. In his first statement, Ford denied seeing a gun. The record reveals that, up until this point, the police made no recording of their conversation with Ford and did not take any notes during the discussion. After Ford identified the defendant,*272 however, the police asked him to make a formal statement, which he did and which the police recorded by audio tape. After recording this inculpatory statement, the police drove Ford and his mother, Sandra Streeter, home.[FN32]

FN31. Ford came to the police's attention during a canvas of the neighborhood through which they learned from LaMont Wilson that Ford had been with the victim earlier that evening and close to the time that the shot was heard. Sometime after midnight, the police went to Ford's house on Newhall Street, where his mother, Sandra Streeter, answered the door and permitted the detectives to enter the house to question Ford.

FN32. Ford's testimony at the second trial conflicted with respect to the periods of time when Streeter was not in Ford's company during the interrogation. Streeter testified that she was not aware, at the time, that Ford gave the police a recorded statement.

Ford made his second audiotaped statement to the police on October 12, 2001.[FN33] In this statement, Ford again identified a photograph of the defendant from a photographic array as depicting the man that he had seen running from the crime scene and added that he had seen the defendant carrying a black handgun. Ford's testimony at the defendant's first trial was consistent with these audiotaped statements. At that trial, when Ford was asked why he had not initially identified the defendant to the police and why he had not mentioned the gun in his first statement, he testified that he had withheld information because he was scared of the defendant and that "[he] would get out and try to kill [him]."

FN33. The record reveals inconsistent testimony with respect to whether Ford initiated contact with the police on October 12, 2001, or whether the detectives came to his house and asked for additional information. It is clear, however, that Ford did give a second audiotaped statement at the police station on October 12 and that his father and Streeter accompanied him to the station on that day.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

At the defendant's second trial, however, Ford recanted all of his prior inculpatory statements about the defendant and renewed his initial assertion that he never saw the defendant in the area of the crime scene or with a gun on October 10, 2001. Moreover, Ford testified that he felt pressured by the police when questioned and that his statements had been compelled. He testified that he felt like a suspect and was afraid that, if he did not give the police information, he would ***273** jeopardize his probationary status. Furthermore, although Ford admitted that he changed residences before the second trial because he felt afraid, while testifying, he affirmatively denied feeling scared of or threatened by the defendant. [FN34] All of Ford's prior inconsistent statements were admitted****1282** at trial not only to impeach him but also for their truth pursuant to § 8-5(1) of the Connecticut Code of Evidence.[FN35]

FN34. Ford testified at trial that, as a result of his probationary status, he had been living in a halfway house at the time of the first trial, where he felt protected and where visitors had to sign in and out.

FN35. Section 8-5 of the 2000 edition of the Connecticut Code of Evidence, which was in effect at the time of the defendant's second trial, provides in relevant part: "The following are not excluded by the hearsay rule, provided the declarant is available for cross-examination at trial:

"(1) Prior inconsistent statement. A prior inconsistent statement of a witness, provided (A) the statement is in writing, (B) the statement is signed by the witness, and (C) the witness has personal knowledge of the contents of the statement."

As the commentary to § 8-5(1) indicates, tape-recorded statements are included within the exception.

Near the end of the trial, the defendant filed a motion to dismiss on the ground that the failure of the police to preserve evidence of the interrogation of Ford prior to his first audiotaped statement violated the defendant's right to a fair trial. Defense counsel argued at the hearing on the motion to dismiss that it is "important that there be some record made of any interview of any witness in a homicide case." The trial court observed that "we usually have the situation arise when ... documents that existed at one time no longer exist either because they were destroyed or lost, whereas, here, we have a situation where the document that you are making reference to, that is, any notes regarding the 'preinterview,' never existed." Furthermore, the trial court agreed with the state's argument that "[t]he defense ... adequately was able to cross-examine Detective [Daryl] Breland and ... Ford regarding that.... [T]hey have completely explored the preinterview,***274** the violation, as they call it, of not preserving, and the jury has heard that." The trial court noted that "[t]he jury has heard testimony of both ... Ford and ... Breland.... [T]hey are going to be called on to make a determination as to really whether or not ... Ford is telling the truth now, or was ... telling the truth then, or was ... telling the truth at the first trial.... And ... that's what the jury's job is. And they have heard the testimony of everybody. It's certainly going to be open to you to argue to the jury that [it does not] have anything from ... Breland.... I think that, certainly, you are entitled to argue to the jury that there was this preinterview concerning which no record, no notes, were made." The trial court ultimately denied the motion to dismiss and denied defense counsel's request for an adverse inference instruction.[FN36] The court did, however, instruct the jury that, in assessing the witnesses' credibility, including that of Breland, it could consider the defendant's argument that Breland deliberately omitted exculpatory information from his report.[FN37]

FN36. We note that the trial court did not issue a separate memorandum of decision on its denial of this motion but, rather, signed a copy of the transcript of the hearing on the motion, which served as its memorandum. The defendant filed a motion for articulation, which was denied, and subsequently filed a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

motion for review of that denial with this court. We granted the motion for review but denied the relief requested therein.

FN37. The trial court instructed the jury in relevant part: "Now, the defendant in this case claims that Detective Breland omitted certain information from his report. If you find that to be the case, you may consider that fact in assessing the overall credibility of ... Breland's trial testimony.

* * *

"Now, in this case ... you heard testimony from [Ford, Breland and Streeter] that when ... Ford was first questioned by the police during the early morning hours of October 11, 2001, he told them that he did not witness anything connected with the shooting of [the victim]. This evidence can be interpreted by you in several ways:

"First, you may consider that evidence for the truth of what it asserts, namely, that he never did witness any activities connected to the shooting on the evening of October 10, 2001.

"And, second, you may further consider ... Ford's original information to police as evidence of a prior consistent statement.

* * *

"Thus, in assessing whether to credit ... Ford's trial testimony, you may consider the fact that the earliest information that he gave to the New Haven police department regarding this investigation, that he knew nothing about this incident, was consistent with what he testified to in court. Use of this prior consistent statement for this purpose is to rehabilitate the credibility of ... Ford in light of the state's claim that his trial testimony is fabricated."

****1283** [24][25] ***275** Generally, "[t]he decision whether to grant a motion to dismiss a criminal charge rests within the sound discretion of the trial court ... and is one that we will not disturb on appeal absent a clear abuse of that discretion."[FN38] *State v. Kelly,* 256 Conn. 23, 77, 770 A. 2d 908 (2001). We note, however, that the underlying determination as to whether the court correctly applied the law is a legal question that we review de novo. See, e.g., *Thompson v. Orcutt,* 257 Conn. 301, 308, 777 A. 2d 670 (2001).

FN38. The state noted in its brief that, in *State v. Welwood,* 258 Conn. 425, 433, 780 A. 2d 924 (2001), we applied a de novo standard of review in determining whether a trial court's dismissal of criminal charges was proper. In *Welwood,* however, the grounds for dismissal related to the court's subject matter jurisdiction and not to the defendant's claim that he did not receive a fair trial. See id. Therefore, *Welwood* is inapposite to the present case.

[26] The defendant's claim is based on the proposition that the police had a duty under the federal and state constitutions to preserve evidence of the entirety of their interrogations of Ford.[FN39] Therefore, we begin by noting that it is well established that there are two areas of "constitutionally guaranteed access to evidence" such that denying or foreclosing the defendant's access to that evidence may constitute a due process violation. (Internal quotation marks omitted.) *State v. Morales,* 232 Conn. 707, 714, 657 A.2d 585 (1995); see also ***276** *Arizona v. Youngblood,* 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). "The first situation concerns the *withholding of exculpatory evidence* by the police from the accused." (Emphasis in original.) *State v. Mor-*

*ales,* supra, at 714, 657 A.2d 585. "The second situation ... concerns the *failure of the police to preserve evidence that might be useful* to the accused." (Emphasis in original.) Id. It is this second situation that the defendant claims is applicable in the present case.

FN39. We note that evidence of these interrogations was presented at trial through the testimony of Ford, Breland and Streeter. Thus, the evidence that the defendant argues was not preserved is, as the defendant described at oral argument before this court, some form of "objective evidence" like notes or a recording of the entirety of the questioning.

Despite these constitutional concerns, it is not sufficient under the federal or state constitution for a defendant simply to demonstrate that the police or the state has failed to preserve evidence. With respect to a due process violation for failure to preserve under the federal constitution, the United States Supreme Court has held that the due process clause of the fourteenth amendment requires that "a criminal defendant ... show bad faith on the part of the police [for] failure to preserve potentially useful evidence [to] constitute a denial of due process of law." *Arizona v. Youngblood,* supra, 488 U.S. at 58, 109 S.Ct. 333. Notably, in *Youngblood,* the court observed that it had adopted a higher burden for defendants seeking to demonstrate a due process violation for failure to preserve evidence than that applicable to claims that the state has suppressed or ****1284** withheld exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (not requiring defendant to show bad faith to demonstrate due process violation). The court in *Youngblood* explained that it was unwilling "to read the 'fundamental fairness' requirement of the [d]ue [p]rocess [c]lause ... as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." (Citation omitted.) *Arizona v. Youngblood,* supra, at 58, 109 S.Ct. 333.

[27] In *Morales,* we rejected the federal bad faith requirement for claims alleging a failure to preserve in violation ***277** of our state constitution. Rather, we maintained that, "in determining whether a defendant has been afforded due process of law under the state constitution, the trial court must employ the ... balancing test [laid out in *State v. Asherman,* supra, 193 Conn. at 724], 478 A.2d 227, weighing the reasons for the unavailability of the evidence against the degree of prejudice to the accused. More specifically, the trial court must balance the totality of the circumstances surrounding the *missing* evidence, including the following factors: the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the defense and the prejudice to the defendant caused by the unavailability of the evidence." (Emphasis added; internal quotation marks omitted.) *State v. Morales,* supra, 232 Conn. at 726-27, 657 A.2d 585.[FN40]

FN40. We note that the parties' briefs included analyses of the application of the four part test from *Morales* to the facts of the present case. Because we conclude that the failure to create a record of the preinterviews with Ford did not constitute a failure to preserve exculpatory or potentially useful evidence, the four part test from *Morales* is not relevant, and we need not address these arguments.

To analyze the defendant's claims properly, we first must discuss the nature of the evidence with which the defendant is concerned. It is well settled that the state, including law enforcement, must disclose to a defendant any "statements" made by witnesses for the government. Practice Book § 40-13(a) provides in relevant part: "Upon written request by the defendant ... the prosecuting authority ... shall ... disclose ... (1) Any statements of the witnesses in the possession of the prosecuting authority or his or her agents, including state and local law enforcement officers, which statements relate to the subject matter about which each witness will testify...." Prac-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

tice Book § 40-15 defines a "statement," for purposes of Practice Book § 40-13, as "(1) A written statement made by a person and signed or otherwise adopted or approved by such ***278** person"; or "(2) A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement." The defendant does not claim that the state withheld statements made by Ford or that the state failed to preserve the audio-taped statements that it created. Rather, the defendant claims that the investigating police officers had a duty to record the entirety of their interviews with Ford and that their failure to do so constituted a failure to preserve evidence within the meaning of *Morales* and *Youngblood.* We disagree.

Practice Book §§ 40-13 and 40-15 are modeled after the federal Jencks Act, 18 U.S.C. § 3500. See *State v. Cain,* 223 Conn. 731, 749, 753, 613 A.2d 804 (1992); ****1285** *State v. Mullings,* 202 Conn. 1, 9 n. 6, 519 A.2d 58 (1987). Although we have not been called on to resolve whether Practice Book §§ 40-13 and 40-15 impose an affirmative duty on the government to create a record of witness interviews, the federal courts have addressed this exact issue under the Jencks Act. Because of the parallels between our rules of practice and the Jencks Act, we deem it appropriate to look to federal court decisions for guidance. Cf. *State v. Morales,* supra, 232 Conn. at 716, 657 A.2d 585.

Our research does not reveal a United States Supreme Court case on this issue, but many of the circuit courts of appeals have concluded that "[t]he Jencks Act does not impose an obligation on government agents to record witness interviews or to take notes during such interviews.... [T]he Act applies only to recordings, written statements, and notes that meet certain criteria, *not to items that never came into being....*" (Emphasis added.) *United States v. Houlihan,* 92 F.3d 1271, 1288 (1st Cir.1996), cert. denied, 519 U.S. 1118, 117 S.Ct. 963, 136 L.Ed.2d 849 (1997); see also, e.g., *United States v. Lopez,* 112 Fed.Appx. 774, 776 (2d Cir.2004) 279 (Jencks Act clearly contemplates only preservation of notes or recorded statements and does not impose duty on government to create them); *United States v. Arteaga,* 807 F.2d 424, 426 (5th Cir.1986) (obligation to preserve recordings once made but no general duty to create recordings); *United States v. Flomenhoft,* 714 F.2d 708, 713 (7th Cir.1983) (no duty to create Jencks Act material), cert. denied, 465 U.S. 1068, 104 S.Ct. 1420, 79 L.Ed.2d 745 (1984). We agree with the sound reasoning of the federal courts that the purpose of the Jencks Act, and, by extension, our comparable rules of practice, is to ensure the *preservation* of notes or recorded statements once they are created. Neither the federal statute nor our rules of practice contain language establishing an affirmative duty to create records, as the defendant would have us acknowledge. Furthermore, *Morales* and *Youngblood* address the "preservation" of evidence, not the collection and creation of evidence. We conclude that the duty to preserve with which *Morales* and *Youngblood* are concerned depends on the government's possession of evidence capable of being preserved. Additionally, a review of our case law generally reveals nothing-nor have the parties directed our attention to any law-that would support the existence of an affirmative duty to create evidence or to record the entirety of communications with witnesses.

[28] We also recognize that the adoption of such a rule would place a substantial burden on the administration of law enforcement and would amount to an unwarranted intrusion by the courts into the professional practices chosen by our trained law enforcement personnel. The First Circuit, in *United States v. Brimage,* 115 F.3d 73 (1st Cir.), cert. denied sub nom. *Ross v. United States,* 522 U.S. 924, 118 S.Ct. 321, 139 L.Ed.2d 248 (1997), observed that "[t]here is a need by law enforcement personnel for considerable flexibility in ***280** how they go about their investigations, and courts should not intrude into this area." Id., at 76. In *Brimage,* the government elected not to create what the court described as "independent verification evidence" in the form of a recording and, instead, elected to rely on the testimony of witnesses at trial. Id. The court concluded that this decision was within the government's discretion and that "the decision not to record a conversation is categorically different

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

from the failure by police to maintain [physical evidence]." Id. Furthermore, in *Campbell v. United States,* 296 F.2d 527 (1st Cir.1961), the First Circuit also noted that ****1286** "[t]he placing of new affirmative duties upon the [Federal Bureau of Investigation] would be entering a field for which [there is] no intimation in the legislative history, or justification in the statute." Id., at 531-32; see also id., at 531 (Jencks Act does not create affirmative duty to take notes during interview of witness). In a related analysis, we also have recognized the potential administrative and financial burdens on municipalities that would result from broadening our interpretation of "statement" in Practice Book § 40-13. See *State v. Cain,* supra, 223 Conn. at 747-48, 752-53, 613 A.2d 804 (rejecting defendant's argument that government had duty to preserve all 911 call recordings as "statements"); see also *State v. Johnson,* 67 Conn.App. 299, 311, 786 A.2d 1269 (2001) ("same intolerable financial and administrative burdens" identified in *Cain* at issue in adopting duty to maintain recordings of police radio broadcasts), cert. denied, 259 Conn. 918, 791 A.2d 566 (2002). For the foregoing reasons, we conclude that the police do not have a duty to make a record of all interviews or interrogations with witnesses.[FN41] In the ***281** present case, the defendant has not adequately alleged a failure to preserve exculpatory evidence, and, thus, *Youngblood* and *Morales* are not applicable to his claim. The trial court's denial of the defendant's motion to dismiss was not an abuse of discretion.

FN41. We agree with the First Circuit Court of Appeals in that, although we do not recognize a per se duty to create evidence of every witness interview, police and prosecutors should be wary of "adopting a 'what we don't create can't come back to haunt us' approach...." *United States v. Houlihan,* supra, 92 F.3d at 1289. In doing so, "prosecutors demean their primary mission: to see that justice is done.... By and large, the legitimate interests of law enforcement will be better served by using recording equipment and/ or taking accurate notes than by playing hide-and-seek." Id.

[29] The defendant also claims that, if the trial court properly denied his motion to dismiss, it improperly declined his request for an adverse inference instruction regarding the unpreserved evidence of the preinterviews. Because we have concluded that the police had no duty to create a record of all interviews with Ford, we also conclude that the trial court properly declined the defendant's request for an adverse inference instruction. In *Morales,* we recognized that a possible remedy for failure to preserve exculpatory evidence short of dismissing the criminal charges against a defendant would be to charge the jury that they may draw an adverse inference from the failure to preserve. *State v. Morales,* supra, 232 Conn. at 729, 730 n. 25, 657 A.2d 585. Such an instruction permits the jury to infer from the failure to preserve that the evidence, if presented at trial, would have been unfavorable to the state. Id., at 730 n. 25, 657 A.2d 585. In the present case, such an instruction would have been improper because the state did not violate the defendant's due process rights, as a matter of law. Therefore, no need for the *Morales* remedies ever arose.[FN42]

FN42. The defendant further argues that the court "exacerbated the harm of its refusal to give the adverse inference charge ... when it charged that prior inconsistent statements can be used substantively when, as in this case, a witness has made a prior statement or testified to facts 'of which he has personal knowledge.' " The result of this, the defendant claims, is that, "since [the jury] did not hear the charge requested by the defense, and since it did hear that Ford's recanted version was admitted because of his personal knowledge, the jury credited the recanted story ... and discredited the testimony at [the defendant's second] trial." We disagree. Viewing the trial court's instructions as a whole, as we are required to do in determining whether it is reasonably possible that the jury was misled; e.g., *State v. Jackson,* 283 Conn. 111, 117, 925 A.2d 1060 (2007); we find no merit to this argument. The trial court first instructed the jury on the evidence of prior *consistent* statements and specifically charged in the defendant's favor that: "[I]n assessing whether to credit ... Ford's trial testimony, you may consider the fact that the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

earliest information that he gave ... that he knew nothing about this incident, was consistent with what he testified to in court.... [I]f you believe that ... Ford's initial claim to the police, that he did not witness anything connected to this investigation, was true, then you may use that evidence to decide, because that claim is consistent with his trial testimony, whether to credit his trial testimony." Only after instructing the jury on the use of prior consistent statements did the court then charge the jury as to how it could consider Ford's prior inconsistent statements.

****1287** ***282** III

The defendant next claims that the trial court limited his cross-examination of Ford and thereby denied the defendant his rights to due process of law and to confront the witnesses against him, in violation of the state and federal constitutions. Specifically, the defendant relies on the trial court's failure to disclose Ford's psychological records and its refusal to permit defense counsel to cross-examine Ford about the nature of the felony charge that resulted in his youthful offender conviction. In response, the state contends that the defendant has waived any claim resulting from the trial court's failure to disclose Ford's psychological records and that the trial court's exclusion of evidence regarding the specific crime underlying Ford's youthful offender status was proper as a matter of law. We agree with the state and address each claim respectively.

A

[30][31][32] Prior to Ford's testimony, his juvenile court, juvenile probation and adult probation records were submitted to the court in response to the defendant's subpoena. The trial court reviewed the probation records and disclosed certain materials to counsel. The court noted, however, that Ford's juvenile probation records contained "some psychological or psychiatric-type records" dating back to April and June, 2000. The court refrained from reviewing those records because it concluded that doing so would invade another layer of ***283** privilege that required the defense to make a preliminary showing that there was some information helpful to the defendant in those records. Defense counsel agreed and called Ford to testify, without the jury present, to attempt to establish that the records should be disclosed. After questioning Ford, defense counsel acknowledged that the defendant could not meet the necessary showing to warrant disclosure of the privileged records. [FN43] The court agreed, and defense counsel withdrew the defendant's request that the court disclose the records and did not request that the court conduct an in camera inspection. In light of this withdrawal, the defendant waived this claim. [FN44]

FN43. It is well established that, prior to disclosure of or an in camera inspection of privileged psychological records, the party seeking such disclosure must demonstrate "a factual basis from which the trial court may conclude that there is a reasonable ground to believe that the records will reveal that at any pertinent time [the witness' psychological condition] affected his testimonial capacity to a sufficient degree to warrant further inquiry." (Internal quotation marks omitted.) *State v. Ortiz,* 252 Conn. 533, 557, 747 A.2d 487 (2000).

FN44. The defendant argues that, even if he failed to preserve this claim properly, it is of constitutional magnitude because it implicates his right to confront the witnesses against him and, therefore, is eligible for review under *State v. Golding,* 213 Conn. 233, 239-40, 567 A.2d 823 (1989). See footnote 45 of this opinion. We disagree. Even if we assume without deciding that the claim is of constitutional magnitude, the defendant's concession that he could not make the requisite factual showing and his subsequent withdrawal of the disclosure request constituted a waiver of any objection to the trial court's failure to disclose. Such claims are not reviewable under *Golding.* See, e.g., *State v. Fabricatore,* 281 Conn. 469, 478, 915 A.2d 872 (2007).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

****1288** B

[33] We next address the defendant's claim that the trial court improperly declined to permit defense counsel to cross-examine Ford regarding the underlying felony charge that gave rise to Ford's youthful offender status. We also conclude that this claim is groundless. Before Ford took the witness stand, defense counsel sought permission to question him about his conviction as a ***284** youthful offender. Specifically, defense counsel requested permission to mention the nature of the underlying charge, which was the felony-level crime of possession of narcotics with intent to sell. The trial court denied defense counsel's request on the ground that, although an adult convicted of the same crime might have a felony conviction that would be proper fodder for impeachment, Ford was a youthful offender, and, thus, his conviction was not a felony conviction. The court did permit defense counsel to question Ford about "the fact that [Ford was] on probation, the length of that probation, [and] the amount of time that he ha[d] hanging over his head...." This area of cross-examination, the court observed, "would give the jury a sense as to the gravity of his situation so far as it may relate to any favorable treatment by the state in return for his testimony...." In delivering its final charge to the jury, the court referenced Ford's criminal record and probation status, and instructed the jury that "our law allows the jury to consider whether ... Ford's status as being on probation at the time of his original statement and at the time of his previous and current testimony could affect his credibility or believability."

In *State v. Keiser,* 196 Conn. 122, 491 A.2d 382 (1985), we concluded that when an individual has been granted youthful offender status, it is improper for the court to treat the underlying charges as "convictions" or to reference them as "convictions" during trial. (Internal quotation marks omitted.) Id., at 128, 491 A.2d 382. In the present case, the nature of the crime underlying Ford's youthful offender adjudication did not constitute a felony conviction such that the specific crime was admissible for impeachment purposes. See Conn.Code Evid. § 6-7(a), commentary. We conclude that the trial court properly permitted defense counsel to inquire about the fact of Ford's youthful offender probation to impeach his ***285** credibility and properly excluded any inquiry into the nature of the underlying charge.

IV

Finally, the defendant seeks reversal of his conviction on the grounds that the trial court improperly charged the jury on "consciousness of guilt" and inadequately charged the jury on the concept of reasonable doubt. The state contends that the trial court's charge was proper. We agree with the state.

[34][35][36] We begin by noting that "[w]hen reviewing [a] challenged jury instruction ... we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts.... [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the ****1289** jury in such a way that injustice is not done to either party under the established rules of law.... As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury ... we will not view the instructions as improper." (Internal quotation marks omitted.) *State v. Reid,* 254 Conn. 540, 559, 757 A.2d 482 (2000). With these general principles in mind, we address each of the defendant's claims pertaining to the court's charge in turn.

A

[37][38] The defendant first claims that the trial court improperly charged on "consciousness of guilt" because such a charge "put the court's imprimatur on the state's version of events. It was not evenhanded and made no mention of the defendant's innocent conduct...." The defendant asserts that defense counsel's objection to the state's request to charge preserved this claim for appeal or, in the alternative, that the claim is reviewable ***286**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

under *State v. Golding,* 213 Conn. 233, 239-40, 567 A.2d 823 (1989). FN45 In response, the state argues that the claim is not reviewable because the basis of defense counsel's objection differs from that raised at trial and because we have declined to view claims challenging consciousness of guilt instructions as constitutional in nature. We agree with the state.

FN45. In *Golding,* we held "that a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." *State v. Golding,* supra, 213 Conn. at 239-40, 567 A.2d 823.

The following additional facts and procedural history are relevant to this claim. In view of Ralph Ford's prior testimony that he had witnessed the defendant running from the direction of the crime scene carrying a gun, the state requested that the trial court instruct the jury that consciousness of guilt may be inferred from flight. Defense counsel objected, prior to the court's charge, on the ground that the instruction necessarily presumed that the defendant "was the person seen fleeing from the crime" and, thus, was prejudicial because it improperly influenced the issue of the shooter's identification in the state's favor. The trial court noted defense counsel's objection but decided to grant the state's request, and instructed the jury accordingly. FN46 At the close of the ****1290 *287** court's charge to the jury, neither counsel excepted to the instruction given on consciousness of guilt. On appeal, the defendant does not renew his argument that the consciousness of guilt instruction improperly presumed that he was the person seen fleeing from the direction of the shooting. Rather, he claims that the charge was not "evenhanded" because it "made no mention of the defendant's innocent conduct" at the dormitory at Southern Connecticut State University shortly after the shooting had occurred.

FN46. The trial court instructed the jury in relevant part: "Now, I want to speak with you concerning a concept which we refer to as consciousness of guilt. In any criminal proceeding, in any criminal trial, it is permissible for the state to show that conduct by a defendant after the time of the alleged offense may fairly have been influenced by the criminal act, that is, the conduct would tend to show that the defendant was conscious of his own guilt, and his actions were in accordance with a guilty mind. Whatever you find proven in this regard must have been influenced by the criminal act and not by any other reason consistent with innocence.

"Now, the state claims that the defendant fled the scene of the alleged crimes. The conduct of a person leaving the scene of the crime may be considered evidence of that defendant's consciousness of guilt. The flight of the person accused of a crime is a circumstance which, when considered together with all the facts, may justify an inference of the accused's guilt. Flight, however, if shown, is not conclusive. First, you must determine if the state has proven that the defendant was present at the scene of the alleged crime, and, if so, if you then find that the state has also proven such flight by the defendant was in connection with the alleged crimes, this does not raise a presumption of guilt. It is circumstantial evidence, and you may or may not infer consciousness of guilt from it. It is to be given the weight to which you think it is entitled under the circumstances shown.

"Let me make this clear to you. It is up to you, as judges of the facts, to decide whether the state has proven that the defendant fled the scene and, if so, whether or not whatever has been proven reflects a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

consciousness of guilt by the defendant, and to consider such in your deliberations in conformity with these instructions."

We have held that the specific grounds for an objection raised at trial are relevant to the preservation of a claim on appeal. See, e.g., *State v. Pinnock,* 220 Conn. 765, 796, 601 A. 2d 521 (1992) (certain objections to "Chip Smith" charge were not preserved because bases for objections were not raised in exception taken before trial court); see also *State v. Melendez,* 74 Conn.App. 215, 229, 811 A. 2d 261 (2002) (claim that consciousness of guilt instruction, as given, was inappropriate not reviewable when counsel objected only generally to charge and not to actual instruction after it was given), cert. denied, 262 Conn. 951, 817 A. 2d 111 (2003). Accordingly, we have explained that, to afford petitioners on appeal an opportunity to raise different theories of ***288** objection would "amount to ambush of the trial court" because, "[h]ad specific objections been made at trial, the court would have had the opportunity to alter [the charge]" or otherwise respond. *State v. Pinnock,* supra, at 796, 601 A.2d 521. As we previously noted, the defendant in the present case does not renew the same theory of objection to the court's consciousness of guilt instruction on appeal that was raised at trial. Because his theory of objection has changed, we conclude that the claim is not reviewable. Furthermore, the claim also is not reviewable under *Golding* because we repeatedly have declined to consider challenges to instructions that allow for a *permissive* inference to be of constitutional magnitude. E.g., *State v. Luster,* 279 Conn. 414, 422, 902 A.2d 636 (2006); *State v. Alston,* 272 Conn. 432, 448, 862 A.2d 817 (2005).

B

The defendant's final claim is that the trial court improperly instructed the jury that reasonable doubt is a "doubt as in the serious affairs that concern you, you would heed," "such a doubt as would cause reasonable [people] to hesitate to act upon it in matters of importance," and "a real doubt, an honest doubt, a doubt that has its foundation in the evidence or lack of evidence." The defendant asserts that this instruction "diluted" the state's burden of proof. The state argues that the charge was proper. We agree with the state.

The following additional facts and procedural history pertain to this claim. In his request to charge, defense counsel objected to the use of certain language in the court's charge on reasonable doubt. Specifically, defense counsel requested that the court refrain from charging that (1) "reasonable doubt is a real doubt, an honest doubt,"[FN47] and that (2) "reasonable ****1291** doubt is a ***289** doubt that the jurors would pay heed to in the serious affairs of their own lives."[FN48] The court's ultimate charge included some of the language to which defense counsel had objected. Any such language that the court retained, however, was, as counsel acknowledged, language that previously has been upheld by this court.[FN49]

FN47. Defense counsel claimed that such language suggests that the doubt must be a substantial doubt.

FN48. Defense counsel claimed, inter alia, that "[t]his language minimizes the seriousness of the task before the jury ... and diminishes the prosecution's burden of proof."

FN49. The trial court charged the jury in relevant part: "Now, the burden to prove the defendant guilty of the crime or crimes with which he is charged is upon the state. The defendant does not have to prove his innocence. This means that the state must prove beyond a reasonable doubt each and every element necessary to constitute the crime charged.

"Whether the burden resting upon the state is sustained depends not on the number of witnesses nor on the quantity of the testimony but on the nature and quality of the testimony.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

"Please bear in mind that one person's testimony, however, is sufficient to convict if you believe it beyond a reasonable doubt and if it establishes, either standing alone or together with any other testimony, all the elements of the crime beyond a reasonable doubt.

"Now, the meaning of 'reasonable doubt' can be arrived at by emphasizing the word 'reasonable.' It is not a surmise, a guess, or a mere conjecture. It is such a doubt as in the serious affairs that concern you, you would heed, that is, such a doubt as would cause reasonable men and women to hesitate to act upon it in matters of importance. It is not hesitation springing from any feelings of pity or sympathy for the accused or any other persons who might be affected by your decision.

"It is, in other words, a real doubt, an honest doubt, a doubt that has its foundation in the evidence or lack of evidence. It is a doubt that is honestly entertained and is reasonable in light of the evidence after a fair comparison and careful examination of the entire evidence.

"Proof beyond a reasonable doubt does not mean proof beyond all doubt. The law does not require absolute certainty on the part of the jury before it returns a verdict of guilty. The law requires that, after hearing all the evidence, if there is something in the evidence that leaves in the minds of the jurors as reasonable men and women a reasonable doubt as to the guilt of the accused, the accused must be given the benefit of that doubt and acquitted. Proof beyond a reasonable doubt is proof that precludes every reasonable hypothesis except guilt and is inconsistent with any other rational conclusion.

"If you can in reason reconcile all of the facts proved with any reasonable theory consistent with the innocence of the accused, then you cannot find him guilty."

The defendant acknowledges in his brief that this court has rejected similar claims of instructional error. ***290** E.g., *State v. Ferguson,* 260 Conn. 339, 371, 796 A. 2d 1118 (2002); *State v. Velasco,* 253 Conn. 210, 249, 751 A. 2d 800 (2000). Moreover, the defendant offers no rationale or argument why we should reconsider this line of cases. See *State v. Betances,* 265 Conn. 493, 511, 828 A. 2d 1248 (2003). Therefore, we reject this claim.

The judgment is affirmed.

In this opinion the other justices concurred.

Conn.,2008.
State v. Johnson
288 Conn. 236, 951 A.2d 1257

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Attachment 6

STATE OF CONNECTICUT
SUPERIOR COURT
2013 SEP 11 PM 2 00

**STATE OF CONNECTICUT**

| | | |
|---|---|---|
| DOCKET NO. CV 09 4002796 | : | SUPERIOR COURT |
| | : | |
| CARVAUGHN JOHNSON<br>(Inmate # 284952) | :<br>: | JUDICIAL DISTRICT<br>OF TOLLAND |
| | : | |
| V. | : | |
| | : | |
| WARDEN | : | SEPTEMBER 11, 2013 |

## MEMORANDUM OF DECISION

The petitioner, Carvaughn Johnson, brings this petition for a writ of habeas corpus claiming that his state and federal constitutional rights to conflict free representation and effective assistance of counsel were violated. The petitioner seeks to have his judgment of conviction vacated, to be released from prison or other such relief as law and justice require. Based upon the credible evidence presented, the court finds for the respondent as to the conflict of interest claim, and finds for the petitioner as to the ineffective assistance of counsel claims.

On October 16, 2003, the petitioner's first criminal trial ended in a mistrial. On February 23, 2004, following a second criminal trial, the petitioner was convicted by a jury of murder in violation of General Statutes § 53a-54a (a) and carrying a pistol without a permit in violation of General Statutes § 29-35. The petitioner was represented at both trials by public defenders Scott Jones and Beth Merkin. The trial court, *Thompson, J.*, sentenced the petitioner to a total effective sentence of forty-three years' incarceration. The petitioner appealed his conviction to the Supreme Court, which affirmed it. *State* v. *Johnson*, 288 Conn. 236, 951 A.2d 1257 (2008). The Supreme Court found that the jury could reasonably have found the following facts:

The defendant shot and killed the sixteen year old victim, Markeith Strong, on the evening of October 10, 2001, in New Haven. In the weeks prior to that evening, the defendant and the victim had been at odds with each other. Approximately three weeks prior to the shooting, the victim's teenage sister, L'Kaya Ford, was sitting with the victim at the corner of Read and Shepard Streets when she observed the defendant approach. The defendant walked toward Ford and the victim, called the victim "a punk," and threatened to assault him. The victim said nothing, and the defendant walked away.

The victim next encountered the defendant in the late afternoon of September 29, 2001, and the two engaged in a dispute over a bicycle. The victim and Ralph Ford were around the intersection of Read and Shepard Streets, where the victim either was riding his bicycle or standing near it, when the defendant stopped him, declared that the bicycle belonged to him and demanded that the victim give it to him. The victim refused and informed the defendant that he had found the bicycle about one month earlier and had fixed it up. The victim told the defendant that he owned the bicycle. The defendant asked for the bicycle a second time, and, when the victim refused, the defendant said, "[d]on't make me do something to you." The defendant then punched the left side of the victim's head twice, which caused a small cut near the victim's left ear. During this encounter, the defendant may have been carrying a gun. The defendant then took the bicycle and rode away.

After this encounter, the victim, accompanied by Ralph Ford, returned home, where his family contacted the New Haven police to report the incident. After speaking with the victim, the police officers radioed a description of the defendant and notice of a possible robbery and larceny. The police did not apprehend any suspect that day. Over the next few days, the defendant approached the victim and L'Kaya Ford about the police report, asserted that he was not going to jail, apologized to the victim and told him not to press charges. Toward the end of September, the defendant also expressed concern to his friend, Tashana Milton Toles, about the possible criminal charges that he faced as a result of the bicycle incident and specifically remarked to her that he thought he might be going back to jail.

