UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CARVAUGHN JOHNSON, | ) | CASE NO. 3:24-CV-01847 (KAD) |
| *Petitioner*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ANGEL QUIROS, | ) | January 13, 2026 |
| *Respondent*. | ) | |

**RULING AND ORDER**

Kari A. Dooley, United States District Judge:

Petitioner Carvaughn Johnson has filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. Pet., ECF No. 1. Respondent Angel Quiros, Commissioner of the Connecticut Department of Correction, has filed a response. Resp., ECF No. 19. For the reasons that follow, Petitioner's habeas petition is **DENIED**.

**Background**

In 2004, a jury found Petitioner guilty of the murder of Markeith Strong in violation of Conn. Gen. Stat. § 53a-54a(a), and of carrying a pistol without a permit in violation of Conn. Gen. Stat. § 29-35.[1] The conviction was affirmed on appeal. *State v. Johnson ("Johnson I")*, 288 Conn. 236, 238–39 (2008). The Court recites herein the facts that the jury could have found, as detailed in the Supreme Court's decision affirming the conviction.

Petitioner and the sixteen-year-old victim, Markeith Strong, had been "at odds with each other" beginning in September 2001. *Id.* at 239. Petitioner approached Strong in mid-September while Strong was sitting with his sister, L'Kaya Ford, on a street corner. *Id.* Petitioner walked towards Strong, called Strong a "punk," and threatened to assault Strong. *Id.*

---

[1] This was Petitioner's second trial, the first having ended in a mistrial when the jury could not reach a verdict.

Approximately two weeks later, Strong was either riding a bicycle or standing near one with Ralph Ford, a mutual friend. *Id.* Petitioner stopped Strong, told Strong that the bicycle was Petitioner's, and demanded Strong give the bicycle back to Petitioner. *Id.* Strong refused. *Id.* When Strong refused a second time, Petitioner said, "don't make me do something to you." *Id.* (brackets omitted). Petitioner, who may have been armed with a gun, punched Strong in the head, took the bicycle, and rode away. *Id.* at 239–40. Strong and Ralph[2] returned home, where Strong's family called the police. *Id.* at 240.

Shortly after the incident with the bicycle, Petitioner approached Strong and L'Kaya about the police report. *Id.* Petitioner told Strong that "he was not going to jail," apologized to Strong, and "told [Strong] not to press charges." *Id.* Petitioner also expressed concern to a friend, Tashana Milton Toles, about possible criminal charges, and he told Toles that he thought he "might be going back to jail." *Id.*

Petitioner approached L'Kaya several weeks later while she was waiting for a bus. *Id.* Petitioner was driving a black Acura or Ford Probe. *Id.* Petitioner accused L'Kaya of being a "snitch," told L'Kaya that he did not like snitches, and that "she knew what happened to snitches in the hood." *Id.* (internal quotation marks omitted). Later that night, L'Kaya, Ralph, and others were gathered on a street corner to celebrate L'Kaya's birthday. *Id.* Strong and Ralph left the gathering around 10 p.m. *Id.* Strong and Ralph later parted ways as Strong took a shortcut home. *Id.* at 241.[3] As Ralph arrived home, he heard a gunshot in the backyard of a home across the street. *Id.* Ralph stepped into his front hallway, where he later testified that he saw Petitioner run from

---

[2] To avoid confusion, the Court refers to Ralph Ford as "Ralph" and L'Kaya Ford as "L'Kaya."

[3] Ralph testified at both the first and second trials. At the second trial, Ralph recanted his prior testimony in which he inculpated Petitioner in the shooting of Strong. The State thereafter used his prior testimony as a *Whelan* statement, and it was admitted substantively for its truth. The Connecticut Supreme Court's recitation of the facts reasonably found by the jury relies, in part, on Ralph's testimony from the first trial. *Johnson I*, 288 Conn. at 241 n.8; *see also State v. Whelan*, 200 Conn. 743 (1986).

that backyard into Ralph's driveway. *Id.* Petitioner, who Ralph said was armed with a handgun, got into a black Acura as it left the driveway. *Id.*

A neighbor named James Baker heard someone run past his window, jump the fence, and enter the backyard. *Id.* Baker heard a single gunshot behind his house at around 10:20 p.m. *Id.* Baker called the police at 10:45 p.m. to report the gunshot. *Id.* Another neighbor, LaMont Wilson, also testified that he heard a gunshot sometime between 10:00 p.m. and 10:45 p.m. *Id.* Strong's next-door neighbor, Joanie Joyner, also heard a gunshot, saw something in her yard at around 11:00 p.m., and called the police at 11:25 p.m. *Id*. at 241–42.

While these events were unfolding, Petitioner called Toles between 9:45 p.m. and 10:00 p.m. to tell Toles that Petitioner was near Toles's dormitory, which was located approximately ten minutes away from the scene of the shooting. *Id.* at 242–43. Toles agreed to meet with Petitioner. *Id.* at 242. Petitioner arrived at the dormitory with a friend at 11:00 p.m. *Id.* Toles let Petitioner into the dormitory and signed Petitioner in as a visitor at 11:10 p.m. *Id.*

New Haven Police Department (NHPD) officers arrived at the scene and located Strong face-down in a backyard at around 11:35 p.m. *Id.* at 243. Strong was unconscious and bleeding from his mouth. *Id.* Strong was later pronounced dead at the hospital. *Id.* It was determined that he died from a single gunshot wound to his face. *Id.*

The State charged Petitioner with Strong's murder on April 24, 2002. *Id.* at 243. Petitioner stood trial for the murder, but the trial court declared a mistrial after the jury was unable to reach a verdict. *Id.* at 243–44. The State tried Petitioner again. *Id.* at 244. This time, the jury found Petitioner guilty of murder and of carrying a pistol without a permit. *Id.* The trial court sentenced Petitioner to 43 years of imprisonment. *Id*. at 238 n.3. Petitioner appealed the criminal judgment

directly to the Connecticut Supreme Court. *Id*. at 238. The Connecticut Supreme Court affirmed Petitioner's conviction. *Id*.