On the morning of October 10, the defendant approached L'Kaya Ford while she was waiting for a bus. The defendant, who was driving a black car that L'Kaya Ford described as an Acura or Ford Probe, pulled the car alongside of her and accused her of being a snitch. The defendant insulted her, told her he did not like snitches and that she knew what happened to "snitches in the hood." That night, the victim, L'Kaya Ford, Ralph Ford, and other friends gathered on the corner of Read and Shepard Streets to celebrate L'Kaya Ford's birthday. Some of the group, but not Ralph Ford or the victim, were drinking alcohol and smoking marijuana. Around 10 p.m., the victim and Ralph Ford departed together. The neighborhood around Read, Shepard, Huntington and Newhall Streets affords many shortcuts through the yards of houses that are occupied by neighborhood residents. On that night, however, Ralph Ford did not take his usual shortcut but parted from the

victim, who took the shortcut home. Ralph Ford then continued walking alone on Read Street and proceeded around the corner to his house on Newhall Street. Upon arriving at his house, Ralph Ford heard a gunshot coming from the backyard of the house across the street. Ralph Ford then entered his front hallway. Ralph Ford heard someone running from the yard across the street and saw the defendant run into the driveway leading to Ford's house. Ralph Ford saw the defendant carrying a semiautomatic handgun and entering a black Acura as it exited the driveway. James Baker, who lived near the crime scene, heard someone run past his window, jump the fence outside his house and head into the backyard, toward Huntington Street. Approximately five minutes later, and around 10:20 p.m., Baker heard a single gunshot coming from behind his house. LaMont Wilson, who had left the group earlier than Ralph Ford and the victim, lived on Read Street and also heard a gunshot from the direction of his backyard, sometime between 10 and 10:45 p.m. Baker called the police at approximately 10:45 p.m. to report the gunshot but did not initially identify himself because he feared retaliation from "certain individuals" for contacting the police. Joanie Joyner, a resident of Huntington Street and the victim's next-door neighbor, also heard a loud "boom" from the direction of her backyard and then, sometime after 11 p.m., saw something in her yard. At approximately 11:25 p.m., she also called the police.

The defendant contacted Toles by telephone between 9:45 and 10 p.m., told her that he was about five minutes away from her dormitory at Southern Connecticut State University, and asked if he could visit her. Toles agreed. The defendant did not arrive at the dormitory until 11 p.m., at which time he phoned Toles from the lobby, and she came down to the lobby to register him as a visitor at the security desk. The defendant was with a friend, Travis Scott. To enter the dormitory, the defendant was required to provide identification at the security desk where security personnel record the information. The sign-in sheet at Toles' dormitory indicated that she signed the defendant into her building at 11:10 p.m. Shortly after they signed in, a fire alarm required all residents and visitors to evacuate the building. The alarm occurred at approximately 11:30 p.m., and the fire department and university police responded to the scene. The defendant and Scott waited with Toles and her roommate until the university permitted students to reenter the building. They retrieved their identification from the security desk and departed. During the investigation, Detective Breland of the New Haven police department drove from Ralph Ford's house to Toles' dormitory, recorded the distance to be about three miles and noted that the trip took approximately ten minutes.

Officers Mark Taylor and Brian Pazsak of the New Haven police department were on patrol in the Newhall and Huntington Street area on the night of October 10, 2001, and received the dispatch related to Baker's and Joyner's calls. Police responded first to Baker's call and investigated the general area, but saw nothing amiss. After responding to Joyner's call around 11:35 p.m., the officers found the victim lying face down in Joyner's backyard. The victim appeared to be unconscious and bleeding from the mouth. The officers also found a spent nine millimeter shell casing nearby. New Haven fire department personnel were called

> but were unable to resuscitate the victim, who was pronounced dead at the Hospital of Saint Raphael in New Haven.
>
> Arkady Katsnelson of the chief medical examiner's office performed an autopsy of the victim on October 11, 2001, and determined that he had died of a single gunshot wound to the right side of his face. Katsnelson concluded that the bullet penetrated the victim's face and neck, and completely severed the spinal cord, instantly incapacitating the victim.

*State* v. *Johnson*, supra, 288 Conn. 239-43 (footnotes omitted.)

The petitioner initiated this petition for habeas corpus on December 18, 2008. In count one of his second amended petition, filed on August 18, 2011, the petitioner brings an actual conflict of interest claim on the grounds that the duty of loyalty owed to the petitioner by his trial counsel was divided as a result of the simultaneous representation of a potential defense witness, William Holly, by trial counsels' supervisor, public defender Thomas Ullmann.

In count two, the petitioner asserts that his trial counsel were ineffective in failing to:

a.) Adequately cross-examine Ralph Ford regarding his possession of a pistol with a description consistent with the murder weapon, and concerning his prior statement that he did not see anything on the night of the murder and that he felt pressure from the police, the victim's family and his family to implicate the petitioner in the shooting;

b.) Present Holly's testimony about Ralph Ford's possession of a pistol with a description consistent with the murder weapon;

c.) Present the testimony of Matthew Whalen, an investigator for the public defender's office, concerning Holly's statement that he saw Ralph Ford in possession of a pistol with a description consistent with the murder weapon;

d.) Present the testimony of Jermaine Diggs about Ralph Ford's prior statement that he did not see anything on the night of the shooting, and that he felt pressure from the police, the victim's family and his family to implicate the petitioner in the shooting;[1]

e.) Present the testimony of Joyce Johnson, the petitioner's sister, about the petitioner's presence at their home at the time of the shooting;

f.) Present the testimony of Taylor Allen about the petitioner's presence at his home at the time of the shooting.

A trial was held in this case on September 21 and 22, 2011, and October 13 and 20, 2011. Oral argument was held on May 14, 2013. The petitioner submitted several exhibits and called seven witnesses: Gerard Petillo, a firearm examiner and shooting incident reconstruction consultant, Holly, Joyce Johnson, the petitioner's sister, Whalen, the public defender's investigator, Attorney Thomas Farver, former counsel for Holly, Attorneys Scott Jones and Beth Merkin, the petitioner's trial attorneys, Attorney Thomas Ullmann, trial counsels' supervisor, counsel to Holly in an unrelated matter, and Taylor Allen, the mother of the petitioner's friend's child. The respondent submitted several exhibits and presented two witnesses: Mark Caporale and Daryl Breland, former New Haven police detectives involved in the murder investigation. Both parties filed post-trial briefs.[2]

---

[1] The petitioner did not present the testimony of Jermaine Diggs and did not brief this issue. It is therefore considered abandoned. See *Solek v. Commissioner of Correction*, 107 Conn. App. 473, 480, 946 A.3d 239, cert. denied, 289 Conn. 902, 957 A.2d 873 (2008) ("[t]he responsibility of a habeas court, in confronting an often voluminous trial court record, is to respond to those claims fairly advanced by the petitioner. The mere recital of those claims in a petition, without supporting oral or written argument, does not adequately place those claims before the court for its consideration").

[2] The delay in the briefing, argument and decision in this case resulted primarily from delays in the petitioner's receipt of the habeas trial transcripts.

The court finds the following facts: In the petitioner's first criminal trial, the court declared a mistrial due to a hung jury. The state presented testimony at the first criminal trial from an eyewitness, Ralph Ford, who testified consistent with his statements to the police that he heard a gunshot and saw the petitioner run out of the backyard across the street carrying a black gun in his hand. At the first trial, trial counsel presented a partial alibi defense with testimony indicating that the petitioner was at Southern Connecticut State University around 11 p.m. on the night of the murder. They did not explain the petitioner's whereabouts between 10 and 11 p.m. After the first trial resulted in a hung jury, a juror indicated that it would have been helpful for the jury to know where the petitioner was at the time of the shooting prior to 11 p.m.

At the petitioner's second criminal trial, the state's key witness, Ford, recanted his prior statement and testimony that he had seen the petitioner running from the crime scene with a gun. Instead, Ford testified that the police forced him to make those statements. Ford's prior inconsistent statements at the first criminal trial were admitted for substantive purposes in the second criminal trial pursuant to the *Whelan* doctrine.[3]

At the second trial, trial counsels' defense strategy was that the state failed to prove the petitioner's guilt beyond a reasonable doubt, that Ford was not credible, and that it was Ford that had accidentally shot the victim, who was Ford's friend. The petitioner's trial attorneys disagreed over whether to present an alibi, including the petitioner's whereabouts between 10 and 11 p.m. or a third party culpability defenses; Attorney Jones wanted to present both defenses and Attorney Merkin did not. Attorney Merkin prevailed and trial counsel did not present either defense at the second trial.

[3] *State v. Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L.Ed.2d 598 (1986).

The second jury found the petitioner guilty of the charges, and the court sentenced the petitioner to a total effective sentence of forty-three years' incarceration. After his direct appeal was denied, the petitioner brought this habeas petition.

Additional findings of fact will be made with respect to each particular claim.

DISCUSSION

**A. Conflict of Interest Claim**

In his conflict of interest claim, the petitioner alleges that trial counsel had a duty to present Holly and Inspector Whalen as witnesses to testify at the second trial as to Holly's statement that he saw Ford in possession of a pistol matching the description of the murder weapon the day of the shooting. The petitioner further claims that trial counsel failed to present this testimony because Attorney Ullmann, the head of the New Haven public defender's office and trial counsels' supervisor, represented Holly in an unrelated manner and advised Holly not to cooperate with the petitioner's defense. This he claims, constituted a conflict of interest.

"Where . . . the defendant claims that his counsel was burdened by an actual conflict of interest . . . the defendant need not establish actual prejudice. . . . Where there is an actual conflict of interest, prejudice is presumed because counsel [has] breach[ed] the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. . . . In a case of a claimed conflict of interest, therefore, in order to establish a violation of the sixth amendment the defendant has a two-pronged task. He must establish (1) that counsel actively represented conflicting interests and (2) that an actual conflict of interest adversely affected his lawyer's performance." (Internal quotation marks omitted.)

*Day* v. *Commissioner of Correction*, 118 Conn. App. 130, 136-37, 983 A.2d 869 (2009), cert. denied, 294 Conn. 930, 986 A.2d 1055 (2010).

"The [United States Court of Appeals for the Second Circuit] has honed this test further. Once a [petitioner] has established that there is an actual conflict, he must show that a lapse of representation . . . resulted from the conflict. . . . To prove a lapse of representation, a [petitioner] must demonstrate that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." (Internal quotation marks omitted.) *Santiago* v. *Commissioner of Correction*, 87 Conn. App. 568, 584, 867 A.2d 70, cert. denied, 273 Conn. 930, 873 A.2d 997 (2005).

Our Supreme Court in *Anderson* v. *Commissioner of Correction*, 308 Conn. 456, 64 A. 3d 325 (2013) recently held that an actual conflict of interest does not arise in cases where public defenders from the same office represent parties with adverse interests unless the petitioner demonstrates specific instances in which his interests were adversely affected by trial counsel's representation. In *Anderson*, the court found that the public defender's representation of the petitioner was governed by rule 1.11 of the Rules of Professional Conduct, which indicates in its commentary that "[b]ecause of the special problems raised by imputation within a government agency, subsection (d) does not impute the conflicts of a lawyer currently serving as an officer or employee of the government to another associated government officers or employees, although ordinarily it will be prudent to screen such lawyers. Rules of Professional Conduct 1.11, commentary." Id., 461. The court then found that even if the petitioner's public defender had breached the Rules of Professional Conduct, "an ethical violation, without more, is insufficient to establish a

constitutional violation." Id., 462. After noting that the habeas court had found no specific instances in which the petitioner's interests had been adversely affected by trial counsel's representation, the court determined that the petitioner failed to demonstrate an actual conflict of interest existed. Id.

At the time of the petitioner's second criminal trial, Holly had a criminal matter pending that was unrelated to the petitioner's case. Attorney Ullmann represented Holly in that matter. Inspector Whalen contacted Holly on behalf of the petitioner's defense, and Holly informed him that he had seen Ford with a handgun with a description similar to the murder weapon. Attorney Ullmann advised Holly not to testify at the petitioner's criminal trial because the same prosecutor was handling both the petitioner's case and Holly's pending case, and he did not want the prosecutor to retaliate against Holly in his case for assisting the petitioner's defense. Attorney Ullmann subsequently appointed a private attorney, Attorney Farver, to represent Holly with respect to Holly's involvement in the petitioner's case. Both Attorney Jones' and Attorney Merkin's decision not to call Holly as a witness at the petitioner's trial was not impacted by the fact that Attorney Ullmann was their supervisor, and had advised Holly not to testify.

Pursuant to the Supreme Court's decision in *Anderson* v. *Commissioner of Correction*, supra, 308 Conn. 456, an actual conflict of interest does not arise in the present case solely because trial counsel and Attorney Ullmann worked in the same government office while representing parties with adverse interests. Further, the court finds no specific instances in which the petitioner's interests have been adversely affected by trial counsels' representation. Attorney Ullmann appointed a private attorney to represent Holly with respect to the petitioner's case to avoid any potential conflict, and both Attorney Jones and

Attorney Merkin testified that Attorney Ullmann's status as their supervisor or position as to Holly's testimony did not impact their decision not to call him as a witness in the petitioner's second trial. Accordingly, the petitioner has failed to prove his actual conflict of interest claim.

**B. Ineffective Assistance of Counsel Claims**

It is well established that: "A criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of a criminal proceeding. *Strickland* v. *Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). This right arises under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. *Baez* v. *Commissioner of Correction*, 34 Conn. App. 236, 242-43, 641 A.2d 147, cert. denied, 231 Conn. 905, 906, 648 A.2d 149 (1994)." *Dennis* v. *Commissioner of Correction*, 134 Conn. App. 520, 531, 39 A.3d 799 (2012).

The standard for proving a claim of ineffective assistance of trial counsel is well established. The petitioner has the burden to establish that "(1) counsel's representation fell below an objective standard of reasonableness, *and* (2) counsel's deficient performance prejudiced the defense because there was a reasonable probability that the outcome of the proceedings would have been different had it not been for the deficient performance." (Internal quotation marks omitted; emphasis in original.) *Johnson* v. *Commissioner of Correction*, 285 Conn. 556, 575, 941 A.2d 248 (2008), citing *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "To satisfy the performance prong, a claimant must demonstrate that 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the [s]ixth [a]mendment." *Ledbetter* v.

*Commissioner of Correction*, 275 Conn. 451, 458, 880 A.2d 160 (2005), cert. denied sub nom. *Ledbetter* v. *Lantz*, 546 U.S. 1187, 126 S. Ct. 1368, 164 L. Ed. 2d 77 (2006), quoting *Strickland* v. *Washington*, supra, 466 U.S. 687.

"In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice . . . are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. . . .

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . .

"Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective

assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." (Internal quotation marks omitted.) *Bryant* v. *Commissioner of Correction*, 290 Conn. 502, 512-13, 964 A.2d 1186 (2009).

Under the second prong of the test, the prejudice prong, the petitioner must show that "counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." (Internal quotation marks omitted.) *Strickland* v. *Washington*, supra, 466 U.S. 687; *Michael T.* v. *Commissioner of Correction*, 307 Conn. 84, 101, 52 A.3d 655 (2012). "The second prong is thus satisfied if the petitioner can demonstrate that there is a reasonable probability that, but for that ineffectiveness, the outcome would have been different." (Internal quotation marks omitted.) *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 522.

*1. Failure to present evidence in support of third party culpability defense*

The petitioner claims that trial counsel were ineffective for failing to call Holly or Inspector Whalen as witnesses to support the theory that Ford accidentally committed the murder, or investigate whether Holly could identify a photograph of the pistol as being the weapon he saw Ford in possession of the day of the shooting.

"It is well established that a defendant has a right to introduce evidence that indicates that someone other than the defendant committed the crime with which the defendant has been charged. . . . The defendant must, however, present evidence that directly connects a third party to the crime. . . . It is not enough to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some

other person may have committed the crime of which the defendant is accused. . . . *State* v. *Arroyo*, 284 Conn. 597, 609, 935 A.2d 975 (2007). . . .

"The admissibility of evidence of third party culpability is governed by the rules relating to relevancy. . . . *State* v. *Ortiz*, 252 Conn. 533, 564, 747 A.2d 487 (2000). Relevant evidence is evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence . . . . *State* v. *West*, 274 Conn. 605, 625, 877 A.2d 787, cert. denied, 546 U.S. 1049, 126 S. Ct. 775, 163 L.Ed.2d 601 (2005); Conn. Code Evid. § 4-1. Accordingly, in explaining the requirement that the proffered evidence establish a direct connection to a third party, rather than raise merely a bare suspicion regarding a third party, [our Supreme Court has] stated: Such evidence is relevant, exculpatory evidence, rather than merely tenuous evidence of third party culpability [introduced by a defendant] in an attempt to divert from himself the evidence of guilt . . . . *State* v. *Smith*, 280 Conn. 285, 304, 907 A.2d 73 (2006). In other words, evidence that establishes a direct connection between a third party and the charged offense is relevant to the central question before the jury, namely, whether a reasonable doubt exists as to whether the defendant committed the offense. Evidence that would raise only a bare suspicion that a third party, rather than the defendant, committed the charged offense would not be relevant to the jury's determination. A trial court's decision, therefore, that third party culpability evidence proffered by the defendant is admissible, necessarily entails a determination that the proffered evidence is relevant to the jury's determination of whether a reasonable doubt exists as to the defendant's guilt. *State* v. *Arroyo*, supra, 284 Conn. 609-10." (Internal quotation marks omitted.) *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 514-

15. "The primary object of third party suspect testimony is not to prove the guilt of the third party but to disprove the guilt of the accused. If it raises a reasonable doubt of his guilt it accomplishes its object." (Internal quotation marks omitted.) *State* v. *Berger*, 249 Conn. 218, 235, 733 A.2d 156 (1999).

"While . . . the decision whether to call a particular witness falls into the realm of trial strategy, which is typically left to the discretion of trial counsel . . . it does not follow necessarily that, in every instance, trial counsel's strategy concerning these decisions is sound." (Citation omitted.) *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 521.

At the second criminal trial, the state established that the bullet recovered from the victim was from a Hi-Point 9 mm pistol or semi-automatic rifle. At the habeas trial, the petitioner established that Ford showed Holly a black handgun that Ford had tucked into the waistband of his pants on the afternoon of the shooting. Holly believed that a photograph of the Hi-Point 9 mm pistol used in the shooting looked like the gun that he saw Ford carrying. The murder weapon and Ford's gun both had ridges above the handle, and ridges were not a common feature on the guns that Holly had seen.

The petitioner's trial attorneys disagreed as to whether the third party culpability defense should be presented to the jury. Attorney Jones believed that Holly's testimony should have been presented and Attorney Merkin did not, even though she admitted that Holly's testimony was consistent with the defense theory of the case which was that Ford accidentally shot the victim. The court finds the third party culpability defense consisting of the facts that (1) Ford had been the last person seen with the victim, (2) was in close proximity to the location of the shooting at the time of the shooting, and (3) had been seen with a gun matching the description of the murder weapon on the day of the shooting, were

consistent with and relevant to the defense's theory that it was Ford who shot the victim by accident.

Both Attorney Jones and Attorney Merkin thought that they would not be able to present Holly's testimony without Ford first admitting that he knew Holly. Trial counsel believed, incorrectly, that they needed, and did not have, a foundation to introduce third party culpability evidence -- that is the testimony of Holly -- once Ralph Ford denied knowing Holly while on the witness stand at the petitioner's criminal trial. At the habeas trial, Attorney Merkin conceded that the presentation of Holly's testimony was not contingent upon Ford admitting that he knew Holly. The issue with presenting testimony supporting a third party culpability defense is not about presenting a foundation for admitting the evidence; it is about the petitioner's constitutional right to present a defense and relevant evidence in support of that defense.

"It is well established that [t]he federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment . . . [guarantees] the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . . When defense evidence is excluded, such exclusion may give rise to a claim of denial of the right to present a defense. . . . A defendant is, however, bound by the rules of evidence in presenting a defense. . . . Although exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights, the constitution does not require that a defendant be permitted to present every piece of evidence he wishes. . . . If the proffered evidence is not relevant, the

defendant's right to confrontation is not affected, and the evidence was properly excluded." (Internal quotation marks omitted.) *State* v. *Hedge*, 297 Conn. 621, 634, 1 A.3d 1051

As discussed, the standard for determining whether evidence of third party culpability is admissible is whether the presented evidence is relevant. Here, it was. Holly's testimony regarding Ford's possession of the same type of gun that was used to kill the victim on the day of the shooting, as well as other facts pointing to Ford as the shooter, would have established the necessary factual nexus for a third party culpability claim regardless of whether Ford knew Holly. The court finds that it is reasonably likely that the trial court would have allowed Holly's testimony.

The state argues that Attorney Farver communicated to the court on Holly's behalf that Holly would assert his Fifth Amendment privilege and refuse to testify if he was called. However, both Attorney Farver and Attorney Merkin testified that they were uncertain that Holly would have been permitted to invoke his Fifth Amendment privilege at the petitioner's criminal trial due to the fact that Holly's pending charges were unrelated to the petitioner's case. At the criminal trial, Farver reported to the court: "I met with Mr. Holly this morning and discussed with him his rights and whether to testify or not to testify if called upon to do so. I explained to him if he, well first of all let me say that he does not wish to testify. It is his position at this point as he expressed to me that he first of all, would exercise a fifth amendment right although, I candidly don't know how far the testimony or the inquiry would be going whether he has such a right. Quite honestly I know that he has pending charges of his own here in the courthouse. I don't believe those are related to this case. However, he would first of all have to assert a Fifth Amendment right. The court may choose to find that he does not have a Fifth Amendment right as to

this particular information that is being sought. If the court were to rule in that fashion and order him to testify I have explained to him that he could be found in contempt of court if he continues to decline to testify he has indicated to me that his position would still be that he would refuse to testify because he has pending charges and he does not want to testify."

The Fifth Amendment to the United States constitution affords to each individual the privilege not to be compelled to incriminate oneself. "The standard for determining whether to permit invocation of the privilege against self-incrimination is well established. To reject the invocation it must be perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] cannot possibly have [a] tendency to incriminate the witness. . . . The right to the privilege does not depend upon the likelihood of prosecution but upon the possibility of prosecution." (Citations omitted, internal quotation marks omitted.) *State* v. *Giraud*, 258 Conn. 631, 640, 783 A.2d 1019 (2001); see *State* v. *Ayuso*, 105 Conn. App. 305, 937 A.2d 1211, cert. denied, 286 Conn. 911, 944 A.2d 983 (2008) (holding fifth amendment privilege properly invoked by witness where witness could be cross-examined regarding drug dealing behavior); *State* v. *Simms*, 170 Conn. 206, 365 A.2d 821 (1976) (finding fifth amendment privilege existed where witness's testimony would indicate witness participated in sale of heroin and could be charged as a principal).

In the present case, Holly's pending charges were unrelated to the petitioner's case, and there is no indication that Holly's testimony that he saw Ford with a gun on the day of the shooting would have exposed him to any criminal prosecution in the petitioner's or any other case. Fear of potential prosecutorial retaliation in an unrelated case does not constitute sufficient grounds to invoke the Fifth Amendment, as it is a mere subjective

belief not a reality and the actual testimony would not have been incriminating in any way. Therefore, the court finds that it is not reasonably likely that Holly would have been permitted to invoke his privilege against self-incrimination in the petitioner's criminal case had trial counsel proffered him as a defense witness to support the third party culpability defense.

In *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. 502, our Supreme Court found that trial counsel's failure to pursue a third party culpability defense constituted ineffective assistance of counsel. The court first found that trial counsel's performance was deficient, finding: "The alternative theory raising a third party culpability defense was well supported by neutral, credible witnesses, whose statements were made contemporaneous to the events. . . . [T]he evidence was relevant, and could have raised a reasonable doubt in the minds of the jury as to the petitioner's guilt. . . . In the light of all the circumstances, including the dubious credibility of the state's two eyewitnesses, the decision not to present the third party culpability defense fell below an objective standard of reasonableness, and therefore, constituted deficient performance under the principles enunciated in *Strickland*." Id., 519-20. The court then found that the petitioner satisfied the performance prong of *Strickland* because the third party culpability defense, as supported by the witnesses' testimony, "likely would have permeated to some degree every aspect of the trial and raised a reasonable doubt in the minds of the jury as to the petitioner's guilt." Id., 523.

Similarly, in *Siemon* v. *Warden*, 184 Conn. 547, 555-56, 440 A.2d 210 (1981), the Supreme Court found deficiency in the failure of defense counsel to present third party culpability evidence. "Here, there was more than mere evidence of a motive on the part of a third party. There was testimony to show that a white, nude man with black hair, a beard

and without a Spanish accent was on the scene of the crime some months earlier. The description matched the composite drawing of the assailant. Moreover, the plaintiff does not have black hair and there was testimony that he did not have a beard on the date of the crime. The victim testified that her assailant did not have an accent. The habeas court found that the plaintiff had a Spanish accent. The unusual fact of encountering a nude man in the same area on three occasions was enough to connect the nude man to the crime with sufficient directness to render the evidence admissible."

In the present case, the court finds that trial counsel was deficient for not pursuing the petitioner's third party culpability defense because it was supported by a neutral, credible witness, and the evidence was relevant to the central issue of whether a reasonable doubt existed as to whether the petitioner committed the crime. As in *Bryant*, in light of all of the circumstances here, particularly the recanted testimony of Ford, whose testimony served as the state's primary evidence, and the facts pointing to Ford's culpability, trial counsels' failure to not present the third party culpability defense fell below an objective standard of reasonableness, and therefore constitutes deficient performance pursuant to *Strickland.*

The court also further finds that trial counsels' failure to present the third party culpability defense prejudiced the petitioner because there is a reasonable probability that the outcome of the proceedings would have been different had the defense been presented to the jury. As a result, the court finds that the petitioner has satisfied the prejudice prong of *Strickland* as to this claim.

*2. Failure to prepare and present alibi defense*

The petitioner claims that trial counsel were ineffective for failing to call Johnson and Allen as witnesses to testify that he was home at the time of the shooting in support of an alibi defense. The court agrees with the petitioner on this claim.

"The failure of defense counsel to call a potential defense witness does not constitute ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense. Defense counsel will be deemed ineffective only when it is shown that a defendant has informed his attorney of the existence of the witness and that the attorney, without a reasonable investigation and without adequate explanation, failed to call the witness at trial. The reasonableness of an investigation must be evaluated not through hindsight but from the perspective of the attorney when he was conducting it. . . . [T]here is a strong presumption that the trial strategy employed by a criminal defendant's counsel is reasonable and is a result of the exercise of professional judgment." (Internal quotation marks omitted.) *Burgos-Torres* v. *Commissioner of Correction*, 142 Conn. App. 627, 639, 64 A.3d 1259, cert. denied, 309 Conn. 909, 68 A.3d 663 (2013). The same standard applies to potential alibi witnesses. *Henderson* v. *Commissioner of Correction*, 129 Conn. App. 188, 194, 19 A.3rd 705, cert. denied, 303 Conn. 901, 31 A.3d 1177 (2011); *Dunkley* v. *Commissioner of Correction*, 73 Conn. App. 819, 823-24, 810 A.2d 281 (2002), cert. denied, 262 Conn. 953, 818 A.2d 780 (2003).

"[E]ven if a tenable strategic justification [exists] that would . . . [account] for [trial counsel's] failure to call . . . alibi witnesses, this would not insulate [trial counsel's] actions from a subsequent claim of ineffective assistance of counsel. The United States Supreme

Court has cautioned that '[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable.' *Roe* v. *Flores-Ortega*, 528 U.S. 470, 481, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000)." *Vasquez* v. *Commissioner of Correction*, 107 Conn. App. 181, 186-87, 944 A.2d 429 (2008).

The petitioner's trial counsel were aware of the two alibi witnesses, Allen and Johnson, who could testify as to petitioner's whereabouts between 10 and 11 p.m. on the evening of the shooting, but disagreed as to whether to an alibi defense should be presented. They were also aware that the jury in the first trial wanted to know where the petitioner was between 10 to 11 p.m. Attorney Jones wanted to present the alibi defense because he believed the witnesses were credible and their testimony explained the petitioner's whereabouts at the time of the shooting in response to the first jury's concerns as to where the petitioner was between 10 and 11 p.m. Attorney Merkin does not like alibi defenses generally and her practice was to not present an alibi defense unless it was rock solid. Attorney Jones conceded to Attorney Merkin's decision to not present the alibi defense because she was more senior to him.

At the second criminal trial, James Baker, a Read Street resident, testified that at 10:20 p.m., he heard a gunshot. Baker did not call the police until 10:45 p.m. Prior to the petitioner's first criminal trial, Attorney Merkin had inaccurate information about the time of the shooting. She mistakenly believed that the shooting occurred at 10:45 p.m. Counsels' Notice of Alibi, dated July 29, 2003, inaccurately reported that Baker called the police at 10:45 p.m., immediately after the shooting occurred. It was only when Baker testified at the petitioner's first criminal trial that counsel became aware that the correct time of the shooting was 10:20 p.m.

Johnson and Allen testified credibly at the habeas trial as to the petitioner's whereabouts on the night of the shooting. Johnson testified that the petitioner was home between 5:00 p.m. and 11 p.m. on the night of the shooting. During that time, Johnson was home with her young son and was for the most part in the living room in the front of the apartment watching television. From her position she would have been able to see if the petitioner had left the house during that time. At some point, Johnson was aware that the petitioner and his friend were at the house and ordered a pizza. The living room had two large windows facing the driveway, and any movement outside would have activated the motion sensor lights in the driveway. If the petitioner had left through the back door, Johnson would have heard him because that door screeched loudly when opened. At approximately 11 p.m., Johnson heard a horn honk outside and she saw the petitioner leave the house with Allen.

Allen, who also testified at the habeas trial credibly, called the petitioner's cell phone at 10:20 p.m., and he asked her to call his home telephone number. Allen immediately hung up and called the petitioner at home on his landline. Allen and the petitioner spoke for approximately ten to fifteen minutes on the petitioner's home phone. The petitioner then called Allen again from his home telephone around 10:40 p.m. or 10:45 p.m. Shortly thereafter, Allen drove to the petitioner's home, picked him up at approximately 10:50 p.m. or 10:55 p.m. and drove him to Southern Connecticut State University. The court finds that the testimony of Allen and Johnson would have been helpful to the petitioner's defense.

Inspector Whalen testified that he interviewed Allen and Johnson. Johnson informed him that the petitioner was at home with a friend on the night of the shooting and someone picked the petitioner up between 10:45 p.m. and 11 p.m. Allen told Inspector Whalen that she called the petitioner at his home at 10:20 p.m., and she picked the petitioner up around 10:35 p.m. or 10:40 p.m. to drive him to Southern Connecticut State University. At the time of his interview with Allen, Inspector Whalen was aware of the fact that the victim was shot at 10:20 p.m. Inspector Whalen reported the information he received from Johnson and Allen to the petitioner's trial counsel.

Trial counsel also had the partial alibi presented at the first criminal trial of Toles who testified that the petitioner arrived at the Southern Connecticut State University to visit her at approximately 11:10 p.m. on the night of the shooting.

The court finds that trial counsel was aware of the statements of Johnson and Allen, that their testimony was credible and that production of such testimony at trial would have been helpful to the defense. See *Henderson* v. *Commissioner of Correction*, 129 Conn. App. 188, 194, 19 A.3rd 705, cert. denied, 303 Conn. 901, 31 A.3d 1177 (2011); *Dunkley* v. *Commissioner of Correction*, supra, 73 Conn. App. 823-24.

In *Dunkley* v. *Commissioner of Correction*, supra, 73 Conn. App. 819, our Appellate Court held that the habeas court properly denied certification on the petitioner's ineffective assistance of counsel claim for counsel's failure to call certain witnesses because the petitioner made no showing that the witnesses' testimony would have been helpful to his defense, and the court found that the witnesses were not credible. Id., 825. Unlike in *Dunkley*, here trial counsels' decision to not call the alibi defense witnesses was not based on the witnesses' credibility. Both Attorney Jones and Attorney Merkin found

Johnson and Allen to be credible witnesses. Moreover, the court finds that their testimony would have been helpful to the petitioner's defense that he was home at the time of the shooting.

Attorney Merkin decided to not present Johnson's testimony because she was related to the petitioner, the shooting occurred in close proximity to the petitioner's home and it was unclear whether the petitioner was in her direct vision for the entire evening. Attorney Merkin did not present Allen's testimony because she believed that Allen estimated the times of the phone calls, and the petitioner's close proximity to the crime scene would have allowed him to commit the murder despite receiving and making the phone calls at the times indicated by Allen. Trial counsel acknowledged at the habeas trial, however, that they failed to investigate Johnson's ability to provide an alibi at the times when the petitioner was not in her direct view. Johnson testified that the motion sensor lights and the screeching back door would have prevented the petitioner from leaving the house without Johnson's knowledge. Moreover, the times of the phone calls between Allen and the petitioner were seen on Allen's caller identification. That evidence if presented would have established that the petitioner was at home using his landline at the time the shooting occurred. Further, while Attorney Merkin was concerned that the alibi defense would place the petitioner in close proximity to the crime scene, there was already evidence before the jury that the petitioner was at Southern Connecticut State University, close to the crime scene, shortly before 11 p.m. on the night of the victim's murder. In addition, the evidence from the three alibi witnesses covered the time period from 10 to 11 p.m., making it highly unlikely that the petitioner could have committed the shooting.

The court is particularly influenced by the fact that when trial counsel decided not to submit the petitioner's alibi, they were aware that the first jury was conflicted about the petitioner's guilt, which resulted in a hung jury and knew that the first jury wanted to know where the petitioner was at the time the shooting occurred. While each jury is different, having this information in the petitioner's second criminal trial was a significant bonus to the defense and should have been utilized in determining whether to pursue the alibi defense.

Pursuant to the foregoing, the court finds that in light of the circumstances in this case, and the credible evidence presented, it was not objectively reasonable for trial counsel to not present the alibi witnesses. The court had the opportunity to hear and to evaluate the two witnesses, and found their testimony to be credible and compelling and would have been helpful to the petitioner's case. See *Gaines* v. *Commissioner of Correction*, 125 Conn. App. 97, 112, 7 A.3d 395 (2010), aff'd, 306 Conn. 664, 51 A.3d 948 (2012) (concluding habeas court properly granted petitioner's habeas petition seeking relief for failing to present an alibi defense, noting "[i]n other cases, the habeas court is faced with the contention that counsel's decision was tactical and not the result of deficient performance [but] [i]n this case . . . the habeas court had the opportunity to hear and to evaluate the two claimed alibi witnesses, whose testimony was found to be credible and compelling.") Trial counsel also found the alibi witnesses to be credible, and that their testimony would have been helpful to the petitioner's defense. Accordingly, the court concludes that the petitioner has met his burden to prove that counsel's conduct was constitutionally deficient under the performance prong of *Strickland*.

The court also finds that trial counsels' failure to call the alibi witnesses prejudiced the petitioner because there is a reasonable probability that the outcome of the proceedings would have been different had it not been for the deficient performance. The court finds that the testimony from Johnson and Allen likely would have affected the verdict, especially in light of the weakness of the state's case and the fact that the jurors at the first criminal trial that resulted in a hung jury were interested in where the petitioner was at the time of the shooting. As a result, the court finds that the petitioner has satisfied the prejudice prong of *Strickland* as to this claim.

CONCLUSION

For all of the foregoing reasons, the petition is denied as to the conflict of interest claim, and granted as to the ineffective assistance of counsel claims. The judgment of conviction is vacated and the case is returned to the trial court in *State* v. *Johnson*, Docket No. CR 02 0003996, Judicial District of New Haven for further proceedings.

So ordered.