Petitioner then filed the first of two state habeas petitions. In 2013, the state habeas court granted Petitioner's first state habeas petition, vacated Petitioner's conviction, and returned the case to the trial court for further proceedings. *Johnson v. Warden ("Johnson II")*, No. TSR-CV-09-4002796-S, 2013 WL 5422895, at *15 (Conn. Super. Ct. Sept. 11, 2013). The State appealed the state habeas judgment to the Connecticut Appellate Court. *See Johnson v. Comm'r of Corr. ("Johnson III")*, 166 Conn. App. 95 (2016). The Appellate Court reversed the state habeas judgment. *Id*. at 142. Petitioner obtained discretionary review of the Appellate Court's decision by the Connecticut Supreme Court. *See Johnson v. Comm'r of Corr. ("Johnson IV")*, 324 Conn. 904 (2017). The Connecticut Supreme Court affirmed the Appellate Court's decision. *See Johnson v. Comm'r of Corr. ("Johnson V")*, 330 Conn. 520 (2019). Petitioner filed his second state habeas petition on July 30, 2018. *See Johnson v. Comm'r of Corr.*, No. TSR-CV-18-4009643-S (Conn. Super. Ct.); *see also* App'x I to Resp., ECF No. 19-9. That habeas case is currently scheduled for trial on November 19, 2026. *Id*.[4]

Petitioner filed the instant federal habeas petition in 2024. ECF No. 1. Petitioner raised five claims in his federal habeas petition. *Id*. at 5–16. Respondent moved to dismiss Petitioner's federal habeas petition as a "mixed petition" because one of Petitioner's claims—namely, the fifth claim—was unexhausted. *See* Mot. to Dismiss, ECF No. 13, at 18. After Petitioner withdrew the unexhausted components and subcomponents of his fifth claim, Pl.'s Obj., ECF No. 15, at 4, 7, the Court denied the motion to dismiss as moot. ECF No. 16, at 7.

---

[4] Petitioner maintained in April 2025 that he was "currently in the process of withdrawing his [second] state habeas petition and ha[d] no interest in bringing those current issues to [c]ourt." Pl.'s Obj., ECF No. 15, at 3. However, according to the state habeas docket, the second state habeas petition is still scheduled for trial in November 2026. *See Johnson v. Comm'r of Corr.*, No. TSR-CV-18-4009643-S (Conn. Super. Ct.), Dkt. Entry 122.00.

Respondent thereafter filed a response addressing the merits of the habeas petition. ECF No. 19. The Court ordered Petitioner to file a reply to this response by August 26, 2025. ECF No. 20. To date, Petitioner has not done so. Accordingly, the Court now reviews the petition on the merits.

**Legal Standard**

The Court will entertain a petition for writ of habeas corpus challenging a state court conviction only if the petitioner claims that his custody violates the Constitution or federal laws. *See* 28 U.S.C. § 2254(a). A claim that a state conviction was obtained in violation of state law is not cognizable in this court. *See Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

Section 2254(d) "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations and internal quotations omitted). This Court cannot grant a petition for writ of habeas corpus filed by a person in state custody as to any claim that was rejected on the merits by the state court unless the adjudication of the claim in state court either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.[5]

28 U.S.C. § 2254(d). This is a very difficult standard to meet. *See Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013).

Clearly established federal law is found in the holdings, not dicta, of the United States Supreme Court at the time of the state court decision. *See Howes v. Fields*, 565 U.S. 499, 505

---

[5] Petitioner makes no claim that the state court decision was based on an unreasonable determination of the facts in light of the evidence presented.

(2012); *Carey v. Musladin*, 549 U.S. 70, 74 (2006). Clearly established federal law "may be either a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." *Kennaugh v. Miller*, 289 F.3d 36, 42 (2d Cir. 2002). Because clearly established federal law must come from the Supreme Court, "circuit precedent does not constitute 'clearly established Federal law[.]'" *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (quoting 28 U.S.C. § 2254(d)(1)).

A decision is "contrary to" clearly established federal law when it applies a rule different from that set forth by the Supreme Court or if it decides a case differently than the Supreme Court on essentially the same facts. *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court "unreasonably applies" Supreme Court law when it has correctly identified the law but unreasonably applies that law to the facts of the case or refuses to extend a legal principle clearly established by the Supreme Court to circumstances intended to be encompassed by the principle. *See Davis v. Grant*, 532 F.3d 132, 140 (2d Cir. 2008).

It is not enough for the state court decision to be incorrect or erroneous. *Eze v. Senkowski*, 321 F.3d 110, 124–25 (2d Cir. 2003). Rather, the state court application of clearly established law must be objectively unreasonable, a substantially higher standard. *Id.*; *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Thus, a state prisoner must show that the challenged court ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Williams v. Taylor*, 529 U.S. 362, 389 (2000) (noting that "state-court judgments must be upheld unless, after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated").

For ineffective assistance of counsel claims, as are included among Petitioner's claims here, federal habeas "review is 'doubly deferential' because counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment[.]" *Woods v. Etherton*, 578 U.S. 113, 117 (2016) (internal quotation marks and citation omitted).

When reviewing a federal habeas petition, this Court presumes that the factual determinations of the state court are correct. 28 U.S.C. § 2254(e)(1). The petitioner bears the burden of rebutting that presumption by clear and convincing evidence. *Id.* The Court's "review under section 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

**Discussion**

As described above, Petitioner's federal habeas petition contains five claims. The Connecticut Supreme Court reviewed four of these claims on direct appeal and one of these claims (containing two subcomponents) on appeal from Petitioner's first state habeas petition. The Court discusses the claims from the direct appeal first and the claims from the first state habeas petition second. To avoid confusion, the Court identifies these claims as Respondent identifies them in the response brief.

### *Courtroom Environment (Claim One)*

The first claim relates to the presence of spectators at trial. Petitioner maintains that he was denied the right to a fair trial because, during Ralph's testimony, jurors observed "several black spectators seated behind the defendant." Pet. at 5. According to Petitioner, the jurors allegedly "believed that the black spectators were there in support of the defendant to intimidate [Ralph] into recanting his statements." *Id.* Petitioner argued on direct appeal that "the jurors'

consideration of the spectators' presence was consideration of a fact outside the evidence, no different than if jurors had done their own investigations and considered any other extraneous facts." *Johnson I*, 288 Conn. at 249 (brackets omitted). Petitioner thus framed this issue as one of juror misconduct.

### *Applicable Supreme Court Law*

Trials open to the public have long existed in our legal system. *See Press-Enter. Co. v. Super. Ct. of Cal.*, 464 U.S. 501, 505 (1984) (noting that "[t]he roots of open trials reach back to the days before the Norman Conquest . . . in England"). Open trials were imported from England to colonial America, *id.* at 508, where they were enshrined as a right guaranteed by the Sixth Amendment of the Constitution. *See* U.S. Const. amend. VI (providing that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial"). Public trials "thus play[] as important a role in the administration of justice today as it did for centuries before our separation from England." *Press-Enter.*, 464 U.S. at 508.

"Openness . . . enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Id.*; *see also Globe Newspaper Co. v. Super. Ct. for Norfolk Cnty.*, 457 U.S. 596, 606 (1982) (noting that "[p]ublic scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process," "fosters an appearance of fairness," and "permits the public to participate in and serve as a check upon the judicial process"). Thus, "the circumstances under which the press and public can be barred from a criminal trial are limited[.]" *Globe Newspaper*, 457 U.S. at 606.

However, the Supreme Court "has made clear that the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial." *Waller v. Georgia*, 467 U.S. 39, 45 (1984). "Central to the right to a fair trial . . . is the principle that 'one

accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.'" *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986) (quoting *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978)). The Supreme Court "has recognized that certain courtroom practices are so inherently prejudicial that they deprive the defendant of a fair trial." *Musladin*, 549 U.S. at 72 (citing *Estelle v. Williams,* 425 U.S. 501, 503–06 (1976); *Flynn,* 475 U.S. at 568). These courtroom practices "pose such a threat to the 'fairness of the factfinding process' that they must be subjected to 'close judicial scrutiny.'" *Flynn,* 475 U.S. at 568 (quoting *Williams,* 425 U.S. at 503–04).