Cobb, J.

Cobb, J.

Copies mailed 9-11-2013 to:
Petitioner, Carvaughn Johnson (with PETCERT & APPLIC FOR WAIVER OF FEES on Appeal)
Damon A. R. Kirschbaum, Esq. (with same as above)
Adrienne Maciulewski, Esq.
Reporter of Judicial Decisions
Judge Susan Q. Cobb.

Attachment 7

166 Conn.App. 95
Appellate Court of Connecticut.

Carvaughn JOHNSON
v.
COMMISSIONER OF CORRECTION.

No. 36185
|
Argued Dec. 10, 2015.
|
Decided June 14, 2016.

**Synopsis**

**Background:** Following affirmance of his convictions for murder and carrying pistol without permit, 288 Conn. 236, 951 A.2d 1257, inmate filed petition for writ of habeas corpus. The Superior Court, Judicial District of Tolland, Cobb, J., 2013 WL 5422895, granted petition in part, and respondent appealed.

**Holdings:** The Appellate Court, Keller, J., held that:

[1] petitioner was not deprived of his right to effective assistance of counsel by counsel's failure to present third party culpability defense, and

[2] petitioner was not deprived of his right to effective assistance of counsel by his counsel's failure to present evidence in support of alibi defense.

Affirmed in part, reversed in part, and remanded.

**Procedural Posture(s):** On Appeal.

West Headnotes (8)

**[1]** **Criminal Law** Presentation of witnesses

Defendant charged with murder was not prejudiced by his counsel's failure to present witness's testimony that he saw victim's friend in possession of pistol that was consistent with pistol that discharged bullet that killed victim in days before shooting, and thus was not deprived of his right to effective assistance of counsel by counsel's failure to present third party culpability defense, even if counsel's decision was result of representation that was not reasonably competent, where witness had indicated that he would refuse to testify, it was likely that trial court would have honored witness's invocation of his Fifth Amendment privilege against self-incrimination, and it was purely speculative that any portions of witness's testimony would have been admissible as evidence of third party culpability. U.S.C.A. Const.Amends. 5, 6.

**[2]** **Self-Incrimination** Incriminating nature in general

Court may not deny witness' invocation of Fifth Amendment privilege against compelled self-incrimination unless it is perfectly clear, from careful consideration of all circumstances in case, that witness is mistaken, and that answers cannot possibly have tendency to incriminate. U.S.C.A. Const.Amend. 5.

**[3]** **Self-Incrimination** Possibility or Danger of Prosecution

To sustain witness's invocation of his Fifth Amendment privilege against self-incrimination, it need only be evident from implications of question, in setting in which it is asked, that responsive answer to question or explanation of why it cannot be answered might be dangerous because injurious disclosure could result. U.S.C.A. Const.Amend. 5.

**[4]** **Self-Incrimination** Determination of Right to Assert Privilege

In appraising witness' invocation of Fifth Amendment privilege against compelled self-incrimination, judge must be governed as much by his personal perception of case's peculiarities

as by facts actually in evidence. U.S.C.A. Const.Amend. 5.

[5] **Self-Incrimination** ⇐ Incriminating nature in general

Fifth Amendment privilege against compelled self-incrimination not only extends to answers that would in themselves support conviction, but likewise embraces those that would furnish link in chain of evidence needed to prosecute claimant for crime. U.S.C.A. Const.Amend. 5.

[6] **Criminal Law** ⇐ Presentation of witnesses

Defendant charged with murder was not deprived of his right to effective assistance of counsel by his counsel's failure to present evidence in support of alibi defense, even though counsel found alibi witnesses to be credible, where counsel determined that witnesses' testimony was not strong evidence and placed defendant near scene of crime at time that it was committed, and made strategic decision to keep jury's focus on weaknesses in state's case, instead of diverting focus to alibi defense. U.S.C.A. Const.Amend. 6.

1 Case that cites this headnote

[7] **Habeas Corpus** ⇐ Issues, proof, and variance

While habeas court has considerable discretion to frame remedy that is commensurate with scope of established constitutional violations, it does not have discretion to look beyond pleadings and trial evidence to decide claims not raised.

[8] **Criminal Law** ⇐ Presumptions and burden of proof in general

In evaluating claim of ineffective assistance of counsel, presumption that counsel has acted reasonably may be overcome by showing that there was no conceivable tactical justification for counsel's strategy. U.S.C.A. Const.Amend. 6.

2 Cases that cite this headnote

**Attorneys and Law Firms**

****1088** James A. Killen, senior assistant state's attorney, with whom, on the brief, were Michael Dearington, state's attorney, and Adrienne Maciulewski, deputy assistant state's attorney, for the appellant (respondent).

Damon A.R. Kirschbaum, with whom, on the brief, was Vishal K. Garg, Wethersfield, for the appellee (petitioner).

BEACH, KELLER and MULLINS, Js.

**Opinion**

KELLER, J.

***97** Upon a grant of certification to appeal, the respondent, the Commissioner of Correction, appeals from the judgment of the habeas court granting in part the amended petition for a writ of habeas corpus filed by the petitioner, Carvaughn Johnson. The respondent claims that the court improperly concluded that the petitioner proved a violation of his right to a fair trial because he did not receive effective assistance ***98** from his trial counsel. We agree with the respondent and, accordingly, reverse in part the judgment of the habeas court.

The following procedural history underlies this appeal. Following a jury trial, the petitioner was convicted of murder in violation of General Statutes § 53a–54a (a) and carrying a pistol without a permit in violation of General Statutes § 29–35. The petitioner was sentenced to a total ****1089** effective term of imprisonment of forty-three years. The petitioner brought a direct appeal to our Supreme Court, which affirmed the judgment of conviction. *State v. Johnson,* 288 Conn. 236, 951 A.2d 1257 (2008). Our Supreme Court set forth the facts that reasonably could have been found by the jury in returning its verdict: "The [petitioner] shot and killed the sixteen year old victim, Markeith Strong, on the evening of October 10, 2001, in New Haven. In the weeks prior to that evening, the [petitioner] and the victim had been at odds with each other.

Approximately three weeks prior to the shooting, the victim's teenage sister, L'Kaya Ford, was sitting with the victim at the corner of Read and Shepard Streets when she observed the [petitioner] approach. [1] The [petitioner] walked toward Ford and the victim, called the victim 'a punk,' and threatened to assault him. The victim said nothing, and the [petitioner] walked away.

"The victim next encountered the [petitioner] in the late afternoon of September 29, 2001, and the two engaged in a dispute over a bicycle. The victim and Ralph Ford [2] were around the intersection of Read and Shepard Streets, where the victim either was riding ***99** his bicycle or standing near it, when the [petitioner] stopped him, declared that the bicycle belonged to him and demanded that the victim give it to him. The victim refused and informed the [petitioner] that he had found the bicycle about one month earlier and had fixed it up. The victim told the [petitioner] that he owned the bicycle. The [petitioner] asked for the bicycle a second time, and, when the victim refused, the [petitioner] said, '[d]on't make me do something to you.' The [petitioner] then punched the left side of the victim's head twice, which caused a small cut near the victim's left ear. During this encounter, the [petitioner] may have been carrying a gun. [3] The [petitioner] then took the bicycle and rode away.

"After this encounter, the victim, accompanied by Ralph Ford, returned home, where his family contacted the New Haven police to report the incident. After speaking with the victim, the police officers radioed a description of the [petitioner] and notice of a possible robbery and larceny. The police did not apprehend any suspect that day. Over the next few days, the [petitioner] approached the victim and L'Kaya Ford about the police report, asserted that he was not going to jail, apologized to the victim and told him not to press charges. Toward the end of September, the [petitioner] also expressed concern to his friend, Tashana Milton Toles, about the possible criminal charges that he faced as a result of the bicycle incident and specifically remarked to her that he thought he might be going back to jail.

"On the morning of October 10, the [petitioner] approached L'Kaya Ford while she was waiting for a bus. The [petitioner], who was driving a black car that ***100** L'Kaya Ford described as an Acura or ****1090** Ford Probe, pulled the car alongside of her and accused her of being a snitch. The [petitioner] insulted her, told her he did not like snitches and that she knew what happened to 'snitches in the hood.' That night, the victim, L'Kaya Ford, Ralph Ford, and other friends gathered on the corner of Read and Shepard Streets to celebrate L'Kaya Ford's birthday. Some of the group, but not Ralph Ford or the victim, were drinking alcohol and smoking marijuana. Around 10 p.m., the victim and Ralph Ford departed together. The neighborhood around Read, Shepard, Huntington and Newhall Streets affords many shortcuts through the yards of houses that are occupied by neighborhood residents. On that night, however, Ralph Ford did not take his usual shortcut but parted from the victim, who took the shortcut home. Ralph Ford then continued walking alone on Read Street and proceeded around the corner to his house on Newhall Street. [4] Upon arriving at his house, Ralph Ford heard a gunshot coming from the backyard of the house across the street. Ralph Ford then entered his front hallway. Ralph Ford heard someone running from the yard across the street and saw the [petitioner] run into the driveway leading to Ford's house. [5] Ralph Ford saw the [petitioner] carrying a semiautomatic handgun and entering a black Acura as it exited the driveway. [6] James Baker, who lived near the crime scene, heard someone ***101** run past his window, jump the fence outside his house and head into the backyard, toward Huntington Street. Approximately five minutes later, and around 10:20 p.m., Baker heard a single gunshot coming from behind his house. LaMont Wilson, who had left the group earlier than Ralph Ford and the victim, lived on Read Street and also heard a gunshot from the direction of his backyard, sometime between 10 and 10:45 p.m. Baker called the police at approximately 10:45 p.m. to report the gunshot but did not initially identify himself because he feared retaliation from 'certain individuals' for contacting the police. Joanie Joyner, a resident of Huntington Street and the victim's next-door neighbor, also heard a loud 'boom' from the direction of her backyard and then, sometime after 11 p.m., saw something in her yard. At approximately 11:25 p.m., she also called the police.

"The [petitioner] contacted Toles by telephone between 9:45 and 10 p.m., told her that he was about five minutes away from her dormitory at Southern Connecticut State University, and asked if he could visit her. Toles agreed. The [petitioner] did not arrive at the dormitory until 11 p.m., at which time he phoned Toles from the lobby, and she came down to the lobby to register him as a visitor at the security desk. [7] The

[petitioner] was with a friend, **1091 Travis Scott.[8] To enter the dormitory, the [petitioner] was required to provide identification at the security desk where security personnel *102 record the information. The sign-in sheet at Toles' dormitory indicated that she signed the [petitioner] into her building at 11:10 p.m. Shortly after they signed in, a fire alarm required all residents and visitors to evacuate the building. The alarm occurred at approximately 11:30 p.m., and the fire department and university police responded to the scene. The [petitioner] and Scott waited with Toles and her roommate until the university permitted students to reenter the building. They retrieved their identification from the security desk and departed. During the investigation, Detective Daryl Breland of the New Haven police department drove from Ralph Ford's house to Toles' dormitory, recorded the distance to be about three miles and noted that the trip took approximately ten minutes.

"Officers Mark Taylor and Brian Pazsak of the New Haven police department were on patrol in the Newhall and Huntington Street area on the night of October 10, 2001, and received the dispatch related to Baker's and Joyner's calls. Police responded first to Baker's call and investigated the general area, but saw nothing amiss. After responding to Joyner's call around 11:35 p.m., the officers found the victim lying face down in Joyner's backyard. The victim appeared to be unconscious and bleeding from the mouth. The officers also found a spent nine millimeter shell casing nearby. New Haven fire department personnel were called but were unable to resuscitate the victim, who was pronounced dead at the Hospital of Saint Raphael in New Haven.

"Arkady Katsnelson of the chief medical examiner's office performed an autopsy of the victim on October 11, 2001, and determined that he had died of a single gunshot wound to the right side of his face.[9] Katsnelson *103 concluded that the bullet penetrated the victim's face and neck, and completely severed the spinal cord, instantly incapacitating the victim." (Footnotes in original.) Id., at 239–43, 951 A.2d 1257.

Thereafter, the petitioner brought an amended petition for a writ of habeas corpus in which he raised two types of claims. In the first count of his petition, the petitioner alleged that his right to conflict free trial counsel had been violated because his trial counsel, Scott Jones and Beth Merkin, had an actual conflict of interest that adversely affected their performance. In the second count of his petition, the petitioner alleged a violation of his right to the effective assistance of counsel. The second count involved trial counsel's failure to present (1) a third party culpability defense **1092 and (2) an alibi defense that explained his whereabouts at the time of the shooting. With respect to the third party culpability defense, the petitioner alleged that his trial counsel had "failed to adequately cross-examine Ralph Ford about ... his possession of a pistol that was consistent with the pistol that discharged the bullet that killed the victim in the days before the shooting; and ... about his prior statement that he did not see anything on the night of the shooting, and that he felt pressure from the police, the victim's family, and his family to implicate the petitioner in the shooting...." Also, the petitioner alleged that his trial counsel had "failed to present the testimony of William Holly about Ralph Ford's possession of a pistol that was consistent with the pistol that discharged the bullet that killed the victim in the days before the shooting ... [and] they failed to present the testimony of ... Matthew Whalen [an investigator for the public defender's office] *104 about William Holly's statement that he saw Ralph Ford in possession of a pistol that was consistent with the pistol that discharged the bullet that killed the victim in the days before the shooting...."[10] With respect to the alibi defense, the petitioner alleged that his trial counsel had "failed to present the testimony of Joyce Johnson, the petitioner's sister, about the petitioner's presence at their home at the time of the shooting; and ... they failed to present the testimony of Taylor Allen about the petitioner's presence at his home at the time of the shooting."

The respondent denied that the petitioner's right to conflict free representation had been violated or that he had been denied his right to effective representation at trial. Additionally, the respondent raised the special defense of procedural default with respect to both counts of the petition for a writ of habeas corpus. In a reply to the respondent's return, the petitioner denied the special defense.

Over the course of five days, the habeas court held an evidentiary hearing with respect to the claims set forth in the petition. In addition to other evidence, the petitioner presented testimony from Jones; Merkin; Holly; Thomas Farver, former counsel for Holly; Whalen; Johnson; Allen; Gerard Petillo, a firearms examiner and shooting incident reconstruction

consultant; and Thomas Ullmann, public defender for the New Haven judicial district who supervised Jones and Merkin in their trial representation of the petitioner. The respondent presented testimony from Marc Caporale and Breland, former detectives with the New Haven ***105** Police Department who had been involved in the investigation into the victim's death. At a separate, subsequent hearing, the court heard lengthy closing arguments, which was followed by the parties' submission of post-trial briefs.

In a thorough memorandum of decision, the habeas court ruled in favor of the respondent with respect to the conflict of interest claim. With respect to the ineffective assistance claim, the court determined that the petitioner's right to the effective representation of counsel had been violated by counsel's failure to present a third party culpability claim and by counsel's failure to present an alibi defense.

The habeas court set forth the following findings of fact: "In the petitioner's first criminal trial, the court declared a mistrial due to a hung jury. The state presented ****1093** testimony at the first criminal trial from an eyewitness, Ralph Ford, who testified consistent with his statements to the police that he heard a gunshot and saw the petitioner run out of the backyard across the street carrying a black gun in his hand. At the first trial, trial counsel presented a partial alibi defense with testimony indicating that the petitioner was at Southern Connecticut State University around 11 p.m. on the night of the murder. [The defense] did not explain the petitioner's whereabouts between 10 and 11 p.m. After the first trial resulted in a hung jury, a juror indicated that it would have been helpful for the jury to know where the petitioner was at the time of the shooting [which occurred] prior to 11 p.m.

"At the petitioner's second criminal trial, the state's key witness, Ford, recanted his prior statement and testimony that he had seen the petitioner running from the crime scene with a gun. Instead, Ford testified that the police forced him to make those statements. Ford's prior inconsistent statements at the first criminal trial ***106** were admitted for substantive purposes in the second criminal trial pursuant to [the doctrine set forth in *State v. Whelan,* 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S.Ct. 597, 93 L.Ed.2d 598 (1986) ].

"At the second trial, trial counsel's defense strategy was that the state failed to prove the petitioner's guilt beyond a reasonable doubt, that Ford was not credible, and that it was Ford that had accidentally shot the victim, who was Ford's friend. The petitioner's trial attorneys disagreed over whether to present an alibi, including the petitioner's whereabouts between 10 and 11 p.m. or a third party culpability defense; Attorney Jones wanted to present both defenses and Attorney Merkin did not. Attorney Merkin prevailed and trial counsel did not present either defense at the second trial." (Footnote omitted.)

In addressing the aspect of the petitioner's ineffective assistance of counsel claim that involved the failure of his trial counsel to present evidence in support of a third party culpability defense, the court set forth relevant legal principles and stated in relevant part: "The petitioner claims that trial counsel were ineffective for failing to call Holly or Inspector Whalen as witnesses to support the theory that Ford accidentally committed the murder, or investigate whether Holly could identify a photograph of the pistol as being the weapon he saw Ford in possession of [on] the day of the shooting....

"At the second criminal trial, the state established that the bullet recovered from the victim was from a Hi–Point nine millimeter pistol or semiautomatic rifle. At the habeas trial, the petitioner established that Ford showed Holly a black handgun that Ford had tucked into the waistband of his pants on the afternoon of the shooting. Holly believed that a photograph of the Hi–Point nine millimeter pistol used in the shooting looked like the gun that he saw Ford carrying. The murder ***107** weapon and Ford's gun both had ridges above the handle, and ridges were not a common feature on the guns that Holly had seen.

"The petitioner's trial attorneys disagreed as to whether the third party culpability defense should be presented to the jury. Attorney Jones believed that Holly's testimony should have been presented and Attorney Merkin did not, even though she admitted that Holly's testimony was consistent with the defense theory of the case, which was that Ford accidentally shot the victim. The court finds the third party culpability defense consisting of the facts that (1) Ford had been the last person seen with the victim, (2) was in close proximity to the location of the shooting at the time of the shooting, and (3) had been seen with a gun matching the description of the ****1094** murder weapon on the day of the shooting, were consistent

with and relevant to the defense theory that it was Ford who shot the victim by accident.

"Both Attorney Jones and Attorney Merkin thought that they would not be able to present Holly's testimony without Ford first admitting that he knew Holly. Trial counsel believed, incorrectly, that they needed, and did not have, a foundation to introduce third party culpability evidence—that is, the testimony of Holly—once Ralph Ford denied knowing Holly while on the witness stand at the petitioner's criminal trial. At the habeas trial, Attorney Merkin conceded that the presentation of Holly's testimony was not contingent upon Ford admitting that he knew Holly. The issue with presenting testimony supporting a third party culpability defense is not about presenting a foundation for admitting the evidence; it is about the petitioner's constitutional right to present a defense and relevant evidence in support of that defense....

"[T]he standard for determining whether evidence of third party culpability is admissible is whether the ***108** presented evidence is relevant. Here, it was. Holly's testimony regarding Ford's possession of the same type of gun that was used to kill the victim on the day of the shooting, as well as other facts pointing to Ford as the shooter, would have established the necessary factual nexus for a third party culpability claim regardless of whether Ford knew Holly. The court finds it reasonably likely that the trial court would have allowed Holly's testimony.

"The [respondent] argues that Attorney Farver communicated to the court on Holly's behalf that Holly would assert his fifth amendment privilege and refuse to testify if he was called [as a witness]. However, both Attorney Farver and Attorney Merkin testified that they were uncertain that Holly would have been permitted to invoke his fifth amendment privilege at the petitioner's criminal trial due to the fact that Holly's pending charges were unrelated to the petitioner's case. At the criminal trial, Farver reported to the court: 'I met with Mr. Holly this morning and discussed with him his rights and whether to testify or not to testify if called upon to do so. I explained to him, if he, well, first of all, let me say that he does not wish to testify. It is his position at this point as he expressed to me that he, first of all, would exercise a fifth amendment right, although I candidly don't know how far the testimony or the inquiry would be going [or] whether he has such a right. Quite honestly, I know that he has pending charges of his own here in the courthouse. I don't believe those are related to this case. However, he would first of all have to assert a fifth amendment right. The court may choose to find that he does not have a fifth amendment right as to this particular information that is being sought. If the court were to rule in that fashion and order him to testify, I have explained to him that he could be found in contempt of court if he continues to ***109** decline to testify; he has indicated to me that his position would still be that he would refuse to testify because he has pending charges and he does not want to testify.' ...

"In the present case, Holly's pending charges were unrelated to the petitioner's case, and there is no indication that Holly's testimony that he saw Ford with a gun on the day of the shooting would have exposed him to any criminal prosecution in the petitioner's or any other case. Fear of potential prosecutorial retaliation in an unrelated case does not constitute sufficient grounds to invoke the fifth amendment, as it is a mere subjective belief, not a reality, and the actual testimony would not have been incriminating in any way. Therefore, the court finds that it is not reasonably likely that Holly would have been permitted ****1095** to invoke his privilege against self-incrimination in the petitioner's criminal case had trial counsel proffered him as a defense witness to support the third party culpability defense....

"In the present case, the court finds that trial counsel was deficient for not pursuing the petitioner's third party culpability defense because it was supported by a neutral, credible witness, and the evidence was relevant to the central issue of whether a reasonable doubt existed as to whether the petitioner committed the crime.... [I]n light of all of the circumstances here, particularly the recanted testimony of Ford, whose testimony served as the state's primary evidence, and the facts pointing to Ford's culpability, trial counsel's failure to ... present the third party culpability defense fell below an objective standard of reasonableness, and therefore constitutes deficient performance pursuant to [*Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ].

"The court also further finds that trial counsel's failure to present the third party culpability defense prejudiced the petitioner because there is a reasonable ***110** probability that the outcome of the proceedings would have been different had the defense been presented to the jury. As a result, the court finds that the petitioner has satisfied the prejudice prong of *Strickland* as to this claim." (Citations omitted.)

In addressing the aspect of the petitioner's ineffective assistance of counsel claim that involved the failure of his trial counsel to present evidence in support of an alibi defense that involved the testimony of Johnson and Allen to explain his whereabouts at the time of the shooting, the court set forth relevant legal principles and stated in relevant part: "The petitioner claims that trial counsel were ineffective for failing to call Johnson and Allen as witnesses to testify that he was home at the time of the shooting in support of an alibi defense. The court agrees with the petitioner on this claim....

"The petitioner's trial counsel [was] aware of the two alibi witnesses, Allen and Johnson, who could testify as to [the] petitioner's whereabouts between 10 and 11 p.m. on the evening of the shooting, but disagreed as to whether an alibi defense should be presented. They were also aware that the jury in the first trial wanted to know where the petitioner was between 10 to 11 p.m. Attorney Jones wanted to present the alibi defense because he believed the witnesses were credible and their testimony explained the petitioner's whereabouts at the time of the shooting in response to the first jury's concerns as to where the petitioner was between 10 and 11 p.m. Attorney Merkin does not like alibi defenses generally, and her practice was not to present an alibi defense unless it was rock solid. Attorney Jones conceded to Attorney Merkin's decision to not present the alibi defense because she was more senior to him.

"At the second criminal trial, James Baker, a Read Street resident, testified that at 10:20 p.m., he heard a gunshot. Baker did not call the police until 10:45 p.m. ***111** Prior to the petitioner's first criminal trial, Attorney Merkin had inaccurate information about the time of the shooting. She mistakenly believed that the shooting occurred at 10:45 p.m. Counsel's notice of alibi, dated July 29, 2003, inaccurately reported that Baker called the police at 10:45 p.m., immediately after the shooting occurred. It was only when Baker testified at the petitioner's first criminal trial that counsel became aware that the correct time of the shooting was 10:20 p.m.

"Johnson and Allen testified credibly at the habeas trial as to the petitioner's whereabouts on the night of the shooting. ****1096** Johnson testified that the petitioner was home between 5 and 11 p.m. on the night of the shooting. During that time, Johnson was home with her young son and was for the most part in the living room in the front of the apartment watching television. From her position, she would have been able to see if the petitioner had left the house during that time. At some point, Johnson was aware that the petitioner and his friend were at the house and ordered a pizza. The living room had two large windows facing the driveway, and any movement outside would have activated the motion sensor lights in the driveway. If the petitioner had left through the back door, Johnson would have heard him because that door screeched loudly when [it was] opened. At approximately 11 p.m., Johnson heard a horn honk outside, and she saw the petitioner leave the house with Allen.

"Allen, who also testified at the habeas trial credibly, called the petitioner's cell phone at 10:20 p.m., and he asked her to call his home telephone number. Allen immediately hung up and called the petitioner at home on his landline. Allen and the petitioner spoke for approximately ten to fifteen minutes on the petitioner's home phone. The petitioner then called Allen again from his home telephone around 10:40 p.m. or 10:45 p.m. Shortly thereafter, Allen drove to the petitioner's home, ***112** picked him up at approximately 10:50 p.m. or 10:55 p.m. and drove him to Southern Connecticut State University. [11] The court finds that the testimony of Allen and Johnson would have been helpful to the petitioner's defense.

"Inspector Whalen testified that he interviewed Allen and Johnson. Johnson informed him that the petitioner was at home with a friend on the night of the shooting and someone picked the petitioner up between 10:45 p.m. and 11 p.m. Allen told Inspector Whalen that she called the petitioner at his home at 10:20 p.m., and she picked the petitioner up around 10:35 p.m. or 10:40 p.m. to drive him to Southern Connecticut State University. At the time of his interview with Allen, Inspector Whalen was aware of the fact that the victim was shot at 10:20 p.m. Inspector Whalen reported the information he received from Johnson and Allen to the petitioner's trial counsel.

"Trial counsel also had the partial alibi presented at the first criminal trial of Toles, who testified that the petitioner arrived at the Southern Connecticut State University to visit her at approximately 11:10 p.m. on the night of the shooting.

"The court finds that trial counsel was aware of the statements of Johnson and Allen, that their testimony was credible and

that production of such testimony at trial would have been helpful to the defense....

"[H]ere, trial counsel's decision to not call the alibi witnesses was not based on the witnesses' credibility. Both Attorney Jones and Attorney Merkin found Johnson and Allen to be credible witnesses. Moreover, the court finds that their testimony would have been helpful ***113** to the petitioner's defense that he was home at the time of the shooting.

"Attorney Merkin decided to not present Johnson's testimony because she was related to the petitioner, the shooting occurred in close proximity to the petitioner's home and it was unclear whether the petitioner was in her direct vision for the entire evening. Attorney Merkin did not present Allen's testimony because she believed that Allen estimated the times of the phone calls, and the petitioner's close proximity to the crime scene would have allowed him to commit the murder despite ****1097** receiving and making the phone calls at the times indicated by Allen. Trial counsel acknowledged at the habeas trial, however, that they failed to investigate Johnson's ability to provide an alibi at the times when the petitioner was not in her direct view. Johnson testified that the motion sensor lights and the screeching back door would have prevented the petitioner from leaving the house without Johnson's knowledge. Moreover, the times of the phone calls between Allen and the petitioner were seen on Allen's caller identification. That evidence, if presented, would have established that the petitioner was at home using his landline at the time the shooting occurred. Further, while Attorney Merkin was concerned that the alibi defense would place the petitioner in close proximity to the crime scene, there was already evidence before the jury that the petitioner was at Southern Connecticut State University, close to the crime scene, shortly before 11 p.m. on the night of the victim's murder. In addition, the evidence from the three alibi witnesses covered the time period between 10 and 11 p.m., making it highly unlikely that the petitioner could have committed the shooting.

"The court is particularly influenced by the fact that when trial counsel decided not to submit the petitioner's alibi, they were aware that the first jury was conflicted ***114** about the petitioner's guilt, which resulted in a hung jury, and [counsel] knew that the first jury wanted to know where the petitioner was at the time the shooting occurred. While each jury is different, having this information in the petitioner's second criminal trial was a significant bonus to the defense and should have been utilized in determining whether to pursue the alibi defense.

"Pursuant to the foregoing, the court finds that in light of the circumstances in this case, and the credible evidence presented, it was not objectively reasonable for trial counsel to not present the alibi witnesses. The court had the opportunity to hear and to evaluate the two witnesses, and found their testimony to be credible and compelling and [that the testimony] would have been helpful to the petitioner's case.... Trial counsel also found the alibi witnesses to be credible, and that their testimony would have been helpful to the petitioner's defense. Accordingly, the court concludes that the petitioner has met his burden to prove that counsel's conduct was constitutionally deficient under the performance prong of *Strickland.*

"The court also finds that trial counsel's failure to call the alibi witnesses prejudiced the petitioner because there is a reasonable probability that the outcome of the proceedings would have been different had it not been for the deficient performance. The court finds that the testimony from Johnson and Allen likely would have affected the verdict, especially in light of the weakness of the state's case and the fact that the jurors at the first criminal trial that resulted in a hung jury were interested in where the petitioner was at the time of the shooting. As a result, the court finds that the petitioner has satisfied the prejudice prong of *Strickland* as to this claim." (Citations omitted; footnote added.)

***115** The court denied the petition with respect to the conflict of interest claim, and granted the petition with respect to the ineffective assistance of counsel claim. The court vacated the judgment of conviction and returned the case to the trial court for further proceedings. Later, the court granted the respondent's petition for certification to appeal, and this appeal by the respondent followed.

The habeas court's memorandum of decision reflects that it considered and analyzed separately each of the two grounds alleged in the petitioner's claim in which ****1098** he alleged that he had received ineffective assistance from his trial counsel. The court determined that the petitioner had satisfied his burden under *Strickland* with respect to his claim that counsel had failed to present certain evidence in support of a third party culpability defense and with respect to his

claim that counsel had failed to present an alibi defense that explained his whereabouts at the time of the shooting. Because the habeas court's judgment rests upon either of these grounds, it is the respondent's burden on appeal to demonstrate that the habeas court erroneously ruled as it did with respect to both grounds.

"When reviewing the decision of a habeas court, the facts found by the habeas court may not be disturbed unless the findings were clearly erroneous.... The issue, however, of [w]hether the representation [that] a defendant received at trial was constitutionally inadequate is a mixed question of law and fact.... As such, that question requires plenary review by [a reviewing court] unfettered by the clearly erroneous standard....

"A criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings.... This right arises under the sixth and fourteenth amendments to ***116** the United States constitution and article first, § 8, of the Connecticut constitution.... It is axiomatic that the right to counsel is the right to the effective assistance of counsel....

"As enunciated in *Strickland v. Washington,* [supra, 466 U.S. at 687, 104 S.Ct. 2052] ... [a] claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong ... the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law.... To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.... A court can find against a petitioner, with respect to a claim of ineffective assistance of counsel, on either the performance prong or the prejudice prong...." (Citations omitted; internal quotation marks omitted.) *Michael T. v. Commissioner of Correction,* 319 Conn. 623, 631–32, 126 A.3d 558 (2015).

## I

**[1]** First, we consider the respondent's claim that the habeas court erroneously concluded that the petitioner was deprived of his right to effective assistance of counsel by his counsel's failure to present testimony from Holly in support of a third party culpability defense. As discussed previously in this opinion, this evidence is centered on the testimony of Holly. We agree with the respondent.

The respondent challenges the court's decision with respect to the third party culpability defense on several grounds. With regard to the court's evaluation of the performance of trial counsel, the respondent argues that it did not afford adequate consideration to the ***117** evidence that defense counsel's failure to present Holly's testimony in support of the third party culpability defense was the result of reasonable trial strategy rather than deficient representation. In this respect, the respondent focuses on evidence presented at the habeas trial that supported a finding that defense counsel, in crafting a sound trial strategy, did not want to divert the jury's attention from the weaknesses in the state's case, particularly, the significance of Ford's recantation. With respect to the prejudice prong of *Strickland,* the ****1099** respondent argues: "[I]n evaluating prejudice from the defense team's decision not to call Holly to the [witness] stand at the criminal trial, the habeas court erred in concluding that the petitioner met his burden of establishing that Holly's testimony carried no possibility of self-incrimination and that, therefore, Holly's fifth amendment privilege would not have been an impediment to his testimony." The respondent argues that the court erroneously concluded that there was a reasonable likelihood that the outcome of the trial would have been different if the evidence at issue had been presented by the defense.

Assuming but not deciding that defense counsel's failure to attempt to present evidence from Holly in support of a third party culpability defense was the result of representation that was not reasonably competent, we nonetheless conclude, under the prejudice prong of *Strickland,* that the petitioner failed to demonstrate that there is a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different.

We turn to the findings of the habeas court as well as some of the pertinent evidence that was not in dispute. The habeas court found, and the record reflects, that when the issue of Holly's testimony was first raised at the time of the criminal trial at a posttrial hearing on the petitioner's motion for a new trial, Holly's counsel, ***118** Farver, communicated to

the court that Holly did not wish to testify, that he intended to exercise his fifth amendment right to remain silent and that, even if the court ordered him to testify, he would decline to do so. Farver communicated to the court that his client's position was based upon the fact that he had criminal charges pending against him.

At the habeas trial, Holly testified that at the time of the petitioner's trial, he was incarcerated in Connecticut and had a case pending in the New Haven courthouse, in which proceeding he was represented by Ullmann. Holly testified that with respect to his testifying at the petitioner's criminal trial, Ullmann and Farver had advised him to invoke his right to remain silent. Holly testified that, later, Farver was appointed to represent him in connection with his potential involvement in the petitioner's trial. Holly testified that he communicated to Ullmann and Farver that he would not testify. He testified, however, that, if he had been ordered to do so, he would have testified consistent with the testimony that he provided before the habeas court in the present case because, if a court determined that he could not invoke his right to remain silent, he would not have had a choice in the matter. Holly explained that one of the reasons why he did not want to testify was because he feared that the prosecutor, who was involved in the petitioner's trial and in a then pending investigation of Holly for the crime of murder, would retaliate against him. He stated, however, that he did not believe that his testimony in the petitioner's case would incriminate him.

At the habeas trial, Ullmann testified that he represented Holly between 2002 and 2005, the time period which encompassed the petitioner's second criminal trial. He testified that he represented Holly with respect to a variety of charges that, following a plea negotiation, resulted in a conviction of robbery in the first degree ***119** and assault on a peace officer. Also, he testified that, at times relevant, he was representing Holly with respect to "some other [legal] issues," as well. Ullmann testified that he became aware that Holly had information that might be relevant to the petitioner's case and that members of the petitioner's defense team wanted to speak with Holly, at which time Ullmann informed Whalen that he was representing Holly in relation to a pending murder investigation ****1100** and that he had advised Holly not to speak with him. Ullmann testified that he understood the information to involve Holly's observation of a potential killer who was armed.

Ullmann testified that, later, he arranged for Farver to represent Holly solely with respect to Holly's potential involvement in the petitioner's trial, but that he continued to represent Holly with respect to his pending charges as well as the murder investigation. With respect to his concern about Holly's cooperation with the petitioner's defense and the importance of providing the petitioner with representation concerning that issue, he stated: "I'm obviously representing somebody who's facing serious criminal charges, who's being investigated for something else, and I'm [given] this information about [the desire of the petitioner's trial attorneys] to put him on the [witness] stand in relation to some gun. I'm not letting them talk to him." Ullmann continued, "there's the potential that William Holly could incriminate himself or hurt his situation in the pending case that ... I was representing him on." Additionally, Ullmann explained that he was motivated by a concern that Holly's cooperation with the defense or his testimony in the petitioner's case could subject him to retaliation by the prosecutor with respect to his "very serious" pending criminal matters.