For example, the Supreme Court held in *Estelle v. Williams* that "the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes[.]" 425 U.S. at 512. In so holding, the *Williams* court recognized that "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment." *Id.* at 504–05. As such, "[t]he defendant's clothing [wa]s so likely to be a continuing influence throughout the trial that . . . an unacceptable risk is presented of impermissible factors coming into play." *Id.* at 505.

Notwithstanding these concerns, the Supreme Court held in *Holbrook v. Flynn* that "the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial" was *not* "the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial." 475 U.S. at 568–69. The *Flynn* court explained that "[t]he chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers' presence." *Id.* at 569. These inferences include

that "the officers [we]re there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence." *Id.* However, the *Flynn* court added that, even if a courtroom environment is not inherently prejudicial, such a finding does not end the analysis. 475 U.S. at 572. If the defendant can demonstrate that the practice or environment *actually* influenced the jury, then a constitutional violation has occurred. *Johnson I*, 288 Conn. at 257–58 (emphasis in original) (citing *Flynn*, 475 U.S. at 572).[6]

The Supreme Court later considered in *Carey v. Musladin* whether a state court's holding that "buttons displaying the victim's image worn by the victim's family during [a defendant's] trial did not deny [the defendant] his right to a fair trial" was "contrary to or an unreasonable application of clearly established federal law, as determined by [the Supreme] Court." 549 U.S. at 72 (citing 28 U.S.C. § 2254(d)(1)). After discussing its holdings in *Williams* and *Flynn*, *id.* at 75, the *Musladin* court observed that, unlike the "state-sponsored" courtroom practices in *Williams* and *Flynn*, "the effect on a defendant's fair-trial rights of the spectator conduct to which [the habeas petitioner] object[ed] [wa]s an open question in our jurisprudence." 549 U.S. at 76. The Supreme Court "ha[d] never addressed a claim that such private-actor courtroom conduct was so inherently prejudicial that it deprived a defendant of a fair trial." *Id.*

The *Musladin* court acknowledged that "lower courts have diverged widely in their treatment of defendants' spectator-conduct claims," with some courts applying *Williams* and *Flynn* to "spectator-conduct claims," others "declin[ing] to extend *Williams* and *Flynn* to spectators' conduct," and still others "distinguish[ing] *Flynn* on the facts." *Id.* at 76–77 (collecting cases). However, the Supreme Court observed that it had never decided whether state courts were required

---

[6] The *Flynn* court "d[id] not minimize the threat that a roomful of uniformed and armed policemen might pose to a defendant's chances of receiving a fair trial," but it could not "find an unacceptable risk of prejudice in the spectacle of four such officers quietly sitting in the first row of a courtroom's spectator section." 475 U.S. at 570–71.

to apply the *Williams* and *Flynn* analysis to spectators' conduct claims. *Id.* at 77. Indeed, absent any Supreme Court decision addressing "the potentially prejudicial effect of spectators' courtroom conduct of the kind involved" in the case before it, the *Musladin* court held that, it could not find that the state court "unreasonably applied clearly established Federal law." *Id.* (internal quotation marks and brackets omitted) (quoting 28 U.S.C. § 2254(d)(1)).

### State Court Decision

The Connecticut Supreme Court concluded on direct appeal that the presence of spectators seated behind Petitioner at trial was "more appropriately characterized as a claim that the courtroom environment or a courtroom situation improperly biased the jury[,]" rather than "juror misconduct." *Johnson I*, 288 Conn. at 249. Construing the claim as thus, the Connecticut Supreme Court considered *Williams*, *Flynn*, *Musladin*, and other lower court decisions "address[ing] the question of whether a *situation, arrangement or presence in the courtroom* during the defendant's trial prejudiced him such that it biased the jury." *Id.* at 250–52 (emphasis in original) (collecting cases). The Connecticut Supreme Court noted that "these cases focus on whether the situation or atmosphere in the courtroom created inherent or actual prejudice to the defendant such that a new trial should be granted." *Id.* at 252. In such cases, "a defendant who claims that a courtroom situation or environment rendered the jury incapable of being impartial has the burden of demonstrating either that the environment was inherently prejudicial or, in the alternative, that it caused actual prejudice." *Id.* at 254 (citing, *inter alia*, *Flynn*, 475 U.S. at 570–72).

The Connecticut Supreme Court acknowledged that "[t]he United States Supreme Court has addressed the issue of whether a courtroom situation is inherently or actually prejudicial only with respect to state-sponsored conduct." *Id.* at 257 (citing *Flynn*, 475 U.S. at 570–72; *Williams*, 425 U.S. at 512–13). With regards to private actor or spectator conduct, there is no U.S. Supreme

Court holding directly on point, but "[f]ederal and state courts have applied th[e] inherent or actual prejudice analysis [in *Williams* and *Flynn*] to claims that private actor or spectator conduct during a trial rendered the proceedings unfair." *Id.* at 258 (collecting cases).

Relying on *Flynn*, the Connecticut Supreme Court "conclude[d] that mere spectator attendance at a public trial is expected and cannot, without more, create an 'unacceptable risk of impermissible factors coming into play,'" so as to reveal inherent prejudice. *Id.* at 259 (quoting *Flynn*, 475 U.S. at 570). The Connecticut Supreme Court also concluded that "the defendant has failed to raise his contention of bias from the realm of speculation to the realm of fact," so as to demonstrate actual prejudice. *Id.* at 266 (internal quotation marks omitted). Thus, the Connecticut Supreme Court held that "[r]egardless of whether private conduct inside the courtroom ever can be deemed inherently prejudicial to a defendant, . . . [Petitioner] has not shown inherent *or* actual prejudice." *Id.* at 258 (emphasis in original).

*Application*

The question for this Court is whether the Connecticut Supreme Court's holding was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Section 2254(d)'s "'contrary to' and 'unreasonable application' clauses have independent meaning," *Bell*, 535 U.S. at 694, but each requires as one of its components the existence of "clearly established federal law." As discussed above, the Supreme Court has yet to address the question of when, if ever, private actor/spectator conduct will deprive a defendant of a fair trial. *See supra* at pp. 10–11. Thus, there is no "clearly established federal law" on the issue, and it is a foregone conclusion that the Connecticut Supreme Court could not have misapplied case law that does not exist. *See Smith v. Wenderlich*, 826 F.3d 641, 649 (2d Cir. 2016) ("When there is no Supreme Court holding on a

given issue, 'it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law' within the meaning of AEDPA." (alterations in original) (quoting *Musladin*, 549 U.S. at 77)).  The Petition is therefore DENIED as to this ground.