At the habeas trial, Farver testified that, during conversations with Holly concerning his involvement in the petitioner's trial, Holly unequivocally stated to him that ***120** he intended to invoke his right to remain silent and that, even if he were ordered to testify, he would decline to do so. Farver testified that he was unsure whether, at the time that he represented Holly, he was awaiting sentencing on charges to which he had pleaded guilty. Moreover, he believed that, at that time, Holly was being investigated for murder. Farver recalled that this murder investigation was related to the fact that Holly "had given a statement possibly [as a] primary or aiding and abetting a conspiracy that he was in a car, not the shooter, but he was busted with the gun." Farver testified that he did not form an opinion with respect to whether Holly could avail himself of his fifth amendment privilege in the petitioner's case.

In its findings, the habeas court did not discuss the significance of Farver's testimony, which was consistent with his representations at the time of the petitioner's second criminal trial, that Holly had represented to him that he would not testify even if he was ordered to do so. The habeas court, implicitly accepted as true Holly's testimony that he would have testified at the petitioner's trial if the court had rejected his invocation of his fifth amendment privilege, and resolved the fifth amendment issue by concluding that "there is no

indication that Holly's testimony that he saw Ford with a gun on the day of the shooting would have exposed him to any criminal prosecution in the petitioner's [case] or any other case." The court also reasoned that Holly's fear of prosecutorial retaliation was not a valid ground upon which to invoke the fifth amendment privilege.

[2] [3] [4] The evidence amply supported the court's finding that Holly had manifested his intention of invoking his fifth amendment right to remain silent if he was called as a witness at the petitioner's trial. The relevant legal principles related to the invocation of that right are well settled in our case law. "A court may not deny a witness' invocation of the fifth amendment privilege ***121** against compelled self-incrimination unless it is *perfectly clear,* from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot* ****1101** *possibly* have [a] tendency to incriminate.... To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.... In appraising a fifth amendment claim by a witness, a judge must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence....

[5] "[T]he right to one's privilege against prosecution that could result from the testimony sought does not depend upon the likelihood of prosecution but upon the *possibility* of prosecution.... [T]he trial court [is] obligated to assess only whether a possibility of future prosecution [exists], or could arise, by virtue of the proffered testimony in light of existing law." (Citations omitted; emphasis in original; internal quotation marks omitted.) *In re Keijam T.,* 226 Conn. 497, 503–504, 628 A.2d 562 (1993). "The privilege afforded [by the fifth amendment] not only extends to answers that would in themselves support a conviction ... but likewise embraces those which would furnish *a link in the chain of evidence needed to prosecute* the claimant for a ... crime." (Emphasis added.) *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951); see also *Malloy v. Hogan,* 378 U.S. 1, 12–13, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *State v. Valeriano,* 191 Conn. 659, 666, 468 A.2d 936 (1983), cert. denied, 466 U.S. 974, 104 S.Ct. 2351, 80 L.Ed.2d 824 (1984); *State v. Auyso,* 105 Conn.App. 305, 314, 937 A.2d 1211, cert. denied, 286 Conn. 911, 944 A.2d 983 (2008).

***122** The respondent argues, and we agree, that the record before the habeas court precluded a careful consideration of all of the circumstances surrounding Holly's invocation of his fifth amendment privilege. Under *Strickland,* it was the petitioner's burden to prove that he was prejudiced by the deficient performance of his trial counsel. In the context of the present claim, that burden necessarily entailed demonstrating that Holly would have been unable to assert a fifth amendment privilege with respect to questions concerning his observations of Ford on the day of the shooting. Yet, the record presented before the habeas court does not reveal many details surrounding the serious legal matters that he faced at the time of the petitioner's second criminal trial. These matters included the robbery in the first degree and assault of a police officer charges to which he had pleaded guilty, as well as a pending investigation for murder.

Moreover, despite the scant information available to the trial court, the undisputed evidence concerning Holly's circumstances that *was* presented to the habeas court supported a conclusion that Holly's testimony about his interaction with Ford possibly incriminated Holly in criminal activity, regardless of whether such criminal activity was related directly to the petitioner's case or the incident at issue therein. As set forth previously, there was evidence that, at times relevant, Holly was the subject of an investigation for a murder that involved the use of a gun. The evidence suggested that he had pleaded guilty to charges of robbery in the first degree and assault of a police officer, but that the proceedings related to such charges had not concluded.

At the habeas trial, the petitioner relied on Holly's testimony to demonstrate that he was prejudiced by trial counsel's failure to present such testimony at his criminal trial. In his posttrial brief before the habeas court, the petitioner drew the attention of the habeas ***123** court to Holly's interaction with Ford, his observations of the gun in Ford's possession, and his attempt ****1102** to gain possession of the gun. Following his direct examination at the habeas trial, the petitioner's counsel asked Holly: "If you had testified, been brought to court and been ordered by the court to testify, would you have testified in the same manner then as you did today?" Holly replied, "Yes."

A review of Holly's testimony at the habeas trial readily reveals that he was asked questions that not merely called for him to describe his observations of and interaction with

Ford on the day of the victim's murder, but that called for him to explain his familiarity with guns. Holly's examination at the habeas trial reveals the type of inquiry that he would have been subjected to at the petitioner's criminal trial and, thus, sheds light on the issue before us. At the habeas trial, Holly testified in relevant part that he observed Ford and the victim on the day of the shooting, when he was either sixteen or seventeen years of age. During his direct examination, the following colloquy occurred between Holly and the petitioner's counsel:

"Q. ... Did [Ford] show you a weapon?

"A. Yes. I tried to take it from him.

"Q. What kind of a weapon did he show you?

"A. It was, like, an all black .380 or a nine millimeter.

"Q. Was it a pistol?

"A. Yes.

"Q. Was it a handgun?

"A. A handgun.

"Q. And you said it was either a nine millimeter or a .380?

***124** "A. Yes.

"Q. And then what did you do when they showed or when Ralph Ford showed it to you?

"A. I asked to see it, for them to put it in my hand. And then he took off running."

Thereafter, the petitioner's counsel showed Holly a photograph of a gun and asked him to compare it with the one that he had observed in Ford's possession. Holly testified that the gun depicted in the photograph was similar to the one that Ford had showed him that day.

During cross-examination, the respondent's counsel asked Holly why he remembered his encounter with Ford. Holly replied that he remembered seeing Ford and the victim "because I tried to get the gun from them. I wanted that gun." Holly testified during cross-examination that Ford had showed him the gun, which was tucked into his waistband, by lifting his shirt. Holly stated that he told Ford to put the gun in his hand. He testified that he "tried to grab" Ford, who pulled away from him. When the respondent's counsel asked Holly about the appearance of the gun, Holly stated: "*I know guns.* Yes, it was black.... I'd seen the clip of the gun. That's how I knew it was either a .380 or a nine millimeter." (Emphasis added.) When asked whether he had seen other young men in the Newhallville neighborhood with guns, Holly went on to testify: "If you were in the streets, you're going to see people with guns."

During redirect examination, Holly was asked once again to compare a photograph of a gun with the gun he had observed. Holly stated: "The gun Ralph Ford showed me looked like one of the guns I had before. That's why I thought it was real. That's why I tried to take it." When asked during further examination by the respondent's counsel about the characteristics of the gun in the photograph, Holly testified that he had seen ***125** similar guns, and that one of the characteristics of the gun in the photograph was uncommon. Specifically, Holly testified that he observed ****1103** ridges on the top of the gun in Ford's possession, above the handle, which he considered to be an uncommon feature of the guns that he had seen.

At the habeas trial, the petitioner did not attempt to demonstrate that, if Holly had invoked his fifth amendment privilege at the time of the criminal trial, his testimony at the criminal trial would have been different from his testimony at the habeas trial. The petitioner, who bore the burden of proving deficient performance and prejudice in connection with trial counsel's failure to present Holly's testimony, appears to have relied on the entirety of Holly's testimony at the habeas trial to sustain his burden of proof. Thus, Holly's habeas testimony was presented as the type of inquiry to which Holly would have been subjected at the petitioner's trial. On the basis of that inquiry, as well as the evidence of the criminal issues that Holly faced at the time of the trial, it is reasonable to conclude that Holly would have been asked to provide answers that possibly would have furnished a link in the chain of evidence needed to prosecute him for one or more crimes.

The inquiries at issue called upon Holly to describe the basis of his ability to accurately characterize the gun in Ford's

possession. In doing so at the habeas trial, Holly revealed that he wanted to gain possession of the gun on the day of the shooting, he attempted forcibly to gain possession of the gun on the day of the shooting, he was very familiar with guns, and he had possessed one or more guns prior to the day of the shooting. Against this evidentiary background, Ullmann's belief, that any inquiry about guns directed at Holly posed a danger to his penal interests, was eminently supported by the questions and answers that comprised Holly's examination at the habeas trial. Moreover, as Ullmann ***126** expressed, concerns that Holly's testimony possibly would have exposed him to criminal prosecution were magnified in the present case in light of the fact that he was already the subject of criminal prosecution in the New Haven judicial district by the same prosecutor that was prosecuting the charges against the petitioner.

Although it appears that the habeas court thoroughly considered the evidence before it, it also appears from the analysis set forth in the court's memorandum of decision that the court took a narrow view of the fifth amendment issue, considering only whether Holly's *direct observations of Ford* likely would have subjected him to criminal prosecution, rather than whether it was possible that any questions asked of Holly during his direct or cross-examination could possibly have incriminated him in any other criminal prosecution. In light of the foregoing, we conclude that the court erred in its determination that Holly could not assert his fifth amendment privilege. It is not perfectly clear from all of the circumstances that Holly's testimony could not possibly have tended to incriminate him and, thus, possibly subject him to prosecution. Because the record reveals that it was likely that the court would have honored Holly's invocation of his fifth amendment privilege with respect to inquiries concerning his interaction with Ford on the day of the shooting, the petitioner cannot rely on Holly's testimony at the habeas trial, or any substantive portion thereof, to demonstrate harm.

In analyzing this claim, we have accepted as true the habeas court's unchallenged finding that Holly *would* have testified at the petitioner's criminal trial if he had been ordered to do so. Assuming, arguendo, that counsel's failure to present Holly's testimony was not the result of sound professional judgment, we conclude that such failure was not prejudicial to the petitioner. As we have explained in our analysis of this claim, it is speculative that the ****1104** court, at the petitioner's criminal ***127** trial, would not have honored Holly's invocation of his privilege against self-incrimination with respect to inquiries concerning his interaction with Ford on the day of the shooting. On the scant record before us concerning Holly's pending matters at the time of the criminal trial, any attempt by this court to determine what portions of Holly's testimony, *if any,* would not have been subject to a specific claim of privilege and would have come before the jury would be speculative in nature. [12]

***128** Moreover, setting aside any issues related to Holly's privilege against self-incrimination, it is purely speculative that any portions of Holly's testimony would have been *admissible* as evidence of third party culpability. With respect to the admissibility of third party culpability evidence, our Supreme Court has stated: "The admissibility of evidence of third party culpability is governed by the rules relating to relevancy.... Relevant evidence is evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence.... Accordingly, in explaining the requirement ****1105** that the proffered evidence establish a direct connection to a third party, rather than raise merely a bare suspicion regarding a third party, we have stated [that] [s]uch evidence is relevant, exculpatory evidence, rather than merely tenuous evidence of third party culpability [introduced by a defendant] in an attempt to divert from himself the evidence of guilt.... In other words, evidence that establishes a direct connection between a third party and the charged offense is relevant to the central question before the jury, namely, whether a reasonable doubt exists as to whether the defendant committed the offense. Evidence that would raise only a bare suspicion that a third party, rather than the defendant, committed the charged offense would not be relevant to the jury's ***129** determination. A trial court's decision, therefore, that third party culpability evidence proffered by the defendant is admissible, necessarily entails a determination that the proffered evidence is relevant to the jury's determination of whether a reasonable doubt exists as to the defendant's guilt....

"Whether a defendant has sufficiently established a direct connection between a third party and the crime with which the defendant has been charged is necessarily a fact intensive inquiry. In other cases, this court has found that proof of a third party's physical presence at a crime scene, combined with evidence indicating that the third party would have had

the opportunity to commit the crime with which the defendant has been charged, can be a sufficiently direct connection for purposes of third party culpability.... Similarly, this court has found the direct connection threshold satisfied for purposes of third party culpability when physical evidence links a third party to a crime scene and there is a lack of similar physical evidence linking the charged defendant to the scene.... Finally, this court has found that statements by a victim that implicate the purported third party, combined with a lack of physical evidence linking the defendant to the crime with which he or she has been charged, can sufficiently establish a direct connection for third party culpability purposes." (Citations omitted; internal quotation marks omitted.) *State v. Baltas,* 311 Conn. 786, 810–12, 91 A.3d 384 (2014).

In the present case, the petitioner did not present any evidence that Ford was armed at the time of the shooting, physical evidence that tied Ford to the shooting scene, or a statement by the victim implicating Ford. Although the petitioner may have attempted to use Holly's testimony in an attempt to demonstrate that Ford was culpable for shooting the victim accidentally, there was no evidence that Ford had a motive to shoot the ***130** victim. In the absence of additional evidence tying Ford to the shooting, it is speculative whether the trial court would have viewed Holly's testimony as proving a direct connection between Ford and the shooting, or whether it would have been viewed as evidence that supported a mere suspicion that he was implicated in the shooting.

Under *Strickland,* the petitioner failed in his burden of demonstrating that his trial counsel's failure to attempt to present Holly's testimony was prejudicial in that there was a reasonable probability that, absent such failure, the outcome of the trial would have been different. [13]

### ****1106 *131** II

**[6]** **[7]** Next, we consider the respondent's claim that the habeas court erroneously concluded that the petitioner was deprived of his right to the effective assistance of counsel by his counsel's failure to present evidence in support of an alibi defense that involved the testimony of Johnson and Allen to explain his whereabouts at the time of the shooting. [14] We ****1107** agree with the respondent ***132** that the petitioner failed to demonstrate that counsel's strategic decision not to present the evidence at issue reflected deficient performance.

The respondent challenges the court's decision with respect to this aspect of the petitioner's ineffective assistance of counsel claim on a variety of grounds. ***133** The respondent argues that the court did not afford adequate consideration to evidence that defense counsel did not present the alibi evidence as part of an objectively reasonable overall trial strategy that was opposed to diverting the jury's attention away from the weaknesses of the state's case and, in particular, the significance of Ford's recantation at the time of the petitioner's second trial. Likewise, the respondent argues that the court did not afford adequate consideration to evidence that, apart from their overall trial strategy, defense counsel had specific concerns about the strength of the alibi evidence as well as its potential favorability to the state's case. Additionally, the respondent argues that the court erroneously concluded that there was a reasonable probability that, if the alibi evidence at issue had been presented to the jury, the result of the proceeding would have been different. Following a careful consideration of the claim, we agree with the respondent that the petitioner failed to demonstrate that counsel's strategic decision not to present the evidence at issue constituted deficient ****1108** performance under the *Strickland* standard.

As stated previously in this opinion, to prevail under *Strickland,* "the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law." (Internal quotation marks omitted.) *Michael T. v. Commissioner of Correction,* supra, 319 Conn. at 631, 126 A.3d 558. "With respect to the performance prong of *Strickland,* we are mindful that [j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.... A ***134** fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a

*strong presumption* that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.... There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way....

"Similarly, the United States Supreme Court has emphasized that a reviewing court is required not simply to give [the trial attorney] the benefit of the doubt ... but to affirmatively entertain the range of possible reasons ... counsel may have had for proceeding as [he] did.... [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; [but] strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., at 632–33, 126 A.3d 558.

**[8]** "Although courts may not indulge post hoc rationalization for counsel's decision making that contradicts the available evidence of counsel's actions ... neither may they insist counsel confirm every aspect of the strategic basis for his or her actions. There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect.... After an adverse verdict at trial even the most experienced counsel may find it ***135** difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. *Strickland,* however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." (Citations omitted; internal quotation marks omitted.) *Harrington v. Richter,* 562 U.S. 86, 109–10, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). The presumption that counsel has acted reasonably may be overcome by a showing that there was no conceivable tactical justification for counsel's strategy. See, e.g., *Holloway v. Commissioner of Correction,* 145 Conn.App. 353, 367, 77 A.3d 777 (2013).

At the habeas trial, Merkin testified that the defense strategy was to discredit Ford's credibility and to challenge the strength of the state's case, particularly with respect to the state's evidence identifying the petitioner as the shooter. Merkin ****1109** testified that the defense attempted to challenge Ford's earlier statements to the police, in which he implicated the petitioner, as being inherently unreliable. Merkin explained: "Part of our theory was that [Ford] wasn't in a location where he could see what he claimed to have seen. Part of it was that he was very coercively, in our view, interrogated by the lead detective in the case in the middle of the night, and therefore the information he gave was not reliable. And part of it was that we had some suspicion or belief that he was actually involved himself, whether accidentally or otherwise killing his friend." Merkin acknowledged, however, that defense counsel had not developed enough evidence to support the latter part of the defense strategy. Consistent with Merkin's testimony, the court found that Merkin "does not like alibi defenses generally, and her practice was not to present an alibi defense unless it was rock solid." [15]

***136** The court found that, through defense investigation, defense counsel became aware of the potential trial testimony of Johnson and Allen, and that defense counsel had found Johnson and Allen to be credible witnesses. The court observed that Merkin decided not to present the testimony of Johnson because she did not believe it was strong evidence. In this regard, the court referred to Merkin's opinions that Johnson was not a disinterested witness because she was the petitioner's sister, Johnson's testimony supported a finding that the petitioner was close to the crime scene at the time that the shooting occurred, and it was unclear from Johnson's testimony whether the petitioner was able directly to observe the petitioner at all times relevant. With respect to Allen, the court referred to Merkin's opinions that Allen's testimony was not strong because she merely had estimated the timing of the telephone calls involving the petitioner, and that the testimony was potentially more favorable to the state's case, particularly in light of the fact that the evidence would have placed the petitioner in close proximity to the crime scene at the time that the shooting occurred. [16]

****1110** ***137** Consistent with the testimony of Merkin and Jones, the court recognized that trial counsel's failure to present the testimony of Johnson and Allen was not inadvertent, but the result of a considered trial strategy. In general terms, the strategy was designed to focus the ***138**

jury's attention on weaknesses in the state's case, particularly the fact that Ford had recanted his earlier statements in which he had identified the petitioner as being present at the scene of the crime with a gun. In this general sense, defense counsel did not want the jury to focus on possible weaknesses in its alibi defense or to afford the prosecutor an opportunity to draw the jury's attention away from the state's case. In specific terms, defense counsel also expressed concerns that were directly related to potential issues with the strength of the potential testimony of Johnson and Allen, as well as concerns that their testimony, if found to be credible by the jury, had the potential to assist the state by demonstrating that, at or around the time of the shooting, the petitioner was at his residence, just two blocks away from the crime scene.

The court, however, did not view defense counsel's general strategic decision to be reasonable because, as it found, the alibi testimony at issue "would have been helpful to the petitioner's defense that he was at home at the time of the shooting." The **1111 court did not appear to afford any deference to defense counsel's concern that presenting the alibi defense would have diverted the jury's attention away from the weaknesses of the state's case, particularly in light of the fact that Merkin believed that the defense had done a "very good job" in undermining Ford's identification of the petitioner. Additionally, rather than evaluating whether there *139 existed conceivable tactical justifications for counsel's assessment of the alibi evidence, the court set forth a number of reasons as to why it did not share trial counsel's concerns about the strength of the alibi testimony. For example, the court, relying on Johnson's testimony, determined that she was able to provide a strong alibi for the petitioner despite the fact that the petitioner was not in her direct view at times relevant. [17] The court determined that any confusion concerning the timing of calls made between Allen and the petitioner could have been resolved by means of evidence obtained from the caller identification feature on Allen's telephone. [18] Moreover, the court determined that counsel's concern that the alibi evidence would have placed the petitioner close to the crime scene at the time of the shooting was unfounded because there was what it considered to be evidence of a similar nature before the jury, namely, evidence that the petitioner was at Southern Connecticut State University shortly before 11 p.m. on the night of the shooting. [19]

*140 Affording plenary review to the issue, we conclude that the representation that the defendant was afforded was constitutionally adequate. The petitioner has failed to sustain his evidentiary burden of demonstrating that, under all of the circumstances, defense counsel's strategic decision not to present the alibi defense was not objectively reasonable. Here, defense counsel described at length the reasons underlying their decision not to present the alibi evidence, and the court found that the decision was not the product of neglect, but strategy. It is not the role of a reviewing court to second-guess the myriad of considerations that underlie a **1112 trial strategy in an attempt to determine with the benefit of hindsight whether it would have made the exact same strategic decisions. Rather, a reviewing court must determine whether, at the time of trial, conceivable justifications existed for the tactical decisions that were made by counsel.

"Our review of an attorney's performance is especially deferential when his or her decisions are the result of relevant strategic analysis.... Thus, [a]s a general rule, a habeas petitioner will be able to demonstrate that trial counsel's decisions were objectively unreasonable only if there [was] no ... tactical justification for the course taken....

"[T]he presentation of testimonial evidence is a matter of trial strategy.... Defense counsel will be deemed ineffective only when it is shown that a defendant has informed his attorney of the existence of a witness and that the attorney ... without adequate *141 explanation ... failed to call the witness at trial.... Furthermore, [t]he failure of defense counsel to call a potential defense witness does not constitute ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense....

"[O]ur habeas corpus jurisprudence reveals several scenarios in which courts will not second-guess defense counsel's decision not to investigate or call certain witnesses or to investigate potential defenses, such as when ... counsel learns of the substance of the witness' testimony and determines that calling that witness is unnecessary or potentially harmful to the case.... Thus, an attorney's choice to pursue a defense that focuses on casting doubt on the state's case rather than on calling his or her own witnesses can be a reasonable choice." (Citations omitted; internal quotation marks omitted.) *Spearman v. Commissioner of Correction*, 164 Conn.App. 530, 541, 138 A.3d 378 (2016). As the United

States Supreme Court has observed, "To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates." *Harrington v. Richter,* supra, 562 U.S. at 109, 131 S.Ct. 770.

The petitioner failed to demonstrate that defense counsel's general strategy to keep the jury's focus on weaknesses in the state's case, instead of diverting focus to an alibi defense, was unreasonable under the circumstances. This is particularly true in light of the weakness in the state's case following Ford's recantation. Moreover, even if the petitioner could demonstrate that such a general strategic decision was unreasonable, in the present case, defense counsel raised many reasonable concerns about the overall strength of the alibi evidence, including its potential to benefit the state's case by placing the petitioner near the scene of the ***142** crime at the time that it was committed. The petitioner has failed to demonstrate that, as a whole, these specific reasons related to defense counsel's evaluation and assessment of the alibi evidence did not reflect sound professional judgment. [20] The fact that this was not the only reasonable trial strategy that was available to counsel, or that it ultimately was not successful, is not dispositive of the issue of whether the strategy employed was objectively reasonable. ****1113** Employing the strong presumption that counsel's conduct reflected reasonable representation, as we must, we conclude that the petitioner failed to satisfy his burden under *Strickland* 's first prong.

The judgment is reversed only with respect to the count alleging ineffective assistance of counsel and the case is remanded to the habeas court with direction to deny the petition for a writ of habeas corpus on that count. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

**All Citations**

166 Conn.App. 95, 140 A.3d 1087

## Footnotes

1 "The record reveals that the area of New Haven where most of the pertinent events occurred is called Newhallville and is a block-shaped area formed around the intersections of Read, Shepard, Huntington and Newhall Streets." *State v. Johnson,* supra, 288 Conn. at 239 n. 4, 951 A.2d 1257.

2 "L'Kaya Ford and Ralph Ford are not related." *State v. Johnson,* supra, 288 Conn. at 239 n. 5, 951 A.2d 1257.

3 "The victim told police investigating the incident that the [petitioner] did not have a weapon. A witness, Dwana Wilson, however, saw the encounter from across the street and testified that she had witnessed the [petitioner] holding a black handgun and pointing it at the victim." *State v. Johnson,* supra, 288 Conn. at 239 n. 6, 951 A.2d 1257.

4 "Ralph Ford did not explain why he did not remain with the victim and take the usual shortcut home that night, other than indicating that he liked to walk on Read Street." *State v. Johnson,* supra, 288 Conn. at 241 n. 7, 951 A.2d 1257.

5 "Ralph Ford, the state's key identification witness, recanted his testimony from the [petitioner's] first trial at the [petitioner's] retrial, but his prior inconsistent statements were used to impeach him at the second trial and admitted as substantive evidence...." *State v. Johnson,* supra, 288 Conn. at 241 n. 8, 951 A.2d 1257.

6 "At trial, Toles testified that, earlier that day, she had seen the [petitioner] in a cranberry colored car that she believed was a Dodge Intrepid. The [petitioner] was a passenger in the car and was accompanied by two other people." *State v. Johnson,* supra, 288 Conn. at 241 n. 9, 951 A.2d 1257.

7 "There was conflicting testimony at trial about the clothes that the [petitioner] was seen wearing on the night the victim was shot. Toles observed him around 11 p.m. wearing '[a] black T-shirt, some blue jeans, a black leather coat, and black Jordan sneakers.' Ralph Ford's testimony from the [petitioner's] first trial was read into evidence at the second trial, and he testified that, when he saw the [petitioner] running across Huntington Street from the direction of the gunshot, the [petitioner] was wearing blue jeans, a grey hooded sweatshirt with orange stripes on the sleeves, and black boots." *State v. Johnson,* supra, 288 Conn. at 242 n. 10, 951 A.2d 1257.

8 "Toles did not see what car, if any, the [petitioner] and Scott arrived in that evening." *State v. Johnson,* supra, 288 Conn. at 242 n. 11, 951 A.2d 1257.

9 "The police, relying on information received and the identifications made by Ralph Ford and L'Kaya Ford, secured a search warrant for the [petitioner's] residence and seized a .45 caliber handgun. Ballistics testing confirmed that the gun seized from the [petitioner's] home was not the gun used to kill the victim. The parties stipulated at trial that there was no record of a permit in the defendant's name to carry a handgun. The police also seized a pair of black, high-top sneakers from the [petitioner's] home but did not find a gray sweatshirt with orange stripes or blue jeans." *State v. Johnson,* supra, 288 Conn. at 243 n. 12, 951 A.2d 1257.

10 Also, the petitioner alleged that counsel rendered deficient representation in that they had failed to present testimony of a Jermaine Diggs, who was not called as a witness at the habeas trial. The habeas court determined that the petitioner abandoned this aspect of his claim of ineffective assistance.

11 Allen testified that she was driving a van when she picked up the petitioner.

12 The petitioner presented Holly's testimony before the habeas court as evidence of prejudice. Before this court, the petitioner observes that, at the time of the criminal trial, the court could have ordered Holly to testify while restricting direct and cross-examination of him in such a manner as to protect his right against self-incrimination. Thus, the petitioner argues that Holly's testimony at the criminal trial "could have been limited to the sole issue of his having seen Ford with a gun similar to that used to kill the victim near the time of the shooting." The petitioner argues that Holly "would have been required to answer questions about having seen Ford with a gun and asking him to describe the gun, even if he would have been permitted to invoke the privilege in response to questions about trying to take the gun." The petitioner's argument in this regard is based on his assertion that "it is perfectly clear from all of the facts presented at the habeas trial that answers from Holly to questions calling for information about his having seen a gun and a description of that gun could not possibly have any tendency to incriminate him."

Holly was not called as a witness at the petitioner's criminal trial and, at the habeas trial, Holly testified without invoking his privilege against self-incrimination. A hearing concerning what inquiries, if any, would have been precluded by the exercise of Holly's privilege did not occur in this case. Thus, the petitioner invites this court to speculate with respect to the portion of that testimony that Holly would have been compelled to provide consistent with the invocation of his privilege. A court's evaluation of whether to preclude the exercise of the fundamental constitutional right at issue is inherently fact-bound. "To sustain the privilege [against self-incrimination], it need only be evident from the implications of the question, in the context in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.... Conversely, before refusing to allow the privilege, the trial court

must find that the answers to any questions proposed cannot possibly have a tendency to incriminate.... The privilege against self-incrimination depends on the mere possibility of prosecution." (Citations omitted; internal quotation marks omitted.) *State v. Cecarelli,* 32 Conn.App. 811, 819, 631 A.2d 862 (1993). We reject the petitioner's argument. In the absence of a factual record that provides far greater information concerning the matters pending against Holly at the time of the criminal trial, it is not perfectly clear that any testimony from Holly in which he described his interaction with Ford and his observations of Ford's gun could not possibly have any tendency to incriminate him. If it would have been feasible and likely for the court to have limited the inquiries of Holly in the manner suggested by the petitioner, it was the petitioner's burden to demonstrate this fact before the habeas court on the basis of adequate facts. We reiterate that it was the petitioner's burden to create a factual record to demonstrate that Holly would not have been permitted to exercise his privilege against self-incrimination with respect to evidence helpful to the petitioner.

13 As discussed previously in this opinion, the petitioner relies on Holly's testimony before the habeas court to demonstrate that, under *Strickland,* he was prejudiced by counsel's failure to present Holly's testimony at his criminal trial. Alternatively, the petitioner argues that this court "should hold that [he] need not prove prejudice because [his] trial counsel's failure to present evidence of third party culpability through ... Holly was an adverse effect of counsel's conflict of interest."

This conflict of interest claim was raised before and rejected on its merits by the habeas court. In relevant part, the court stated: "[T]he petitioner alleges that trial counsel had a duty to present Holly and Inspector Whalen as witnesses to testify at the second trial as to Holly's statement that he saw Ford in possession of a pistol matching the description of the murder weapon [on] the day of the shooting. The petitioner further claims that trial counsel failed to present this testimony because Attorney Ullmann, the head of the New Haven public defender's office and trial counsel's supervisor, represented Holly in an unrelated [matter] and advised Holly not to cooperate with the petitioner's defense. This, he claims, constituted a conflict of interest.

* * *

"At the time of the petitioner's second criminal trial, Holly had a criminal matter pending that was unrelated to the petitioner's case. Attorney Ullmann represented Holly in that matter. Inspector Whalen contacted Holly on behalf of the petitioner's defense, and Holly informed him that he had seen Ford with a handgun with a description similar to the murder weapon. Attorney Ullmann advised Holly not to testify at the petitioner's criminal trial because the same prosecutor was handling both the petitioner's case and Holly's pending case, and he did not want the prosecutor to retaliate against Holly in his case for assisting the petitioner's defense. Attorney Ullmann subsequently appointed a private attorney, Attorney Farver, to represent Holly with respect to Holly's involvement in the petitioner's case. Both Attorney Jones' and Attorney Merkin's decision not to call Holly as a witness at the petitioner's trial was not impacted by the fact that Attorney Ullmann was their supervisor, and had advised Holly not to testify....

> "[A]n actual conflict of interest does not arise in the present case solely because trial counsel and Attorney Ullmann worked in the same government office while representing parties with adverse interests. Further, the court finds no specific instances in which the petitioner's interests have been adversely affected by trial counsel's representation. Attorney Ullmann appointed a private attorney to represent Holly with respect to the petitioner's case to avoid any potential conflict, and both Attorney Jones and Attorney Merkin testified that Attorney Ullmann's status as their supervisor or [his] position as to Holly's testimony did not impact their decision not to call him as a witness in the petitioner's

second trial. Accordingly, the petitioner has failed to prove his actual conflict of interest claim."

In arguing before this court that a conflict of interest actually existed that obviated the requirement that he prove that he was prejudiced by defense counsel's failure to present Holly's testimony, the petitioner argues that the habeas court erred in its critical finding that Ullmann did not have any adverse effect on defense counsel's representation of him, and that Ullmann did not impact their decision not to present Holly's testimony. The petitioner's argument with respect to an actual conflict of interest on the part of defense counsel is not persuasive. Before this court, the petitioner calls into question the factual determinations of the habeas court with respect to defense counsel's loyalties and their decision-making concerning Holly. His arguments fail because the court's unambiguous factual findings in this regard are amply supported by the testimony presented at the habeas trial.

14 In his brief before this court, the petitioner asserts that the judgment of the habeas court may be supported by the fact that defense counsel "failed to adequately investigate the strength of the petitioner's alibi." He argues that "trial counsel failed to adequately investigate the strength of the alibi witnesses" and "had no reasonable basis to stop investigating before discovering [relevant] facts" related to their testimony. The petitioner argued that, had defense counsel questioned Johnson adequately, they would have learned that he could not have left his residence without alerting her that he was doing so.

The petitioner's arguments that are based upon an inadequate investigation are not properly before us. In his amended petition for a writ of habeas corpus, the pleading that framed the issues before the court, the petitioner did not set forth allegations related to deficiencies in defense counsel's investigation of the alibi witnesses. Rather, he alleged that defense counsel had "failed to present" the testimony of Johnson and Allen. Moreover, the habeas court's memorandum of decision does not reflect that the court considered on its merits any claim related to inadequate investigation of the witnesses at issue. The court stated among its many findings that, at the habeas trial, defense counsel "acknowledged ... that they failed to investigate Johnson's ability to provide an alibi at the times when the petitioner was not in her direct view." There is nothing in the court's decision to reflect, however, that the court based its decision on that isolated finding or any theory of the case related to defense counsel's investigation. Consistent with the grounds set forth in the amended petition for a writ of habeas corpus, the court stated that the issue before it was the petitioner's claim "that trial counsel were ineffective for failing to call Johnson and Allen as witnesses to testify that he was at home at the time of the shooting in support of an alibi defense."

This is not one of the rare cases in which, in the absence of an amendment to the operative pleadings, a lower court has considered, or granted relief, on the basis of a technically unpleaded claim that was actually litigated at trial. See *Stafford Higgins Industries, Inc. v. Norwalk,* 245 Conn. 551, 575, 715 A.2d 46 (1998). "It is well settled that [t]he petition for a writ of habeas corpus is essentially a pleading and, as such, it should conform generally to a complaint in a civil action.... The principle that a [petitioner] may rely only upon what he has alleged is basic.... It is fundamental in our law that the right of a [petitioner] to recover is limited to the allegations of his complaint.... While the habeas court has considerable discretion to frame a remedy that is commensurate with the scope of the established constitutional violations ... it does not have the discretion to look beyond the pleadings and trial evidence to decide claims not raised.... This court is not bound to consider claimed errors unless it appears on the record that the question was distinctly raised ... and was ruled upon and decided by the court adversely to the [petitioner's] claim.... This court is not compelled to consider issues neither alleged in the habeas petition nor considered at the habeas proceeding...." (Citation

omitted; internal quotation marks omitted.) *Greene v. Commissioner of Correction,* 131 Conn.App. 820, 822, 29 A.3d 171 (2011), cert. denied, 303 Conn. 936, 36 A.3d 695 (2012); see also *Johnson v. Commissioner of Correction,* 285 Conn. 556, 580, 941 A.2d 248 (2008). In conformity with this principle of appellate review, we decline to address on their merits any arguments related to the alleged deficient performance of defense counsel in failing to properly investigate the strength of the alibi witnesses' potential testimony.

15 In this regard, Merkin testified: "It was my belief ... from years of doing this type of work ... that unless they are solid, [alibis] can get you into trouble. It's the last thing the jury hears if you have a good prosecutor who's a good cross-examiner and can try to kind of attack either a family member who's an alibi witness or some other vulnerability to the alibi. To me, it pulls attention away from the weaknesses in the state's case, and it kind of develops jurors' focus on the weaknesses in the alibi. So, it's just been my practice to shy away from alibis unless they're solid, and I had some concerns about the alibi in this case."