### *Police Documentation/Adverse Inference (Claim 2)*

Petitioner's second claim concerns police officers' failure to record Ralph's purportedly exculpatory statements.  *See* Pet. at 7.

Some background information on the interrogation and testimony of Ralph Ford is necessary.[7]  At the time of the murder, Ralph was a 15-year-old juvenile offender who was a mutual friend of both the Petitioner and victim.  *See id.*  Shortly after the murder, Ralph was asked to go down to the NHPD police station and be interviewed in connection with the murder. Detectives Daryl Breland, Stephen Coppola, and Edwin Rodriguez engaged in a lengthy pre-interview with Ralph, which was not recorded in anyway, whether by audio, video, or written contemporaneous notes.  Although not recorded, there is no dispute that during the pre-interview, Ralph first denied knowing anything about the murder.

Detective Breland testified that Ralph's mother was with him during the pre-interview, and that the detectives asked her to leave later during the recorded interview.  However, Ralph later testified that he was interviewed alone at the station.  *See also id.*  At Petitioner's first trial, Ralph testified that he saw Petitioner with a gun running away from the scene of the shooting, and the NHPD officers also testified that Ralph had told them that during the pre-interview.  However, at Petitioner's second trial, Ralph recanted his prior testimony and testified that his statements to the police were false and had been coerced by the NHPD officers during the pre-interview.  *See* App'x

---

[7] Most of this information is distilled from the transcripts of Petitioner's criminal trial in February 2004 and his state habeas trial in September 2011, attached to the Respondent's submission in opposition to the Petition.  *See* App'x AA–BB, ECF Nos. 19-10 to 19-23.

AA 2/11/04, ECF No. 19-12 (Ralph Ford's trial testimony). The State therefore used Ralph's inculpatory testimony from the first trial substantively under *State v. Whelan*, 200 Conn. 743 (1986), at the second trial.

Petitioner argued on direct appeal that the NHPD "had failed to preserve the methods by which they interrogated [Ralph] [during the pre-interview] and, thus, violated the defendant's due process rights under the state and federal constitutions," and that "the trial court improperly denied [Petitioner's] request for an adverse inference instruction as an alternative remedy for this alleged due process violation." *Johnson I*, 288 Conn. at 270.

*Applicable Supreme Court Law*

The Supreme Court held in *Brady v. Maryland* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). In *Arizona v. Youngblood*, the Supreme Court noted that "[t]he Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence." 488 U.S. 51, 57 (1988). However, the *Youngblood* court nonetheless determined that "the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.*

This partly stems from the Supreme Court's "unwillingness to read the 'fundamental fairness' requirement of the Due Process Clause as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Id.* at 58 (internal citation omitted). Accordingly, the

14

*Youngblood* court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* Relying on *Youngblood*, the Supreme Court later held in *Illinois v. Fisher* that a defendant's due process rights were not violated when "police, acting in good faith and according to normal police procedures, destroyed evidence that respondent had requested more than 10 years earlier in a discovery motion." 540 U.S. 544, 545, 548 (2004) (per curiam).

### State Court Decision

The Connecticut Supreme Court acknowledged *Youngblood*'s holding that "the due process clause of the fourteenth amendment requires that a criminal defendant show bad faith on the part of the police for failure to preserve potentially useful evidence to constitute a denial of due process of law." *Johnson I*, 288 Conn. at 276 (cleaned up) (quoting *Youngblood*, 488 U.S. at 58). But it identified the important distinction "between allegations that the police had failed to *preserve* exculpatory evidence and allegations that the police had failed to *create* evidence that might have been exculpatory." *Id.* at 270 (emphasis in original). Thus, the determinative question on appeal was whether the NHPD had an obligation to document the pre-interview with Ralph, and whether the failure to do so constituted a failure to preserve evidence within the meaning of *Youngblood*. *See id.* at 270–71, 278.

Because the Connecticut Practice Book rule governing this issue "parallels" the federal Jencks Act, 18 U.S.C. § 3500, the Connecticut Supreme Court "look[ed] to federal court decisions for guidance" on this issue. *Id.* at 278. The Connecticut Supreme Court's "research d[id] not reveal a United States Supreme Court case on this issue, but many of the circuit courts of appeals have concluded that the Jencks Act does not impose an obligation on government agents to record witness interviews or to take notes during such interviews . . . . The Act applies only to recordings,

written statements, and notes that meet certain criteria, *not to items that never came into being . . . .*" *Johnson I*, 288 Conn. at 278–79 (emphasis in original) (brackets omitted) (quoting *United States v. Houlihan*, 92 F.3d 1271, 1288 (1st Cir. 1996)) (collecting cases).

The Connecticut Supreme Court "agree[d] with the sound reasoning of the federal courts that the purpose of the Jencks Act, and, by extension, [Connecticut's] comparable rules of practice, is to ensure the *preservation* of notes or recorded statements once they are created," and observed that "*Youngblood* address[es] the 'preservation' of evidence, not the collection and creation of evidence." *Id.* at 279.   Accordingly, the Connecticut Supreme Court concluded that "the duty to preserve with which . . . *Youngblood* [is] concerned depends on the government's possession of evidence capable of being preserved." *Id.*

The Connecticut Supreme Court therefore held that Petitioner "has not adequately alleged a failure to preserve exculpatory evidence, and, thus, *Youngblood* . . . [is] not applicable to his claim." *Id.* at 281.   And because police were under no duty to record all interviews with Ralph, the trial court had properly denied Petitioner's request for an adverse jury instruction.  *Id.*

> *Application*

As with the claim above, there was no "United States Supreme Court case on this issue." *Johnson I*, 288 Conn. at 278.   As such, the Connecticut Supreme Court's decision cannot be "contrary to" clearly established law, for the same reasons described above.  *See Woods*, 575 U.S. at 317–18; *Ortiz*, 586 F.3d at 156.

To the extent there was any "governing legal rule" to apply, the Connecticut Supreme Court did not apply it unreasonably.  *Grant*, 532 F.3d at 140.   On habeas review, the Court is not concerned with whether the state court properly applied state law.  *See Estelle*, 502 U.S. at 68.

Rather, the Court is concerned only with whether the state court properly applied federal law (such as *Youngblood*).  *See* 28 U.S.C. § 2254(a).

The Connecticut Supreme Court did not unreasonably apply *Youngblood* or its offshoot, *Fisher*.  To sustain a due process violation, *Youngblood* requires a defendant to show "bad faith on the part of the police" in their "failure to preserve potentially useful evidence."  488 U.S. at 58.  And *Fisher* held that police did not violate a defendant's due process rights when they destroyed evidence while acting in good faith.  540 U.S. at 545, 548.  Because federal statutes and case law imposed no "affirmative duty to create records," *Johnson I*, 288 Conn. at 279, Petitioner is unable to show the police violated his due process rights as delineated in *Youngblood*.  Accordingly, the Connecticut Supreme Court reasonably applied *Youngblood* to hold that Petitioner "ha[d] not adequately alleged a failure to preserve exculpatory evidence." *Id.* at 281.