Similarly, Merkin stated: "I know that there's a difference of opinion on this.... My opinion is that if you put alibi evidence on which has vulnerabilities, after the state's sole eyewitness testifies ... the last piece of the case that the jury is left with is a weak or possibly problematic alibi, and it draws the jury's attention away from the weaknesses in the state's case. Jurors aren't supposed to shift burdens and things of that sort, but it's my opinion that ... if they're presented with alibi evidence that's not solid, their focus kind of gets taken away from the weaknesses in the state's case."

16 Defense counsel did not testify that they disbelieved Johnson or Allen. Merkin testified that she had a wide range of concerns with respect to presenting the testimony of Johnson and Allen in support of an alibi defense. Merkin explained that Johnson was not a disinterested witness, but a family member of the petitioner; the alibi evidence would have demonstrated that the petitioner was close to the scene of the shooting at the time that the shooting occurred; and she believed that Johnson's testimony was not strong because Johnson had not informed the police about the petitioner's whereabouts. Merkin also explained that Johnson was not always consistent with respect to when she had observed the petitioner leave the residence, and that she did not believe that Johnson's version of events would withstand a thorough cross-examination because it would have been relatively easy for a skilled prosecutor to draw the jury's attention to the fact that she did not directly observe the petitioner at all times relevant. She stated that the fact that Johnson was unable to testify that she directly had observed the petitioner in her residence at the time of the shooting was a deficiency in the alibi.

Merkin explained that because of uncertainties in Allen's testimony, she was not satisfied that it would have precluded the jury from finding that the petitioner committed the shooting and, in any event, it demonstrated that he was in close proximity to the crime scene at the time of the shooting. Moreover, Merkin believed that Allen's testimony was not favorable to the extent that it essentially demonstrated that the petitioner had asked Allen to drive him away from the general area of the crime scene at a late hour of the day. With respect to this last observation, Merkin testified that she had concerns that such evidence would have permitted the state to seek an instruction concerning evidence of flight and consciousness of guilt, to the petitioner's detriment. She stated: "I didn't like that because the jurors could infer that he had maybe done the shooting and was taking off [with Allen]."

Repeatedly, Merkin indicated that she deemed the fact that the alibi evidence would have placed the petitioner near the scene of the shooting to be an important factor that mitigated against presenting the evidence at issue. Despite her reservations about alibi defenses, Merkin testified that if the alibi evidence had placed the petitioner farther away from the scene of the crime she would not have "struggled" with the decision whether to present the evidence. Merkin testified that if Johnson and Allen could have supported an alibi that was

"connected to a location miles away from the crime ... the balance for me would have tipped in favor of putting that defense on in front of this jury."

In his testimony before the habeas court, Jones discussed the general defense strategy of focusing on the weakness of Ford's identification of the petitioner. Jones shared some of Merkin's concerns with respect to the strength of the alibi evidence, particularly the concern that the evidence did not provide a rock-solid alibi that, if believed, precluded a finding that the petitioner could have committed the crime. Jones observed that the alibi evidence would have placed the petitioner at his home, which was located mere blocks from the crime scene. Jones expressed his concern that, even if the alibi evidence had been presented to the jury, the jury could have found it plausible that the petitioner had the opportunity to commit the crime. Jones, like Merkin, wrestled with the issue of whether it was a good strategy to divert the jury's attention to an alibi defense, but he indicated that he favored presenting the alibi evidence. Despite this disagreement with her as to trial strategy, he viewed Merkin as an excellent trial attorney and agreed with her overall assessment of the weaknesses in the state's case.

17 In this regard, the court appears to have relied on Johnson's testimony that, even if she was not able to directly view the petitioner, she would have been able to determine if he had left the residence because she would have heard the kitchen door open and would have noticed if the motion-activated light outside of her residence had been activated by his movement. The court found, and the evidence reflects, that defense counsel did not investigate Johnson's testimony in this regard. Even if defense counsel had been aware of this explanation from her, however, it would not have been unreasonable for counsel, in the exercise of sound professional judgment, to determine that the evidence was not persuasive in nature.

18 Although the court appears to have determined that the defense could have presented evidence of this nature with respect to *all* calls made between the petitioner and Allen on the night of the shooting, Allen testified that the caller identification system on her telephone contained information about the telephone calls that the petitioner made to her. Allen testified that the system did not have information about the timing of the telephone calls that she allegedly had made to the petitioner closer to the suspected time of the shooting. Thus, the evidence presented at the habeas trial did not undermine the sound strategic reasons articulated by Merkin for not presenting Allen's testimony.

19 There was evidence that the shooting occurred between 10:20 and 10:30 p.m. There was evidence that the petitioner's residence was within two blocks of the crime scene and that it took the petitioner several minutes to drive to Southern Connecticut State University from his residence. Thus, the evidence showing that the petitioner was at Southern Connecticut State University shortly before 11 p.m. is not as potentially incriminating as the alibi evidence that would have placed the petitioner at his residence, just two blocks from the crime scene, at a time that was much closer to the suspected time of the shooting.

20 Although the court did not refer to it when assessing the reasonableness of defense counsel's strategic decision not to present Johnson's testimony, we note that an excerpt from one of the police incident reports that was introduced as an exhibit during the habeas trial reflects that, on the day following the shooting, the petitioner, after signing a waiver of rights form, told the police that he was home at his residence on Butler Street the night before, but he "could not remember who was home or saw him."

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment
Judgment Reversed in Part by Johnson v. Commissioner of Correction, Conn.App., June 14, 2016

2013 WL 5422895
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut,
Judicial District of Tolland.

Carvaughn JOHNSON
v.
WARDEN.

No. CV094002796.
|
Sept. 11, 2013.

**Opinion**

COBB, J.

*1 The petitioner, Carvaughn Johnson, brings this petition for a writ of habeas corpus claiming that his state and federal constitutional rights to conflict free representation and effective assistance of counsel were violated. The petitioner seeks to have his judgment of conviction vacated, to be released from prison or other such relief as law and justice require. Based upon the credible evidence presented, the court finds for the respondent as to the conflict of interest claim, and finds for the petitioner as to the ineffective assistance of counsel claims.

On October 16, 2003, the petitioner's first criminal trial ended in a mistrial. On February 23, 2004, following a second criminal trial, the petitioner was convicted by a jury of murder in violation of General Statutes § 53a–54a(a) and carrying a pistol without a permit in violation of General Statutes § 29–35. The petitioner was represented at both trials by public defenders Scott Jones and Beth Merkin. The trial court, Thompson, J., sentenced the petitioner to a total effective sentence of forty-three years' incarceration. The petitioner appealed his conviction to the Supreme Court, which affirmed it. *State v. Johnson,* 288 Conn. 236, 951 A.2d 1257 (2008). The Supreme Court found that the jury could reasonably have found the following facts.

> The defendant shot and killed the sixteen year old victim, Markeith Strong, on the evening of October 10, 2001, in New Haven. In the weeks prior to that evening, the defendant and the victim had been at odds with each other. Approximately three weeks prior to the shooting, the victim's teenage sister, L'Kaya Ford, was sitting with the victim at the corner of Read and Shepard Streets when she observed the defendant approach. The defendant walked toward Ford and the victim, called the victim "a punk," and threatened to assault him. The victim said nothing, and the defendant walked away.

> The victim next encountered the defendant in the late afternoon of September 29, 2001, and the two engaged in a dispute over a bicycle. The victim and Ralph Ford were around the intersection of Read and Shepard Streets, where the victim either was riding his bicycle or standing near it, when the defendant stopped him, declared that the bicycle belonged to him and demanded that the victim give it to him. The victim refused and informed the defendant that he had found the bicycle about one month earlier and had fixed it up. The victim told the defendant that he owned the bicycle. The defendant asked for the bicycle a second time, and, when the victim refused, the defendant said, "[d]on't make me do something to you." The defendant then punched the left side of the victim's head twice, which caused a small cut near the victim's left ear. During this encounter, the defendant may have been carrying a gun. The defendant then took the bicycle and rode away.

> After this encounter, the victim, accompanied by Ralph Ford, returned home, where his family contacted the New Haven police to report the incident. After speaking with the victim, the police officers radioed a description of the defendant and notice of a possible robbery and larceny. The police did not apprehend any suspect that day. Over the next few days, the defendant approached the victim and L'Kaya Ford about the police report, asserted that he was not going to jail, apologized to the victim and told him not to press charges. Toward the end of September, the defendant also expressed concern to his friend, Tashana Milton Toles, about the possible criminal charges that he faced as a result of the bicycle incident and specifically

remarked to her that he thought he might be going back to jail.

***2** On the morning of October 10, the defendant approached L'Kaya Ford while she was waiting for a bus. The defendant, who was driving a black car that L'Kaya Ford described as an Acura or Ford Probe, pulled the car alongside of her and accused her of being a snitch. The defendant insulted her, told her he did not like snitches and that she knew what happened to "snitches in the hood." That night, the victim, L'Kaya Ford, Ralph Ford, and other friends gathered on the corner of Read and Shepard Streets to celebrate L'Kaya Ford's birthday. Some of the group, but not Ralph Ford or the victim, were drinking alcohol and smoking marijuana. Around 10 p.m., the victim and Ralph Ford departed together. The neighborhood around Read, Shepard, Huntington and Newhall Streets affords many shortcuts through the yards of houses that are occupied by neighborhood residents. On that night, however, Ralph Ford did not take his usual shortcut but parted from the victim, who took the shortcut home. Ralph Ford then continued walking alone on Read Street and proceeded around the corner to his house on Newhall Street. Upon arriving at his house, Ralph Ford heard a gunshot coming from the backyard of the house across the street. Ralph Ford then entered his front hallway. Ralph Ford heard someone running from the yard across the street and saw the defendant run into the driveway leading to Ford's house. Ralph Ford saw the defendant carrying a semiautomatic handgun and entering a black Acura as it exited the driveway. James Baker, who lived near the crime scene, heard someone run past his window, jump the fence outside his house and head into the backyard, toward Huntington Street. Approximately five minutes later, and around 10:20 p.m., Baker heard a single gunshot coming from behind his house. LaMont Wilson, who had left the group earlier than Ralph Ford and the victim, lived on Read Street and also heard a gunshot from the direction of his backyard, sometime between 10 and 10:45 p.m. Baker called the police at approximately 10:45 p.m. to report the gunshot but did not initially identify himself because he feared retaliation from "certain individuals" for contacting the police. Joanie Joyner, a resident of Huntington Street and the victim's next-door neighbor, also heard a loud "boom" from the direction of her backyard and then, sometime after 11 p.m., saw something in her yard. At approximately 11:25 p.m., she also called the police.

The defendant contacted Toles by telephone between 9:45 and 10 p .m., told her that he was about five minutes away from her dormitory at Southern Connecticut State University, and asked if he could visit her. Toles agreed. The defendant did not arrive at the dormitory until 11 p.m., at which time he phoned Toles from the lobby, and she came down to the lobby to register him as a visitor at the security desk. The defendant was with a friend, Travis Scott. To enter the dormitory, the defendant was required to provide identification at the security desk where security personnel record the information. The sign-in sheet at Toles' dormitory indicated that she signed the defendant into her building at 11:10 p.m. Shortly after they signed in, a fire alarm required all residents and visitors to evacuate the building. The alarm occurred at approximately 11:30 p.m., and the fire department and university police responded to the scene. The defendant and Scott waited with Toles and her roommate until the university permitted students to reenter the building. They retrieved their identification from the security desk and departed. During the investigation, Detective Breland of the New Haven police department drove from Ralph Ford's house to Toles' dormitory, recorded the distance to be about three miles and noted that the trip took approximately ten minutes.

***3** Officers Mark Taylor and Brian Pazsak of the New Haven police department were on patrol in the Newhall and Huntington Street area on the night of October 10, 2001, and received the dispatch related to Baker's and Joyner's calls. Police responded first to Baker's call and investigated the general area, but saw nothing amiss. After responding to Joyner's call around 11:35 p.m., the officers found the victim lying face down in Joyner's backyard. The victim appeared to be unconscious and bleeding from the mouth. The officers also found a spent nine millimeter shell casing nearby. New Haven fire department personnel were called but were unable to resuscitate the victim, who was pronounced dead at the Hospital of Saint Raphael in New Haven.

Arkady Katsnelson of the chief medical examiner's office performed an autopsy of the victim on October 11, 2001, and determined that he had died of a single gunshot wound to the right side of his face. Katsnelson concluded that the

bullet penetrated the victim's face and neck, and completely severed the spinal cord, instantly incapacitating the victim.

*State v. Johnson, supra,* 288 Conn. at 239–43 (footnotes omitted).

The petitioner initiated this petition for habeas corpus on December 18, 2008. In count one of his second amended petition, filed on August 18, 2011, the petitioner brings an actual conflict of interest claim on the grounds that the duty of loyalty owed to the petitioner by his trial counsel was divided as a result of the simultaneous representation of a potential defense witness, William Holly, by trial counsels' supervisor, public defender Thomas Ullmann.

In count two, the petitioner asserts that his trial counsel were ineffective in failing to:

a.) Adequately cross examine Ralph Ford regarding his possession of a pistol with a description consistent with the murder weapon, and concerning his prior statement that he did not see anything on the night of the murder and that he felt pressure from the police, the victim's family and his family to implicate the petitioner in the shooting;

b.) Present Holly's testimony about Ralph Ford's possession of a pistol with a description consistent with the murder weapon;

c.) Present the testimony of Matthew Whalen, an investigator for the public defender's office, concerning Holly's statement that he saw Ralph Ford in possession of a pistol with a description consistent with the murder weapon;

d.) Present the testimony of Jermaine Diggs about Ralph Ford's prior statement that he did not see anything on the night of the shooting, and that he felt pressure from the police, the victim's family and his family to implicate the petitioner in the shooting; [1]

e.) Present the testimony of Joyce Johnson, the petitioner's sister, about the petitioner's presence at their home at the time of the shooting;

f.) Present the testimony of Taylor Allen about the petitioner's presence at his home at the time of the shooting.

***4** A trial was held in this case on September 21 and 22, 2011, and October 13 and 20, 2011. Oral argument was held on May 14, 2013. The petitioner submitted several exhibits and called seven witnesses: Gerard Petillo, a firearm examiner and shooting incident reconstruction consultant, Holly, Joyce Johnson, the petitioner's sister, Whalen, the public defender's investigator, Attorney Thomas Farver, former counsel for Holly, Attorneys Scott Jones and Beth Merkin, the petitioner's trial attorneys, Attorney Thomas Ullmann, trial counsels' supervisor, counsel to Holly in an unrelated matter, and Taylor Allen, the mother of the petitioner's friend's child. The respondent submitted several exhibits and presented two witnesses: Mark Caporale and Daryl Breland, former New Haven police detectives involved in the murder investigation. Both parties filed post-trial briefs. [2]

The court finds the following facts: In the petitioner's first criminal trial, the court declared a mistrial due to a hung jury. The state presented testimony at the first criminal trial from an eyewitness, Ralph Ford, who testified consistent with his statements to the police that he heard a gunshot and saw the petitioner run out of the backyard across the street carrying a black gun in his hand. At the first trial, trial counsel presented a partial alibi defense with testimony indicating that the petitioner was at Southern Connecticut State University around 11 p.m. on the night of the murder. They did not explain the petitioner's whereabouts between 10 and 11 p.m. After the first trial resulted in a hung jury, a juror indicated that it would have been helpful for the jury to know where the petitioner was at the time of the shooting prior to 11 p.m.

At the petitioner's second criminal trial, the state's key witness, Ford, recanted his prior statement and testimony that he had seen the petitioner running from the crime scene with a gun. Instead, Ford testified that the police forced him to make those statements. Ford's prior inconsistent statements at the first criminal trial were admitted for substantive purposes in the second criminal trial pursuant to the *Whelan* doctrine. [3]

At the second trial, trial counsels' defense strategy was that the state failed to prove the petitioner's guilt beyond a reasonable doubt, that Ford was not credible, and that it was Ford that

had accidentally shot the victim, who was Ford's friend. The petitioner's trial attorneys disagreed over whether to present an alibi, including the petitioner's whereabouts between 10 and 11 p.m. or a third party culpability defenses; Attorney Jones wanted to present both defenses and Attorney Merkin did not. Attorney Merkin prevailed and trial counsel did not present either defense at the second trial.

The second jury found the petitioner guilty of the charges, and the court sentenced the petitioner to a total effective sentence of forty-three years' incarceration. After his direct appeal was denied, the petitioner brought this habeas petition.

***5** Additional findings of fact will be made with respect to each particular claim.

DISCUSSION

A. Conflict of Interest Claim

In his conflict of interest claim, the petitioner alleges that trial counsel had a duty to present Holly and Inspector Whalen as witnesses to testify at the second trial as to Holly's statement that he saw Ford in possession of a pistol matching the description of the murder weapon the day of the shooting. The petitioner further claims that trial counsel failed to present this testimony because Attorney Ullmann, the head of the New Haven public defender's office and trial counsels' supervisor, represented Holly in an unrelated manner and advised Holly not to cooperate with the petitioner's defense. This he claims, constituted a conflict of interest.

"Where ... the defendant claims that his counsel was burdened by an actual conflict of interest ... the defendant need not establish actual prejudice ... Where there is an actual conflict of interest, prejudice is presumed because counsel [has] breach[ed] the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests ... In a case of a claimed conflict of interest, therefore, in order to establish a violation of the sixth amendment the defendant has a two-pronged task. He must establish (1) that counsel actively represented conflicting interests and (2) that an actual conflict of interest adversely affected his lawyer's performance." (Internal quotation marks omitted.) *Day v. Commissioner of Correction,* 118 Conn.App. 130, 136–37, 983 A.2d 869 (2009), cert. denied, 294 Conn. 930, 986 A.2d 1055 (2010).

"The [United States Court of Appeals for the Second Circuit] has honed this test further. Once a [petitioner] has established that there is an actual conflict, he must show that a lapse of representation ... resulted from the conflict ... To prove a lapse of representation, a [petitioner] must demonstrate that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." (Internal quotation marks omitted.) *Santiago v. Commissioner of Correction,* 87 Conn.App. 568, 584, 867 A.2d 70, cert. denied, 273 Conn. 930, 873 A.2d 997 (2005).

Our Supreme Court in *Anderson v. Commissioner of Correction,* 308 Conn. 456, 64 A.3d 325 (2013), recently held that an actual conflict of interest does not arise in cases where public defenders from the same office represent parties with adverse interests unless the petitioner demonstrates specific instances in which his interests were adversely affected by trial counsel's representation. In *Anderson,* the court found that the public defender's representation of the petitioner was governed by rule 1.11 of the Rules of Professional Conduct, which indicates in its commentary that "[b]ecause of the special problems raised by imputation within a government agency, subsection (d) does not impute the conflicts of a lawyer currently serving as an officer or employee of the government to another associated government officers or employees, although ordinarily it will be prudent to screen such lawyers. Rules of Professional Conduct 1.11, commentary." *Id.,* at 461. The court then found that even if the petitioner's public defender had breached the Rules of Professional Conduct, "an ethical violation, without more, is insufficient to establish a constitutional violation." *Id.,* at 462. After noting that the habeas court had found no specific instances in which the petitioner's interests had been adversely affected by trial counsel's representation, the court determined that the petitioner failed to demonstrate an actual conflict of interest existed. *Id.*

***6** At the time of the petitioner's second criminal trial, Holly had a criminal matter pending that was unrelated to the petitioner's case. Attorney Ullmann represented Holly in that matter. Inspector Whalen contacted Holly on behalf

of the petitioner's defense, and Holly informed him that he had seen Ford with a handgun with a description similar to the murder weapon. Attorney Ullmann advised Holly not to testify at the petitioner's criminal trial because the same prosecutor was handling both the petitioner's case and Holly's pending case, and he did not want the prosecutor to retaliate against Holly in his case for assisting the petitioner's defense. Attorney Ullmann subsequently appointed a private attorney, Attorney Farver, to represent Holly with respect to Holly's involvement in the petitioner's case. Both Attorney Jones' and Attorney Merkin's decision not to call Holly as a witness at the petitioner's trial was not impacted by the fact that Attorney Ullmann was their supervisor, and had advised Holly not to testify.

Pursuant to the Supreme Court's decision in *Anderson v. Commissioner of Correction, supra,* 308 Conn. at 456, an actual conflict of interest does not arise in the present case solely because trial counsel and Attorney Ullmann worked in the same government office while representing parties with adverse interests. Further, the court finds no specific instances in which the petitioner's interests have been adversely affected by trial counsels' representation. Attorney Ullmann appointed a private attorney to represent Holly with respect to the petitioner's case to avoid any potential conflict, and both Attorney Jones and Attorney Merkin testified that Attorney Ullmann's status as their supervisor or position as to Holly's testimony did not impact their decision not to call him as a witness in the petitioner's second trial. Accordingly, the petitioner has failed to prove his actual conflict of interest claim.

B. Ineffective Assistance of Counsel Claims

It is well established that: "A criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of a criminal proceeding. *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This right arises under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. *Baez v. Commissioner of Correction,* 34 Conn.App. 236, 242–43, 641 A.2d 147, cert. denied, 231 Conn. 905, 906, 648 A.2d 149 (1994)." *Dennis v. Commissioner of Correction,* 134 Conn.App. 520, 531, 39 A.3d 799 (2012).

The standard for proving a claim of ineffective assistance of trial counsel is well established. The petitioner has the burden to establish that "(1) counsel's representation fell below an objective standard of reasonableness, *and* (2) counsel's deficient performance prejudiced the defense because there was a reasonable probability that the outcome of the proceedings would have been different had it not been for the deficient performance." (Internal quotation marks omitted; emphasis in original.) *Johnson v. Commissioner of Correction,* 285 Conn. 556, 575, 941 A.2d 248 (2008), citing *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "To satisfy the performance prong, a claimant must demonstrate that 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed ... by the [s]ixth [a]mendment." *Ledbetter v. Commissioner of Correction,* 275 Conn. 451, 458, 880 A.2d 160 (2005), cert. denied sub nom. *Ledbetter v. Lantz,* 546 U.S. 1187, 126 S.Ct. 1368, 164 L.Ed.2d 77 (2006), quoting *Strickland v. Washington, supra,* 466 U.S. at 687.

*7 "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice ... are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant ...

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable ... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the

circumstances, the challenged action might be considered sound trial strategy ...

"Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." (Internal quotation marks omitted.) *Bryant v. Commissioner of Correction,* 290 Conn. 502, 512–13, 964 A.2d 1186 (2009).

Under the second prong of the test, the prejudice prong, the petitioner must show that "counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable." (Internal quotation marks omitted.) *Strickland v. Washington, supra,* 466 U.S. at 687; *Michael T. v. Commissioner of Correction,* 307 Conn. 84, 101, 52 A.3d 655 (2012). "The second prong is thus satisfied if the petitioner can demonstrate that there is a reasonable probability that, but for that ineffectiveness, the outcome would have been different." (Internal quotation marks omitted.) *Bryant v. Commissioner of Correction, supra,* 290 Conn. at 522.

1. Failure to present evidence in support of third-party culpability defense

The petitioner claims that trial counsel were ineffective for failing to call Holly or Inspector Whalen as witnesses to support the theory that Ford accidentally committed the murder, or investigate whether Holly could identify a photograph of the pistol as being the weapon he saw Ford in possession of the day of the shooting.

***8** "It is well established that a defendant has a right to introduce evidence that indicates that someone other than the defendant committed the crime with which the defendant has been charged ... The defendant must, however, present evidence that directly connects a third party to the crime ... It is not enough to show that another had the motive to commit the crime ... nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused ... *State v. Arroyo,* 284 Conn. 597, 609, 935 A.2d 975 (2007) ...

"The admissibility of evidence of third party culpability is governed by the rules relating to relevancy ... *State v. Ortiz,* 252 Conn. 533, 564, 747 A.2d 487 (2000). Relevant evidence is evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence ... *State v. West,* 274 Conn. 605, 625, 877 A.2d 787, cert. denied, 546 U.S. 1049, 126 S.Ct. 775, 163 L.Ed.2d 601 (2005); Conn.Code Evid. § 4–1. Accordingly, in explaining the requirement that the proffered evidence establish a direct connection to a third party, rather than raise merely a bare suspicion regarding a third party, [our Supreme Court has] stated: Such evidence is relevant, exculpatory evidence, rather than merely tenuous evidence of third party culpability [introduced by a defendant] in an attempt to divert from himself the evidence of guilt ... *State v. Smith,* 280 Conn. 285, 304, 907 A.2d 73 (2006). In other words, evidence that establishes a direct connection between a third party and the charged offense is relevant to the central question before the jury, namely, whether a reasonable doubt exists as to whether the defendant committed the offense. Evidence that would raise only a bare suspicion that a third party, rather than the defendant, committed the charged offense would not be relevant to the jury's determination. A trial court's decision, therefore, that third party culpability evidence proffered by the defendant is admissible, necessarily entails a determination that the proffered evidence is relevant to the jury's determination of whether a reasonable doubt exists as to the defendant's guilt. *State v. Arroyo, supra,* 284 Conn. at 609–10." (Internal quotation marks omitted.) *Bryant v. Commissioner of Correction, supra,* 290 Conn. at 514–15. "The primary object of third party suspect testimony is not to prove the guilt of the third party but to disprove the guilt of the accused. If it raises a reasonable doubt of his guilt it accomplishes its object." (Internal quotation marks omitted.) *State v. Berger,* 249 Conn. 218, 235, 733 A.2d 156 (1999).

"While ... the decision whether to call a particular witness falls into the realm of trial strategy, which is typically left to the discretion of trial counsel ... it does not follow necessarily that, in every instance, trial counsel's strategy concerning these decisions is sound." (Citation omitted.)

*Bryant v. Commissioner of Correction, supra,* 290 Conn. at 521.

***9** At the second criminal trial, the state established that the bullet recovered from the victim was from a Hi–Point 9 mm pistol or semi-automatic rifle. At the habeas trial, the petitioner established that Ford showed Holly a black handgun that Ford had tucked into the waistband of his pants on the afternoon of the shooting. Holly believed that a photograph of the Hi–Point 9 mm pistol used in the shooting looked like the gun that he saw Ford carrying. The murder weapon and Ford's gun both had ridges above the handle, and ridges were not a common feature on the guns that Holly had seen.

The petitioner's trial attorneys disagreed as to whether the third-party culpability defense should be presented to the jury. Attorney Jones believed that Holly's testimony should have been presented and Attorney Merkin did not, even though she admitted that Holly's testimony was consistent with the defense theory of the case which was that Ford accidentally shot the victim. The court finds the third-party culpability defense consisting of the facts that (1) Ford had been the last person seen with the victim, (2) was in close proximity to the location of the shooting at the time of the shooting, and (3) had been seen with a gun matching the description of the murder weapon on the day of the shooting, were consistent with and relevant to the defense's theory that it was Ford who shot the victim by accident.

Both Attorney Jones and Attorney Merkin thought that they would not be able to present Holly's testimony without Ford first admitting that he knew Holly. Trial counsel believed, incorrectly, that they needed, and did not have, a foundation to introduce third-party culpability evidence—that is the testimony of Holly—once Ralph Ford denied knowing Holly while on the witness stand at the petitioner's criminal trial. At the habeas trial, Attorney Merkin conceded that the presentation of Holly's testimony was not contingent upon Ford admitting that he knew Holly. The issue with presenting testimony supporting a third-party culpability defense is not about presenting a foundation for admitting the evidence; it is about the petitioner's constitutional right to present a defense and relevant evidence in support of that defense.

"It is well established that [t]he federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense ... The sixth amendment ... [guarantees] the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies ... When defense evidence is excluded, such exclusion may give rise to a claim of denial of the right to present a defense ... A defendant is, however, bound by the rules of evidence in presenting a defense ... Although exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights, the constitution does not require that a defendant be permitted to present every piece of evidence he wishes ... If the proffered evidence is not relevant, the defendant's right to confrontation is not affected, and the evidence was properly excluded." (Internal quotation marks omitted.) *State v. Hedge,* 297 Conn. 621, 634, 1 A.3d 1051.

***10** As discussed, the standard for determining whether evidence of third-party culpability is admissible is whether the presented evidence is relevant. Here, it was. Holly's testimony regarding Ford's possession of the same type of gun that was used to kill the victim on the day of the shooting, as well as other facts pointing to Ford as the shooter, would have established the necessary factual nexus for a third-party culpability claim regardless of whether Ford knew Holly. The court finds that it is reasonably likely that the trial court would have allowed Holly's testimony.

The state argues that Attorney Farver communicated to the court on Holly's behalf that Holly would assert his Fifth Amendment privilege and refuse to testify if he was called. However, both Attorney Farver and Attorney Merkin testified that they were uncertain that Holly would have been permitted to invoke his Fifth Amendment privilege at the petitioner's criminal trial due to the fact that Holly's pending charges were unrelated to the petitioner's case. At the criminal trial, Farver reported to the court: "I met with Mr. Holly this morning and discussed with him his rights and whether to testify or not to testify if called upon to do so. I explained to him if he, well first of all let me say that he does not wish to testify. It is his position at this point as he expressed to me that he first of all, would exercise a fifth amendment right although, I candidly don't know how far the testimony or the inquiry would be going whether he has such a right. Quite honestly I know that he has pending charges of his own here in the courthouse. I don't believe those are related to this case. However, he would

first of all have to assert a Fifth Amendment right. The court may choose to find that he does not have a Fifth Amendment right as to this particular information that is being sought. If the court were to rule in that fashion and order him to testify I have explained to him that he could be found in contempt of court if he continues to decline to testify he has indicated to me that his position would still be that he would refuse to testify because he has pending charges and he does not want to testify."

The Fifth Amendment to the United States constitution affords to each individual the privilege not to be compelled to incriminate oneself. "The standard for determining whether to permit invocation of the privilege against self-incrimination is well established. To reject the invocation it must be perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] cannot possibly have [a] tendency to incriminate the witness ... The right to the privilege does not depend upon the likelihood of prosecution but upon the possibility of prosecution." (Citations omitted, internal quotation marks omitted.) *State v. Giraud,* 258 Conn. 631, 640, 783 A.2d 1019 (2001); see *State v. Ayuso,* 105 Conn.App. 305, 937 A.2d 1211, cert. denied, 286 Conn. 911, 944 A.2d 983 (2008) (holding fifth amendment privilege properly invoked by witness where witness could be cross examined regarding drug dealing behavior); *State v. Simms,* 170 Conn. 206, 365 A.2d 821 (1976) (finding fifth amendment privilege existed where witness's testimony would indicate witness participated in sale of heroin and could be charged as a principal).

***11** In the present case, Holly's pending charges were unrelated to the petitioner's case, and there is no indication that Holly's testimony that he saw Ford with a gun on the day of the shooting would have exposed him to any criminal prosecution in the petitioner's or any other case. Fear of potential prosecutorial retaliation in an unrelated case does not constitute sufficient grounds to invoke the Fifth Amendment, as it is a mere subjective belief not a reality and the actual testimony would not have been incriminating in any way. Therefore, the court finds that it is not reasonably likely that Holly would have been permitted to invoke his privilege against self-incrimination in the petitioner's criminal case had trial counsel proffered him as a defense witness to support the third-party culpability defense.

In *Bryant v. Commissioner of Correction, supra,* 290 Conn. at 502, our Supreme Court found that trial counsel's failure to pursue a third-party culpability defense constituted ineffective assistance of counsel. The court first found that trial counsel's performance was deficient, finding: "The alternative theory raising a third party culpability defense was well supported by neutral, credible witnesses, whose statements were made contemporaneous to the events ... [T]he evidence was relevant, and could have raised a reasonable doubt in the minds of the jury as to the petitioner's guilt ... In the light of all the circumstances, including the dubious credibility of the state's two eyewitnesses, the decision not to present the third party culpability defense fell below an objective standard of reasonableness, and therefore, constituted deficient performance under the principles enunciated in *Strickland.*" *Id.,* at 519–20. The court then found that the petitioner satisfied the performance prong of *Strickland* because the third-party culpability defense, as supported by the witnesses' testimony, "likely would have permeated to some degree every aspect of the trial and raised a reasonable doubt in the minds of the jury as to the petitioner's guilt." *Id.,* at 523.

Similarly, in *Siemon v. Warden,* 184 Conn. 547, 555–56, 440 A.2d 210 (1981), the Supreme Court found deficiency in the failure of defense counsel to present third-party culpability evidence. "Here, there was more than mere evidence of a motive on the part of a third party. There was testimony to show that a white, nude man with black hair, a beard and without a Spanish accent was on the scene of the crime some months earlier. The description matched the composite drawing of the assailant. Moreover, the plaintiff does not have black hair and there was testimony that he did not have a beard on the date of the crime. The victim testified that her assailant did not have an accent. The habeas court found that the plaintiff had a Spanish accent. The unusual fact of encountering a nude man in the same area on three occasions was enough to connect the nude man to the crime with sufficient directness to render the evidence admissible."

***12** In the present case, the court finds that trial counsel was deficient for not pursuing the petitioner's third-party culpability defense because it was supported by a neutral, credible witness, and the evidence was relevant to the central issue of whether a reasonable doubt existed as to whether the petitioner committed the crime. As in *Bryant,* in light of all of the circumstances here, particularly the recanted testimony of

Ford, whose testimony served as the state's primary evidence, and the facts pointing to Ford's culpability, trial counsels' failure to not present the third-party culpability defense fell below an objective standard of reasonableness, and therefore constitutes deficient performance pursuant to *Strickland.*

The court also further finds that trial counsels' failure to present the third-party culpability defense prejudiced the petitioner because there is a reasonable probability that the outcome of the proceedings would have been different had the defense been presented to the jury. As a result, the court finds that the petitioner has satisfied the prejudice prong of *Strickland* as to this claim.

2. Failure to prepare and present alibi defense

The petitioner claims that trial counsel were ineffective for failing to call Johnson and Allen as witnesses to testify that he was home at the time of the shooting in support of an alibi defense. The court agrees with the petitioner on this claim.

"The failure of defense counsel to call a potential defense witness does not constitute ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense. Defense counsel will be deemed ineffective only when it is shown that a defendant has informed his attorney of the existence of the witness and that the attorney, without a reasonable investigation and without adequate explanation, failed to call the witness at trial. The reasonableness of an investigation must be evaluated not through hindsight but from the perspective of the attorney when he was conducting it ... [T]here is a strong presumption that the trial strategy employed by a criminal defendant's counsel is reasonable and is a result of the exercise of professional judgment." (Internal quotation marks omitted.) *Burgos–Torres v. Commissioner of Correction,* 142 Conn .App. 627, 639, 64 A.3d 1259, cert. denied, 309 Conn. 909, 68 A.3d 663 (2013). The same standard applies to potential alibi witnesses. *Henderson v. Commissioner of Correction,* 129 Conn.App. 188, 194, 19 A.3rd 705, cert. denied, 303 Conn. 901, 31 A.3d 1177 (2011); *Dunkley v. Commissioner of Correction,* 73 Conn.App. 819, 823–24, 810 A.2d 281 (2002), cert. denied, 262 Conn. 953, 818 A.2d 780 (2003).

"[E]ven if a tenable strategic justification [exists] that would ... [account] for [trial counsel's] failure to call ... alibi witnesses, this would not insulate [trial counsel's] actions from a subsequent claim of ineffective assistance of counsel. The United States Supreme Court has cautioned that '[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable.' *Roe v. Flores–Ortega,* 528 U.S. 470, 481, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000)." *Vasquez v. Commissioner of Correction,* 107 Conn.App. 181, 186–87, 944 A.2d 429 (2008).