Lastly, Petitioner has not shown that the state court "refus[ed] to extend a legal principle that the Supreme Court has clearly established to a new situation in which it should govern." *Grant*, 532 F.3d at 140.  Petitioner would, in theory, argue that *Youngblood* should be extended to first establish a duty to create, and then to preserve, potentially exculpatory evidence, or perhaps to require recording or note taking of all witness interviews.  He offers no sound basis to do so, and such a rule would run contrary to the Jencks Act and the authority discussed above.  And the Court is not aware of any Supreme Court case which would suggest even an inclination to create such a duty.  Certainly, *Youngblood* offers no such suggestion.  Accordingly, the state court did not unreasonably apply clearly established law.

Because Petitioner has failed to show that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), Petitioner's federal habeas petition is denied on this ground.

### *Cross-Examination/Confrontation (Claim Three)*

Petitioner's next claim relates to his inability to cross-examine Ralph on certain issues. Petitioner claims that the state trial court "sealed [Ralph's] psychological and psychiatric records" and then "refused to allow [Petitioner] to confront [Ralph] with these records or cross-examine him." Pet. at 8. Petitioner also argued on direct appeal that the trial court improperly refused to "permit defense counsel to cross-examine [Ralph] about the nature of the felony charge that resulted in his youthful offender conviction." *Johnson I*, 288 Conn. at 282. Petitioner argued that these failures violated "his rights to due process of law and to confront the witnesses against him, in violation of the state and federal constitutions." *Id.*

Respondent maintains that the component of this claim related to Ralph's psychological and psychiatric records is procedurally defaulted. Resp. at 26. "A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed." *Martinez v. Ryan*, 566 U.S. 1, 9 (2012). Here, the Connecticut Supreme Court concluded that Petitioner "waived" the claim related to Ralph's psychiatric records because "defense counsel withdrew the defendant's request that the court disclose the records and did not request that the court conduct an *in camera* inspection." *Johnson I*, 288 Conn. at 283. Waived claims are procedurally defaulted. *See Dixon v. Miller*, 293 F.3d 74, 80 (2d Cir. 2002) (agreeing with district court that Petitioner, "by failing to lodge a specific objection [in the state trial court], was procedurally barred from raising his claim in federal habeas proceedings").

18

Notwithstanding the procedural default of this claim, "[a] prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." *Martinez*, 566 U.S at 10. But because Petitioner has offered no explanation for the default, he has made no such showing. Accordingly, the Court agrees with Respondent that Petitioner is procedurally barred from seeking review of any error related to the non-disclosure of Ralph's psychological and psychiatric records. As such, the Court only reviews the component of this claim related to Petitioner's inability to cross-examine Ralph on his adjudication as a youthful offender arising from a felony arrest.

*Applicable Supreme Court Law*

"The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986) (quotation omitted). "This has long been read as securing an adequate opportunity to cross-examine adverse witnesses." *United States v. Owens*, 484 U.S. 554, 557 (1988). However, that right is not unfettered. *See Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) ("Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish" (emphasis in original)).

Trial courts "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679. Courts may also preclude cross-examination containing evidence that is "otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). However, as discussed in detail below,

the Supreme Court held in *Davis v. Alaska* that, notwithstanding such state evidentiary rules, defendants retain a right to cross-examine a prosecution witness on his juvenile record in order to show potential bias. 415 U.S. 308, 319 (1974).

A habeas court "do[es] not sit to review the trial judge's exercise of discretion, but rather to assess whether the state court's denial of [the defendant's] Confrontation Clause claim was reasonable." *Id.* (internal quotation marks omitted). "Moreover, for habeas to be warranted, the trial court's denial must not have been harmless, that is, it must have had a substantial and injurious effect or influence in determining the jury's verdict." *Id.* (internal quotation marks omitted) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

### State Court Decision

Here, the trial court prohibited Petitioner from "cross-examin[ing] [Ralph] regarding the [nature of the] underlying felony charge that gave rise to [Ralph's] youthful offender status." *Johnson I*, 288 Conn. at 283. The trial court prohibited Petitioner from cross-examining Ralph on this issue because, "although an adult convicted of the same crime might have a felony conviction that would be proper fodder for impeachment, [Ralph] was a youthful offender, and, thus, his conviction was not a felony conviction." *Id.* at 284. The Connecticut Supreme Court affirmed the trial court's decision because, under Connecticut case law, a youthful offender adjudication does not qualify as a felony conviction, "such that the specific crime was admissible for impeachment purposes." *Id.*

### Application

The Court first considers whether the state court's decision to prohibit cross-examination of Ralph with his youthful offender adjudication was "contrary to" clearly established federal law. As stated above, Petitioner may show this if "the state court applie[d] a rule different from the

20

governing law set forth in [Supreme Court] cases" or (2) the state court "decid[ed] a case differently than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts." *Bell*, 535 U.S. at 694. The Court considers each in turn.

Here, the "governing law" on this issue is the Supreme Court's decision in *Davis v. Alaska* (mentioned above), in which the Supreme Court held that "the Sixth and Fourteenth Amendments conferred the right to cross-examine a particular prosecution witness about his delinquency adjudication for burglary and his status as a probationer," in order to "show the existence of possible bias and prejudice." 415 U.S. 308, 321 (1974) (Stewart, J., concurring). The Connecticut Supreme Court did not address *Davis* in its analysis of this issue, *see Johnson I*, 288 Conn. at 283–85, but a habeas court's "review is of the state court's decision, not the cases it cited (or failed to cite) along the way." *See Stock v. Rednour*, 621 F.3d 644, 648 (7th Cir. 2010); *see also Early v. Packer*, 537 U.S. 3, 8 (2002) ("[Section 2254(d)(1)] does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them" (emphasis and brackets in original)).

In *Davis*, the defendant allegedly broke into a bar and stole a safe. 415 U.S. at 309. Police later located the safe twenty-six miles away, on a family's private property. *Id.* A juvenile who lived on that property told investigating officers that he had seen and spoken to two men near where the safe was discovered on the date it was stolen. *Id.* The juvenile later identified the defendant in a photo lineup as one of those two men. *Id.* at 309–10. Police arrested the defendant, and the juvenile identified the defendant in a live lineup. *Id.* at 310.

The juvenile was "a crucial witness for the prosecution." *Id.* The juvenile was also "on probation by order of a juvenile court after having been adjudicated a delinquent for burglarizing two cabins." *Id.* at 311. The prosecution sought a "protective order to prevent any reference to

[the] juvenile['s] record by the defense in the course of cross-examination." *Id.* at 310. The defendant objected, arguing that the defense only intended to use the juvenile's record to show that the juvenile "acted out of fear or concern of possible jeopardy to his probation." *Id.* at 311. The trial court disagreed and entered a protective order in accordance with state law, prohibiting admission of a juvenile's record in a court proceeding. Crucially, at trial, the trial court prohibited any mention of or inquiry into the existence of the witness's juvenile delinquency adjudication. *Id.* at 312–13.