***13** The petitioner's trial counsel were aware of the two alibi witnesses, Allen and Johnson, who could testify as to petitioner's whereabouts between 10 and 11 p.m. on the evening of the shooting, but disagreed as to whether an alibi defense should be presented. They were also aware that the jury in the first trial wanted to know where the petitioner was between 10 to 11 p.m. Attorney Jones wanted to present the alibi defense because he believed the witnesses were credible and their testimony explained the petitioner's whereabouts at the time of the shooting in response to the first jury's concerns as to where the petitioner was between 10 and 11 p.m. Attorney Merkin does not like alibi defenses generally and her practice was to not present an alibi defense unless it was rock solid. Attorney Jones conceded to Attorney Merkin's decision to not present the alibi defense because she was more senior to him.

At the second criminal trial, James Baker, a Read Street resident, testified that at 10:20 p.m., he heard a gunshot. Baker did not call the police until 10:45 p.m. Prior to the petitioner's first criminal trial, Attorney Merkin had inaccurate information about the time of the shooting. She mistakenly believed that the shooting occurred at 10:45 p.m. Counsels' Notice of Alibi, dated July 29, 2003, inaccurately reported that Baker called the police at 10:45 p.m., immediately after the shooting occurred. It was only when Baker testified at the petitioner's first criminal trial that counsel became aware that the correct time of the shooting was 10:20 p.m.

Johnson and Allen testified credibly at the habeas trial as to the petitioner's whereabouts on the night of the shooting. Johnson testified that the petitioner was home between 5:00 p.m. and 11 p.m. on the night of the shooting. During that time, Johnson was home with her young son and was for the most part in the living room in the front of the apartment

watching television. From her position she would have been able to see if the petitioner had left the house during that time. At some point, Johnson was aware that the petitioner and his friend were at the house and ordered a pizza. The living room had two large windows facing the driveway, and any movement outside would have activated the motion sensor lights in the driveway. If the petitioner had left through the back door, Johnson would have heard him because that door screeched loudly when opened. At approximately 11 p.m., Johnson heard a horn honk outside and she saw the petitioner leave the house with Allen.

Allen, who also testified at the habeas trial credibly, called the petitioner's cell phone at 10:20 p.m., and he asked her to call his home telephone number. Allen immediately hung up and called the petitioner at home on his landline. Allen and the petitioner spoke for approximately ten to fifteen minutes on the petitioner's home phone. The petitioner then called Allen again from his home telephone around 10:40 p.m. or 10:45 p.m. Shortly thereafter, Allen drove to the petitioner's home, picked him up at approximately 10:50 p.m. or 10:55 p.m. and drove him to Southern Connecticut State University. The court finds that the testimony of Allen and Johnson would have been helpful to the petitioner's defense.

***14** Inspector Whalen testified that he interviewed Allen and Johnson. Johnson informed him that the petitioner was at home with a friend on the night of the shooting and someone picked the petitioner up between 10:45 p.m. and 11 p.m. Allen told Inspector Whalen that she called the petitioner at his home at 10:20 p.m., and she picked the petitioner up around 10:35 p.m. or 10:40 p.m. to drive him to Southern Connecticut State University. At the time of his interview with Allen, Inspector Whalen was aware of the fact that the victim was shot at 10:20 p.m. Inspector Whalen reported the information he received from Johnson and Allen to the petitioner's trial counsel.

Trial counsel also had the partial alibi presented at the first criminal trial of Toles who testified that the petitioner arrived at the Southern Connecticut State University to visit her at approximately 11:10 p.m. on the night of the shooting.

The court finds that trial counsel was aware of the statements of Johnson and Allen, that their testimony was credible and that production of such testimony at trial would have been helpful to the defense. See *Henderson v. Commissioner of Correction,* 129 Conn.App. 188, 194, 19 A.3rd 705, cert. denied, 303 Conn. 901, 31 A.3d 1177 (2011); *Dunkley v. Commissioner of Correction, supra,* 73 Conn.App. at 823–24.

In *Dunkley v. Commissioner of Correction, supra,* 73 Conn.App. at 819, our Appellate Court held that the habeas court properly denied certification on the petitioner's ineffective assistance of counsel claim for counsel's failure to call certain witnesses because the petitioner made no showing that the witnesses' testimony would have been helpful to his defense, and the court found that the witnesses were not credible. *Id.,* at 825. Unlike in *Dunkley,* here trial counsels' decision to not call the alibi defense witnesses was not based on the witnesses' credibility. Both Attorney Jones and Attorney Merkin found Johnson and Allen to be credible witnesses. Moreover, the court finds that their testimony would have been helpful to the petitioner's defense that he was home at the time of the shooting.

Attorney Merkin decided to not present Johnson's testimony because she was related to the petitioner, the shooting occurred in close proximity to the petitioner's home and it was unclear whether the petitioner was in her direct vision for the entire evening. Attorney Merkin did not present Allen's testimony because she believed that Allen estimated the times of the phone calls, and the petitioner's close proximity to the crime scene would have allowed him to commit the murder despite receiving and making the phone calls at the times indicated by Allen. Trial counsel acknowledged at the habeas trial, however, that they failed to investigate Johnson's ability to provide an alibi at the times when the petitioner was not in her direct view. Johnson testified that the motion sensor lights and the screeching back door would have prevented the petitioner from leaving the house without Johnson's knowledge. Moreover, the times of the phone calls between Allen and the petitioner were seen on Allen's caller identification. That evidence if presented would have established that the petitioner was at home using his landline at the time the shooting occurred. Further, while Attorney Merkin was concerned that the alibi defense would place the petitioner in close proximity to the crime scene, there was already evidence before the jury that the petitioner was at Southern Connecticut State University, close to the crime scene, shortly before 11 p.m. on the night of the victim's murder. In addition, the evidence from the three alibi witnesses covered the time period from 10 to 11 p.m., making

it highly unlikely that the petitioner could have committed the shooting.

***15** The court is particularly influenced by the fact that when trial counsel decided not to submit the petitioner's alibi, they were aware that the first jury was conflicted about the petitioner's guilt, which resulted in a hung jury and knew that the first jury wanted to know where the petitioner was at the time the shooting occurred. While each jury is different, having this information in the petitioner's second criminal trial was a significant bonus to the defense and should have been utilized in determining whether to pursue the alibi defense.

Pursuant to the foregoing, the court finds that in light of the circumstances in this case, and the credible evidence presented, it was not objectively reasonable for trial counsel to not present the alibi witnesses. The court had the opportunity to hear and to evaluate the two witnesses, and found their testimony to be credible and compelling and would have been helpful to the petitioner's case. See *Gaines v. Commissioner of Correction,* 125 Conn.App. 97, 112, 7 A.3d 395 (2010), aff'd, 306 Conn. 664, 51 A.3d 948 (2012) (concluding habeas court properly granted petitioner's habeas petition seeking relief for failing to present an alibi defense, noting "[i]n other cases, the habeas court is faced with the contention that counsel's decision was tactical and not the result of deficient performance [but][i]n this case ... the habeas court had the opportunity to hear and to evaluate the two claimed alibi witnesses, whose testimony was found to be credible and compelling"). Trial counsel also found the alibi witnesses to be credible, and that their testimony would have been helpful to the petitioner's defense. Accordingly, the court concludes that the petitioner has met his burden to prove that counsel's conduct was constitutionally deficient under the performance prong of *Strickland.*

The court also finds that trial counsels' failure to call the alibi witnesses prejudiced the petitioner because there is a reasonable probability that the outcome of the proceedings would have been different had it not been for the deficient performance. The court finds that the testimony from Johnson and Allen likely would have affected the verdict, especially in light of the weakness of the state's case and the fact that the jurors at the first criminal trial that resulted in a hung jury were interested in where the petitioner was at the time of the shooting. As a result, the court finds that the petitioner has satisfied the prejudice prong of *Strickland* as to this claim.

## CONCLUSION

For all of the foregoing reasons, the petition is denied as to the conflict of interest claim, and granted as to the ineffective assistance of counsel claims. The judgment of conviction is vacated and the case is returned to the trial court in *State v. Johnson,* Docket No. CR 02 0003996, Judicial District of New Haven for further proceedings.

So ordered.

**All Citations**

Not Reported in A.3d, 2013 WL 5422895

## Footnotes

1 The petitioner did not present the testimony of Jermaine Diggs and did not brief this issue. It is therefore considered abandoned See *Solek v. Commissioner of Correction,* 107 Conn.App. 473, 480, 946 A 3d 239, cert. denied, 289 Conn. 902, 957 A.2d 873 (2008) ("[t]he responsibility of a habeas court, in confronting an often voluminous trial court record, is to respond to those claims fairly advanced by the petitioner. The mere recital of those claims in a petition, without supporting oral or written argument, does not adequately place those claims before the court for its consideration").

2 The delay in the briefing, argument and decision in this case resulted primarily from delays in the petitioner's receipt of the habeas trial transcripts.

3 *State v. Whelan,* 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S.Ct 597, 93 L.Ed.2d 598 (1986).

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Attachment 8

324 Conn. 904
Supreme Court of Connecticut.

Carvaughn JOHNSON
v.
COMMISSIONER OF CORRECTION

Decided January 4, 2017

**Attorneys and Law Firms**

Vishal K. Garg, in support of the petition.

James A. Killen, senior assistant state's attorney, in opposition.

**Opinion**

The petitioner Carvaughn Johnson's petition for certification for appeal from the Appellate Court, 166 Conn.App. 95, 140 A.3d 1087 (2016), is granted, limited to the following issues:

"1. Whether the Appellate Court properly concluded that the claim that defense counsel's failure to investigate alibi witnesses was deficient performance was not reviewable because the petitioner failed to adequately raise the claim before the habeas court?

"2. Whether the Appellate Court properly concluded that defense counsel's failure to present an alibi defense was not deficient performance?

"3. Whether the Appellate Court properly concluded that the petitioner was not prejudiced by his counsel's failure to present evidence of third party culpability?"

**All Citations**

324 Conn. 904, 152 A.3d 545 (Mem)

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Attachment 9

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by State v. Carpenter, Conn.App., November 19, 2019

330 Conn. 520
Supreme Court of Connecticut.

Carvaughn JOHNSON
v.
COMMISSIONER OF CORRECTION

(SC 19856)
|
Argued September 12, 2018
|
Officially released January 8, 2019

**Synopsis**
**Background:** Following affirmance of his convictions for murder and carrying pistol without permit, 288 Conn. 236, 951 A.2d 1257, petitioner filed petition for writ of habeas corpus. The Superior Court, Judicial District of Tolland, Cobb, J., 2013 WL 5422895, granted petition in part. Commissioner of Corrections appealed. The Appellate court, 166 Conn.App. 95, 140 A.3d 1087, affirmed in part, reversed in part, and remanded. Petitioner, on the grant of certification, appealed.

**Holdings:** The Supreme Court, D'Auria, J., held that:

[1] defense counsel's decision not to present alibi witnesses was matter of reasonable trial strategy and not ineffective assistance;

[2] proposed witness's testimony failed to establish sufficient nexus between victim's murder and third-party, as necessary for admission of third-party culpability evidence;

[3] defense counsel's decision not to offer proposed witness's testimony was matter of reasonable trial strategy and not ineffective assistance; and

[4] petitioner failed to establish that proposed witness could not have invoked privilege against self-incrimination, and thus he could not demonstrate prejudice prong of ineffective assistance.

Affirmed.

**Procedural Posture(s):** Appellate Review; Post-Conviction Review.

West Headnotes (40)

**[1]** **Habeas Corpus** Findings; formal orders
**Habeas Corpus** Questions of law and fact
**Habeas Corpus** Clear error

In reviewing habeas claims, the Supreme Court is mindful that the habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous; the application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review.

**[2]** **Criminal Law** Deficient representation and prejudice in general

To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland*, which requires that a petitioner satisfy both a performance prong and a prejudice prong. U.S. Const. Amend. 6.

2 Cases that cite this headnote

**[3]** **Criminal Law** Deficient representation in general

To satisfy the performance prong of an ineffective assistance claim, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment. U.S. Const. Amend. 6.

8 Cases that cite this headnote

[4] **Criminal Law** Prejudice in general

To satisfy the prejudice prong of an ineffective assistance claim, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. U.S. Const. Amend. 6.

6 Cases that cite this headnote

[5] **Criminal Law** Determination

Although a habeas petitioner can succeed on an ineffective assistance claim only if he satisfies both performance and prejudice prongs, a reviewing court can find against a petitioner on either ground. U.S. Const. Amend. 6.

8 Cases that cite this headnote

[6] **Criminal Law** Deficient representation in general

Deficient performance prong of *Strickland* for demonstrating ineffective assistance is based on what an objectively reasonable attorney would do under the circumstances: the defendant must show that counsel's representation fell below an objective standard of reasonableness. U.S. Const. Amend. 6.

[7] **Criminal Law** Deficient representation in general

Proper measure of attorney performance, for purposes of an ineffective assistance claim, is reasonableness under prevailing professional norms. U.S. Const. Amend. 6.

[8] **Criminal Law** Deficient representation in general

In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. U.S. Const. Amend. 6.

1 Case that cites this headnote

[9] **Criminal Law** Adequacy of Representation

A fair assessment of attorney performance, for purposes of an ineffective assistance claim, requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. U.S. Const. Amend. 6.

[10] **Criminal Law** Presumptions and burden of proof in general

**Criminal Law** Strategy and tactics in general

Because of the difficulties inherent in making the evaluation of counsel's perspective at the time of the alleged ineffective assistance, a court examining an ineffective assistance claim must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. U.S. Const. Amend. 6.

4 Cases that cite this headnote

[11] **Criminal Law** Adequacy of Representation

There are countless ways to provide effective assistance in any given case, and even the best criminal defense attorneys would not defend a particular client in the same way. U.S. Const. Amend. 6.

2 Cases that cite this headnote

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

[12] **Criminal Law** Presumptions and burden of proof in general

Reviewing court examining an ineffective assistance claim is required not simply to give the trial attorney the benefit of the doubt but to affirmatively entertain the range of possible reasons counsel may have had for proceeding as he did. U.S. Const. Amend. 6.

2 Cases that cite this headnote

[13] **Criminal Law** Presentation of witnesses

When faced with the question of whether counsel performed deficiently, as an element of ineffective assistance, by failing to call a certain witness, the question is whether this omission was objectively reasonable because there was a strategic reason not to offer such testimony and whether reasonable counsel could have concluded that the benefit of presenting the witness's testimony was outweighed by any damaging effect it might have. U.S. Const. Amend. 6.

3 Cases that cite this headnote

[14] **Habeas Corpus** Presentation and reservation in lower habeas court of grounds of review

Habeas petitioner adequately preserved his claim for appeal that defense counsel performed deficiently, as an element of ineffective assistance, by failing to adequately investigate alibi witnesses and present alibi defense in murder prosecution, though habeas petition framed claim as a failure to present alibi witnesses, not as failure to investigate; petitioner proceeded on general theory that adequate investigation would have rendered concerns about its weakness unfounded and, thus, counsel would have presented testimony at trial, counsel was questioned extensively at habeas trial regarding their investigation, inadequate presentation was inextricably linked to related claim of inadequate preparation, and there was no prejudice to State under the circumstances. U.S. Const. Amend. 6.

2 Cases that cite this headnote

[15] **Habeas Corpus** Presentation and reservation in lower habeas court of grounds of review

Supreme Court reviews only claims that were distinctly raised before the habeas court.

2 Cases that cite this headnote

[16] **Criminal Law** Alibi

Defense counsel's decision not to present testimony of two witnesses placing defendant at home and on landline phone around time of murder as alibi defense was matter of reasonable trial strategy and not ineffective assistance; counsel was concerned that alibi testimony would place defendant in close proximity to shooting, that it would allow prosecutor to argue consciousness of guilt on basis of flight, because he had left area shortly after shooting, that jury could have questioned whether witness at home with defendant, who was his sister, was biased or distracted by television or her children, and that imprecise timing of phone calls left open possibility that defendant participated in murder and in telephone calls, and counsel wanted to focus jury on State's key witness recanting prior statements. U.S. Const. Amend. 6.

[17] **Criminal Law** Investigating, locating, and interviewing witnesses or others

**Criminal Law** Presentation of witnesses

Defense counsel will be deemed ineffective for failing to present witness testimony only if they knew of the existence of a witness and, without a reasonable investigation and without adequate explanation, failed to call the witness at trial. U.S. Const. Amend. 6.

1 Case that cites this headnote

[18] **Criminal Law** ⟹ Preparation for trial

Reasonableness of an investigation by counsel, for purposes of an ineffective assistance claim, must be evaluated not through hindsight but from the perspective of the attorney when he was conducting it. U.S. Const. Amend. 6.

[19] **Criminal Law** ⟹ Raising of Particular Defense or Contention

To render effective assistance, counsel need not track down each and every lead or personally investigate every evidentiary possibility before choosing a defense and developing it. U.S. Const. Amend. 6.

3 Cases that cite this headnote

[20] **Criminal Law** ⟹ Presentation of witnesses

Failure of defense counsel to call a potential defense witness does not constitute ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense. U.S. Const. Amend. 6.

6 Cases that cite this headnote

[21] **Criminal Law** ⟹ Presentation of witnesses

Even if a witness is found to be highly credible by counsel or by the habeas court, it may be a reasonable strategic decision, and not ineffective assistance, not to offer that witness' testimony if the witness would be vulnerable to attack on other grounds, or their testimony would raise other concerns or leave gaps in a defense. U.S. Const. Amend. 6.

2 Cases that cite this headnote

[22] **Habeas Corpus** ⟹ Scope and Standards of Review

Plenary review, rather than abuse of discretion standard, applied to Supreme Court's review of habeas court's determination that defense counsel rendered ineffective assistance in failing to present third-party culpability evidence in murder trial, though petitioner asserted that Appellate Court should have afforded deference to habeas court's determinations because the issues, including whether proposed witness would have been allowed to invoke his Fifth Amendment privilege against self-incrimination, were evidentiary in nature; habeas court was called on to review hypothetical actions of another court regarding admissibility and privilege, not to make discretionary evidentiary rulings at trial it was conducting, and Supreme Court was equally capable of reviewing that legal question. U.S. Const. Amends. 5, 6.

[23] **Appeal and Error** ⟹ Evidence and Witnesses in General

Evidentiary rulings are afforded deference because a trial court has the inherent discretionary power to control the proceedings before it.

[24] **Criminal Law** ⟹ Incriminating others

Admissibility of evidence of third–party culpability in criminal case is governed by the rules relating to relevancy.

[25] **Evidence** ⟹ Tendency to Prove or Disprove Fact at Issue; Relevance

"Relevant evidence" is evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence.

More cases on this issue

[26] **Criminal Law** ⟹ Incriminating others

Proffered third-party culpability evidence must establish a direct connection to a third party,

rather than raise merely a bare suspicion regarding a third party, to be relevant and admissible; such evidence is relevant, exculpatory evidence, rather than merely tenuous evidence of third–party culpability introduced by a defendant in an attempt to divert from himself the evidence of guilt.

11 Cases that cite this headnote

[27] **Criminal Law** Incriminating others

Evidence that establishes a direct connection between a third party and the charged offense is relevant to the central question before the jury, namely, whether a reasonable doubt exists as to whether the defendant committed the offense, so as to be admissible as third-party culpability evidence.

7 Cases that cite this headnote

[28] **Criminal Law** Incriminating others

Evidence that would raise only a bare suspicion that a third party, rather than the defendant, committed the charged offense would not be relevant to the jury's determination, and thus would not be admissible as third-party culpability evidence.

7 Cases that cite this headnote

[29] **Criminal Law** Incriminating others

A trial court's decision that third–party culpability evidence proffered by the defendant is admissible necessarily entails a determination that the proffered evidence is relevant to the jury's determination of whether a reasonable doubt exists as to the defendant's guilt.

[30] **Criminal Law** Incriminating others

Whether a defendant seeking admission of third-party culpability evidence has sufficiently established a direct connection between a third party and the crime with which the defendant has been charged is necessarily a fact intensive inquiry.

5 Cases that cite this headnote

[31] **Criminal Law** Raising of Particular Defense or Contention

It is not ineffective assistance of counsel to decline to pursue a third–party culpability defense when there is insufficient evidence to support that defense. U.S. Const. Amend. 6.

2 Cases that cite this headnote

[32] **Homicide** Incriminating Others

Proposed witness's testimony, that he had seen victim's friend with gun similar to murder weapon a few days before the murder, would have failed to establish a sufficient nexus between victim's friend and murder necessary to be relevant and admissible as third-party culpability evidence, though victim's friend was apparently last person to see him alive; there was no clear evidence that victim's friend possessed murder weapon, as proposed witness never definitively testified that gun he saw was type of gun identified as murder weapon, and there was no indication that anyone saw friend shoot victim or that he was present at crime scene.

More cases on this issue

[33] **Criminal Law** Presentation of witnesses

Defense counsel's decision not to offer witness's testimony that he had seen victim's friend with gun similar to murder weapon in days before murder was matter of reasonable trial strategy and not ineffective assistance, though it was consistent with defense theory of case that friend had accidentally shot victim; witness's testimony would have required jury to essentially conduct trial within a trial to determine whether there was sufficient evidence that third-party had shot victim, so as to create reasonable doubt about defendant's guilt, evidence directly connecting

friend to shooting was weak enough that it possibly would have served only to confuse or distract the jury, and defense counsel wanted to focus jury on friend's recantation of prior statements implicating defendant in murder. U.S. Const. Amend. 6.

[34] **Criminal Law** ⇐ Presentation of witnesses

Habeas petitioner failed to conclusively establish that proposed witness could not have successfully invoked his Fifth Amendment privilege against self-incrimination, and thus petitioner could not establish prejudice prong of claim that defense counsel rendered ineffective assistance in failing to present proposed witness's testimony that he had seen victim's friend with gun similar to murder weapon in days before murder as third-party culpability evidence; witness's proposed testimony that he recognized friend's gun because it looked like gun he had previously possessed had possibility to result in injurious disclosure because, at time of trial, witness had been charged with armed robbery involving gun and was being investigated in connection with other murder involving gun. U.S. Const. Amends. 5, 6.

[35] **Self-Incrimination** ⇐ Determination of Right to Assert Privilege

A court may not deny a witness' invocation of the Fifth Amendment privilege against compelled self-incrimination unless it is perfectly clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answers cannot possibly have a tendency to incriminate. U.S. Const. Amend. 5.

[36] **Self-Incrimination** ⇐ Determination of Right to Assert Privilege

To sustain the Fifth Amendment privilege against self-incrimination, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. U.S. Const. Amend. 5.

[37] **Self-Incrimination** ⇐ Indirect incrimination; responses linking or leading to evidence of criminal activity

Privilege against self-incrimination afforded by the Fifth Amendment not only extends to answers that would in themselves support a conviction under a criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a crime; but this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer. U.S. Const. Amend. 5.

1 Case that cites this headnote

[38] **Self-Incrimination** ⇐ Determination of Right to Assert Privilege

To sustain the Fifth Amendment privilege against self-incrimination, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result; the trial judge in appraising the claim must be governed as much by his or her personal perception of the peculiarities of the case as by the facts actually in evidence. U.S. Const. Amend. 5.

1 Case that cites this headnote

[39] **Self-Incrimination** ⇐ Testimony at Trial

A witness cannot invoke his Fifth Amendment privilege against self-incrimination as a pretext to avoid answering questions. U.S. Const. Amend. 5.

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**[40]** **Self-Incrimination** ⇐ Incriminating nature in general

Standard for determining whether a witness may invoke the Fifth Amendment privilege against self-incrimination is not whether the witness correctly believes that his testimony would be self-incriminating but, rather, whether there is a possibility of incrimination. U.S. Const. Amend. 5.

**Attorneys and Law Firms**

****57** Damon A. R. Kirschbaum, with whom were Vishal K. Garg, West Hartford and, on the brief, Desmond M. Ryan, for the appellant (petitioner).

James A. Killen, senior assistant state's attorney, with whom, on the brief, were Patrick J. Griffin, state's attorney, and Adrienne Russo, deputy assistant state's attorney, for the appellee (respondent).

Robinson, C.J., and Palmer, McDonald, D'Auria, Kahn and Ecker, Js.

**Opinion**

D'AURIA, J.

***523** The petitioner, Carvaughn Johnson, appeals, upon our grant of certification, from the judgment of the Appellate Court reversing in part the judgment of the habeas court, which granted in part his petition for a writ of habeas corpus on the ground that his defense counsel had provided ineffective assistance by failing (1) to adequately prepare and present an alibi defense, and (2) to present a third-party culpability defense. The Appellate Court agreed with the respondent, the Commissioner of Correction, that it was reasonable trial strategy not to present an alibi defense, that the petitioner's claim of inadequate investigation of the alibi defense was unpreserved, and that the petitioner was not prejudiced by counsel's failure to present a third-party culpability defense. Because we hold that it was not deficient performance for defense counsel not to present the alibi defense and that it was not deficient performance or prejudicial for defense counsel not to present the third-party culpability defense, we affirm the judgment of the Appellate Court.

I

A

The jury in the underlying criminal case reasonably could have found the following facts, as set forth in this court's decision in *State* v. *Johnson*, 288 Conn. 236, 951 A.2d 1257 (2008), which affirmed the trial court's judgment of conviction on direct appeal: "The [petitioner] shot and killed the sixteen year old victim, Markeith Strong, on the evening of October 10, 2001, in New Haven. In the weeks prior to that evening, the [petitioner] and the victim had been at odds with each other. Approximately three weeks prior to the shooting, the victim's teenage sister, L'Kaya Ford [L'Kaya], was sitting with the victim at the corner of Read and Shepard Streets when she observed the [petitioner] approach. ***524** The [petitioner] walked toward [L'Kaya] and the victim, called the victim 'a punk,' and threatened to assault him. The victim said nothing, and the [petitioner] walked away.

"The victim next encountered the [petitioner] in the late afternoon of September 29, 2001, and the two engaged in a dispute over a bicycle. The victim and Ralph Ford [Ford] were around the intersection of Read and Shepard Streets, where the victim either was riding his bicycle or standing ****58** near it, when the [petitioner] stopped him, declared that the bicycle belonged to him and demanded that the victim give it to him. The victim refused and informed the [petitioner] that he had found the bicycle about one month earlier and had fixed it up. The victim told the [petitioner] that he owned the bicycle. The [petitioner] asked for the bicycle a second time, and, when the victim refused, the [petitioner] said, '[d]on't make me do something to you.' The [petitioner] then punched the left side of the victim's head twice, which caused a small cut near the victim's left ear. During this encounter, the [petitioner] may have been carrying a gun. The [petitioner] then took the bicycle and rode away.

"After this encounter, the victim, accompanied by [Ford], returned home, where his family contacted the New Haven police to report the incident. After speaking with the victim,

the police officers radioed a description of the [petitioner] and notice of a possible robbery and larceny. The police did not apprehend any suspect that day. Over the next few days, the [petitioner] approached the victim and [L'Kaya] about the police report, asserted that he was not going to jail, apologized to the victim and told him not to press charges. Toward the end of September, the [petitioner] also expressed concern to his friend, Tashana Milton Toles, about the possible criminal charges that he faced as a result of the bicycle ***525** incident and specifically remarked to her that he thought he might be going back to jail.

"On the morning of October 10, the [petitioner] approached [L'Kaya] while she was waiting for a bus. The [petitioner], who was driving a black car that [L'Kaya] described as an Acura or Ford Probe, pulled the car alongside of her and accused her of being a snitch. The [petitioner] insulted her, told her he did not like snitches and that she knew what happened to 'snitches in the hood.' That night, the victim, [L'Kaya], [Ford], and other friends gathered on the corner of Read and Shepard Streets to celebrate [L'Kaya's] birthday. Some of the group, but not [Ford] or the victim, were drinking alcohol and smoking marijuana. Around 10 p.m., the victim and [Ford] departed together. The neighborhood around Read, Shepard, Huntington and Newhall Streets affords many shortcuts through the yards of houses that are occupied by neighborhood residents. On that night, however, [Ford] did not take his usual shortcut but parted from the victim, who took the shortcut home.[1] [Ford] then continued walking alone on Read Street and proceeded around the corner to his house on Newhall Street. Upon arriving at his house, [Ford] heard a gunshot coming from the backyard of the house across the street. [Ford] then entered his front hallway. [Ford] heard someone running from the yard across the street and saw the [petitioner] run into the driveway leading to Ford's house. [Ford] saw the [petitioner] carrying a semiautomatic handgun and entering a black Acura as it exited the driveway. James ***526** Baker, who lived near the crime scene, heard someone run past his window, jump the fence outside his house and head into the backyard, toward Huntington Street. Approximately five minutes later, and around ****59** 10:20 p.m., Baker heard a single gunshot coming from behind his house. LaMont Wilson, who had left the group earlier than [Ford] and the victim, lived on Read Street and also heard a gunshot from the direction of his backyard, sometime between 10 and 10:45 p.m. Baker called the police at approximately 10:45 p.m. to report the gunshot but did not initially identify himself because he feared retaliation from 'certain individuals' for contacting the police. Joanie Joyner, a resident of Huntington Street and the victim's next-door neighbor, also heard a loud 'boom' from the direction of her backyard and then, sometime after 11 p.m., saw something in her yard. At approximately 11:25 p.m., she also called the police.

"The [petitioner] contacted Toles by telephone between 9:45 and 10 p.m., told her that he was about five minutes away from her dormitory at Southern Connecticut State University, and asked if he could visit her. Toles agreed. The [petitioner] did not arrive at the dormitory until 11 p.m., at which time he phoned Toles from the lobby, and she came down to the lobby to register him as a visitor at the security desk. The [petitioner] was with a friend, Travis Scott. To enter the dormitory, the [petitioner] was required to provide identification at the security desk where security personnel record the information. The sign-in sheet at Toles' dormitory indicated that she signed the [petitioner] into her building at 11:10 p.m. Shortly after they signed in, a fire alarm required all residents and visitors to evacuate the building. The alarm occurred at approximately 11:30 p.m., and the fire department and university police responded to the scene. The [petitioner] and Scott waited with Toles and her roommate until the university permitted students to reenter the building. They ***527** retrieved their identification from the security desk and departed. During the investigation, Detective Daryl Breland of the New Haven [P]olice [D]epartment drove from [Ford's] house to Toles' dormitory, recorded the distance to be about three miles and noted that the trip took approximately ten minutes.

"Officers Mark Taylor and Brian Pazsak of the New Haven [P]olice D]epartment were on patrol in the Newhall and Huntington Street area on the night of October 10, 2001, and received the dispatch related to Baker's and Joyner's calls. Police responded first to Baker's call and investigated the general area, but saw nothing amiss. After responding to Joyner's call around 11:35 p.m., the officers found the victim lying face down in Joyner's backyard. The victim appeared to be unconscious and bleeding from the mouth. The officers also found a spent nine millimeter shell casing nearby. New Haven [F]ire [D]epartment personnel were called but were unable to resuscitate the victim, who was pronounced dead at the Hospital of Saint Raphael in New Haven.

"Arkady Katsnelson of the [C]hief [M]edical [E]xaminer's [O]ffice performed an autopsy of the victim on October 11, 2001, and determined that he had died of a single gunshot wound to the right side of his face. Katsnelson concluded that the bullet penetrated the victim's face and neck, and completely severed the spinal cord, instantly incapacitating the victim. The [petitioner] was charged with the victim's murder and related crimes ... and subsequently was tried. After seven days of deliberations, the jury in the [petitioner's] first trial was unable to reach a verdict. Therefore, the trial court, *Licari, J.*, declared a mistrial pursuant to Practice Book § 42-45." (Footnote added and footnotes omitted.) Id., at 239–44, 951 A.2d 1257.

After a second trial, the petitioner was convicted of murder in violation of ****60** General Statutes § 53a-54a(a) ***528** and carrying a pistol without a permit in violation of General Statutes § 29-35. The petitioner was sentenced to a total effective term of imprisonment of forty-three years. This court affirmed the judgment of conviction. Id., at 290, 951 A.2d 1257.

B

Thereafter, the petitioner brought an amended petition for a writ of habeas corpus, claiming that his defense counsel, Scott Jones and Beth Merkin, had provided ineffective assistance and had an actual conflict of interest. Only the ineffective assistance of counsel claim is relevant to the present appeal. Regarding the ineffective assistance of counsel claim, the petitioner alleged that defense counsel failed (1) to present an alibi defense through the testimony of his sister, Joyce Johnson (Joyce), and his friend, Taylor Allen, and (2) to present a third-party culpability defense through the testimony of William Holly.

With respect to the alibi defense, the petitioner claimed that defense counsel had performed deficiently by failing to adequately prepare and present the testimony of Joyce and Allen. According to the petitioner, if defense counsel had properly investigated his alibi, they would have realized that he was home with Joyce and speaking on the telephone with Allen via his landline at the time of the murder. With respect to the third-party culpability defense, the petitioner claimed that defense counsel had performed deficiently by failing to present the testimony of Holly, who would have testified that a few days before the murder, he saw Ford with a gun that was similar to the murder weapon.

After a five day trial, the habeas court ruled in favor of the petitioner with respect to both ineffective assistance of counsel claims but rejected his conflict of interest claim. In its memorandum of decision, the habeas court set forth the following additional facts: ***529** "In the petitioner's first criminal trial, the court declared a mistrial due to a hung jury. The state presented testimony at the first criminal trial from an eyewitness, [Ford], who testified consistent with his statements to the police that he heard a gunshot and saw the petitioner run out of the backyard across the street carrying a black gun in his hand. At the first trial, trial counsel presented a partial alibi defense with testimony indicating that the petitioner was at Southern Connecticut State University around 11 p.m. on the night of the murder. [The defense] did not explain the petitioner's whereabouts between 10 and 11 p.m. After the first trial resulted in a hung jury, a juror indicated that it would have been helpful for the jury to know where the petitioner was at the time of the shooting [which occurred] prior to 11 p.m.

"At the petitioner's second criminal trial, the state's key witness, Ford, recanted his prior statement and testimony that he had seen the petitioner running from the crime scene with a gun. Instead, Ford testified that the police forced him to make those statements. Ford's prior inconsistent statements at the first criminal trial were admitted for substantive purposes in the second criminal trial pursuant to [the doctrine set forth in *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S.Ct. 597, 93 L.Ed.2d 598 (1986) ].

"At the second trial, trial counsel's defense strategy was that the state failed to prove the petitioner's guilt beyond a reasonable doubt, that Ford was not credible, and that it was Ford [who] had accidentally shot the victim, who was Ford's friend. The petitioner's trial attorneys disagreed over whether to present an alibi, including ****61** the petitioner's whereabouts between 10 and 11 p.m. or a third-party culpability defense; Attorney Jones wanted to present both defenses and Attorney Merkin did not. Attorney Merkin prevailed, and trial counsel did not present either defense at the second trial." (Footnote omitted.)

***530** Regarding the alibi defense, the habeas court stated: "The petitioner's trial counsel were aware of the two alibi witnesses, Allen and [Joyce], who could testify as to [the] petitioner's whereabouts between 10 and 11 p.m. on the evening of the shooting, but disagreed as to whether ... an alibi defense should be presented. They were also aware that the jury in the first trial wanted to know where the petitioner was between 10 to 11 p.m."