> The case ultimately reached the Supreme Court, where the issue presented was thus:

> whether the Confrontation Clause requires that a defendant in a criminal case be allowed to impeach the credibility of a prosecution witness by cross-examination directed at possible bias deriving from the witness' probationary status as juvenile delinquent when such an impeachment would conflict with a State's asserted interest in preserving the confidentiality of juvenile adjudications of delinquency.

*Id.* at 309. The *Davis* court acknowledged that a defendant may attempt to discredit a witness by introducing the witness's prior conviction in two ways: to impeach their general character, *id.* at 316, or to "reveal[] possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." *Id.* The *Davis* court recognized that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.* at 316–17.

Applying these principles, the *Davis* court concluded that "[t]he claim of bias which the defense sought to develop was admissible to afford a basis for an inference of undue pressure because of [the juvenile's] vulnerable status as a probationer, as well as of [the juvenile's] possible concern that he might be a suspect in the investigation." *Id.* at 317–18 (internal citation and footnote omitted). The *Davis* court also "conclud[ed] that the right of confrontation [wa]s paramount to the State's policy of protecting a juvenile offender['s]" privacy. *Id.* at 319. The

*Davis* court thus held that "defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Id.* at 318.[8]

*Davis* is certainly factually similar to Petitioner's case.  Here, as in *Davis*, Petitioner sought to cross-examine "a crucial witness for the prosecution" regarding the witness's adjudication as a youthful offender.  *Davis*, 415 U.S. at 310–311; *Johnson I*, 288 Conn. at 283.  Here, as in *Davis*, the trial court relied on state law to preclude the cross-examination insofar as youthful offender records are not generally available to the public.  *Davis*, 415 U.S. at 311; *Johnson I*, 288 Conn. at 284.  It would seem then that, as in *Davis*, Petitioner's "right of confrontation [would be] paramount to the State's policy of protecting a [youthful] offender."  *Davis*, 415 U.S. at 311.  Unlike here, however, the *Davis* court was concerned with a very specific problem—the ability of a criminal defendant to use a juvenile adjudication for the purposes of showing *bias*, *i.e.*, a motive to fabricate.  *See Abel*, 469 U.S. at 50.

Crucial to the Supreme Court's decision in *Davis* was that the juvenile witness was, at the time of the investigation, on probation for the same type of offense that the police were investigating.  *See Davis*, 415 U.S. at 310–11, 318.  Because the juvenile witness was on probation, his juvenile adjudication for burglary and probationary status were probative of his motive to lie to police because of his "vulnerable status as a probationer"[9] or a "possible concern that he might

___

[8] However, Justice Stewart, in a brief concurrence emphasized that "the [Supreme] Court neither holds nor suggests that the Constitution confers a right in *every case* to impeach the general credibility of a witness through cross-examination about his past delinquency adjudications or criminal convictions."  415 U.S. at 321 (Stewart, J., concurring) (emphasis added).  The Supreme Court has later interpreted *Davis* as "hold[ing] that the Confrontation Clause of the Sixth Amendment requires a defendant to have some opportunity to show bias on the part of a prosecution witness."  *United States v. Abel*, 469 U.S. 45, 50 (1984); *see also Nevada v. Jackson*, 569 U.S. 505, 512 (2013) (discussing *Davis*).

[9] A person subject to a period of probation is at risk for additional restrictions or even revocation, a reality certainly known to police officers.

be a suspect in the investigation." *Id.*  The Court also noted that, through cross-examination of the witness about his status as a probationer, the defendant could have developed a basis "for an inference of undue pressure [by the police] because of [the juvenile's] vulnerable status as a probationer." *Id.* at 317–18.

While true that Ralph, like the juvenile in *Davis*, was on probation, *Johnson I*, 288 Conn. at 284, Ralph had been adjudicated as a youthful offender for the "crime of possession of narcotics with intent to sell," *Johnson I*, 288 Conn. at 284, which is not the same type of crime that police were investigating when they spoke to Ralph.  *See id.* at 236 n.12 (noting that police relied on information and identifications made by Ralph and L'Kaya to obtain a search warrant for Petitioner's home).  Thus, because cross-examining Ralph about his drug offense would not have uncovered a motive to lie to police, the concerns animating the *Davis* court's decision are missing here.  Because police were not investigating a drug crime, Ralph would not have had the same motive as the juvenile in *Davis* to make "a hasty and faulty identification" of Petitioner "to shift suspicion away from himself."

Revealing Ralph's juvenile drug offense would have provided to the jury nothing more than "a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony."  *Davis*, 415 U.S. at 316.  But *Davis* "neither holds nor suggests that the Constitution confers a right in *every case* to impeach the general credibility of a witness through cross-examination about his past delinquency adjudications or criminal convictions."  415 U.S. at 321 (Stewart, J., concurring) (emphasis added).

Even if *Davis* counsels a different outcome, the state court's denial of Petitioner's Confrontation Clause claim did not have "a substantial and injurious effect or influence in determining the jury's verdict."  *Alvarez*, 763 F.3d at 230 (internal quotation marks omitted).

Though the state trial court prohibited Petitioner from "mention[ing] the nature of the underlying charge," the state trial court permitted Petitioner to "question [Ralph] about the fact that [Ralph] was on probation, the length of that probation, and the amount of time that he had hanging over his head[.]" *Johnson I*, 288 Conn. at 284 (cleaned up).  And the state trial court also instructed the jury that it could consider "whether [Ralph's] status as being on probation at the time of his original statement and at the time of his previous and current testimony could affect his credibility or believability." *Id.* (cleaned up).  Thus, the state trial court permitted Petitioner to probe the type of bias with which the Supreme Court was concerned in *Davis* (*i.e.*, whether Ralph's status as a juvenile probationer left him vulnerable to police coercion).[10]  *See Davis*, 415 U.S. at 318.

Because no Supreme Court decision unequivocally required the trial court to permit Petitioner to introduce the nature of Ralph's youthful offender adjudication for the purpose of impeaching Ralph's testimony, the state court did not "appl[y] a rule different from the governing law set forth in [Supreme Court] cases." *Bell*, 535 U.S. at 694.  And because *Davis* is factually distinguishable from Petitioner's case, the state court did not "decide[] a case differently than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts." *Id.*  Accordingly, the state court's decision was not "contrary to" clearly established law.

Nor did the state court unreasonably apply clearly established law.  The state court did not "correctly identif[y] the governing legal rule but appl[y] it unreasonably to the facts" in Petitioner's case, nor did it "refuse[] to extend a legal principle that the Supreme Court has clearly established to a new situation in which it should govern." *Grant*, 532 F.3d at 140.  The state court decided this issue by applying state law, not federal law. *See Johnson I*, 288 Conn. at 283–85 (citing *State*

---

[10] Indeed, because Ralph Ford had recanted his testimony and identification of the Petitioner at that point, Ralph himself testified before the jury that the NHPD detectives had "pressured" him to make that identification. *See generally* App'x AA 2/11/04, ECF No. 19-12 (trial testimony of Ralph Ford).  Thus, this line of inquiry about Ralph's potential bias was thoroughly explored during trial.