The habeas court specifically found that "[Joyce] and Allen testified credibly at the habeas trial as to the petitioner's whereabouts on the night of the shooting. [Joyce] testified that the petitioner was home between 5 p.m. and 11 p.m. on the night of the shooting. During that time, [Joyce] was home with her young son and was, for the most part, in the living room in the front of the apartment watching television. From her position, she would have been able to see if the petitioner had left the house during that time. At some point, [Joyce] was aware that the petitioner and his friend were at the house and ordered a pizza. The living room had two large windows facing the driveway, and any movement outside would have activated the motion sensor lights in the driveway. If the petitioner had left through the back door, [Joyce] would have heard him because that door screeched loudly when [it was] opened. At approximately 11 p.m., [Joyce] heard a horn honk outside, and she saw the petitioner leave the house with Allen."

The habeas court also found that "Allen, who also testified at the habeas trial credibly, called the petitioner's cell phone at 10:20 p.m., and he asked her to call his home telephone number. Allen immediately hung up and called the petitioner at home on his landline. Allen and the petitioner spoke for approximately ten to fifteen minutes on the petitioner's home phone. The petitioner then called Allen again from his home telephone ***531** around 10:40 p.m. or 10:45 p.m. Shortly thereafter, Allen drove to the petitioner's home, picked him up at approximately 10:50 p.m. or 10:55 p.m. and drove him to Southern Connecticut State University."

The habeas court also found "that trial counsel [were] aware of the statements of [Joyce] and Allen, that their testimony was credible and that production of such testimony at trial would have been helpful to the defense." Specifically, it found that "trial counsel's decision to not call the alibi witnesses was not based on the witnesses' credibility. Both Attorney Jones and Attorney Merkin found [Joyce] and Allen to be credible witnesses. Moreover, the court finds that their testimony would have been helpful to the petitioner's defense that he was home at the time of the shooting.

"Attorney Merkin decided to not present [Joyce's] testimony because she was related to the petitioner, the shooting occurred in close proximity to the petitioner's home and it was unclear whether the petitioner was in her direct vision for the entire evening. Attorney Merkin did not present Allen's testimony because she believed that Allen estimated the times of the phone calls, and the petitioner's close proximity to the crime scene would have allowed him to commit the murder despite receiving and making the phone calls at the times indicated by Allen. Trial counsel acknowledged at the habeas trial, however, that they failed to investigate [Joyce's] ability to provide an alibi at the times ****62** when the petitioner was not in her direct view.

"[Joyce] testified that the motion sensor lights and the screeching back door would have prevented the petitioner from leaving the house without [Joyce's] knowledge. Moreover, the times of the phone calls between Allen and the petitioner were seen on Allen's caller identification. That evidence, if presented, would have established that the petitioner was at home using ***532** his landline at the time the shooting occurred. Further, while Attorney Merkin was concerned that the alibi defense would place the petitioner in close proximity to the crime scene, there was already evidence before the jury that the petitioner was at Southern Connecticut State University, close to the crime scene, shortly before 11 p.m. on the night of the victim's murder. In addition, the evidence from the three alibi witnesses covered the time period between 10 and 11 p.m., making it highly unlikely that the petitioner could have committed the shooting."

The habeas court was "particularly influenced by the fact that when trial counsel decided not to submit the petitioner's alibi, they were aware that the first jury was conflicted about the petitioner's guilt, which resulted in a hung jury, and [counsel] knew that the first jury wanted to know where the petitioner was at the time the shooting occurred. While each jury is different, having this information in the petitioner's second criminal trial was a significant bonus to the defense and should have been utilized in determining whether to pursue the alibi defense."

Because the habeas court found Joyce and Allen credible and that their testimony would have been helpful to the alibi defense, the habeas court concluded that it was not reasonable trial strategy for defense counsel not to present their testimony, and, thus, defense counsel performed deficiently. Additionally, the habeas court found that the petitioner was prejudiced by defense counsel's deficient performance.

Regarding the third-party culpability defense, the habeas court stated in relevant part: "At the second criminal trial, the state established that the bullet recovered from the victim was from a Hi-Point nine millimeter pistol or semiautomatic rifle. At the habeas trial, the petitioner established that Ford showed Holly a black ***533** handgun that Ford had tucked into the waistband of his pants on the afternoon of the shooting. Holly believed that a photograph [he was shown, which had been admitted into evidence], of the Hi-Point nine millimeter pistol used in the shooting looked like the gun that he saw Ford carrying. The murder weapon and Ford's gun both had ridges above the handle, and ridges were not a common feature on the guns that Holly had seen.

"The petitioner's trial attorneys disagreed as to whether the third-party culpability defense should be presented to the jury. Attorney Jones believed that Holly's testimony should have been presented and Attorney Merkin did not, even though she admitted that Holly's testimony was consistent with the defense theory of the case, which was that Ford accidentally shot the victim.[2] The court finds the third-party ****63** culpability defense consisting of the facts that (1) Ford had been the last person seen with the victim, (2) was in close proximity to the location of the shooting at the time of the shooting, and (3) had been seen with a gun matching the description of the murder weapon on the day of the shooting, were consistent with and relevant to the defense theory that it was Ford who shot the victim by accident.

"Both Attorney Jones and Attorney Merkin thought that they would not be able to present Holly's testimony without Ford first admitting that he knew Holly. Trial ***534** counsel believed, incorrectly, that they needed, and did not have, a foundation to introduce third-party culpability evidence—that is, the testimony of Holly—once [Ford] denied knowing Holly while on the witness stand at the petitioner's criminal trial. At the habeas trial, Attorney Merkin conceded that the presentation of Holly's testimony was not contingent upon Ford admitting that he knew Holly." (Footnote added.)

The habeas court went on to state that "[t]he standard for determining whether evidence of third-party culpability is admissible is whether the presented evidence is relevant. Here, it was. Holly's testimony regarding Ford's possession of the same type of gun that was used to kill the victim on the day of the shooting, as well as other facts pointing to Ford as the shooter, would have established the necessary factual nexus for a third-party culpability claim regardless of whether Ford knew Holly. The court finds that it is reasonably likely that the trial court would have allowed Holly's testimony."

Regarding the argument that Holly might have invoked his fifth amendment privilege against self-incrimination and not testified at the petitioner's criminal trial, the habeas court found that Holly's appointed counsel at the time, Attorney Thomas Farver, "had communicated to the [trial] court on Holly's behalf that Holly would assert his fifth amendment privilege and refuse to testify if he was called [as a witness due to pending charges of robbery as well as other charges against him, and an unrelated murder investigation]. However, both Attorney Farver and Attorney Merkin testified that they were uncertain that Holly would have been permitted to invoke his fifth amendment privilege at the petitioner's criminal trial due to the fact that Holly's pending charges were unrelated to the petitioner's case....

"In the present case, Holly's pending charges were unrelated to the petitioner's case, and there is no indication ***535** that Holly's testimony that he saw Ford with a gun on the day of the shooting would have exposed him to any criminal prosecution in the petitioner's or any other case. Fear of potential prosecutorial retaliation in an unrelated case does not constitute sufficient grounds to invoke the fifth amendment, as it is a mere subjective belief, not a reality, and the actual testimony would not have been incriminating in any way. Therefore, the court finds that it is not reasonably likely that Holly would have been permitted to invoke his privilege against self-incrimination in the petitioner's criminal case had trial counsel proffered him as a defense witness to support the third-party culpability defense." (Citations omitted.)

The habeas court determined that because Holly's testimony was relevant, and, thus, admissible as third-party culpability evidence, and not privileged under the fifth amendment,

defense counsel were **64 deficient for failing to present a third-party culpability defense. The habeas court further found that the petitioner was prejudiced by defense counsel's actions. Accordingly, the habeas court granted the petitioner's habeas petition with respect to the ineffective assistance of counsel claims.

C

The respondent appealed to the Appellate Court. See *Johnson* v. *Commissioner of Correction*, 166 Conn. App. 95, 140 A.3d 1087 (2016). The Appellate Court reversed the habeas court's judgment in part.[3] As to the alibi defense, the Appellate Court determined that it was a reasonable, strategic decision not to present an alibi defense, despite the witnesses' credibility, in light of defense counsel's strategy of focusing on the weaknesses in the state's case instead of muddying the waters *536 with an alibi defense that raised "many reasonable concerns ...." Id., at 141, 140 A.3d 1087. Such concerns included placing the petitioner in very close proximity to the shooting at or near the time of the shooting and allowing the state to argue consciousness of guilt on the basis of the petitioner's having fled from the area of the crime to Southern Connecticut State University. Id., at 137 n.16, 142, 140 A.3d 1087.

As to the third-party culpability defense, the Appellate Court assumed without deciding that defense counsel's performance was deficient. Id., at 117, 140 A.3d 1087. However, the Appellate Court determined that the petitioner was not prejudiced by defense counsel's deficient performance because it was speculative as to whether any portion of Holly's testimony would have been admissible as third-party culpability evidence; id., at 128, 140 A.3d 1087; and because the petitioner had failed to establish that Holly would not have been entitled to invoke his fifth amendment right against self-incrimination. Id., at 126, 140 A.3d 1087. The Appellate Court determined that it was speculative as to whether the trial court would have viewed the third-party culpability evidence as having proved a direct connection between Ford and the murder. Id., at 129–30, 140 A.3d 1087. Specifically, the Appellate Court reasoned that there was no evidence that Ford was armed with the murder weapon at the scene of the crime at the time of the shooting. Id. Regarding Holly's fifth amendment privilege, the Appellate Court determined that there was insufficient evidence in the record to establish that it was perfectly clear that Holly was not entitled to invoke his fifth amendment privilege. Id., at 122, 126, 140 A.3d 1087.

Accordingly, the Appellate Court reversed the judgment of the habeas court with respect to the petitioner's ineffective assistance of counsel claims and remanded the case to the habeas court with direction to deny the petition for a writ of habeas corpus as to those claims. Id., at 142, 140 A.3d 1087. We granted certification as to whether (1) the *537 petitioner's claim that defense counsel performed deficiently by failing to adequately investigate the alibi witnesses was reviewable, (2) defense counsel's failure to present an alibi defense constituted deficient performance, and (3) the petitioner was prejudiced by defense counsel's failure to present a third-party culpability defense. See *Johnson* v. *Commissioner of Correction*, 324 Conn. 904, 152 A.3d 545 (2017).

II

The petitioner claims that the Appellate Court improperly rejected the habeas **65 court's conclusion that defense counsel provided ineffective assistance of counsel. First, the petitioner claims that the Appellate Court improperly held that defense counsel's failure to present alibi witnesses was reasonable trial strategy. Second, he claims that the Appellate Court improperly held that he was not prejudiced by defense counsel's failure to present evidence of third-party culpability.

[1] "In reviewing these claims, we are mindful that [t]he habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous.... The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Internal quotation marks omitted.) *Breton* v. *Commissioner of Correction*, 325 Conn. 640, 666–67, 159 A.3d 1112 (2017).

[2] [3] [4] [5] "To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Strickland* requires that a petitioner satisfy both a performance prong

and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was ***538** not functioning as the counsel guaranteed ... by the [s]ixth [a]mendment.... To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.... Although a petitioner can succeed only if he satisfies both prongs, a reviewing court can find against a petitioner on either ground." (Citations omitted; internal quotation marks omitted.) *Breton* v. *Commissioner of Correction*, supra, 325 Conn. at 668–69, 159 A.3d 1112.

**[6]** **[7]** **[8]** Because both of the petitioner's claims involve whether defense counsel performed deficiently by failing to present the testimony of certain witnesses, we note that the deficient performance prong of *Strickland* is based on what an objectively reasonable attorney would do under the circumstances: "[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness.... The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.... In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." (Citations omitted.) *Strickland* v. *Washington*, supra, 466 U.S. at 688, 104 S.Ct. 2052; accord *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 79–80, 967 A.2d 41 (2009); *Bryant* v. *Commissioner of Correction*, 290 Conn. 502, 512–13, 964 A.2d 1186, cert. denied sub nom. *Murphy* v. *Bryant*, 558 U.S. 938, 130 S.Ct. 259, 175 L.Ed.2d 242 (2009).

**[9]** **[10]** **[11]** **[12]** "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that ***539** counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.... There are countless ways to provide effective assistance in any given case. Even the ****66** best criminal defense attorneys would not defend a particular client in the same way.... [A] reviewing court is required not simply to give [the trial attorney] the benefit of the doubt ... but to affirmatively entertain the range of possible reasons ... counsel may have had for proceeding as [he] did ...." (Citation omitted; internal quotation marks omitted.) *Michael T.* v. *Commissioner of Correction*, 319 Conn. 623, 632, 126 A.3d 558 (2015).

**[13]** When faced with the question of whether counsel performed deficiently by failing to call a certain witness, the question is whether "this omission was objectively reasonable because there was a strategic reason not to offer such ... testimony ... [and] whether reasonable counsel could have concluded that the benefit of presenting [the witness' testimony] ... was outweighed by any damaging effect" it might have. (Citation omitted.) Id., at 633–34, 126 A.3d 558.

A

The petitioner's first claim is that, as the habeas court determined, defense counsel acted deficiently by failing to investigate and present alibi witnesses. Specifically, he argues that defense counsel based their decision not to call alibi witnesses on their erroneous belief that the petitioner's alibi defense was weak. The petitioner contends that if defense counsel had fully investigated the alibi witnesses' potential testimony, they would have realized that their concerns were misplaced, especially in light of the habeas court's finding that the alibi witnesses were credible.

***540** The respondent counters that defense counsel made a reasonable, strategic decision that was based on a myriad of concerns, regardless of the alibi witnesses' credibility. The respondent's principal contention is that the Appellate Court properly concluded that it was a reasonable tactical decision not to distract the jury from Ford's recantation by muddying the waters with an alibi defense that was not airtight and was possibly more harmful than helpful. We agree with the respondent and the Appellate Court.

1

**[14]** As an initial matter, we must address the reviewability of the inadequate investigation portion of the petitioner's claim. The Appellate Court held that the petitioner's claim

of inadequate investigation of the alibi witnesses was not properly preserved because he framed his claim as a failure to " 'present' " alibi witnesses, not as a failure to investigate. *Johnson* v. *Commissioner of Correction*, supra, 166 Conn. App. at 132 n.14, 140 A.3d 1087. We disagree with the Appellate Court.

**[15]** The Appellate Court is correct that we review only claims that were distinctly raised before the habeas court. See, e.g., *Eubanks* v. *Commissioner of Correction*, 329 Conn. 584, 597–98, 188 A.3d 702 (2018). We conclude that the petitioner did distinctly raise before the habeas court his claim that defense counsel failed to "properly prepare and present" his alibi defense. Although, in his amended petition for a writ of habeas corpus, the petitioner phrased his claim as a failure to "present" the testimony of Joyce and Allen, it is sufficiently clear from the record that, throughout the habeas proceedings, the petitioner proceeded on a general theory that if defense counsel had adequately investigated his alibi defense, they would have learned that their concerns about its weaknesses were unfounded and, thus, would have presented the alibi witnesses' ***541** testimony at trial. See *Broadnax* v. *New Haven*, 270 Conn. 133, 173–74, 851 A.2d 1113 (2004) ("[t]he complaint must be read in its entirety in such a way as to give ****67** effect to the pleading with reference to the general theory upon which it proceeded, and do substantial justice between the parties" [internal quotation marks omitted] ).

Both parties questioned defense counsel extensively at the habeas trial regarding their investigation into the alibi defense. The respondent never objected to the petitioner's argument that his claim of failure to present the alibi defense was premised on defense counsel's failure to adequately investigate the defense. The petitioner's posttrial brief framed his claim as a failure "to properly prepare and present [his] alibi defense ...." He specifically argued in his posttrial brief that defense counsel's failure to sufficiently investigate his alibi defense led to their failure to present alibi witnesses. In response, the respondent in [his] posttrial brief argued that defense counsel's actions constituted reasonable trial strategy, notwithstanding the failure to investigate Joyce more thoroughly.

We see no meaningful distinction between the phrases "failure to prepare and present" and "failure to investigate and present" that renders the investigation portion of this claim unpreserved. "Preparation" necessarily includes "investigation." See *Skakel* v. *Commissioner of Correction*, 329 Conn. 1, 34, 188 A.3d 1 (2018) ("[p]retrial investigation, principally because it provides a basis [on] which most of the defense case must rest, is, perhaps, the most critical stage of a lawyer's preparation" [internal quotation marks omitted] ); *State* v. *Komisarjevsky*, 302 Conn. 162, 177–78, 25 A.3d 613 (2011) ("[t]he right to prepare a defense for its presentation at trial is an integral part of a fair trial, and includes investigation of material facts and access to potential witnesses").

***542** Moreover, we note that underlying a claim of failure to present a witness are the issues of whether defense counsel conducted a reasonable investigation and had an adequate explanation for deciding not to call that witness. See *State* v. *Talton*, 197 Conn. 280, 297, 497 A.2d 35 (1985) (defense counsel will be deemed ineffective only if they know about a witness, and "without a reasonable investigation and without adequate explanation, failed to call the witness at trial"). In the present case, the record establishes that the petitioner's claim of inadequate presentation was inextricably linked to his related claim of inadequate preparation. In other words, the petitioner's claim was premised on the argument that, if defense counsel had adequately investigated his alibi defense, they would have learned that their concerns regarding its weaknesses were unfounded and, thus, would have presented the alibi witnesses' testimony at trial.

Finally, as reflected in its memorandum of decision, the habeas court understood the petitioner's claim as a "[f]ailure to prepare and present [an] alibi defense." In reciting the relevant law on this issue, the habeas court specifically stated that "[d]efense counsel will be deemed ineffective only when it is shown that a defendant has informed his attorney of the existence of the witness and that the attorney, without a reasonable investigation and without adequate explanation, failed to call the witness at trial." (Internal quotation marks omitted.) The habeas court found that defense counsel had "failed to investigate [Joyce's] ability to provide an alibi at the times when the petitioner was not in her direct view."

It is clear to us that the habeas court considered defense counsel's investigation of Joyce in reaching its determination that her testimony would have provided an alibi and should have been presented to the jury. Thus, all parties and the habeas court were aware that ***543** the petitioner's claim of failure to present the alibi defense included his claim that defense counsel had allegedly ****68** undertaken

an inadequate investigation. Therefore, our review of this claim would not prejudice the respondent. We find that the petitioner adequately preserved his claim that defense counsel performed deficiently by failing to adequately prepare and present his alibi defense.

2

The following additional facts are necessary to our determination of this claim. At the habeas trial, Joyce testified that the petitioner was home with her from approximately 5 to 11 p.m. on the night of the shooting. She further testified that the petitioner had a female guest named Camia at the house from between approximately 6 to 8 p.m. and that he stayed home after she left. Joyce testified that during the critical time between 10 and 11 p.m., when the murder occurred, the petitioner was home, "walking around the house" "back and forth [in between] rooms [and] talking on the phone," but that he was "mainly in his room." During this time, she was in the living room playing with her children and watching television. She admitted, however, that the petitioner was not consistently within her line of sight. She testified that the petitioner left the house at about 11 p.m. and that he did not leave the house at any other time between 5 and 10:45 p.m. because either she would have seen him leave through the front door, or, if he had left through the back door, she would have seen the sensor light located in the driveway go on or would have heard the back door screech. Joyce testified that she never gave a sworn statement to the police but did convey all of this information to defense counsel's investigator, Matthew Whalen, prior to the second trial.

**[16]** Joyce's testimony was not offered at the criminal trial because defense counsel elected not to present an alibi ***544** defense. Attorney Jones testified that he and Attorney Merkin disagreed about this decision. Attorney Jones testified that he wanted to present the alibi defense but Attorney Merkin did not.[4] In the end, defense counsel testified that after hearing Ford recant during the state's case-in-chief, Attorney Jones yielded to Attorney Merkin's decision not to present the alibi defense on the ground that it was cleaner to have "the jury just focused on whether or not the state met its burden of proof through Ralph Ford," in light of the fact that he was the sole eyewitness and had recanted on the witness stand at the second trial. Defense counsel were concerned that the alibi defense would "[pull] attention away from [the recantation and] the weaknesses in the state's case and ... [place the] jurors' focus on the weaknesses in the alibi."

Attorney Merkin testified that Joyce's testimony was weak on the basis of various concerns she had: "[O]ne, that she's a family member; two, that this [the alibi] happened a block away from the shooting; number three, that he was getting a ride and leaving the area at 10:45 [p.m., creating possible consciousness of guilt evidence on the basis of flight]. I didn't like that because the jurors could infer that he had maybe done the shooting and was taking ****69** off. Plus, I thought that we had done a very good job in [the] second trial of attacking Ralph Ford."[5] An additional concern, according to Attorney ***545** Merkin, was that Joyce did not come forward and give a statement to the police.[6] Attorney Merkin also testified that when the defense team initially spoke with Joyce, she was not as clear and certain about the times when the petitioner was home,[7] or about whether the petitioner was within her range of vision or in the house the entire night until 10:45 p.m. Attorney Merkin related that she was concerned that, on cross-examination, the prosecutor could get Joyce to admit that her attention had wandered to the television or that she had gone into another room for a few minutes, allowing for the inference that the petitioner could have left without her knowledge.

Although Attorney Jones admitted that he was "pretty confident" that he and Attorney Merkin never asked Joyce *how* she knew the petitioner was in the house even when she did not see him, he nevertheless testified that if they had known about the sensor light and screeching door, "it wouldn't have necessarily made or broke the decision in this regard to present the alibi defense." He testified that there remained the concern that Joyce "could not unequivocally tell you that she was in the presence of [the petitioner] between 10:20 and even 10:45 p.m. ... Not continuously ...." Additionally, although the jury knew that the petitioner's home was close to the crime scene, in the absence of the alibi testimony, there was no evidence in the record to suggest that the petitioner was home at the ***546** time of the murder,[8] and such evidence could have had the harmful effect of placing him in very close proximity to the crime scene at the time of the shooting.

As to Allen, she testified at the habeas trial that she had called the petitioner on his cellular phone between 10 and 10:20 p.m.

on the night of the shooting. According to her, the petitioner answered her call and told her to call him back on his home phone. She testified that she called him back on his landline and that they spoke for approximately ten to fifteen minutes. Allen testified that they spoke about the **70 petitioner lending her money to buy supplies for her baby. She further testified that he then called her from his landline at 10:35 p.m. and that they spoke for approximately five minutes. Her caller identification system recorded that the petitioner called her from his landline at 10:35 p.m., but it did not record the timing of the prior calls. Allen then picked the petitioner up with her vehicle at his home at approximately 10:50 p.m. and drove him to Southern Connecticut State University. Allen testified that she related this information to Investigator Whalen.

Investigator Whalen testified at the habeas trial that although Allen told the police that she first had called the petitioner on his landline at approximately 10:20 p.m. on the night of the shooting, she told him that she initially called him on his cell phone and then called him back on his landline between 10 and 10:15 p.m. *547 Moreover, Investigator Whalen testified that because the shooting occurred sometime between 10:20 and 10:30 p.m. and because Allen was uncertain as to the timing of the first two phone calls, there was "no definitive information from her that a phone call was taking place during the time that ... the shots were fired ...." [9]

Attorney Jones testified that although he wanted to present the alibi defense, he was concerned that Allen's testimony would place the petitioner in close proximity to the shooting and that "the jury could find it plausible that he could slip out [of his home to commit the murder] in a relatively short time period." Attorney Merkin testified that, in addition to her general concerns about alibi defenses; see footnote 4 of this opinion; she was concerned that Allen was not certain enough about the timing and length of the first two phone calls. Allen's testimony regarding the length of the first call to the petitioner's landline was uncertain, fluctuating anywhere between five minutes, ten minutes, and twenty minutes. Attorney Merkin believed Allen to be "vulnerable to cross-examination.... How do you know how long you were talking, you know; are you sure it was 10:00? Was it 10:00? Was it 10:20? You say 10:00 or 10:20—you know, things like that that were shifting variables in her testimony, that concerned me." Like Attorney Jones, Attorney Merkin also testified that she was concerned about placing the petitioner in close proximity to the crime scene and informing the jury that, soon after the shooting, the petitioner fled from the area. Attorney Merkin testified that she did not want *548 the issues of timing, proximity, and flight to distract the jury's attention "away from the questions about [Ford's] credibility."

**[17]** **[18]** In determining whether defense counsel failed to properly prepare and present Joyce's and Allen's alibi testimony, the following additional legal principles guide our analysis. Defense counsel will be deemed ineffective only if they knew of the existence of a witness and, "without a reasonable investigation and without adequate explanation, failed to call the witness at trial. The reasonableness of an investigation must be evaluated not through hindsight but from the perspective of the attorney when he was conducting it." *State* v. *Talton*, supra, 197 Conn. at 297–98, 497 A.2d 35.

**71 "[O]ur habeas corpus jurisprudence reveals several scenarios in which courts will not second-guess defense counsel's decision not to investigate or call certain witnesses or to investigate potential defenses, [including] ... when ... counsel learns of the substance of the witness' testimony and determines that calling that witness is unnecessary or potentially harmful to the case ...." *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 681–82, 51 A.3d 948 (2012); see *Morquecho* v. *Commissioner of Correction*, 164 Conn. App. 676, 685, 138 A.3d 424 (2016) ("we note that the petitioner's first criminal trial resulted in a hung jury, lending credence to [defense counsel's] decision not to present 'weak witnesses' who could tarnish the petitioner's defense during his second criminal trial").

**[19]** **[20]** Moreover, "we acknowledge that counsel need not track down each and every lead or personally investigate every evidentiary possibility before choosing a defense and developing it." (Internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. at 683, 51 A.3d 948. "[T]he failure of defense counsel to call a potential defense witness does not constitute *549 ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense." Id., at 681, 51 A.3d 948. When the failure to call a witness implicates an alibi defense, an alibi witness' testimony has been found unhelpful and defense counsel's actions have been found reasonable when "the proffered witnesses would fail to account sufficiently for a defendant's location during the time or period in question ...." *Spearman*

v. *Commissioner of Correction*, 164 Conn. App. 530, 546, 138 A.3d 378, cert. denied, 321 Conn. 923, 138 A.3d 284 (2016); see also *Morquecho* v. *Commissioner of Correction*, supra, 164 Conn. App. at 685, 138 A.3d 424 (decision not to call alibi witnesses was reasonable when "no witness could establish that the petitioner was at home during the critical time frame").

For example, in *Spearman* v. *Commissioner of Correction*, supra, 164 Conn. App. at 533, 138 A.3d 378, the petitioner alleged that his defense counsel had performed deficiently by failing to present alibi witnesses at his criminal trial. The petitioner in *Spearman* had been charged with and convicted of arson for setting fire to a house located across the street from the house in which he was staying. Id., at 534–35, 546, 138 A.3d 378. Alibi witnesses told defense counsel that the petitioner had been asleep in his room at the time the fire was set and started. Id., at 548, 550–52, 138 A.3d 378. All of the alibi witnesses were believed to be credible by defense counsel. Id., at 546, 138 A.3d 378. However, defense counsel was concerned that the alibi witnesses were vulnerable on cross-examination because they were all family members, they could not provide an airtight alibi, and they would place the petitioner in close proximity to the crime scene. Defense counsel in *Spearman* found the alibi to be weak because although the witnesses credibly stated that they believed the petitioner to be in his room asleep, the petitioner had not been in their line of sight during the relevant time period. Id., at 548, 138 A.3d 378. ***550** As a result, defense counsel decided not to offer an alibi defense at trial.

Both the habeas court and the Appellate Court in *Spearman* held defense counsel's decision to be reasonable trial strategy.[10] Id., at 552, 561, 138 A.3d 378. Specifically, ****72** both courts determined that defense counsel "reasonably was concerned about offering the alibi testimony because none of these witnesses [was] able to provide an alibi for the petitioner before the fire, and it was not disputed that the petitioner's house was in close proximity to, and easily accessible by the petitioner from, the site of the arson. In particular, [defense counsel] testified that cross-examination might potentially have exposed the possibility that the petitioner [c]ould ... have woken up and went out the back door and returned .... None of the proffered alibi testimony, even if believed, established that the petitioner was in bed ... either sufficiently prior to, or at the precise moment, when the fire was started." (Internal quotation marks omitted.) Id., at 562, 138 A.3d 378. The Appellate Court in *Spearman* found defense counsel's decision reasonable even though the state's case was relatively weak and rested primarily on the testimony of one eyewitness of questionable credibility.

In the present case, defense counsel testified to a variety of strategic reasons for their decision not to present an alibi defense. We are required to "indulge [the] strong presumption that counsel made all significant decisions in the exercise of reasonable professional judgment." (Internal quotation marks omitted.) *Cullen* v. *Pinholster*, 563 U.S. 170, 196, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011). In fact, we are "required not simply to give [the] attorneys the benefit of the doubt ***551** ... but to affirmatively entertain the range of possible reasons ... counsel may have had for proceeding as they did ...." (Citations omitted; internal quotation marks omitted.) Id.

In general, defense counsel were concerned that the alibi defense would distract the jury from Ford's recantation.[11] Defense counsel decided to focus the jury's attention on the fact that the state had a weak case and that the only eyewitness had recanted on the witness stand, especially in light of the fact that the first trial ended in a hung jury. Defense counsel wanted the last thing that the jury heard before it began deliberations to be the state's lack of evidence, and not a possibly problematic alibi defense. Specifically, as to both Joyce and Allen, defense counsel were concerned that the alibi defense would place the petitioner in close proximity to the crime scene and allow the prosecutor to argue consciousness of guilt on the basis of flight because both witnesses testified that the petitioner left the area at approximately 10:50 p.m. As to Joyce in particular, defense counsel believed that she would be vulnerable on cross-examination based on her bias as a family member, the petitioner's having been outside of her line of sight when they were in the house together, her having been potentially too distracted by her children and the television to notice the petitioner leaving the ***552** house, her failure to give a sworn statement to the police, and the petitioner's failure to identify her to the police as an alibi witness. As to Allen, defense counsel ****73** had concerns that the imprecise timing of the telephone calls between her and the petitioner, and the shooting, would allow the jury to infer that the petitioner had

time to both commit the murder and speak with Allen on the telephone.

The reasons stated by defense counsel are similar to those found reasonable in *Spearman*. In both cases, the alibi witnesses were family, the alibi placed the petitioner in close proximity to the crime scene, and the alibi witnesses testified that the petitioner was home but not within their line of sight. In the present case, although Joyce testified that she would have known if the petitioner left the house because of the screeching back door and sensor lights in the driveway, her testimony did not account for the fact that the petitioner was not within her line of sight during the time of the murder. It was reasonable for defense counsel to be concerned that the jury might have questioned whether she was distracted by the television or her children that night.[12] Such a concern was justified even if she was considered a credible witness by the habeas court or defense counsel.

**[21]** Additionally, although the jury reasonably could have concluded that Allen's testimony established that the petitioner was speaking with her from his landline at the time of the murder, the imprecision in the timing of the calls and the timing of the murder also made it ***553** possible that the jury could have concluded that he participated in the calls and committed the murder, especially given the close proximity of his house to the crime scene. Once again, despite the habeas court's finding that Allen's testimony was credible it was reasonable for defense counsel to be concerned that the jury might determine that the imprecision in timing left open the possibility that the petitioner committed the murder and participated in the telephone calls.

It is important to accord due weight to defense counsel's concern that the alibi testimony would have placed the petitioner a mere two blocks from the crime scene at or near the time of shooting. The petitioner argues that the alibi defense would not have been risky because the jury already knew where the petitioner's house was located and that at approximately 11 p.m. he was a few miles away from the crime scene at Southern Connecticut State University. But the alibi evidence, if presented, would have established that at the time of the shooting, the petitioner was at or near his home in very close proximity to the shooting. No other evidence so directly highlighted the petitioner's proximity to the scene of the crime at the time of the shooting. There is a distinction ***554** between being a few miles away from the crime scene soon after the murder, and being within two blocks of the crime scene at or near the time of the murder and then fleeing from the scene shortly thereafter.

As a result, we conclude, as the Appellate Court did in *Spearman*, that counsel made a reasonable strategic decision because "the proffered witnesses would [have] fail[ed] to account sufficiently for [the petitioner's] location during the time or period in question ...." *Spearman v. Commissioner of Correction*, supra, 164 Conn. App. at 546, 138 A.3d 378. Even if "there [was] some showing that the [alibi] testimony would have been helpful in establishing the asserted [alibi] defense"; (internal quotation marks omitted) *Gaines v. Commissioner of Correction*, supra, 306 Conn. at 681, 51 A.3d 948; defense counsel made a strategic decision that presenting an alibi defense had the potential to be more harmful than helpful to the petitioner's case. See id., at 681–82, 51 A.3d 948; see also *Morquecho v. Commissioner of Correction*, supra, 164 Conn. App. at 681–85, 138 A.3d 424 (defense counsel's decision not to present alibi was reasonable strategy when alibi did not definitely place petitioner home at time of murder and would possibly distract jury from state's weak case). Although the state's case against the petitioner might not have been overwhelming and another attorney might have defended him differently,[14] we cannot conclude that his conviction was a result of constitutionally deficient counsel under *Strickland*.

***555** Nevertheless, the petitioner argues that proper investigation into the testimony of Joyce and Allen would have enabled defense counsel to address any weaknesses in the alibi defense. As to Joyce, he argues that defense counsel's concern about his having been outside of Joyce's line of sight when he was in the house with her would have been ameliorated if defense counsel had learned that Joyce would have known if he had left the house because she would have heard the screeching back door or seen the outdoor sensor lights. At the habeas trial, defense counsel admitted to not having asked or known about the screeching back door or the sensor lights. But Attorney Jones also testified that such knowledge would not have affected the decision not to present the alibi defense. Screeching door or not, defense counsel still had concerns regarding (1) the petitioner's having been outside of Joyce's line of sight, (2) Joyce's having potentially been too distracted by her children and the television to notice

the petitioner leaving the house, even with the screeching door and sensor lights, (3) proximity to the crime scene, (4) consciousness of guilt on the basis of flight, and (5) bias. Defense counsel ceased investigating only after they decided that calling Joyce potentially ****75** would be more harmful than helpful to the case. See *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. at 681–82, 51 A.3d 948. Such a decision is reasonable, and we will not second-guess it with the advantage of hindsight.

As to Allen, the petitioner alleges that defense counsel would have presented her testimony if they had properly investigated the timing of the telephone calls between her and the petitioner. He contends that defense counsel were mistaken regarding the timing of the calls and the shooting. If defense counsel had been fully aware of Allen's testimony, the petitioner reasons, they would have realized that her testimony made it impossible for him to have time to participate in the ***556** telephone calls with Allen and to leave the house to commit the murder.

It is true that at the first criminal trial, defense counsel mistakenly believed that the shooting occurred at approximately 10:45 p.m. At oral argument before this court, the petitioner contended that during the second criminal trial, defense counsel continued to labor under the misapprehension that the shooting occurred at 10:45 p.m. His contention was based on defense counsel's notice of alibi, which stated that the shooting occurred at 10:45 p.m. The notice of alibi, however, was from the first criminal trial. Defense counsel testified at the habeas trial that by the time of the *second* trial, they *were* aware that the shooting occurred between 10:20 and 10:30 p.m., and that Allen had indicated that she had spoken with the petitioner on the telephone via his landline sometime between 10 and 10:20 p.m. for an uncertain length of time and again at 10:35 p.m. Defense counsel knew of and considered this information when they decided not to present Allen's testimony at the second criminal trial. As a result, the petitioner has not identified any information that defense counsel failed to glean from their investigation of Allen. [15]

Additionally, the petitioner argues that defense counsel's decision to forgo an alibi defense was not reasonable ***557** because a juror from the first criminal trial specifically told defense counsel that it would have been helpful if the jury knew where the petitioner was between 10 and 11 p.m. on the night of the shooting. According to the petitioner, his "whereabouts at the time of the shooting was the most significant factor in the jury's failure to acquit." [16] This reasoning is flawed on two accounts. First, although the first jury may have wanted to know where the petitioner was at the relevant time, the answer provided by the alibi evidence was decidedly double-edged because it placed the ****76** petitioner extremely close to the scene of the crime. Second, the second trial occurred under circumstances that were markedly different from those of the first trial because of Ford's recantation. It was reasonable for defense counsel to change their strategy accordingly. Defense counsel made the strategic decision that, despite the first jury's having wanted to know the petitioner's whereabouts, the alibi evidence had the potential to do more harm than good at the second trial and should be sidelined in favor of a less risky strategy that was based on Ford's recantation.