*v. Keiser*, 196 Conn. 122 (1985)).  But even if the state court's application of state law was in error, which the Court does not decide, the state court's decision was still in step with *Davis*.  *See Rivera v. Portuondo*, 156 F. App'x 426 (2d Cir. 2005) (summary order) (concluding that "[w]hether the trial court committed evidentiary error under New York state law is irrelevant because, even if error had occurred, the Appellate Division did not unreasonably apply [Supreme Court precedent]").  Unreasonable application requires "some increment of incorrectness beyond error in order to obtain habeas relief."  *Cotto v. Herbert*, 331 F.3d 217, 248 (2d Cir. 2003) (internal quotation marks omitted).  Because the state court's decision accords with *Davis*, the Court finds no error in the state's court's decision, let alone "incorrectness beyond error."  *Id.*  Accordingly, Petitioner's habeas petition is denied on this ground.

### *Consciousness of Guilt (Claim Four)*

Petitioner next maintains that "the court gave an erroneous charge on consciousness of guilt." Pet. at 10.  On appeal, the Connecticut Supreme Court agreed with the State that this claim was unreviewable because "defense counsel's objection differ[ed] from that raised at trial and because [the Connecticut Supreme Court] ha[s] declined to view claims challenging consciousness of guilt instructions as constitutional in nature."  *Johnson I*, 288 Conn. at 286.  Because the Connecticut Supreme Court found the claim unreviewable, Respondent now maintains that the claim is procedurally defaulted.  Resp. at 30.  The Court agrees.

As with Petitioner's claim related to Ralph's psychological and psychiatric records, Petitioner did not properly preserve his claim related to the jury instruction.  *See Johnson I*, 288 Conn. at 282, 287.  As such, the Connecticut Supreme Court did not consider the jury instruction claim on the merits.  *See id.* at 288.  This claim is thus procedurally defaulted.  *See Beverly v. Warden*, No. 3:07-CV-1333 (RNC), 2009 WL 322870, at *3 (D. Conn. Feb. 10, 2009) (concluding

that claim involving "consciousness of guilt instruction" was procedurally defaulted because state court declined to review claim after petitioner "failed to properly preserve it at trial").

Petitioner "may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." *Martinez*, 566 U.S at 10. But because Petitioner has offered no explanation for the default, he has made no such showing. Accordingly, the Court agrees with Respondent that Petitioner is procedurally barred from seeking review of error related to the consciousness of guilt jury instruction.

### *Ineffective Assistance of Counsel Claims (Ground Five)*

Petitioner's ineffective assistance of counsel claim consists of four subcomponents. *See* Order, ECF No. 16, at 6–7 (describing those four subcomponents). Petitioner raised the first two subcomponents in his first habeas petition. *See id.* at 7. Petitioner withdrew the latter two subcomponents because he failed to exhaust them. *See id.* Thus, only two components remain: defense counsel's (1) failure to investigate or call alibi witnesses and (2) failure to present a third-party culpability defense. *See id.* at 6. The Court discusses each in turn.

#### *Failure to Call Alibi Witnesses*

Petitioner contended in state court that defense counsel provided ineffective assistance of counsel by failing "to present an alibi defense through the testimony of his sister, Joyce Johnson (Joyce), and his friend, Taylor Allen[.]" *Johnson V*, 330 Conn. at 528. Petitioner maintained that "the Appellate Court improperly held that defense counsel's failure to present alibi witnesses was reasonable trial strategy." *Id.* at 537. Petitioner claimed that "defense counsel based their decision not to call alibi witnesses on their erroneous belief that the petitioner's alibi defense was weak" and that "if defense counsel had fully investigated the alibi witnesses' potential testimony, they

would have realized that their concerns were misplaced, especially in light of the habeas court's finding that the alibi witnesses were credible." *Id.* at 539.

*Applicable Supreme Court Law*

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel." *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003) (per curiam).  That guarantee "includes the right to the effective assistance of counsel." *Garza v. Idaho*, 586 U.S. 232, 237 (2019) (internal quotation marks omitted) (quoting *Strickland v. Washington*, 466 U.S. 668, 686 (1984)).  "Under *Strickland*, a defendant who claims ineffective assistance of counsel must prove (1) that counsel's representation fell below an objective standard of reasonableness and (2) that any such deficiency was prejudicial to the defense[.]"  *Id.* (internal quotations marks and citation omitted).

"Counsel is 'strongly presumed' to have exercised reasonable judgment in all significant decisions."  *Murden v. Artuz*, 497 F.3d 178, 198 (2d Cir. 2007) (quoting *Strickland*, 466 U.S. at 690); *see also Cullen*, 563 U.S. at 196 (noting that "*Strickland* specifically commands that a court must indulge the strong presumption that counsel made all significant decisions in the exercise of reasonable professional judgment" and "affirmatively entertain the range of possible reasons [defense] counsel may have had for proceeding as they did" (internal quotation marks omitted)).  Thus, "[c]ourts applying *Strickland* are especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury."  *Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005).

"The decision not to call a particular witness is typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess."  *United States v. Luciano,* 158 F.3d 655, 660 (2d Cir. 1998) (per curiam).  Accordingly, "counsel's decision as to 'whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse

in professional representation.'" *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) (quoting *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997)).

*State Court Decision*

The Connecticut Supreme Court evaluated Petitioner's ineffective assistance of counsel claim under *Strickland*. *See Johnson V*, 330 Conn. at 537–39. Joyce Johnson testified at Petitioner's habeas trial that Petitioner "was home with her from approximately 5 to 11 p.m. on the night of the shooting." *Id.* at 543. However, one of Petitioner's defense attorneys also testified that defense counsel decided "not to present the alibi defense on the ground that it was cleaner to have the jury just focused on whether or not the state met its burden of proof through Ralph Ford, in light of the fact that he was the sole eyewitness and had recanted on the witness stand at the second trial." *Id.* at 544 (internal quotation marks omitted). Moreover, Petitioner's defense attorneys were concerned that Joyce's testimony would have been "weak" because she was a family member, lived a block away from the shooting, had not given a statement to police, was uncertain about specific times with the defense team, and that Petitioner was not in "her range of vision" all night. *See id.* at 544–45. The other alibi witness, Allen, was unable to establish that she was on the phone with Petitioner when the shooting occurred. *See id.* at 546–47.