For all of the foregoing reasons, we agree with the Appellate Court that defense counsel made a reasonable strategic decision not to present an alibi defense that possibly would have been more harmful than helpful by distracting the jury from Ford's recantation, introducing issues of proximity and consciousness of guilt, and failing to account definitively for the petitioner's whereabouts during the time of the shooting. Because defense counsel's performance was not deficient, we conclude that the petitioner failed to satisfy his burden under the first prong of *Strickland*.

***558** B

**[22]** **[23]** The petitioner next claims that the Appellate Court improperly concluded that he was not prejudiced by defense counsel's failure to present third-party culpability evidence. Specifically, he argues that the Appellate Court improperly determined that (1) Holly's testimony was inadmissible as third-party culpability evidence, and (2) he had failed to establish that Holly would not have been allowed to invoke his fifth amendment privilege against self-incrimination. [17] As to whether there was sufficient evidence to establish third-party culpability, the petitioner argues that there was substantial evidence connecting Ford to the shooting because he was the last person to see the victim alive and had possessed a gun similar to the murder weapon. [18]

As to ***559** Holly's fifth ****77** amendment privilege, the petitioner argues that Holly would have provided no valid basis at the criminal trial for invoking this privilege.

The respondent contends that the Appellate Court properly determined that Holly's testimony was inadmissible and that there was insufficient evidence to determine whether Holly would have been able to successfully invoke his fifth amendment privilege. We agree with the reasoning of the Appellate Court, although we believe that the admissibility of Holly's testimony is more appropriately considered under the deficient performance prong of *Strickland*, whereas the issue of his fifth amendment privilege should be reviewed under the prejudice prong. Accordingly, we affirm the decision of the Appellate Court, albeit on slightly different grounds.

The following additional facts are necessary to our determination of this claim. At the underlying criminal trial, the state offered the testimony of James Stephenson, a firearms and tool mark examiner with the state's forensic science laboratory. Stephenson testified that a nine millimeter cartridge casing was found at the scene of the crime and that a nine millimeter jacketed bullet was retrieved from the victim's gunshot wound. He testified that there was no scientific way to prove that the bullet was part of the cartridge casing that had been found at the scene of the crime. Additionally, the murder weapon had never been recovered. However, on the basis of the markings on the bullet, he testified that the bullet had been fired from a gun manufactured by Hi-Point and that the gun was either a semiautomatic pistol or a rifle.

At the habeas trial, the petitioner offered the testimony of Gerard Petillo, a firearms expert, who confirmed ***560** Stephenson's testimony that Hi-Point guns create distinctive ballistics evidence. Petillo further testified regarding unique physical characteristics of Hi-Point guns, such as the Hi-Point logo and firearm information stamped onto the left side of the gun. Neither expert testified about whether the ridging design near the handle of a Hi-Point semiautomatic pistol was unique to pistols manufactured by Hi-Point.

At the habeas trial, Holly testified that he saw the victim and Ford on the afternoon of the shooting coming down Newhall Street on bicycles when they stopped and Ford showed Holly a handgun that he had tucked into the waistband of his pants. Holly testified that he tried to grab the gun because he wanted it but that Ford ran away.

Holly testified that he saw only the handle of the gun, not the barrel. He described the gun as either a nine millimeter or .380 caliber black pistol. He testified further that he was not sure if the gun was real or fake and thought it could have been a BB gun. However, Holly did testify that it "looked like one of the guns [he] had before" and that he knew guns. When shown the photograph of a black, Hi-Point nine millimeter semiautomatic pistol, Holly testified that "[t]hat might be it. It looked like the gun" that he saw in Ford's possession because of the ridges at the top near the handle but that he had seen other kinds of guns with ridges in the past. He further testified that he had provided all of this information to Investigator Whalen.

Despite having provided this information at the habeas trial, Holly also testified that he had told both his own attorneys and Investigator Whalen that he was not willing to testify at the criminal trial. He testified that he had been advised by counsel ****78** to invoke his fifth amendment privilege against self-incrimination. Nevertheless, he testified that if he had been ordered to testify ***561** by the criminal court, he would have testified. He testified that he did not recall telling Attorney Farver that he would not testify at the criminal trial even if the trial court rejected his claim of a fifth amendment privilege. Holly testified that his reason for not wanting to testify was that he was worried that the prosecutor handling a criminal case then pending against him also was the prosecutor for the petitioner's case and would hold any testimony favorable to the petitioner against him.

Holly testified that although he wanted to invoke his fifth amendment privilege, he had not been worried at the time of the criminal trial that he possibly would incriminate himself if he had been required to take the witness stand. This claim does not withstand scrutiny. Holly had multiple criminal cases pending against him at the time of the petitioner's criminal trial. Specifically, Farver testified at the habeas trial that Holly was under investigation in a murder case and had been "busted with the gun" involved in that case. Additionally, Attorney Thomas Ullman, a public defender who represented Holly in connection with other criminal matters, testified at the habeas trial that he represented Holly at the time of the petitioner's criminal trial in relation to charges of robbery in the first degree and assault on a police officer. Attorney Ullman also testified that he had represented Holly in some other matters as well at that time but that they did not result

in a plea or sentence. On the basis of these other pending criminal matters, Attorney Ullman stated, he advised Holly not to speak with Investigator Whalen or to testify at the petitioner's criminal trial "[b]ecause [there was] the potential that ... Holly could incriminate himself or hurt his situation in the pending case" in which Attorney Ullman was representing him.

Attorney Farver testified that Holly had informed him that he intended to invoke his fifth amendment privilege, but he did not recall Holly's reasoning for wanting ***562** to do so and believed that even if he did recall Holly's reasoning, such information would be privileged. He further testified that he had told the criminal court at the hearing on a motion for a new trial that Holly would be exercising his fifth amendment right because he had pending charges and did not want to testify. He also had told the court that although he was not certain whether Holly could successfully invoke this privilege, Holly had told him that he would not testify even if ordered to do so by the court.

At the habeas trial, defense counsel's description of Holly's hypothetical, third-party culpability testimony differed from Holly's testimony at the habeas trial. Both Attorney Jones and Attorney Merkin testified that Holly had informed them that he had seen Ford with a gun two or three days before the victim was shot. Specifically, defense counsel testified that Holly had informed them that two or three days before the murder, he had seen Ford, the victim, and another person named Cory Hunter on the corner of Newhall and Huntington Streets, and that Ford had "[e]ither a nine millimeter or a .380 caliber, black semiautomatic" gun. Although Holly was not sure if the gun was real or fake and did not know the manufacturer, he told defense counsel that he had wanted the gun and tried to grab it. Additionally, Attorney Jones testified that Holly did not witness Ford shoot the victim and that the murder weapon was never recovered.

On the basis of this information, defense counsel testified that, at the time of the criminal trial, (1) they did not believe that ****79** there was sufficient evidence to support a third-party culpability defense, and, (2) as with the alibi testimony, they did not want to distract from the weakness of the state's case and Ford's recantation. ***563** [19] Defense counsel were concerned that there was not a sufficient nexus to establish third-party culpability because Holly's testimony did not directly connect Ford to the murder in any way: Holly's testimony was about seeing a gun two or three days prior to the murder, not on the day of the murder; there were no statements by Ford about using the gun; Holly could not provide specific information regarding the gun, such as its manufacturer, make, or model; and no one witnessed Ford using the gun. However, Attorney Merkin admitted at the habeas trial that defense counsel did not show Holly a photograph of a nine millimeter Hi-Point pistol to see if he could identify it as the kind of gun he saw in Ford's waistband.

Attorney Jones also testified that he was aware that Holly would exercise his fifth amendment right not to testify, "[t]o the extent that he could," if called to testify. He recalled that Holly had been advised not to cooperate and to invoke his fifth amendment privilege. Nevertheless, Attorney Jones testified that this knowledge did not factor into the decision not to call Holly at the criminal trial.

Attorney Merkin also testified that Holly's intention to invoke his fifth amendment privilege against self-incrimination was not part of her decision not to call him as a witness. She was aware, however, of his intention to invoke the privilege and thought about his intent to do so prior to making the decision not to call him. Attorney Merkin further testified that although Holly never was implicated in the present case, his testimony regarding his attempt to grab the gun from Ford may have been self-incriminating.

***564** 1

With this factual backdrop in mind, "the question of whether [counsel's] actions fell below an objective standard of reasonableness turns on whether [the] decision not to solicit the testimony of ... [a witness] to support the [third-party] culpability defense can be considered sound trial strategy, or whether it constitutes a serious deviation from the actions of an attorney of ordinary training and skill in criminal law." *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. at 513, 964 A.2d 1186.

**[24]** **[25]** **[26]** **[27]** **[28]** **[29]** To determine whether an objectively reasonable attorney would decide not to present a third-party culpability defense on the ground of inadmissibility, it is necessary to review the legal principles

underlying such a defense: "The admissibility of evidence of [third–party] culpability is governed by the rules relating to relevancy.... Relevant evidence is evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence.... Accordingly ... the proffered evidence [must] establish a direct connection to a third party, rather than raise merely a bare suspicion regarding a third party .... Such evidence is relevant, exculpatory evidence, rather than merely tenuous evidence of [third–party] culpability [introduced by a defendant] in an attempt to divert from himself the evidence **80 of guilt.... In other words, evidence that establishes a direct connection between a third party and the charged offense is relevant to the central question before the jury, namely, whether a reasonable doubt exists as to whether the defendant committed the offense. Evidence that would raise only a bare suspicion that a third party, rather than the defendant, committed the charged offense would not be relevant to the jury's determination. A trial court's decision, therefore, that [third–party] culpability evidence proffered by the *565 defendant is admissible, necessarily entails a determination that the proffered evidence is relevant to the jury's determination of whether a reasonable doubt exists as to the defendant's guilt." (Citations omitted; internal quotation marks omitted.) Id., at 514–15, 964 A.2d 1186.

**[30]** "Whether a defendant has sufficiently established a direct connection between a third party and the crime with which the defendant has been charged is necessarily a fact intensive inquiry. In other cases, this court has found that proof of a third party's physical presence at a crime scene, combined with evidence indicating that the third party would have had the opportunity to commit the crime with which the defendant has been charged, can be a sufficiently direct connection for purposes of third party culpability.... Similarly, this court has found the direct connection threshold satisfied for purposes of [third–party] culpability when physical evidence links a third party to a crime scene and there is a lack of similar physical evidence linking the charged defendant to the scene.... Finally, this court has found that statements by a victim that implicate the purported third party, combined with a lack of physical evidence linking the defendant to the crime with which he or she has been charged, can sufficiently establish a direct connection for [third–party] culpability purposes." (Citations omitted.) *State* v. *Baltas*, 311 Conn. 786, 811–12, 91 A.3d 384 (2014).

**[31]** "It is not ineffective assistance of counsel ... to decline to pursue a [third–party] culpability defense when there is insufficient evidence to support that defense. See *Dunkley* v. *Commissioner of Correction*, 73 Conn. App. 819, 827, 810 A.2d 281 (2002) (no evidence to support [third–party] claim, in part, because no one at scene implicated alleged third party), cert. denied, 262 Conn. 953, 818 A.2d 780 (2003); see also *Floyd* v. *Commissioner of Correction*, 99 Conn. App. 526, 531–32, 914 A.2d 1049 (insufficient evidence to substantiate ***566** [third–party] claim when predicated on alleged testimony of unlocated drug dealers who were also gang members), cert. denied, 282 Conn. 905, 920 A.2d 308 (2007); *Santiago* v. *Commissioner of Correction*, 87 Conn. App. 568, 591–92, 867 A.2d 70 ( [third–party] statements did not contain sufficient substance to support viable [third–party] claim), cert. denied, 273 Conn. 930, 873 A.2d 997 (2005); *Alvarez* v. *Commissioner of Correction*, 79 Conn. App. 847, 851, 832 A.2d 102 (insufficient evidence to support [third–party] culpability defense when petitioner called only one witness at habeas hearing who did not even observe shooting), cert. denied, 266 Conn. 933, 837 A.2d 804 (2003); *Daniel* v. *Commissioner of Correction*, 57 Conn. App. 651, 684, 751 A.2d 398 (testimony not sufficient to raise [third–party] culpability defense because supporting witnesses' statements were inconsistent), cert. denied, 254 Conn. 918, 759 A.2d 1024 (2000)." *Bryant* v. *Commissioner of Correction*, supra, 290 Conn. at 515–16, 964 A.2d 1186.

**[32]** In the present case, one of the reasons that defense counsel decided not to present a third-party culpability defense was that they did not believe that Holly's **81 testimony was sufficient to establish a direct connection between Ford and the shooting but, rather, that it created only a mere suspicion that Ford may have accidentally shot the victim. According to defense counsel, there was no evidence that directly established that Ford shot the victim, either accidentally or otherwise, and none was introduced at the criminal trial. [20] In the absence of this nexus, defense counsel believed that Holly's testimony was irrelevant and, thus, inadmissible.

***567** Defense counsel were correct that Holly's testimony would have failed to establish a sufficient nexus between the victim's murder and Ford. The third-party culpability evidence would have consisted of the following: (1) Ford

had been the last person seen with the victim; (2) Ford had been in close proximity to the crime scene near the time of the shooting; and (3) Ford had been seen with a black semiautomatic pistol—manufacturer unknown, possibly fake—two to three days before the shooting.

Although Holly stated at the habeas trial that the gun he saw looked similar to the photograph he had been shown of a nine millimeter Hi-Point semiautomatic pistol, he never definitively testified that the gun he saw was a nine millimeter Hi-Point semiautomatic pistol. He testified only that the gun he saw might have been a nine millimeter Hi-Point pistol on the basis of the fact that its ridges looked similar. He admitted, however, that he had seen other guns that have these kinds of ridges as well. There also was no evidence admitted at the habeas trial to establish that these ridges were a unique characteristic of a Hi-Point pistol. Thus, there was no clear evidence that Ford possessed the murder weapon.

Additionally, as far as defense counsel were aware,[21] there was no evidence that Ford had a gun in his possession at the time of the murder. There also was no evidence ***568** that anyone saw Ford shoot the victim or that Ford was present at the crime scene at the time of the shooting. Moreover, the record is devoid of any statements by Ford, the victim, or any other witness that would implicate Ford as the shooter.

As a result, the third-party culpability evidence at best created a mere suspicion of, but was too speculative to establish, a direct connection between Ford and the murder.[22] In the absence of this nexus, ****82** Holly's testimony was irrelevant and, thus, likely inadmissible.

**[33]** Even if Holly's testimony did create some direct link between Ford and the murder, this nexus was sufficiently weak so as to justify defense counsel's strategic decision not to offer Holly's testimony on the ground that it would distract the jury from the weakness of the state's case and Ford's recantation. See, e.g., *Michael T.* v. *Commissioner of Correction*, supra, 319 Conn. at 634, 126 A.3d 558 ("whether reasonable counsel could have concluded that the benefit of presenting [expert witness' testimony] ... was outweighed by any damaging effect" that could occur, where testimony could have ***569** provided basis for admission of other evidence potentially harmful to petitioner); *Gaines* v. *Commissioner of Correction*, supra, 306 Conn. at 681–82, 51 A.3d 948 (it is not deficient performance not to call witness if "counsel learns of the substance of the witness' testimony and determines that calling that witness is ... potentially harmful to the case"). Holly's testimony would have required the jury essentially to conduct a trial within a trial to determine whether there was sufficient evidence that Ford had shot the victim so as to create reasonable doubt about the petitioner's guilt. As discussed previously, the evidence directly connecting Ford to the shooting was weak enough that it possibly would have served only to confuse or distract the jury by focusing the jury on the competing likelihood of whether Ford or the petitioner committed the murder. After all, the petitioner recently had assaulted and injured the victim and taken a bicycle from him. He expressed to Toles that he was concerned that he might be going back to jail over that incident. In an attempt to focus the jury on Ford's recantation and not to muddy the waters, defense counsel made a reasonable strategic decision not to present a third-party culpability defense through Holly's testimony on the grounds that it was inadmissible and would distract from Ford's recantation. Accordingly, defense counsel did not perform deficiently by failing to present a third-party culpability defense. Therefore, the petitioner's claim fails under the first prong of *Strickland.*

2

**[34]** Moreover, even if Holly's testimony were admissible, we also conclude that the petitioner failed to establish that Holly would have been unable to successfully invoke his fifth amendment privilege against self-incrimination. Without such evidence, the petitioner cannot establish prejudice under the second prong of *Strickland.*

***570** Under the prejudice prong of *Strickland*, the petitioner was required to "demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Internal quotation marks omitted.) ****83** *Breton* v. *Commissioner of Correction*, supra, 325 Conn. at 669, 159 A.3d 1112. It is undisputed that if Holly had been called at the criminal trial, he would have attempted to invoke his fifth amendment privilege against self-incrimination.[23] As a result, to prove prejudice, the petitioner was required to establish that Holly's invocation of the privilege would have been rejected.

**[35]** **[36]** It is well settled that "[a] court may not deny a witness' invocation of the fifth amendment privilege against compelled self-incrimination unless it is *perfectly clear*, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have [a] tendency to incriminate.... To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered *might* be dangerous because injurious disclosure could result." (Citations omitted; emphasis added; internal quotation marks omitted.) *Martin* v. *Flanagan*, 259 Conn. 487, 495, 789 A.2d 979 (2002); accord *In re Keijam T.*, 226 Conn. 497, 503–504, 628 A.2d 562 (1993).

**[37]** **[38]** "The privilege afforded not only extends to answers that would in themselves support a conviction under a ... criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a ... crime. ***571** ... But this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer.... To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence." (Citations omitted; internal quotation marks omitted.) *Hoffman* v. *United States*, 341 U.S. 479, 486–87, 71 S.Ct. 814, 95 L.Ed. 1118 (1951).

In the present case, there was insufficient evidence to determine that Holly's invocation of his fifth amendment privilege would not have been sustained. Holly's testimony included an admission that he attempted to steal a gun, that he had previously possessed a similar gun, and that he "knew" guns. These statements must be viewed in light of Holly's pending armed robbery and assault charges, and the unrelated murder investigation. From this limited record, it appears that both the robbery charge and the murder investigation involved guns. It is unknown from this record what kinds of guns were at issue in those other matters. It is also unknown whether these other crimes occurred before or after the murder in this case. As a result, it is plausible that Holly's statement that he previously possessed a similar gun would implicate him in these other crimes. On this record, therefore, it is not "perfectly clear" that Holly would not have been entitled to invoke his fifth amendment privilege. In the absence of such clarity, the criminal trial court likely would have been precluded from denying Holly's invocation of his fifth amendment privilege against compelled self-incrimination.

***572** The petitioner argues that this analysis focuses on the wrong question. He contends ****84** that the question is not whether Holly actually was entitled to invoke the privilege, but whether, on the basis of the information that would have been presented at the criminal trial, the trial court would have permitted Holly to invoke the privilege. The petitioner contends, on the basis of the evidence that would have been available at the time of the criminal trial, that there would not have been sufficient evidence to establish that Holly would be incriminated by his testimony such that the court would have rejected his invocation of the fifth amendment privilege.

The petitioner is correct that the question at issue is not whether Holly actually was entitled to invoke his fifth amendment privilege against self-incrimination. The petitioner, however, attempts to place too stringent of a burden on Holly to establish his right to remain silent at trial. For Holly to have invoked this privilege at the underlying criminal trial, he would not have had to prove that his testimony definitively would have incriminated him. To invoke the privilege, "it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." (Internal quotation marks omitted.) *Martin* v. *Flanagan*, supra, 259 Conn. at 495, 789 A.2d 979. Thus, the question is: on the basis of the evidence provided, was there a possibility that Holly's testimony might be dangerous to him because injurious disclosure could result?

The testimony of Holly, Attorney Ullman, and Attorney Farver at the habeas trial established that there was indeed a possibility that Holly's testimony might ***573** result in an injurious disclosure.[24] Specifically, Holly's testimony involved his previous possession of guns. At the time of trial, Holly was charged with armed robbery involving a gun and was being investigated in connection with a murder that involved a gun. As a result, Holly's testimony that he recognized Ford's gun because it looked like a gun that he

previously possessed had the possibility to "be dangerous because injurious disclosure could result." (Internal quotation marks omitted.) Id.

Because of this possibility of danger, a court could not reject Holly's invocation of the fifth amendment privilege because it would not be "perfectly clear" that he was not entitled to invoke the privilege. It was the petitioner's burden under *Strickland* to establish deficient performance by presenting sufficient evidence to show that it was perfectly clear that Holly was mistaken and that the trial court would have rejected his invocation. As discussed previously, the evidence presented at the habeas trial was insufficient to establish that it **85 was "perfectly clear" that Holly was not entitled to invoke this privilege.

To overcome the shortcomings in the record, the petitioner emphasizes the fact that Holly testified that *574 he did not believe that his testimony would incriminate him. The petitioner contends that, on the basis of this statement, Holly could not have invoked the privilege because a witness must have "reasonable cause to apprehend danger ...." *Hoffman* v. *United States*, supra, 341 U.S. at 486, 71 S.Ct. 814.

[39] [40] It is true that a witness cannot invoke his fifth amendment privilege as a pretext to avoid answering questions. The standard, however, for determining whether a witness may invoke the privilege is not whether the witness correctly believes that his testimony would be self-incriminating but, rather, whether there is a possibility of incrimination. See *In re Keijam T.*, supra, 226 Conn. at 504, 628 A.2d 562. As discussed previously, on the basis of the limited evidence in the record, there was such a possibility, and Holly's counsel had so advised him.

In the absence of the petitioner's having conclusively established that Holly could not invoke his fifth amendment privilege against self-incrimination and would have been required to testify, the petitioner cannot establish that he was prejudiced by defense counsel's failure to present a third-party culpability defense through Holly's testimony. See *Smith* v. *Commissioner of Correction*, 141 Conn. App. 626, 634–35, 62 A.3d 554 (no prejudice when witness invoked fifth amendment privilege), cert. denied, 308 Conn. 947, 67 A.3d 290 (2013); *Robinson* v. *Warden*, Docket No. CV-04-0004561, 2009 WL 1333799, *4–5 (Conn. Super. April 21, 2009) (no prejudice where counsel believed witnesses might have invoked fifth amendment privilege), appeal dismissed sub nom. *Robinson* v. *Commissioner of Correction*, 129 Conn. App. 699, 21 A.3d 901, cert. denied, *575 302 Conn. 921, 28 A.3d 342 (2011); see also *Robinson* v. *Commissioner of Correction*, 129 Conn. App. 699, 704, 21 A.3d 901 (it was strategic decision by counsel not to call witness when counsel believed that witness might invoke fifth amendment privilege), cert. denied, 302 Conn. 921, 28 A.3d 342 (2011). Accordingly, the petitioner cannot establish his claim under the second prong of *Strickland*.

The judgment is affirmed.

In this opinion the other justices concurred.

**All Citations**

330 Conn. 520, 198 A.3d 52

## Footnotes

1 The jury reasonably could have found these facts regarding Ford's actions on the basis of his testimony from the petitioner's first trial, which culminated in a hung jury and a mistrial. At the second trial, Ford recanted and testified that he never saw the petitioner on the night of the shooting but felt pressured by the police to implicate the petitioner. Ford's testimony from the first trial was read into the record at the second trial pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S.Ct. 597, 93 L.Ed.2d 598 (1986).

2 At the habeas trial, Attorney Merkin testified that the theory of defense was that "there was not enough evidence in a single eyewitness [identification] case to convict [the petitioner]" and that the strategy for presenting this defense was "[t]o discredit ... [Ford] as best we could and kind of make a claim that—with very weak credibility, that the jury shouldn't find that [the petitioner] was the person who committed this crime." As to Ford, specifically, part of defense counsel's theory, Merkin testified, "was that [Ford] wasn't in a location where he could see what he claimed to have seen. Part of it was that he was very coercively, in our view, interrogated .... And part of it was that we had some suspicion or belief that he was actually involved himself, whether accidentally or otherwise killing his friend."

3 The petitioner has not challenged the habeas court's rejection of his conflict of interest claim on appeal.

4 Attorney Merkin testified that she generally preferred not to present an alibi defense unless it was airtight: "My belief about alibis is that unless they are solid, they can get you into trouble. It's the last thing the jury hears if you have a good prosecutor who's a good cross-examiner and can try to kind of attack either a family member who's an alibi witness or some other vulnerability to the alibi. To me, it pulls attention away from the weaknesses in the state's case, and it kind of develops jurors' focus on the weaknesses in the alibi. So, it's just been my practice to shy away from alibis unless they're solid, and I had some concerns about the alibi in this case."

5 Although Attorney Merkin testified that the petitioner's house was one block away from the crime scene and Attorney Jones testified that it was a few blocks away, the evidence offered at the criminal trial established that the petitioner's house was approximately two blocks from the crime scene.

6 Detective Breland, who was in charge of the police investigation, testified at the habeas trial that Joyce did not provide him with information or give a sworn statement. Moreover, he testified that the petitioner did not tell him that Joyce had been home with him at the time of the murder. Rather, according to Detective Breland, the petitioner told him that he did not know who was home with him on the night of the murder.

7 For example, Attorney Merkin testified that, initially, Joyce informed the defense team that the petitioner left the house sometime between 11 p.m. and 12 a.m. but then in a later interview stated that he left sometime between 10:45 and 11 p.m.

8 The only evidence presented at the petitioner's criminal trial regarding his whereabouts on the night of the murder was the testimony of Toles that the petitioner had called her at about 9:45 p.m. from his cell phone, stating that he was in the area and wanted to stop by her dormitory room at Southern Connecticut State University. She further testified that the petitioner did not immediately show up but that he arrived at her dormitory room at about 11 p.m. Southern Connecticut State University is approximately three miles from the crime scene. Although this evidence placed the petitioner a few miles from the crime scene after the murder, there was no evidence that placed him within two blocks of the crime scene at or near the time of the murder, as Joyce's testimony would have done.

9 At the criminal trial, Joyner, who lived in the house outside of which the victim's body was found, testified that she heard a boom sound sometime between 10:25 and 10:30 p.m. Additionally, Baker, who lived in the neighborhood close to where the shooting occurred, testified at the criminal trial that he heard a person run past his window on the side of his house and into his backyard at about 10:15 p.m. and then heard a gunshot approximately five minutes later at about 10:20 p.m.

10 The Appellate Court in *Spearman* held both that defense counsel's decision was reasonable trial strategy and that the petitioner was not prejudiced by defense counsel's decision. See *Spearman* v. *Commissioner of Correction*, supra, 164 Conn. App. at 565, 138 A.3d 378.

11 The petitioner argues that defense counsel's decision not to present an alibi defense cannot be strategic on the basis of counsel's not wanting to distract the jury from Ford's recantation because defense counsel did not know about the recantation prior to the start of evidence in the second trial. The petitioner argues that defense counsel are attempting to retroactively justify their actions. Attorney Merkin, however, testified that she made the final decision not to offer the alibi defense only after hearing Ford's recantation.

Moreover, the habeas court never determined that defense counsel's actions were not strategic; rather, it determined that defense counsel's strategy was unreasonable. As such, the issue is not whether defense counsel's decision not to present the alibi defense was strategic but whether it was a reasonable strategic decision.

12 Joyce never testified that she was tasked with watching the petitioner or keeping account of his movements on the night of the shooting. Rather, she testified that the petitioner was not consistently within her line of sight during the time of the shooting and that she was watching her children and the television. If she had testified at the underlying criminal trial, the jury reasonably could have found that her focus had been on her children and the television.

13 The petitioner contends that if defense counsel believes an alibi witness to be credible, it is deficient performance not to offer the witness' testimony at trial. This argument, however, ignores the fact that even if a witness is found to be highly credible by counsel or by the habeas court, it may be a reasonable strategic decision not to offer that witness' testimony if the witness would be vulnerable to attack on other grounds, or their testimony would raise other concerns or leave gaps in a defense. See *Michael T.* v. *Commissioner of Correction*, supra, 319 Conn. at 637, 126 A.3d 558 ("in making a tactical decision whether to proffer [highly credible] expert testimony, reasonable counsel would have recognized that [the witness] would have been vulnerable to attack on various grounds"). Even though defense counsel found Joyce and Allen to be credible, defense counsel reasonably believed that the testimony of Joyce and Allen did not definitively account for the petitioner's whereabouts and instead created issues regarding the petitioner's proximity to the crime scene and consciousness of guilt. The credibility of Joyce and Allen did nothing to ameliorate defense counsel's concerns about these issues.

14 Attorney Jones and Attorney Merkin testified that they disagreed about whether their concerns regarding the alibi defense outweighed the benefits of presenting the alibi defense. This case exemplifies the well established principle that because no two lawyers will try a case the same way, we must "affirmatively entertain the range of possible reasons [for counsel's decisions] ...." (Internal quotation marks omitted.) *Michael T.* v. *Commissioner of Correction*, supra, 319 Conn. at 632, 126 A.3d 558. This disagreement between defense counsel also is further proof that they strategically and thoughtfully considered the potential benefits and harm of presenting the alibi defense. Under the circumstances of this case, such consideration is not constitutionally deficient.

15 To the extent that the petitioner argued before this court that defense counsel should have conducted additional investigation by obtaining phone records to solidify the timing of the telephone calls, he did not raise this argument in the habeas court and failed to present any evidence at his habeas trial to establish that the telephone records would have definitively proved that he was at home talking to Allen on the telephone via his landline at the precise time of the shooting. Not only did the petitioner fail to offer any telephone records

that showed the timing of the telephone calls, but he failed to offer any evidence that established the precise time of the shooting. In the absence of such evidence, and in light of the proximity of the crime scene to the petitioner's house, the alibi defense leaves open the possibility that the petitioner could have left home unnoticed, committed the crime, and returned home unnoticed in a short span of time.

16 Despite the petitioner's contention that the jury in his first trial would have found him not guilty if it had known his whereabouts at the time of the shooting, it is noteworthy that defense counsel spoke only with a single juror about her concerns, and that that juror reported that the jury was divided ten to two in favor of finding the petitioner guilty.

17 The petitioner contends that because these issues are evidentiary in nature, the Appellate Court should have afforded deference to the habeas court's determinations and reviewed the issues under the abuse of discretion standard. We disagree.

Evidentiary rulings are afforded deference because a trial court has the inherent discretionary power to control the proceedings before it. See *Downs* v. *Trias*, 306 Conn. 81, 102, 49 A.3d 180 (2012) ("trial court possesses inherent discretionary powers to control proceedings, exclude evidence, and prevent occurrences that might unnecessarily prejudice the right of any party to a fair trial" [internal quotation marks omitted] ). In the present case, the habeas court was not exercising its discretion to control the habeas trial. Rather, the habeas court was asked to determine a legal question—if Holly had been called at the underlying criminal trial, would the trial court have been compelled to admit his testimony or exercised *its* discretion to do so? As such, the habeas court was called on to review the hypothetical actions of another court regarding admissibility and privilege, not to make discretionary evidentiary rulings in a trial it was conducting. This court is equally capable of reviewing this legal question. Accordingly, our review is plenary.

18 The petitioner also argues that the Appellate Court, acting sua sponte, improperly reached an issue that the parties did not brief: whether Holly's testimony was admissible as evidence of third-party culpability. We disagree. In the petitioner's brief before the Appellate Court, he specifically argued that defense counsel were deficient for failing to offer the testimony of Holly because it provided a sufficient factual nexus connecting Ford to the murder, which triggered the petitioner's right to present a third-party culpability defense. He argued that the habeas court properly determined that this nexus existed, making Holly's testimony relevant and, thus, admissible. Because the petitioner raised this issue before the Appellate Court as support for upholding the habeas court's decision, we reject the petitioner's argument that the Appellate Court improperly addressed this issue sua sponte.

19 Defense counsel also testified at the habeas trial that they thought at the time of the second criminal trial that Ford had to admit to knowing Holly in order to create a foundation to present Holly's testimony. Defense counsel admitted at the habeas trial, however, that no such foundation was required.

20 Attorney Merkin testified that people in the community did mention to Investigator Whalen that there was a rumor that Ford had accidentally shot the victim, but there were no witnesses who were able to testify that they heard Ford confess or saw Ford shoot the victim.

21 Attorney Merkin, Attorney Jones, and Investigator Whalen consistently testified that Holly initially told them that he had seen Ford with a gun a few days before the murder. We are required to review defense counsel's performance on the basis of "counsel's perspective at the time," not on the basis of hindsight. *Strickland* v. *Washington*, supra, 466 U.S. at 689, 104 S.Ct. 2052. Defense counsel testified that on the basis of what Holly told them, they believed he had seen Ford with a gun two or three days before the shooting, not on the day of the shooting, as Holly later testified during the habeas trial. Additionally, even if Holly did see Ford with a

gun on the day of the murder, as he claimed at the habeas trial, no evidence established that Ford continued to have the gun in his possession later that night at the time of the murder.

22 As further support for defense counsel's decision not to offer Holly's testimony because it was too speculative, it is noteworthy that in denying defense counsel's motion for a new trial, the trial court determined that defense counsel's argument that Holly's testimony provided a direct connection between Ford and the murder was "pure speculation." Following the jury's verdict in the second criminal trial, defense counsel filed a motion for a new trial on the ground that Holly's testimony should have been presented and was exculpatory. Because of Holly's intention to invoke his fifth amendment privilege against self-incrimination, the trial court accepted as true defense counsel's representation as to his proposed testimony for purposes of deciding the motion. Even after crediting Holly's testimony, the trial court determined that Holly's testimony would not produce a different result in a new trial because his testimony raised mere speculation, not a direct connection, that Ford committed the murder. The petitioner did not challenge this ruling on direct appeal. If he had done so, the issue would have been subject to the abuse of discretion standard of review because the judge who heard the motion for a new trial was the same judge who presided over the criminal trial. See *Jones* v. *State*, 328 Conn. 84, 104–105, 177 A.3d 534 (2018).

23 Although there is a dispute as to whether Holly would have testified if the trial court had rejected his invocation of the fifth amendment privilege, there is no dispute that Holly would have attempted to invoke the privilege.

24 The habeas court made no findings regarding the credibility of Attorney Ullman and Attorney Farver. It did, however, emphasize the fact that Attorney Farver was uncertain as to whether Holly would be able to invoke the fifth amendment privilege. The habeas court determined that Holly would have been required to testify because his pending charges were unrelated to the present case and there was no indication that his statement that he saw Ford with a gun would have exposed him to criminal liability in these other unrelated cases.

As the Appellate Court properly and succinctly stated: "[T]he [habeas] court took a [too] narrow view of the fifth amendment issue, considering only whether Holly's direct observations of Ford likely would have subjected him to criminal prosecution, rather than whether it was possible that any questions asked of Holly during his direct or cross-examination could possibly have incriminated him in any other criminal prosecution." (Emphasis omitted.) *Johnson* v. *Commissioner of Correction*, supra, 166 Conn. App. at 126, 140 A.3d 1087.

---

End of Document © 2024 Thomson Reuters. No claim to original U.S. Government Works.