Relying in part on the Supreme Court's decision in *Cullen v. Pinholster*, 563 U.S. 170 (2011), the Connecticut Supreme Court concluded that "defense counsel made a reasonable strategic decision not to present an alibi defense that possibly would have been more harmful than helpful by distracting the jury from [Ralph's] recantation, introducing issues of proximity and consciousness of guilt, and failing to account definitively for the petitioner's whereabouts during the time of the shooting." *Johnson V*, 330 Conn. at 557. Because defense counsel's performance

was not deficient, the Connecticut Supreme Court held that "[P]etitioner failed to satisfy his burden under the first prong of *Strickland*." *Id.*

*Application*

The Court first considers whether the state court's decision was "contrary to" clearly established law for the reasons described in *Bell*, 535 U.S. at 694. The Supreme Court has not definitively decided whether or when defense counsel provides ineffective assistance to a defendant by failing to call potential alibi witnesses. Thus, *Strickland* is the applicable "governing law" on this point. *See Kennaugh*, 289 F.3d at 42; *Rosario v. Ercole*, 601 F.3d 118, 123, 128 (2d Cir. 2010) (noting that *Strickland* is the "clearly established law" that applies to ineffective assistance of counsel claims and evaluating whether state court properly applied *Strickland* to claim that defense counsel failed to investigate alibi witnesses). The Connecticut Supreme Court applied the *Strickland* framework to reach its holding. *See Johnson V*, 330 Conn. at 557. Moreover, the state court could not have decided the case differently than the Supreme Court "on a set of materially indistinguishable facts" because no such comparator case exists. *See Ortiz*, 586 F.3d at 156. Accordingly, the state court's decision was not "contrary to" clearly established law.

Nor did the state court unreasonably apply *Strickland. Grant*, 532 F.3d at 140. The state court applied *Strickland* consistent with Second Circuit decisions applying *Strickland* in similar contexts. *See, e.g.*, *Matthews v. Mazzuca*, 120 F. App'x 856, 858 (2d Cir. 2005) (summary order) (affirming denial of ineffective assistance of counsel claim where alibi witness could not account for defendant's whereabouts at the time of the crime); *Bennett v. Fischer*, 246 F. App'x 761, 765 (2d Cir. 2007) (summary order) (affirming denial of ineffective assistance of counsel claim in which one alibi witness was "moderately credible except that she could not be believed on the critical issue of the date and time [because] she had a chance encounter with petitioner on the early

30

morning of the murder" and another was "wholly incredible" (internal quotation marks omitted));

*Rosario*, 601 F.3d at 127 (affirming denial of ineffective assistance of counsel claim where alibi

witnesses were "questionable" (internal quotation marks omitted)).

And because the state courts applied *Strickland* here as other courts have done, there is no

basis for a claim that the state court refused to extend the *Strickland* principles to circumstances

intended to be encompassed by them.  *See Grant*, 532 F.3d at 140.  Because the state court's

decision was not contrary to or an unreasonable application of clearly established law, the habeas

petition must be denied on this ground.

### Failure to Present a Third-Party Defense

Petitioner also argued on appeal to the Connecticut Supreme Court that "the Appellate

Court improperly concluded, [as to the second prong of *Strickland*], that he was not prejudiced by

defense counsel's failure to present third-party culpability evidence."  *Johnson V*, 330 Conn. at

558.  William Holly testified at the habeas trial that Ralph had shown Holly a gun on the day of

the shooting.  *Id.* at 560.  But when defense counsel had interviewed Holly before the criminal

trial, Holly told defense counsel that Holly had seen Ralph with the gun "two or three days before

the murder."  *Id.* at 562.  Defense counsel further testified that this statement, in their view, was

not sufficient to support a third-party culpability defense and that, "as with the alibi testimony,

they did not want to distract from the weakness of the state's case and [Ralph's] recantation."  *Id.*

Petitioner disagreed.  *See id.* at 558–59.

### Applicable Supreme Court Law

Presenting a third-party culpability defense, like presenting an alibi defense, required

Petitioner's counsel to present evidence.  *See State v. Rosario*, 99 Conn. App. 92, 107 (2007)

(noting that a defendant may mount a third-party culpability defense if the defendant can "show

some evidence which directly connects a third party to the crime with which the defendant is charged" (internal quotation marks omitted)). As with Petitioner's alibi claim, *Strickland* is the standard by which this claim is measured.

*State Court Decision*

As required, the state court decided this issue using *Strickland*'s framework. *See Johnson V*, 330 Conn. at 564. In deciding whether defense counsel's decision not to call Holly was "objectively reasonable," the state court agreed with defense counsel that Holly's testimony would have "at best created a mere suspicion of, but was too speculative to establish, a direct connection between [Ralph] and the murder." *Id.* at 568. As such, the testimony "was irrelevant and, thus, likely inadmissible." *Id.* Because the evidence would have been inadmissible, defense counsel's performance was not deficient, and thus "the petitioner's claim fail[ed] under the first prong of *Strickland*." *Id.* at 569.

*Application*

The analysis here is the same as the analysis for the alibi claim. There is no Supreme Court case describing under what circumstances a defense attorney's failure to call a witness to establish third-party culpability violates the Sixth Amendment right to the effective assistance of counsel. Therefore, *Strickland* applies. *See Rosario*, 601 F.3d at 123, 128; *Floyd v. Murphy*, No. 3:01-CV-1221 (CFD), 2008 WL 616090, at *15 (D. Conn. Mar. 3, 2008) (analyzing under *Strickland* claim that trial counsel "failed to investigate information that might support a claim of third[-]party culpability"). The state court thoroughly analyzed counsel's decision and representation under *Strickland* to reach its decision that counsel's conduct was strategic and not constitutionally deficient. *See Johnson V*, 330 Conn. at 569. And nor has the Court been presented with a case involving "materially indistinguishable facts" where a different outcome was obtained. Thus,

32

there is no case from which the state court might be claimed to have improperly departed.  *See Ortiz*, 586 F.3d at 156.  Accordingly, the state court's decision was not "contrary to" clearly established law.

Nor did the state court unreasonably apply *Strickland*.  The state court applied *Strickland* consistent with Second Circuit decisions involving analogous facts.  *See*, *e.g.*, *Greiner*, 417 F.3d at 323–25 (analyzing under *Strickland* defense counsel's failure to introduce evidence to establish third-party culpability).  And because the state courts applied *Strickland* here as other courts have done, there is no basis for a claim that the state court refused to extend the *Strickland* principles to circumstances intended to be encompassed by them.  *Grant*, 532 F.3d at 140.  Accordingly, because the state court's decision was not contrary to or an unreasonable application of clearly established law, the habeas petition must be denied on this ground.

**Conclusion**

Because Petitioner has failed to show that the state courts rendered a decision that "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d), his habeas petition is **DENIED**.

The Court concludes that jurists of reason would not find it debatable that the state court rendered a decision that was contrary to or involved an unreasonable application of clearly established federal law.  Thus, a certificate of appealability will not issue.  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (holding that when a district court denies a habeas petition on procedural

grounds, a certificate of appealability should issue if jurists of reason would find debatable the correctness of the district court's decision).

      **SO ORDERED** this 13th day of January, 2026, at Bridgeport, Connecticut.

                        /s/ Kari A. Dooley
                        KARI A. DOOLEY
                        UNITED STATES DISTRICT JUDGE